**HATTIS & LUKACS**
Daniel M. Hattis, Esq. (SBN 232141)
Paul Karl Lukacs, Esq. (SBN 197007)
11711 SE 8th Street, Suite 120
Bellevue, Washington 98005
Tel.: (425) 233-8628
Fax: (425) 412-7171
dan@hattislaw.com
pkl@hattislaw.com

*Attorneys for Plaintiffs*
*and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD CHRISTIANSON, ISABEL PRADO, NEIL MOURA, and DANIEL POLINSKY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> COX COMMUNICATIONS, INC., and COXCOM, LLC, <br><br> Defendants. | Case No. __'22CV1290 RSH MSB__ <br><br> **CLASS ACTION** <br><br> **COMPLAINT FOR:** <br><br> **(1) VIOLATION OF CAL. CIVIL CODE § 1750;** <br><br> **(2) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17500;** <br><br> **(3) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17200;** <br><br> **(4) VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NRS 598;** <br><br> **(5) BREACH OF CONTRACT;** <br><br> **(6) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br><br> **DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, and Daniel Polinsky, on behalf of themselves and all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendants Cox Communications, Inc., and CoxCom, LLC (collectively, "Cox"):

## INTRODUCTION AND SUMMARY

1.      This action challenges a deceptive pricing scheme whereby Cox covertly increased the monthly service rate for its cable TV service plans[1] in the middle of promised fixed-rate term contracts. For years, Cox has enticed customers to enter into 24-month contracts for Cox's cable TV service plans by promising a fixed monthly rate for two years. Customers who entered into these 24-month contracts gave up their ability to freely quit or downgrade their service for the 24 months without incurring a significant early termination fee. Customers locked themselves into these 24-month contracts because Cox had represented to them that Cox was similarly locking itself into charging no more than the promised fixed rate during the contract term. However, Cox's representations were false because Cox intended to, and did, increase the monthly service rate mid-contract by increasing two disguised monthly service charges labeled on the bill as the "Broadcast Surcharge" and the "Regional Sports Surcharge." Cox failed to adequately disclose these service charges during the signup process, and Cox never disclosed the fact that Cox could, and would, use these service charges as a covert way to increase the monthly service rate mid-contract despite Cox's promises to the contrary.

2.      Since 2015, Cox has increased the Broadcast Surcharge and the Regional Sports Surcharge at least once a year—each time between $1.00 to $3.50 per Surcharge—on all of its cable TV customers regardless of whether they were in the middle of a purportedly fixed-price contractual period.

3.      Starting March 23, 2021, Cox updated its new cable TV service plan

---

[1] The term "cable TV service plan" as used in this Complaint includes a service plan that "bundles" television with other services such as internet, phone, and/or home security.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge. Instead, Cox significantly increased the prices of its new cable TV service plans by an amount equivalent to the lost Surcharges revenue. By rolling the Broadcast Surcharge and Regional Sports Surcharge into the (now higher) top-line advertised price for its cable TV service plans, Cox was admitting that the Surcharges had really just been disguised double-charges for cable TV service all along. And Cox was <u>also</u> admitting that Cox's mid-contract increases to the Surcharges were in fact unlawful increases to its purportedly fixed monthly <u>service</u> rates, in breach of its agreements with its customers.

4.     Notably, even after March 23, 2021, Cox continued to bill subscribers under <u>existing</u> term contracts for the Surcharges and for the increases made thereto, and Cox continued to impose <u>new</u> increases to the Surcharges even in the middle of fixed-rate contracts—most recently in March 2022, when Cox increased the Broadcast Surcharge by $3.00, to $19.00.

5.     Plaintiffs estimate that Cox has extracted **<u>over $70 million</u>** since 2015 from more than 1 million California and Nevada cable TV subscribers via mid-contract increases to the Broadcast Surcharge and the Regional Sports Surcharge.

6.     All four Plaintiffs bring this lawsuit on behalf of themselves and classes of similarly situated California consumers, seeking restitution and/or contract damages, and pre- and post-judgment interest. Plaintiff Daniel Polinsky also brings this lawsuit on behalf of himself and classes of similarly situated Nevada consumers, seeking damages and/or restitution, punitive damages, and pre- and post-judgment interest. Plaintiffs also seek attorneys' fees and costs.

7.     By this action, Plaintiffs are seeking a refund of <u>only</u> the amount of the mid-contract *increases* to the Broadcast Surcharge and the Regional Sports Surcharge that Plaintiffs and the members of the Classes paid (i.e., they are not seeking a refund of the full monthly amount of the Surcharges listed on the bill).

8.     Meanwhile, Cox's misconduct is ongoing with regard to Class

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

members who are under term contracts that are still subject to the Broadcast Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiffs also seek an order enjoining Cox from charging Class members who are in fixed-rate contracts, any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

## **THE PARTIES**

9.     Plaintiff Donald Christianson is a citizen and resident of San Diego County, California.

10.     Plaintiff Isabel Prado is a citizen and resident of San Diego County, California.

11.     Plaintiff Neil Moura is a citizen and resident of San Diego County, California.

12.     Plaintiff Daniel Polinsky is a citizen and resident of Orange County, California.

13.     Defendant Cox Communications, Inc., is a privately-owned subsidiary of Cox Enterprises, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and/or nerve center in Atlanta, Georgia. The footer of Cox's public website targeted to current and prospective residential cable TV customers states: "©1998 – 2022 Cox Communications, Inc."[2] Cox customer bills, including the bills sent to Plaintiffs, instruct customers that checks should be made payable to "Cox Communications."

14.     Defendant CoxCom, LLC, is a subsidiary of Cox Communications, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and/or nerve center in Atlanta, Georgia. The Cox

---

[2] *See* https://www.cox.com/residential/home.html, last accessed August 28, 2022.

"Residential Customer Service Agreement"[3] for Cox residential customers states that it "sets forth the terms and conditions under which CoxCom, LLC or one or more of its subsidiaries or affiliates authorized by applicable regulatory, franchise or license authority … agrees to provide Services."

## JURISDICTION AND VENUE

15.   **Subject Matter Jurisdiction.** The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—i.e., Class Action Fairness Act jurisdiction —because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

16.   **Personal Jurisdiction**. This Court has personal jurisdiction over Cox because, without limitation: (1) Cox has purposely availed itself of the privileges of conducting business activities in California; (2) Cox currently maintains systematic and continuous business contacts with California including marketing, selling, and issuing cable TV service plans and bundles to Plaintiffs and other California consumers; (3) Cox has entered into contracts with Plaintiffs and other California consumers to provide cable TV services; and (4) Cox maintains offices and retail locations throughout California. Cox has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible.

17.   **Venue**. Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiffs Donald Christianson, Isabel Prado, and Neil Moura reside in this District; many of the acts and transactions giving rise to this action occurred in this District; Cox is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District through distribution and sale of its services in this District, does substantial business in this District, and is subject to

---

[3] Available at https://www.cox.com/aboutus/policies/customer-service-agreement.html, last accessed August 28, 2022.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

personal jurisdiction in this District.

**FACTUAL ALLEGATIONS OF COX'S DECEPTIVE PRICING SCHEME**

18.     For years, Cox has engaged in a deceptive pricing scheme, whereby Cox advertised its cable TV service plans at fixed monthly rates that were locked in during a 24-month contract, but Cox then covertly increased the monthly service rate in the middle of the contract via increases to the "Broadcast Surcharge" and the "Regional Sports Surcharge."

19.     Cox enticed customers to enter into 24-month contracts for Cox's cable TV service plans by promising a fixed monthly rate for the 24 months. Customers who entered into these 24-month contracts gave up their ability to freely quit or downgrade their service for the 24 months without incurring an early termination fee. Customers locked themselves into these 24-month contracts because Cox had represented to them that Cox was similarly locking itself into charging no more than the promised fixed service price during the contract term. However, Cox's representations were <u>false</u> because Cox intended to, and did, increase the monthly service rate mid-contract by increasing two disguised monthly service charges which it labeled the "Broadcast Surcharge" and the "Regional Sports Surcharge." Cox never disclosed these service charges during the signup process or the fact that Cox could, and would, use these service charges as a covert way to increase the monthly service rate mid-contract.

**A.     The Broadcast Surcharge and the Regional Sports Surcharge.**

20.     The Broadcast Surcharge is a monthly television service charge that Cox began adding to its bills in 2015 at a rate of $3.00 a month. Cox buried this service charge in its monthly bill at the end of the "Monthly Services" section under "Additional TV." Cox provided no definition or explanation of the Broadcast Surcharge in its monthly bills. In fact, Cox used the Broadcast Surcharge as a way to covertly increase the monthly service price during a customer's promised fixed-rate contract.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

21.     The Regional Sports Surcharge is a separate monthly television service charge that Cox began adding to its bills in 2017 at a rate of $3.00 a month. Cox similarly buried this service charge in its monthly bill at the end of the "Monthly Services" section under "Additional TV," and provided no definition of the charge in its monthly bills. Like the Broadcast Surcharge, Cox used the Regional Sports Surcharge as a way to covertly increase the monthly service price during a customer's promised fixed-rate contract.

22.     All members of the putative classes were charged, and received mid-contract increases to, the Broadcast Surcharge. The Broadcast Surcharge was uniformly charged to all Cox cable TV subscribers since 2015, excluding only subscribers who signed up for brand-new service plans after March 23, 2021. Most members of the putative classes were also charged, and received mid-contract increases to, the Regional Sports Surcharge. The Regional Sports Surcharge was charged to Cox television subscribers with "Contour TV" (previously called "Essential TV") or higher—which comprises the overwhelming majority of Cox cable TV subscribers.

23.     Cox has steadily increased the Broadcast Surcharge and the Regional Sports Surcharge on at least an annual basis since introducing them, regardless of whether the customer was in the middle of a supposedly fixed-price contract. Today, the Broadcast Surcharge is $19.00 per month, and the Regional Sports Surcharge is up to $12.00 per month, for a total of up to $31.00 per month.

24.     Starting March 23, 2021, Cox updated its new cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge. Instead, Cox significantly increased the advertised prices of its new cable TV service plans by up to $28.00—an amount equivalent to the lost Surcharges revenue.

25.     By rolling the Broadcast Surcharge and Regional Sports Surcharge amounts into the (now higher) top-line price for its cable TV services, Cox was

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

admitting that the Surcharges had really just been disguised double-charges for cable TV service all along. And Cox was further admitting that Cox's mid-contract increases to the Surcharges were in fact unlawful increases to its purportedly fixed monthly <u>service</u> rates, in breach of its agreements with its customers.

26.    Notably, even after March 23, 2021, Cox continued to bill subscribers under <u>existing</u> term contracts for the Surcharges and for the increases made thereto, and Cox continued to impose <u>new</u> increases to the Surcharges even in the middle of fixed-rate contracts—most recently in March 2022, when Cox increased the Broadcast Surcharge by $3.00, to $19.00.

27.    Based on Plaintiffs' calculations, since 2015 Cox has improperly extracted over $70 million from more than 1 million California and Nevada cable TV subscribers via mid-contract increases to the Broadcast Surcharge and the Regional Sports Surcharge.

**B.    Cox Aggressively Pushed 24-Month Contracts by Promising Fixed Monthly Service Rates for the Contract Period.**

28.    Cox currently provides cable TV services to approximately 3 million households nationwide, including approximately 400,000 households in California and over 400,000 households in Nevada.

29.    At all relevant times, Cox has advertised its cable TV service plans through pervasive marketing directed at the consuming public in California and Nevada. This marketing has included advertisements on the Cox website; materials and advertising at its California and Nevada retail stores where customers can sign up for Cox services; video advertisements via YouTube, Facebook, and Twitter; and television, radio, and other internet advertisements.

30.    Through all of these channels, Cox consistently and prominently advertised particular, flat monthly prices for its cable TV service plans that were "guaranteed" and "price-locked" during a <u>24-month service agreement</u>.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**1.    Signing up with Cox sales or customer service agents.**

31.    When customers signed up for Cox cable TV service over the phone, via internet chat, or at one of Cox's brick-and-mortar stores, Cox sales or customer service agents as a matter of policy only promoted service plans that were subject to 24-month service agreements. Cox's agents pushed 24-month service agreements—which have significant early termination fees—by promising customers that the advertised service rates were "guaranteed" and "price-locked" for the two years. And, even though it was possible to request to sign up for month-to-month service rather than a 24-month service agreement, Cox agents were trained to not mention the month-to-month option unless a customer specifically asked for it.

32.    Cox agents as a matter of policy did not disclose or mention that Cox could, and would, increase the monthly service price mid-contract (in the middle of the service agreement) by increasing two disguised service charges—the Broadcast Surcharge and the Regional Sports Surcharge.

33.    Discovery will show that Cox had a uniform, standard policy of having its sales agents not mention or disclose the existence of the Broadcast Surcharge or the Regional Sports Surcharge, let alone that the monthly service price could or would be further increased mid-contract via increases to the Surcharges.

**2.    Signing up on the Cox website.**

34.    Cox similarly pushed 24-month service agreements onto customers who signed up on Cox's website. For years, when a customer visited Cox's website to sign up for cable TV service, Cox only displayed service plans on its offer webpages that were advertised at fixed prices for 24 months, subject to a 24-month service agreement. The option to go month-to-month was not even presented among the list of service plans.

35.    On Cox's website and throughout the online order process, Cox repeatedly—and falsely—represented that agreeing to a 24-month service agreement **"guaranteed"** that the monthly service price would be locked-in for two

---

CLASS ACTION COMPLAINT

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

years.

36.     For example, Cox had an FAQ on its website about term service agreements that encouraged customers to enter into 24-month service agreements. One of the FAQ questions asked: "What if I don't want a service agreement?" Cox's posted answer to the question was: "**Service agreements give you peace of mind that your bill won't change over the course of the agreement**, but you can opt out during checkout for $10 more per month." (emphasis added).

37.     When a customer went through the online order process, at the top of each page was a link to "see Offer Terms" which, if clicked, opened a pop-up box where Cox explicitly promised that the rate for the customer's service would not increase during the contract period. Below is a screenshot which is representative of what Cox displayed from at least 2018 through 2021 to customers who clicked on the "see Offer Terms" link which was on the top of every page in the order process:

**Cox Online Order Process "See Offer Terms" Pop-Up**



HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

38.    Cox promised: "The Service Agreement lets you **guarantee** the regular rates on Cox TV, Internet and Phone services for 2 years. **The rates for your *services* will not increase above the Service Agreement rate** when you agree to keep your main services (TV, Internet and/or Phone) **for the 2 years**." (emphasis added).

39.    Immediately below that, Cox stated: "**What's covered and not covered**. The Service Agreement is offered on TV, Internet and Phone services plus their features, such as a premium channel or voice mail. The Service Agreement does not apply to charges for equipment (such as a receiver or modem), per use items (like a movie rental) and fees for non-services (like taxes and surcharges) which may change." Notably, Cox here describes **"surcharges"** as "fees for *non-services*" (as a reasonable consumer would expect). Yet in fact Cox has admitted that the Broadcast **Surcharge** and the Regional Sports **Surcharge** are in fact fees for *services* (see ¶¶ 50–56 below).

40.    Cox made similar representations about the fixed-price of its cable TV service plans during the contract term on the next-to-last page of the online order process—the "Service Agreement" page.

41.     Below is a screenshot which is representative of what Cox displayed from at least 2018 through 2021 to customers at the end of the online order process:

**Cox Online Order Process "Service Agreement" Page**



42.     On this "Service Agreement" page, Cox informed the customer that "The offer and pricing you have selected requires a service agreement." Cox provided the customer with two options: (1) a "2 Year Term Service Agreement" (which was pre-selected); or (2) a "Month to Month – No Term Service

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Agreement" at an additional $10 per month.

43.     Again, Cox promised that "**The rates for your *services* will not increase above the Service Agreement rate** when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years." (emphasis added).

44.     Cox's website and its online order process were designed to push customers into 24-month contracts by only advertising cable TV service plans with 24-month contracts and by promising "peace of mind" that customers' monthly service rates would not increase during the contract.

**C.     Cox Increased the Monthly Service Rate Mid-Contract by Increasing Two Disguised Television Service Fees—the Broadcast Surcharge and the Regional Sports Surcharge.**

45.     Cox's representations that the monthly service rate was "guaranteed" and "price-locked" and that its service agreements "give you peace of mind that your bill won't change over the course of the agreement" were all <u>false</u>. Cox as a matter of policy increased the monthly service rate in the middle of customers' fixed-rate contracts by increasing two disguised television service fees—the Broadcast Surcharge and the Regional Sports Surcharge.

46.     Cox has increased the Broadcast Surcharge and the Regional Sports Surcharge at least once a year since 2015—each time between $1.00 to $3.50 per Surcharge. And Cox imposed these annual increases on all of its cable TV subscribers even if they were in the middle of a promised fixed-price contract.

47.     For example, Cox increased the monthly service price twice, by a total of $8.00, during the span of Plaintiffs Donald Christianson and Isabel Prado's supposedly "guaranteed" fixed-rate service contract. In February 2020—6 months into their 24-month term—Cox increased the Broadcast Surcharge from $10.00 to $13.50 and the Regional Sports Surcharge from $7.00 to $8.00. Then, in February 2021—18 months into their 24-month term—Cox again increased the Broadcast Surcharge from $13.50 to $16.00 and the Regional Sports Surcharge from $8.00 to

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

$9.00.

48.    Contrary to Cox's fixed-price "guarantee," Cox utilized the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the supposedly fixed-rate contract. Because these subsequent increases to the Broadcast Surcharge and the Regional Sports Surcharge were relatively small—typically between $1.00 to $3.50 per Surcharge—and were not included in the "Total Your Cox Bundle" price displayed at the top of the bill, Cox knew that customers were unlikely to notice the increased amount of the service charges. Given that taxes and other government-related charges can already vary by small amounts from month to month, Cox knew that customers reasonably expected small changes in the total amount billed each month and would not notice that Cox increased the service price by increasing the amount of these disguised service charges.

49.    At no point, either prior to or at the time customers signed up for service, did Cox disclose that Cox could, and would, use the Broadcast Surcharge and the Regional Sports Surcharge to increase the monthly service price mid-contract. Rather, Cox made affirmative misrepresentations to the contrary. As detailed above, Cox repeatedly—and falsely—represented to customers that signing up for a 24-month service agreement would "guarantee" that the "rates for your services will not increase" during the 24-month contract. Cox even explicitly—and falsely—stated that the service agreement covered "TV, Internet and Phone services plus their features" and only did not cover equipment, per use items, and "fees for non-services ..."

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**D.   It Is Indisputable That the Broadcast Surcharge and the Regional Sports Surcharge Are Charges for Service.**

50.   It cannot be disputed that the Surcharges are in fact charges for cable TV service. In fact, Cox has repeatedly <u>admitted</u> that the Broadcast Surcharge and the Regional Sports Surcharge are charges for services.

51.   Notably, Cox lists the Broadcast Surcharge and Regional Sports Surcharge in the "Monthly **Services**" section of the bill under "Additional TV." Below is a screenshot of what the Monthly Services section looks like on a customer's bill:

**February 2021 Bill of Plaintiffs Christianson and Prado**

| MONTHLY SERVICES | Mar 1 - Mar 28 |
|---|---|

▷ *Indicates the service is part of a 24 Month Service Agreement with Cox. You may make changes to the services indicated, however an early termination fee (ETF) may be charged if one or more of your TV, Internet, Home Automation or Phone service is fully disconnected and part of your Agreement.*

**YOUR COX BUNDLE**

**TV**
  ▷ **Contour TV**
  *Includes: Cox TV Starter, Expanded Service, Advanced TV Service and Contour Guide*

  ▷ *Contour Receiver*
  ▷ *HBO Max*

**Internet**
  ▷ **Cox High Speed Internet Preferred**
  *Includes: Preferred Internet, Download speeds up to 150 Mbps, 1.25 TB (1,280 GB) Monthly Data Plan, Over 3 million WiFi hotspots and Cox Security Suite Plus.*

| Total Your Cox Bundle | $89.99 |
|---|---|

**ADDITIONAL TV**

| Other Fees and Surcharges | |
|---|---|
| Broadcast Surcharge | $16.00 |
| Regional Sports Surcharge | 9.00 |
| Total Additional TV | **$25.00** |

| TOTAL MONTHLY SERVICES | **$114.99** |
|---|---|

CLASS ACTION COMPLAINT

- 14 -

52.     Meanwhile, Cox did <u>not</u> list the Broadcast Surcharge or the Regional Sports Surcharge under the separate section on the bill labeled "Taxes, Fees and Surcharges."

53.     Cox has admitted that the Broadcast Surcharge and the Regional Sports Surcharge are just carved-out portions of the customer's cable TV service, which <u>prior to 2015 were included in the top-line service plan price</u>.

54.     For example, in one discussion thread on Cox's website, a Cox representative stated that:

> <u>In the past, all Cox television programming costs and fees were simply rolled together in our charges for Advanced TV service or the specific Tier of service</u>. Over the years, Cox has had to raise service rates due to rising video programming costs and network retransmission fees. In an effort to meet the demand for more transparent billing practices, <u>we introduced surcharges as a way to highlight the different costs associated with the delivery of broadcast TV networks. The separate line items simply allow customers to better track how these costs impact their total TV charge</u>.[4]

55.     Cox's representations on its website, on its bills, and by its own agents have made it abundantly clear that the Broadcast Surcharge and the Regional Sports Surcharge are television <u>service</u> charges.

56.     And when Cox stopped charging the Surcharges to subscribers of its new cable TV plans beginning March 23, 2021—and Cox instead increased the top-line price of its TV service plans by an equivalent amount—Cox was further admitting that the Surcharges had really just been <u>disguised double-charges for TV service all along</u>.

---

[4] https://forums.cox.com/forum_home/tv_forum/f/tv-forum/16427/to-keep-you-better-informed-a-6-00-surcharge-what, last accessed August 28, 2022.

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

## PLAINTIFFS' FACTUAL ALLEGATIONS

**Plaintiffs Donald Christianson and Isabel Prado**

57.     Plaintiffs Donald Christianson and Isabel Prado are, and at all relevant times have been, citizens and residents of La Mesa, California.

58.     Since at least 2010, Mr. Christianson and Ms. Prado have been living together. When they first moved to their previous address in 2010, they signed up for one of Cox's cable TV and internet service plans. This was five years before Cox first started charging the Broadcast Surcharge and seven years before Cox first started charging the Regional Sports Surcharge.

59.     In 2012, Mr. Christianson and Ms. Prado moved to their current address. When they moved, they transferred their Cox cable TV and internet service plan from their old address to their new address. Cox still had not started charging either the Broadcast Surcharge or the Regional Sports Surcharge.

60.     Mr. Christianson and Ms. Prado kept their same Cox cable TV and internet service plan up until June 2019. During this time, Cox quietly added the Broadcast Surcharge in 2015, initially at $3.00 a month, and later added the Regional Sports Surcharge in 2017, also initially at $3.00 a month. Mr. Christianson and Ms. Prado were completely unaware that Cox had added these Surcharges or that Cox was quietly increasing them over the years.

61.     In June 2019, looking for ways to save money, Mr. Christianson and Ms. Prado decided to downgrade their Cox service plan, which at that time was over $150 a month for TV and internet. Initially, they intended to switch to an internet-only plan and cut out television altogether. However, when they called Cox to switch plans, the sales agent offered to give them a very basic television service (approximately 30 channels) for free with their internet service.

62.     Mr. Christianson and Ms. Prado had this internet and "free" television service plan for three months.

63.     In September 2019, a Cox sales agent called Mr. Christianson and

Ms. Prado to inform them that they were going over their internet data limit each month. They were going over their data limit because they now almost exclusively watched television shows using streaming services like Hulu and Netflix.

64.     Customers who went over their internet data limit had to pay additional monthly fees based on how much data the customer used over the limit. At the time, Cox also offered unlimited internet data plans at an additional monthly cost.

65.     Mr. Christianson and Ms. Prado could have purchased the unlimited internet data plan or paid the additional monthly fee for going over their data limit. Instead, however, the Cox sales agent used this opportunity to try to upsell them on one of Cox's higher-tier TV and internet service bundles. The agent's pitch was that if they had a television service plan with more channels, they could cut back on streaming and avoid going over their internet data limit each month.

66.     The Cox sales agent quoted Mr. Christianson and Ms. Prado a two-year "locked-in" price for TV and internet subject to a 24-month service agreement.

67.     Based on the sales agent's representations, Mr. Christianson and Ms. Prado reasonably believed that the monthly service price for TV and internet would not increase during the two-year "locked-in" period.

68.     Based on the sales agent's representations, Mr. Christianson and Ms. Prado ordered the TV and internet service plan.

69.     At no point during the phone call did the Cox sales agent mention the existence or the amounts of the additional Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the two-year price-locked period by increasing the undisclosed Broadcast Surcharge and Regional Sports Surcharge.

70.     In February 2020—6 months into Mr. Christianson and Ms. Prado's 24-month "locked-in" price contract—Cox *increased* the price of their cable TV service by $4.50 by raising the amount of the so-called Surcharges. Specifically,

Cox increased the Broadcast Surcharge by $3.50 (from $10.00 to $13.50) and the Regional Sports Surcharge by $1.00 (from $7.00 to $8.00).

71.    In February 2021—18 months into their 24-month "locked-in" price contract—Cox again *increased* the price of their cable TV service, this time by $3.50, by raising the amount of the so-called Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

72.    When Mr. Christianson and Ms. Prado's 24-month contract ended in August 2021, they dropped their cable TV service altogether and switched to an internet-only plan from Cox.

73.    Mr. Christianson and Ms. Prado did not learn that Cox had increased their cable TV service rate mid-contract until it was brought to their attention by their counsel in April 2022.

74.    When Mr. Christianson and Ms. Prado signed up for Cox's cable TV services in September 2019 and committed to a 24-month contract, they were relying on Cox's explicit representations regarding the fixed monthly rate under the 24-month contract. Mr. Christianson and Ms. Prado did not expect (and Cox did not tell them) that Cox would actually increase the monthly service rate (first by $4.50 more per month and then again by another $3.50 more per month) in the middle of the contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to them. If Mr. Christianson and Ms. Prado had known that information, they would not have ordered the TV and internet service bundle.

75.    During their promised 24-month "locked-in" price contract, Mr. Christianson and Ms. Prado suffered damages of **$110.00** in the form of mid-contract *increases* to their monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

76.    Mr. Christianson and Ms. Prado's Cox account is in Ms. Prado's name,

1   with Mr. Christianson being an authorized user who can make changes to their

2   services and pay their bills. Throughout the duration of their 24-month contract,

3   Mr. Christianson and Ms. Prado would alternate between paying their monthly bill

4   using money from Mr. Christianson's bank account and money from Ms. Prado's

5   bank account. They would also occasionally visit their nearby Cox service center

6   and pay their monthly bill in cash.

7   **Plaintiff Neil Moura**

8       77.    Plaintiff Neil Moura is, and at all relevant times has been, a citizen and

9   resident of Oceanside, California.

10      78.    Mr. Moura has been a Cox cable TV subscriber for at least the last 15

11  years.

12      79.    Around four years ago, Mr. Moura started having technical problems

13  with his Cox cable TV service. After speaking with several Cox customer service

14  agents, Mr. Moura eventually spoke to a Cox agent named Kristi Swangel. In

15  addition to helping Mr. Moura with his service issues, Ms. Swangel also gave him a

16  promotional discount off his internet and TV service plan.

17      80.    In July 2020, the promotional discount that Ms. Swangel gave

18  Mr. Moura expired, causing his monthly bill to increase. On July 4, 2020,

19  Mr. Moura emailed Ms. Swangel asking if there was any way to lower his bill, such

20  as cutting portions of his service or getting a promotional discount. Mr. Moura

21  explained that he was retired and on a fixed income. He needed an affordable and

22  fixed-rate monthly bill.

23      81.    On July 8, 2020, Ms. Swangel emailed Mr. Moura back and stated that

24  she could give him a promotional discount that would reduce his monthly service

25  rate to "just under $208" for 24 months subject to a 24-month service agreement.

26      82.    Based on Ms. Swangel's representations, Mr. Moura reasonably

27  believed that his monthly service rate would remain at "just under $208" for 24

28  months (subject to any increases to taxes or government fees).

---

CLASS ACTION COMPLAINT                          - 19 -

83.    Mr. Moura accepted the promotional offer and agreed to the 24-month fixed-price service agreement. When he received his next bill in August 2020, it was $207.79—"just under $208."

84.    Nowhere in Ms. Swangel's email did she inform Mr. Moura that Cox could, and would, increase his monthly service rate during the 24-month contract by increasing the Broadcast Surcharge and the Regional Sports Surcharge.

85.    In fact, Cox increased Mr. Moura's service rate twice during his 24-month contract—first in March 2021 and then again in March 2022.

86.    On Mr. Moura's March 2021 bill—only 8 months into his 24-month purportedly fixed price contract—Cox *increased* the price of his cable TV service by $3.50 by raising the amount of the so-called Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

87.    On Mr. Moura's March 2022 bill—20 months into his 24-month purportedly fixed price contract—Cox again *increased* the price of his cable TV service, this time by $3.00, by raising the amount of the Broadcast Surcharge by $3.00 (from $16.00 to $19.00).

88.    Mr. Moura did not learn that Cox had been increasing his cable TV service rate mid-contract until it was brought to his attention by his counsel in April 2022.

89.    When Mr. Moura committed to a 24-month contract, he relied on Cox's representations regarding the monthly rate of his Cox internet and TV service plan being "just under $208" for the duration of the 24-month contract. Mr. Moura did not expect (and Cox did not tell him) that Cox would ultimately increase that rate *twice* (first by $3.50 per month and then again by another $3.00 per month) in the middle of the contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Moura had known that

1    information, he would not have been willing to pay as much for his services and

2    would have acted differently.

3        90.    Mr. Moura suffered damages of **$68.00** during the term of his 24-

4    month contract in the form of ***increases*** to his purportedly fixed monthly service

5    rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

6    **Plaintiff Daniel Polinsky**

7        91.    Since November 2020, Plaintiff Daniel Polinsky has been a citizen and

8    resident of San Clemente, California. Prior to that, from August 2019 to October

9    2020, Mr. Polinsky was a citizen and resident of Nevada.

10        92.    Mr. Polinsky first signed up for Cox's services in August 2019 while

11    he was living in Nevada. Mr. Polinsky signed up through Cox's website.

12        93.    After browsing Cox's various service plans on the Cox website, Mr.

13    Polinsky selected one of Cox's internet and cable TV service plan bundles. On the

14    offer webpage for the internet and cable TV service plan, Cox prominently

15    advertised the plan as having a fixed monthly rate for 24 months with a two-year

16    service agreement.

17        94.    Based on these representations, Mr. Polinsky selected the service plan

18    and initiated the online order process.

19        95.    As Mr. Polinsky went through the online order process, he viewed

20    Cox's repeated representations that the monthly charges for the service plan would

21    be the same fixed rate for 24 months. For example, Mr. Polinsky viewed the

22    "Service Agreement" webpage (*see* ¶ 41, *supra*), where the "2 Year Term Service

23    Agreement" option was preselected, and where Cox stated: "The Service

24    Agreement lets you guarantee the regular rates on Cox TV, Internet and Phone

25    services for the two years. The rates for your services will not increase above the

26    Service Agreement rate when you agree to keep your main services (TV, Internet

27    and/or Phone) for the 2 years."

28        96.    Nowhere during the online order process did Cox indicate that Cox

---

CLASS ACTION COMPLAINT                    - 21 -                    **HATTIS & LUKACS**
                                                                   11711 SE 8th Street, Suite 120
                                                                   Bellevue, WA 98005
                                                                   www.hattislaw.com

could, and would, increase the monthly service rate mid-contract via increases to additional disguised monthly service charges.

97.    Relying on Cox's repeated representations regarding the fixed monthly price of the service plan for the two-year contract period, Mr. Polinsky completed the online purchase process and submitted his order.

98.    At no point was Mr. Polinsky aware that Cox would bill him any additional monthly service charges. At no point in the online purchase process did Mr. Polinsky see any mention of the existence of additional monthly service charges such as the Broadcast Surcharge or the Regional Sports Surcharge. Mr. Polinsky also had no idea that Cox could, and would, increase the service rate during the promised two-year fixed-rate period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

99.    In February 2020—6 months into Mr. Polinsky's 24-month purportedly fixed price contract—Cox increased the Broadcast Surcharge from $10.00 to $13.50. Based on Plaintiffs' counsel's investigation, Cox also increased the Regional Sports Surcharge at the same time.[5]

100.    Mr. Polinsky never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contract.

101.    Mr. Polinsky was signed up for electronic billing and Cox's automatic billing program, EasyPay, as Cox encouraged him to do. Through this billing process, Mr. Polinsky received a monthly Cox billing email which stated his bill total and informed him that his bill would be automatically paid by the payment due date because he was signed up for EasyPay. Cox's EasyPay feature discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has

---

[5] Based on Plaintiffs' counsel's investigation, Cox increased the Regional Sports Surcharge every year in nearly every region that Cox provided service, including in its single Nevada service region. For example, in February 2021, Cox increased the Regional Sports Surcharge from $8.50 to $9.00 in its single Nevada service region.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge. Because the increases are relatively small compared to a customer's total monthly bill, customers would not notice the increase or would reasonably believe that the increase was due to increased taxes or government fees. A reasonable consumer would not assume that an increase to his or her monthly bill total was due to Cox unlawfully increasing the monthly service rate in the middle of the promised fixed-price contract.

102.    In November 2020, Mr. Polinsky moved to San Clemente, California. When he moved, he was unable to transfer his existing Cox service plan from Nevada. Instead, Mr. Polinsky signed up for a new internet and cable TV service plan from Cox. Mr. Polinsky once again signed up through Cox's website. And, once again, Mr. Polinsky chose an internet and TV service plan that Cox advertised as having a fixed monthly rate for 24 months with a two-year service agreement. Mr. Polinsky went through materially the same online order process and saw materially the same representations as he had when he previously signed up in August 2019.

103.    When Mr. Polinsky signed up for Cox service in November 2020, he still did not know that Cox could, and would, increase his service rate during the promised fixed-rate period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

104.    On Mr. Polinsky's February 2021 bill—only 3 months into his 24-month purportedly fixed-price contract—Cox *increased* the price of his cable TV service by $3.50 by raising the amount of the so-called Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

105.    On Mr. Polinsky's February 2022 bill—15 months into his 24-month purportedly fixed-price contract—Cox *increased* the price of his cable TV service again, this time by $6.00, by raising the amount of the so-called Surcharges.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  Specifically, Cox increased the Broadcast Surcharge by $3.00 (from $16.00 to

2  $19.00) and the Regional Sports Surcharge by $3.00 (from $9.00 to $12.00).

3      106.  Mr. Polinsky did not learn that Cox had been increasing his service

4  rate mid-contract until it was brought to his attention by his counsel in May 2022.

5      107.  When Mr. Polinsky signed up for Cox's cable TV services, both in

6  August 2019 and again in November 2020, he was relying on Cox's explicit

7  representations regarding the fixed monthly rate under the 24-month contract.

8  Mr. Polinsky did not expect (and Cox did not tell him) that Cox would in fact

9  increase the monthly service rate in the middle of the contract via increases to

10 disguised monthly service charges which it labeled the Broadcast Surcharge and the

11 Regional Sports Surcharge. That information would have been material to him. If

12 Mr. Polinsky had known that information, he would not have been willing to pay as

13 much for his services and would have acted differently.

14     108.  During his 24-month contract in Nevada, Mr. Polinsky suffered

15 damages of **$31.50** in the form of an ***increase*** to his monthly service rate via a raise

16 of the Broadcast Surcharge in February 2020. Based on counsel's investigation, Mr.

17 Polinsky suffered additional damages during the contract due to the ***increase*** of the

18 Regional Sports Surcharge at the same time (the precise amount of the increase will

19 be obtained in discovery).

20     109.  Regarding his 24-month contract in California, Mr. Polinsky suffered

21 damages of **$80.00** through May 2022 in the form of ***increases*** to his monthly

22 service rate via raises of the Broadcast Surcharge and the Regional Sports

23 Surcharge. Mr. Polinsky terminated his Cox services in mid-May when he moved

24 to a new location outside of Cox's service area.

25

26

27

28

CLASS ACTION COMPLAINT        - 24 -        **HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

## **CLASS ALLEGATIONS**

110.   Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

111.   All four Plaintiffs seek to represent the following "**California Class**":

> **All individual consumers who entered into a term contract for Cox cable TV service in California where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

112.   Plaintiff Daniel Polinsky also seeks to represent the following "**California Online Signup Subclass**":

> **All individual consumers who signed up online on Cox's website for a term contract for Cox cable TV service in California where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

113.   Plaintiff Daniel Polinsky also seeks to represent the following "**Nevada Class**":

> **All individual consumers who entered into a term contract for Cox cable TV service in Nevada where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

114.   Plaintiff Daniel Polinsky also seeks to represent the following "**Nevada Online Signup Subclass**":

> **All individual consumers who signed up online on Cox's website for a term contract for Cox cable TV service in Nevada where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

115.   <u>This Court should apply the discovery rule to extend any applicable</u> <u>limitations period (and the corresponding class period) for each class and subclass</u> <u>to the date on which Cox first engaged in its practice of increasing the Broadcast</u> <u>Surcharge and the Regional Sports Surcharge in the middle of a term contract</u>. The nature of Cox's misconduct was non-obvious and intentionally concealed from its cable TV subscribers. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Classes could have, through the use of reasonable diligence, learned of the accrual of their claims against Cox at an earlier time.

116.   Specifically excluded from the Classes are Cox and any entities in which Cox has a controlling interest, Cox's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

117.   ***Numerosity.*** The number of members of each Class are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of class members of each Class prior to discovery. However, based on information and belief, each Class comprises tens of thousands of individuals. The exact number and identities of Class members are contained in Cox's records and can be easily ascertained from those records.

118.   ***Commonality and Predominance.*** This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over any questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a.   Whether Cox employed a uniform policy of charging the Broadcast Surcharge and the Regional Sports Surcharge to its customers who subscribed to cable TV service;

b.   What is the nature or purpose of the Broadcast Surcharge;

1          c.     What is the nature or purpose of the Regional Sports Surcharge;

2          d.     Whether the Broadcast Surcharge is a monthly service fee for

3 providing cable TV service;

4          e.     Whether the Regional Sports Surcharge is a monthly service fee

5 for providing cable TV service;

6          f.     Whether increases to the Broadcast Surcharge and the Regional

7 Sports Surcharge are increases to the monthly service price;

8          g.     Whether Cox offered term contracts where Cox promised that

9 the monthly service price would be fixed during the term contract;

10         h.     Whether Cox advertised and represented to customers that the

11 monthly service price for Cox's cable TV service plans was fixed during the term

12 contract;

13         i.     Whether Cox's policy and practice of increasing the monthly

14 service price mid-contract via increases to the Broadcast Surcharge and the

15 Regional Sports Surcharge is material information, such that a reasonable consumer

16 would find that information important to the consumer's purchase decision;

17         j.     Whether Cox's policy and practice of advertising and

18 representing that the prices of its service plans were fixed and would not increase

19 during a term contract, when in fact Cox intended to, and did, increase service

20 prices during that period by increasing the Broadcast Surcharge and the Regional

21 Sports Surcharge is false, deceptive, or misleading;

22         k.     Whether it was a breach of contract for Cox to increase the

23 monthly service price mid-contract by increasing the Broadcast Surcharge and the

24 Regional Sports Surcharge;

25         l.     Whether it was a breach of the covenant of good faith and fair

26 dealing for Cox to increase the monthly service price mid-contract by increasing the

27 Broadcast Surcharge and the Regional Sports Surcharge;

28         m.     <u>For the California Classes</u>: Whether Cox's misrepresentations

CLASS ACTION COMPLAINT     - 27 -     **HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1 and misconduct alleged herein violated California Civil Code § 1750 *et seq.*
2 (CLRA), California Business & Professions Code § 17500 *et seq.* (FAL), and
3 California Business & Professions Code § 17200 *et seq.* (UCL); and

4        n.    For the Nevada Classes: Whether Cox's misrepresentations and
5 misconduct alleged herein violated the Nevada Deceptive Trade Practices Act
6 (NDTPA), NRS Chapter 598.

7     119.  ***Typicality***. Plaintiffs' claims are typical of Class members' claims.
8 Plaintiffs and Class members all sustained injury as a direct result of Cox's
9 standard practices and schemes, bring the same claims, and face the same potential
10 defenses.

11     120.  ***Adequacy***. Plaintiffs and their counsel will fairly and adequately
12 protect Class members' interests. Plaintiffs have no interests antagonistic to Class
13 members' interests and are committed to representing the best interests of the
14 Classes. Moreover, Plaintiffs have retained counsel with considerable experience
15 and success in prosecuting complex class action and consumer protection cases.

16     121.  ***Superiority.*** A class action is superior to all other available methods
17 for fairly and efficiently adjudicating this controversy. Each Class member's
18 interests are small compared to the burden and expense required to litigate each of
19 his or her claims individually, so it would be impractical and would not make
20 economic sense for Class members to seek individual redress for Cox's conduct.
21 Individual litigation would add administrative burden on the courts, increasing the
22 delay and expense to all parties and to the court system. Individual litigation would
23 also create the potential for inconsistent or contradictory judgments regarding the
24 same uniform conduct. A single adjudication would create economies of scale and
25 comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate
26 any difficulties in managing a class action trial.

27
28

CLASS ACTION COMPLAINT    - 28 -    **HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

122.   By its conduct and omissions alleged herein, Cox has acted and refused to act on grounds that apply generally to the Classes, such that declaratory relief is appropriate respecting the Classes as a whole.

123.   Cox is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox that consist of representations of fact about Cox's business operations or services that is or was made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in, Cox's services or the statement is or was made in the course of delivering Cox's services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox for which the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statements to, or otherwise influence, an actual or potential buyer or customer.

## CAUSES OF ACTION

### COUNT I
**Violation of the Consumers Legal Remedies Act**
**California Civil Code § 1750 *et seq*.**

124.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

125.   All four Plaintiffs bring this cause of action in their individual capacities and as representatives of the California Class.

126.   Defendants are each a "person," as defined by Cal. Civ. Code § 1761(c).

127.   Plaintiffs and the California Class members are each "consumers," as defined by Cal. Civ. Code §1761(d).

128.   Cox's cable TV service plans—including service plans that "bundle" television with other services such as internet, phone, and/or home security—are "services," as defined by Cal. Civ. Code § 1761(b).

- 29 -

1  129.  The purchase of a Cox cable TV service plan by each Plaintiff is a

2  "transaction," as defined by Cal. Civ. Code § 1761(e).

3  130.  Each Plaintiff purchased Cox's cable TV service plans for personal,

4  family, and/or household purposes, as meant by Cal. Civ. Code § 1761(d).

5  131.  Venue is proper under Cal. Civil Code § 1780(d) because a substantial

6  portion of the transactions at issue occurred in this county. Plaintiffs' declarations

7  establishing that this Court is a proper venue for this action are attached hereto as

8  **Exhibit A.**

9  132.  By its conduct and omissions alleged herein, Cox has committed

10  unlawful methods, acts or practices, including:

11  a.  Misrepresenting that the prices of its cable TV service plans are

12  fixed and will not increase during the contract term, despite Cox's pattern and

13  practice of increasing service prices mid-contract by raising the Broadcast

14  Surcharge and the Regional Sports Surcharge; and

15  b.  Increasing the Broadcast Surcharge and Regional Sports

16  Surcharge on customers in the middle of promised fixed-rate contracts.

17  133.  The unlawful methods, acts or practices alleged herein to have been

18  undertaken by Cox were all committed intentionally and knowingly. The unlawful

19  methods, acts or practices alleged herein to have been undertaken by Cox did not

20  result from a bona fide error notwithstanding the use of reasonable procedures

21  adopted to avoid such error.

22  134.  Cox's conduct alleged herein has violated the CLRA in multiple

23  respects, including, but not limited to, the following:

24  a.  Cox represented that its cable TV service plans had

25  characteristics that they did not have (Cal. Civ. Code § 1770(a)(5));

26  b.  Cox advertised its cable TV service plans with an intent not to

27  sell them as advertised (Cal. Civ. Code § 1770(a)(9));

28  c.  Cox made false or misleading statements of fact concerning

reasons for, existence of, or amounts of, price reductions. (Cal. Civ. Code § 1770(a)(13));

        d.     Cox misrepresented that its cable TV service plans were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

        e.     Cox inserted unconscionable provisions in its consumer agreements, including, but not limited to, an arbitration clause which impairs the ability of customers to enforce their legal rights including their ability to bring arbitrations, in violation of California law (Cal. Civ. Code § 1770(a)(19)).

135.   With respect to any omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and the California Class members; (b) Cox concealed material information from Plaintiffs and the California Class members; and (c) Cox made partial representations, including regarding the supposedly fixed monthly rate of its service plans, which were false and misleading absent the omitted information.

136.   Cox's misrepresentations deceive and have a tendency to deceive the general public.

137.   Cox's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

138.   Plaintiffs and the California Class members reasonably relied on Cox's material misrepresentations, and would not have purchased, or would have paid less money for, Cox's cable TV service plans had they known the truth.

139.   As a direct and proximate result of Cox's violations of the CLRA, Plaintiffs and the California Class members have been harmed and lost money or property.

140.   Cox's conduct has caused substantial injury to Plaintiffs and the

CLASS ACTION COMPLAINT     - 31 -     HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

California Class members.

141.   Cox's misconduct is ongoing with regard to California Class members who are under term contracts that are still subject to the Broadcast Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiffs seek an order enjoining Cox from charging California Class members who are in fixed-rate contracts any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

142.   In accordance with California Civil Code § 1782(a), Plaintiffs, through counsel, served Cox with notice of its CLRA violations by USPS certified mail, return receipt requested on August 30, 2022.

143.   If Cox fails to provide appropriate relief for its CLRA violations within 30 days of its receipt of Plaintiffs' notification letter, Plaintiffs will amend or seek leave to amend this Complaint to pray for compensatory and punitive damages as permitted by Cal. Civ. Code §§ 1780 and 1782(b), along with attorneys' fees and costs.

**<u>COUNT II</u>**

**Violation of California's False Advertising Law**
**California Business and Professions Code § 17500 *et seq*.**

144.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

145.   All four Plaintiffs bring this cause of action in their individual capacities and as representatives of the California Class.

146.   By its conduct and omissions alleged herein, Cox has committed acts of untrue or misleading advertising, as defined by and in violation of California Business & Professions Code § 17500, *et seq.*, also known as California's False Advertising Law ("FAL"). These acts include misrepresenting that the prices of its cable TV service plans are fixed and will not increase during the contract term,

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1   despite Cox's pattern and practice of increasing service prices mid-contract by

2   raising the Broadcast Surcharge and the Regional Sports Surcharge.

3       147.   With respect to omissions, Cox at all relevant times had a duty to

4   disclose the information in question because, inter alia: (a) Cox had exclusive

5   knowledge of material information that was not known to Plaintiffs and the

6   California Class members; (b) Cox concealed material information from Plaintiffs

7   and the California Class members; and (c) Cox made partial representations,

8   including regarding the supposedly fixed monthly prices of its services, which were

9   false or misleading absent the omitted information.

10      148.   Cox committed such violations of the FAL with actual knowledge that

11  its advertising was untrue or misleading, or Cox, in the exercise of reasonable care,

12  should have known that its advertising was untrue or misleading.

13      149.   Cox's misrepresentations and nondisclosures deceived and had a

14  tendency to deceive the general public.

15      150.   Cox's misrepresentations and nondisclosures are material, in that a

16  reasonable person would attach importance to the information and would be

17  induced to act on the information in making purchase decisions.

18      151.   Plaintiffs and members of the California Class reasonably relied on

19  Cox's material misrepresentations and nondisclosures, and would not have

20  purchased, or would have paid less money for, Cox's cable TV services had they

21  known the truth.

22      152.   As a direct and proximate result of Cox's violations of the FAL,

23  Plaintiffs and the California Class members lost money.

24      153.   By its conduct and omissions alleged herein, Cox received more

25  money from Plaintiffs and the California Class members than it should have

26  received, and that money is subject to restitution.

27      154.   Plaintiffs seek an order granting restitution to Plaintiffs and the

28  California Class members in an amount to be proven at trial. Plaintiffs further seek

1   an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

2

3                                   <u>COUNT III</u>

4   **Violation of California's Unfair Competition Law**
    **California Business and Professions Code § 17200 _et seq_.**

5       155.   Plaintiffs reallege and incorporate by reference all paragraphs

6   previously alleged herein.

7       156.   All four Plaintiffs bring this cause of action in their individual

8   capacities and as representatives of the California Class.

9       157.   California Business & Professions Code § 17200, _et seq._, also known

10  as California's Unfair Competition Law ("UCL"), prohibits any unfair, unlawful, or

11  fraudulent business practice.

12      158.   Cox has violated the UCL by engaging in the following **_unlawful_**

13  business acts and practices:

14          a.      Making material misrepresentations in violation of Cal. Civ.

15  Code §§ 1770(a)(5), (9), (13), and (16) (the CLRA);

16          b.      Inserting unconscionable provisions in its consumer agreements

17  in violation of Cal. Civ. Code § 1770(a)(19) (the CLRA);

18          c.      Making material misrepresentations in violation of Cal. Bus. &

19  Prof. Code § 17500 _et seq._ (the FAL); and

20          d.      Engaging in deceit in violation of Cal Civ. Code §§ 1709–1710.

21      159.   Cox has violated the UCL by engaging in the following **_unfair_** and

22  **_fraudulent_** business acts and practices:

23          a.      Misrepresenting that the prices of its cable TV service plans are

24  fixed and will not increase during the contract term, despite Cox's pattern and

25  practice of increasing service prices mid-contract by raising the Broadcast

26  Surcharge and the Regional Sports Surcharge;

27          b.      Increasing the Broadcast Surcharge and Regional Sports

28  Surcharge on customers in the middle of promised fixed-rate contracts; and

---

CLASS ACTION COMPLAINT                  - 34 -          **HATTIS & LUKACS**
                                                        11711 SE 8th Street, Suite 120
                                                        Bellevue, WA 98005
                                                        www.hattislaw.com

c.      Preventing or discouraging customers from freely canceling their services if they learned that Cox had increased the price of their services in the middle of promised fixed-rate contracts via increases to the Broadcast Surcharge and the Regional Sports Surcharge.

160.   With respect to omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and the the California Class members; (b) Cox concealed material information from Plaintiffs and the California Class members; and (c) Cox made partial representations, including regarding the supposedly fixed monthly prices of its services, which were false or misleading absent the omitted information.

161.   Cox's misrepresentations and nondisclosures deceive and have a tendency to deceive the general public.

162.   Cox's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

163.   Plaintiffs and members of the California Class reasonably relied on Cox's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, Cox's cable TV services had they known the truth.

164.   As a direct and proximate result of Cox's unfair, unlawful, and fraudulent conduct, Plaintiffs and the California Class members lost money.

165.   By its conduct and omissions alleged herein, Cox received more money from Plaintiffs and the California Class members than it should have received, and that money is subject to restitution.

166.   Cox's conduct and omissions alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the California Classes. Perpetrating a years-long scheme of

misleading and overcharging customers is immoral, unethical, and unscrupulous. Moreover, Cox's conduct is oppressive and substantially injurious to consumers. By its conduct alleged herein, Cox has improperly extracted tens of millions of dollars from California consumers. There is no utility to Cox's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm to consumers caused by Cox's conduct alleged herein.

167.   Plaintiffs seek an order granting restitution to Plaintiffs and the California Class members in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

168.   Cox's misconduct is ongoing with regard to California Class members who are under term contracts that are still subject to the Broadcast Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiffs seek an order enjoining Cox from charging California Class members who are in fixed-rate contracts any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

<u>**COUNT IV**</u>
**Violation of the Nevada Deceptive Trade Practices Act**
**NRS Chapter 598**

169.   Plaintiff Daniel Polinsky realleges and incorporates by reference all paragraphs previously alleged herein.

170.   Plaintiff Daniel Polinsky brings this cause of action in his individual capacity and as a representative of the Nevada Classes.

171.   Under the Nevada Deceptive Trade Practices Act ("NDTPA"), "[a]n action may be brought by any person who is a victim of consumer fraud." NRS 41.600(1). "If the claimant is the prevailing party, the court shall award the claimant: (a) Any damages that the claimant has sustained; (b) Any equitable relief that the court deems appropriate; and (c) The claimant's costs in the action and

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    reasonable attorney's fees." NRS 41.600(3).

2        172.   Actionable "consumer fraud" includes deceptive trade practices as

3    defined in NRS 598.0915 to 598.0925. *See* NRS 41.600(2)(e).

4        173.   "To state a private right of action under the NDTPA, a plaintiff must

5    allege: (1) defendant violated the NDTPA, (2) causing plaintiff, (3) damages."

6    *Switch, Ltd. v. Uptime Inst., LLC*, 426 F. Supp. 3d 636, 643 (D. Nev. 2019).

7        174.   Cox's practice of increasing service prices in the middle of promised

8    fixed-rate contracts by raising the Broadcast Surcharge and the Regional Sports

9    Surcharge violates the NDTPA in the following ways:

10            a.      Cox knowingly represented that its cable TV service plans had

11   characteristics that they did not have (NRS 598.0915(5));

12            b.      Cox advertised its cable TV service plans with an intent not to

13   sell them as advertised (NRS 598.0915(9));

14            c.      Cox made false or misleading statements of fact concerning the

15   prices of its cable TV service plans. (NRS 598.0915(13));

16            d.      Cox knowingly made false representations in transactions

17   related to its cable TV service plans (NRS 598.0915(15));

18            e.      Cox failed to disclose a material fact in connection with the sale

19   of its cable TV service plans (NRS 598.0923(1)(b)); and

20            f.      Cox used an unconscionable practice in its transactions related

21   to its cable TV service plans ((NRS 598.0923(1)(e)).

22       175.   With respect to any omissions, Cox at all relevant times had a duty to

23   disclose the information in question because, inter alia: (a) Cox had exclusive

24   knowledge of material information that was not known to Plaintiff and the Class

25   members; (b) Cox concealed material information from Plaintiff and the Class

26   members; and (c) Cox made partial representations, including regarding the

27   supposedly fixed monthly rate of its service plans, which were false and misleading

28   absent the omitted information.

---

CLASS ACTION COMPLAINT                           - 37 -

176.   The deceptive trade practices alleged herein to have been undertaken by Cox were all committed intentionally and knowingly. The deceptive trade practices alleged herein to have been undertaken by Cox did not result from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

177.   Cox's misrepresentations deceive and have a tendency to deceive the general public.

178.   Cox's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

179.   Plaintiff Polinsky and the Nevada Class members reasonably relied on Cox's material misrepresentations, and would not have purchased, or would have paid less money for, Cox's cable TV service plans had they known the truth.

180.   As a direct and proximate result of Cox's violations of the NDTPA, Plaintiff Polinsky and the Nevada Class members have been harmed and lost money or property.

181.   Plaintiff Polinsky seeks an order awarding damages and equitable relief (including restitution and/or disgorgement) to Mr. Polinsky and the Nevada Class members in an amount to be proven at trial. NRS 41.600(3). Mr. Polinsky also seeks punitive damages. NRS 42.005. Mr. Polinsky further seeks an award of attorneys' fees and costs. NRS 41.600(3).

182.   Cox's misconduct is ongoing with regard to Nevada Class members who are under term contracts that are still subject to the Broadcast Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiff Polinsky seeks an order enjoining Cox from charging Nevada Class members who are in fixed-rate contracts, any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

1
2

**COUNT V**

**Breach of Contract**

3   183.   Plaintiffs reallege and incorporate by reference all paragraphs
4   previously alleged herein.

5   184.   All four Plaintiffs bring this cause of action in their individual
6   capacities and as representatives of the Classes.

7   185.   Plaintiffs allege this cause of action in the alternative to Count VI.

8   186.   Cox entered into contracts with Plaintiffs and all members of the
9   Classes when Plaintiffs and the members of the Classes each accepted Cox's offer
10  of a specified cable TV service plan under a term contract.

11  187.   All of the contracts between Cox and Plaintiffs and the members of the
12  Classes contained the following material terms: Cox would provide the ordered
13  cable TV service plan, and, in exchange, the customer would pay a specific
14  promised monthly price for service that was fixed for a specific period of months.

15  188.   Plaintiffs and the members of the Classes have performed, for the
16  relevant time frame, all of each's material obligations under the contract or have
17  been excused from any non-performance.

18  189.   Cox breached the contract by increasing the monthly service price in
19  the middle of its term contracts with Plaintiffs and each member of the Classes via
20  raises of the Broadcast Surcharge and the Regional Sports Surcharge.

21  190.   Plaintiffs and the members of the Classes sustained damages as a result
22  of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the
23  Classes paid in mid-contract increases to the Broadcast Surcharge and the Regional
24  Sports Surcharge.

25

**COUNT VI**

26  **Breach of the Implied Covenant of Good Faith and Fair Dealing**

27  191.   Plaintiffs reallege and incorporate by reference all paragraphs
28  previously alleged herein.

---

CLASS ACTION COMPLAINT      - 39 -      HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

192.   All four Plaintiffs bring this cause of action in their individual capacities and as representatives of the Classes.

193.   Plaintiffs allege this cause of action in the alternative to Count V.

194.   To the extent any applicable contract could be read as granting Cox discretion to increase the Broadcast Surcharge and the Regional Sports Surcharge in the middle of promised fixed-rate term service agreements—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by California law and by Nevada law.

195.   Cox has violated the covenant of good faith and fair dealing by its conduct alleged herein.

196.   Cox has abused any discretion it purportedly had under any applicable contract to raise the monthly price for Cox's cable TV services in the middle of the term contract. Cox used the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the contract period, despite Cox's promises and advertising that the service rates were "guaranteed" to not change during the term contract.

197.   Cox meanwhile utilized the threat of imposing an early termination fee to discourage customers from freely canceling their services if they ever learned that Cox had increased their service price mid-contract via increases to the Broadcast Surcharge and the Regional Sports Surcharge.

198.   Cox's mid-contract increases to the Broadcast Surcharge and the Regional Sports Surcharge defied customers' reasonable expectations, were objectively unreasonable, and frustrated the basic terms of the parties' agreement. Cox's conduct alleged herein was arbitrary and in bad faith.

199.   Cox's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the members of the Classes the full benefit of their bargains with Cox.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

200.   Plaintiffs and the members of the Classes have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Cox. There is no legitimate excuse or defense for Cox's conduct.

201.   Any attempts by Cox to defend its mid-contract service price increases through reliance on supposed contractual provisions will be without merit. Plaintiffs and the members of the Classes never knowingly agreed to any such provisions, are not subject to them, or the provisions are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are unenforceable in light of the hidden and deceptive nature of Cox's misconduct, among other reasons. Any such provisions, even if they existed, would not excuse Cox's abuses of discretion or otherwise preclude Plaintiffs and the members of the Classes from recovering for breach of the covenant of good faith and fair dealing.

202.   Plaintiffs and the members of the Classes sustained damages as a result of Cox's breaches of the covenant of good faith and fair dealing. Plaintiffs seek damages in the amount they and the Classes paid in mid-contract increases to the Broadcast Surcharge and the Regional Sports Surcharge.

## PRAYER FOR RELIEF

203.   On behalf of themselves and the proposed Classes, Plaintiffs request that the Court order relief and enter judgment against Cox as follows:

a.   Declare this action to be a proper class action, certify the proposed California Classes and proposed Nevada Classes, appoint Plaintiffs and their counsel to represent the California Classes, and appoint Plaintiff Polinsky and his counsel to represent the Nevada Classes;

b.   Order that the discovery rule applies to extend any applicable limitations period (and the corresponding class period) for each Class to the date on which Cox first engaged in its practice of increasing the Broadcast Surcharge and the Regional Sports Surcharge in the middle of its term contracts;

CLASS ACTION COMPLAINT

- 41 -

c.     Order Cox to stop charging Class members who are in fixed-rate contracts any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts;

d.     Order disgorgement and/or restitution, including, without limitation, disgorgement of all revenues, profits and/or unjust enrichment that Cox obtained, directly or indirectly, from Plaintiffs and the members of the Classes as a result of the unlawful conduct alleged herein regarding raises of the Broadcast Surcharge and the Regional Sports Surcharge during their fixed-rate contracts;

e.     Order Cox to pay damages for breach of contract (or in the alternative, for breach of the implied covenant of good faith and fair dealing) to members of each Class in the amount they paid in mid-contract increases to the Broadcast Surcharge and the Regional Sports Surcharge;

f.     Order Cox to pay damages, and also punitive damages, to Plaintiff Polinsky and the members of the Nevada Classes for violation of the Nevada Deceptive Trade Practices Act;

g.     Order Cox to pay attorneys' fees, costs, and pre-judgment and post-judgment interest to the extent allowed by law; and

h.     Grant such other relief as this Court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Each Plaintiff, individually and as a class representative on behalf of all others similarly situated, demands a trial by jury on all issues so triable.


DATED: August 30, 2022.


Presented by:

HATTIS & LUKACS

By: _____
Daniel M. Hattis (SBN 232141)

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul Karl Lukacs (SBN 197007)
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, Washington 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

*Attorneys for Plaintiffs
and the Proposed Classes*

CLASS ACTION COMPLAINT

- 43 -