**HATTIS & LUKACS**
Daniel M. Hattis, Esq. (SBN 232141)
Paul Karl Lukacs, Esq. (SBN 197007)
11711 SE 8th Street, Suite 120
Bellevue, Washington 98005
Tel.: (425) 233-8650
Fax: (425) 412-7171
dan@hattislaw.com
pkl@hattislaw.com

*Attorneys for Plaintiffs
and the Proposed Classes*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD CHRISTIANSON, ISABEL PRADO, NEIL MOURA, DANIEL POLINSKY, CRISTINA ABDALA, JESSICA BAZAN, PAULA CHRISTOPHER, GREGORY CLARK, JANINE CLARK, JOSEPH DEPEW, BRENDA DEPPERSCHMIDT, JAMES GAMBLE, KELLY GILLILAND, BRIAN HARGETT, ADRIENNE JACKSON, LYSSA JORDAN, WAYNE KALAYJIAN, JENNIFER KLAT, NESTOR MENDEZ, STEPHEN METZGER, JAMES MILLS, MICHAEL MITCHELL, ROSA MONTANEZ, LAUREN RAMOS, ROBYNN ROWE, PATRICIA SALVACION, ROBERT TICE, JOHN WILEY, AND STEPHANIE WILEY, on behalf of themselves and all others similarly situated, | Case No. 3:22-cv-01290-RSH-MSB |

**FIRST AMENDED CLASS ACTION COMPLAINT**

**FOR:**

**(1) VIOLATION OF CAL. CIVIL CODE § 1750;**

**(2) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17500;**

**(3) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17200;**

**(4) VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NRS 598;**

**(5) BREACH OF CONTRACT;**

**(6) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**DEMAND FOR JURY TRIAL**

Plaintiffs,

v.

COX COMMUNICATIONS, INC., COXCOM, LLC, and COX COMMUNICATIONS CALIFORNIA, LLC,

Defendants.

FIRST AMENDED
CLASS ACTION COMPLAINT

1    Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky,

2   Cristina Abdala, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark,

3   Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian

4   Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Jennifer Klat, Nestor

5   Mendez, Stephen Metzger, James Mills, Michael Mitchell, Rosa Montanez, Lauren

6   Ramos, Robynn Rowe, Patricia Salvacion, Robert Tice, John Wiley, and Stephanie

7   Wiley, on behalf of themselves and all others similarly situated, allege as follows,

8   on personal knowledge and investigation of their counsel, against Defendants Cox

9   Communications, Inc., CoxCom, LLC, and Cox Communications California, LLC

10   (collectively, "Cox"):

11                    **INTRODUCTION AND SUMMARY**

12    1.    This action challenges a deceptive pricing scheme whereby Cox

13   covertly increased the monthly service rate for its cable TV service plans[1] in the

14   middle of promised fixed-rate term contracts. For years, Cox enticed customers to

15   enter into 12- or 24-month contracts (hereinafter, "term contracts") for Cox's cable

16   TV service plans by promising a fixed monthly rate for the duration of the contract.

17   Customers who entered into these term contracts gave up their ability to freely quit

18   or downgrade their service during the contract term without incurring a significant

19   early termination fee. Customers locked themselves into these term contracts

20   because Cox had represented to them that Cox was similarly locking itself into

21   charging no more than the promised fixed rate during the contract term.

22    2.    However, Cox's representations were false because Cox intended to,

23   and did, increase the monthly service rate mid-contract by increasing two disguised

24   monthly service charges labeled on the bill as the "Broadcast Surcharge" and the

25   "Regional Sports Surcharge" (the "Surcharges"). Cox failed to adequately disclose

26   these service charges during the signup process, and Cox did not define or explain

---

27   [1] The term "cable TV service plan" as used in this Complaint includes a service
28   plan that "bundles" television with other services such as internet, phone, and/or
home security.

FIRST AMENDED
CLASS ACTION COMPLAINT

- 1 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

the Surcharges on the monthly bill. And Cox never disclosed the fact that Cox could, and would, use the Surcharges as a covert way to increase the monthly service rate mid-contract despite Cox's promises to the contrary.

3. Since 2015, Cox has increased the Broadcast Surcharge and the Regional Sports Surcharge at least once a year—each time between $1.00 to $3.50 per Surcharge—on all of its cable TV customers regardless of whether they were in the middle of a fixed-price contractual period.

4. Starting March 23, 2021, Cox updated its new cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge. Instead, Cox significantly increased the prices of its new cable TV service plans by an amount equivalent to the lost Surcharges revenue. By rolling the Broadcast Surcharge and Regional Sports Surcharge into the (now higher) top-line advertised price for its cable TV service plans, Cox was admitting that the Surcharges had really just been disguised double-charges for cable TV service all along. And Cox was also admitting that Cox's mid-contract increases to the Surcharges were in fact increases to its purportedly fixed monthly service rates, in breach of its agreements with its customers.

5. Notably, even after March 23, 2021, Cox continued to bill subscribers under existing term contracts for the Surcharges and for the increases made thereto, and Cox continued to impose new increases to the Surcharges even in the middle of fixed-rate contracts—most recently in March 2022, when Cox increased the Broadcast Surcharge by $3.00, to $19.00.

6. Plaintiffs estimate that Cox has extracted **over $70 million** since 2015 from more than 1 million California and Nevada cable TV subscribers via mid-contract increases to the Broadcast Surcharge and the Regional Sports Surcharge.

7. All 29 Plaintiffs bring this lawsuit on behalf of themselves and classes of similarly situated California consumers, seeking damages and/or restitution, punitive damages, and pre- and post-judgment interest. Plaintiff Daniel Polinsky

also brings this lawsuit on behalf of himself and classes of similarly situated Nevada consumers, seeking damages and/or restitution, punitive damages, and pre- and post-judgment interest.

8.      By this action, Plaintiffs are seeking a refund of <u>only</u> the amount of the mid-contract **increases** to the Broadcast Surcharge and the Regional Sports Surcharge that Plaintiffs and the members of the Classes paid (i.e., they are not seeking a refund of the full monthly amount of the Surcharges listed on the bill).

9.      **Private injunctive relief.** Cox's misconduct is ongoing with regard to Class members who are under term contracts that are still subject to the Broadcast Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiffs also seek an order enjoining Cox from charging Class members who are in fixed-rate contracts, any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

10.    **Public injunctive relief.** Each Plaintiff, on behalf of himself or herself and as a private attorney general, seeks the imposition of public injunctive relief to protect the general public from further or future false advertising by Cox. Specifically, each Plaintiff seeks a permanent public injunction against Cox as follows: (1) an order enjoining Cox from falsely advertising the prices of its service plans to members of the general public; (2) an order enjoining Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary monthly service charges or fees; and (3) an order enjoining Cox from advertising fixed-rate promotional or contract periods when in fact Cox may increase the service price during the fixed-rate period by imposing or increasing discretionary monthly service charges or fees.

11.    Plaintiffs also seek attorneys' fees and costs.

## THE PARTIES

12.    Plaintiff Donald Christianson is a citizen and resident of San Diego

FIRST AMENDED
CLASS ACTION COMPLAINT

- 3 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    County, California.

2        13.    Plaintiff Isabel Prado is a citizen and resident of San Diego County,

3    California.

4        14.    Plaintiff Neil Moura is a citizen and resident of San Diego County,

5    California.

6        15.    Plaintiff Daniel Polinsky is a citizen and resident of Orange County,

7    California.

8        16.    Plaintiff Cristina Abdala is a citizen and resident of Aliso Viejo,

9    California.

10        17.    Plaintiff Jessica Bazan is a citizen and resident of Laguna Hills,

11    California.

12        18.    Plaintiff Paula Christopher is a citizen and resident of San Diego,

13    California.

14        19.    Plaintiff Gregory Clark is a citizen and resident of San Marcos,

15    California.

16        20.    Plaintiff Janine Clark is a citizen and resident of San Marcos,

17    California.

18        21.    Plaintiff Joseph Depew is a citizen and resident of El Cajon,

19    California.

20        22.    Plaintiff Brenda Depperschmidt is a citizen and resident of El Cajon,

21    California.

22        23.    Plaintiff James Gamble is a citizen and resident of Irvine, California.

23        24.    Plaintiff Kelly Gilliland is a citizen and resident of Lemon Grove,

24    California.

25        25.    Plaintiff Brian Hargett is a citizen and resident of San Diego,

26    California.

27        26.    Plaintiff Adrienne Jackson is a citizen and resident of San Diego,

28    California.

27. Plaintiff Lyssa Jordan is a citizen and resident of Spring Valley, California.

28. Plaintiff Wayne Kalayjian is a citizen and resident of Palos Verdes Estates, California.

29. Plaintiff Jennifer Klat is a citizen and resident of San Diego, California.

30. Plaintiff Nestor Mendez is a citizen and resident of San Marcos, California.

31. Plaintiff Stephen Metzger is a citizen and resident of Lake Forest, California.

32. Plaintiff James Mills is a citizen and resident of Escondido, California.

33. Plaintiff Michael Mitchell is a citizen and resident of Lemon Grove, California.

34. Plaintiff Rosa Montanez is a citizen and resident of Escondido, California.

35. Plaintiff Lauren Ramos is a citizen and resident of San Pedro, California.

36. Plaintiff Robynn Rowe is a citizen and resident of Santa Barbara, California.

37. Plaintiff Patricia Salvacion is a citizen and resident of Chula Vista, California.

38. Plaintiff Robert Tice is a citizen and resident of Chula Vista, California.

39. Plaintiff John Wiley is a citizen and resident of Santa Barbara, California.

40. Plaintiff Stephanie Wiley is a citizen and resident of Santa Barbara, California.

41. Defendant Cox Communications, Inc., is a privately-owned subsidiary

FIRST AMENDED
CLASS ACTION COMPLAINT

- 5 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

of Cox Enterprises, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and/or nerve center in Atlanta, Georgia. The footer of Cox's public website targeted to current and prospective residential cable TV customers states: "©1998 – 2022 Cox Communications, Inc."[2] Cox customer bills, including the bills sent to Plaintiffs, instruct customers that checks should be made payable to "Cox Communications."

42.     Defendant CoxCom, LLC, is a subsidiary of Cox Communications, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and/or nerve center in Atlanta, Georgia. The Cox "Residential Customer Service Agreement"[3] for Cox residential customers states that it "sets forth the terms and conditions under which CoxCom, LLC or one or more of its subsidiaries or affiliates authorized by applicable regulatory, franchise or license authority … agrees to provide Services."

43.     Defendant Cox Communications California, LLC, is a subsidiary of Cox Communications, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and/or nerve center in Atlanta, Georgia.

## JURISDICTION AND VENUE

44.     **Subject Matter Jurisdiction.** The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—i.e., Class Action Fairness Act jurisdiction —because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

45.     **Personal Jurisdiction**. This Court has personal jurisdiction over Cox

---

[2] *See* https://www.cox.com/residential/home.html, last accessed November 22, 2022.

[3] Available at https://www.cox.com/aboutus/policies/customer-service-agreement.html, last accessed November 22, 2022.

because, without limitation: (1) Cox has purposely availed itself of the privileges of conducting business activities in California; (2) Cox currently maintains systematic and continuous business contacts with California including marketing, selling, and issuing cable TV service plans and bundles to Plaintiffs and other California consumers; (3) Cox has entered into contracts with Plaintiffs and other California consumers to provide cable TV services; and (4) Cox maintains offices and retail locations throughout California. Cox has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible.

46. **Venue**. Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Jennifer Klat, Nestor Mendez, James Mills, Michael Mitchell, Rosa Montanez, Patricia Salvacion, and Robert Tice reside in this District; many of the acts and transactions giving rise to this action occurred in this District; Cox is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District through distribution and sale of its services in this District, does substantial business in this District, and is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS OF COX'S DECEPTIVE PRICING SCHEME

47. Cox currently provides cable TV services to approximately 3 million households nationwide, including approximately 400,000 households in California and over 400,000 households in Nevada.

48. For years, Cox has engaged in a deceptive pricing scheme, whereby Cox advertised its cable TV service plans at fixed monthly rates that were locked in during a 12- or 24-month contract ("term contract"), but Cox then covertly increased the monthly service rate in the middle of the contract via increases to the "Broadcast Surcharge" and the "Regional Sports Surcharge."

49. Cox enticed customers to enter into term contracts for Cox's cable TV

1   service plans by promising a fixed monthly rate for the duration of the contract.

2   Customers who entered into these term contracts gave up their ability to freely quit

3   or downgrade their service for the during the contract term without incurring an

4   early termination fee. Customers locked themselves into these term contracts

5   because Cox had represented to them that Cox was similarly locking itself into

6   charging no more than the promised fixed service price during the contract term.

7       50.     However, Cox's representations were false because Cox intended to,

8   and did, increase the monthly service rate mid-contract by increasing two disguised

9   monthly service charges which it labeled the "Broadcast Surcharge" and the

10   "Regional Sports Surcharge." Cox failed to adequately disclose these service

11   charges during the signup process, and Cox did not define or explain the Surcharges

12   on the monthly bill. And Cox **never** disclosed the fact that Cox could, and would,

13   use the Surcharges as a covert way to increase the monthly service rate mid-

14   contract despite Cox's representations and promises to the contrary.

15       **A.     The Broadcast Surcharge and the Regional Sports Surcharge.**

16       51.     The Broadcast Surcharge is a monthly television service charge that

17   Cox began adding to its bills in 2015 at a rate of $3.00 a month. Cox buried this

18   service charge in its monthly bill at the end of the "Monthly Services" section under

19   "Additional TV." Cox provided no definition or explanation of the Broadcast

20   Surcharge in its monthly bills. In fact, Cox used the Broadcast Surcharge as a way

21   to covertly increase the monthly service price during a customer's promised fixed-

22   rate contract.

23       52.     The Regional Sports Surcharge is a separate monthly television service

24   charge that Cox began adding to its bills in 2017 at a rate of $3.00 a month. Cox

25   similarly buried this service charge in its monthly bill at the end of the "Monthly

26   Services" section under "Additional TV." Cox provided no definition or

27   explanation of the Regional Sports Surcharge in its monthly bills. Like the

28   Broadcast Surcharge, Cox used the Regional Sports Surcharge as a way to covertly

FIRST AMENDED
CLASS ACTION COMPLAINT

- 8 -

increase the monthly service price during a customer's promised fixed-rate contract.

53.    All members of the putative classes were charged, and received mid-contract increases to, the Broadcast Surcharge. The Broadcast Surcharge was uniformly charged to all Cox cable TV subscribers since 2015, excluding only subscribers who signed up for brand-new service plans after March 23, 2021.

54.    Most members of the putative classes were also charged, and received mid-contract increases to, the Regional Sports Surcharge. The Regional Sports Surcharge was charged to Cox television subscribers with "Contour TV" (previously called "Essential TV") or higher—which comprises the overwhelming majority of Cox cable TV subscribers.

55.    Cox has steadily increased the Broadcast Surcharge and the Regional Sports Surcharge on at least an annual basis since introducing them, <u>regardless of whether the customer was in the middle of a promised fixed-price contract</u>. Today, the Broadcast Surcharge is $19.00 per month, and the Regional Sports Surcharge is up to $12.00 per month, for a total of up to $31.00 per month.

56.    Starting March 23, 2021, Cox updated its <u>new</u> cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge. Instead, Cox significantly increased the advertised prices of its new cable TV service plans by up to $28.00—an amount <u>equivalent</u> to the lost Surcharges revenue.

57.    By rolling the Broadcast Surcharge and Regional Sports Surcharge amounts into the (now higher) top-line price for its cable TV services, Cox was <u>admitting</u> that the Surcharges had really just been disguised double-charges for cable TV service all along. And Cox was further <u>admitting</u> that Cox's mid-contract increases to the Surcharges were in fact increases to its purportedly fixed monthly <u>service</u> rates, in breach of its agreements with its customers.

58.    Notably, even after March 23, 2021, Cox continued to bill subscribers under <u>existing</u> term contracts for the Surcharges and for the increases made thereto,

and Cox continued to impose <u>new</u> increases to the Surcharges even in the middle of fixed-rate contracts—most recently in March 2022, when Cox increased the Broadcast Surcharge by $3.00, to $19.00.

59.     Based on Plaintiffs' calculations, since 2015 Cox has improperly extracted over $70 million from more than 1 million California and Nevada cable TV subscribers via <u>mid-contract increases</u> to the Broadcast Surcharge and the Regional Sports Surcharge.

**B.     Cox Aggressively Pushed Term Contracts by Promising Fixed Monthly Service Rates During the Contract Period.**

60.     At all relevant times, Cox has advertised its cable TV service plans through pervasive marketing directed at the consuming public in California and Nevada. This marketing has included advertisements on the Cox website; materials and advertising at its California and Nevada retail stores where customers can sign up for Cox services; video advertisements via YouTube, Facebook, and Twitter; and television, radio, and other internet advertisements.

61.     Through all of these channels, Cox consistently and prominently advertised particular, flat monthly prices for its cable TV service plans that were "guaranteed" and "price-locked" during a 12- or 24-month service agreement.

62.     These 12- or 24-month service agreements imposed significant early termination fees on the customer if the customer failed to maintain the services through the end of the contract.

**1.     <u>Signing up with Cox sales or customer service agents</u>.**

63.     When customers signed up for Cox cable TV service over the phone, via internet chat, or at one of Cox's brick-and-mortar stores, Cox sales or customer service agents as a matter of policy only promoted service plans that were subject to 12- or 24-month service agreements. Cox's agents pushed these term contracts— which have significant early termination fees—by promising customers that the advertised service rates were "guaranteed" and "price-locked" for those one or two

years. And, even though it was possible to request to sign up for month-to-month service rather than a 12- or 24-month service agreement, Cox agents were trained to not mention the month-to-month option unless a customer specifically asked for it.

64.    Cox agents as a matter of policy did not disclose or mention that Cox could, and would, increase the monthly service price mid-contract (in the middle of the service agreement) by <u>increasing two disguised service charges</u>—the <u>Broadcast Surcharge</u> and the <u>Regional Sports Surcharge</u>.

65.    Discovery will show that Cox had a uniform, standard policy of having its sales and customer service agents: (1) not mention or disclose the existence of the Broadcast Surcharge or the Regional Sports Surcharge; and (2) not mention or disclose that the monthly service price could or would be further increased mid-contract via increases to the Surcharges.

### 2.    <u>Signing up on the Cox website.</u>

66.    Cox similarly pushed 12- and 24-month service agreements onto customers who signed up on Cox's website. For years, when a customer visited Cox's website to sign up for cable TV service, Cox only displayed service plans on its offer webpages that were advertised at fixed prices for 12 or 24 months, subject to a term service agreement. The option to go month-to-month was not even presented in the list of service plans on the Cox website.

67.    On Cox's website and throughout the online order process, Cox repeatedly—and falsely—represented that agreeing to a 12- or 24-month service agreement **"guaranteed"** that the monthly service price would be locked-in for the duration of the contract.

68.    For example, on Cox's FAQ webpages, one of the questions asked: "What if I don't want a service agreement?" Cox's posted answer to the question was: "**Service agreements give you peace of mind that your bill won't change over the course of the agreement**, but you can opt out during checkout for $10 more per month." (emphasis added).

69.     When a customer went through the online order process, at the top of each page was a link to "see Offer Terms" which, if clicked, opened a pop-up box where Cox explicitly promised that the rate for the customer's service <u>would not increase</u> during the contract period. Below is a screenshot which is representative of what Cox displayed from at least 2018 through 2021 to customers who clicked on the "see Offer Terms" link which was on the top of every page in the order process:

**Cox Online Order Process "See Offer Terms" Pop-Up**



70.     Cox promised: "The Service Agreement lets you **guarantee** the regular rates on Cox TV, Internet and Phone services for 2 years. **The rates for your** *services* **will not increase above the Service Agreement rate** when you agree to keep your main services (TV, Internet and/or Phone) **for the 2 years**." (emphasis added).

71.     Immediately below that, Cox stated: "**What's covered and not covered**. The Service Agreement is offered on TV, Internet and Phone services plus their features, such as a premium channel or voice mail. The Service Agreement

FIRST AMENDED
CLASS ACTION COMPLAINT

- 12 -

HATTIS & LUKACS
11711 SE 8ᵗʰ Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

does not apply to charges for equipment (such as a receiver or modem), per use items (like a movie rental) and fees for non-services (like taxes and surcharges) which may change."

72.     Notably, Cox here describes **"surcharges"** as "fees for ***non-services***" (as a reasonable consumer would expect). Yet in fact Cox has admitted that the Broadcast **Surcharge** and the Regional Sports **Surcharge** are in fact fees for *services* (see ¶¶ 85–91 below).

73.     Cox made similar representations about the "guaranteed" fixed-price of its term cable TV service plans on the next-to-last page of the online order process—the "Service Agreement" page.

FIRST AMENDED
CLASS ACTION COMPLAINT                - 13 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

74.     Below is a screenshot which is representative of what Cox displayed from at least 2018 through 2021 to customers at the end of the online order process:

**Cox Online Order Process "Service Agreement" Page**



75.     On this "Service Agreement" page, Cox informed the customer that "The offer and pricing you have selected requires a service agreement." Cox provided the customer with two options: (1) a "2 Year Term Service Agreement" (which was pre-selected); or (2) a "Month to Month – No Term Service

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 14 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Agreement" at an additional $10 per month.

76.     Again, Cox promised that "**The rates for your *services* will not increase above the Service Agreement rate** when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years." (emphasis added).

77.     Cox's website and its online order process were designed to lure and trap customers into 12- or 24-month term contracts by promising "peace of mind" that customers' monthly service rates would not increase during the contract.

### C.     Cox Increased the Monthly Service Rate Mid-Contract by Increasing Two Disguised Television Service Fees—the Broadcast Surcharge and the Regional Sports Surcharge.

78.     Cox's representations that the monthly service rate was "guaranteed" and "price-locked" and that its service agreements "give you peace of mind that your bill won't change over the course of the agreement" were all <u>false</u>. Cox as a matter of policy increased the monthly service rate in the middle of customers' fixed-rate contracts by increasing two disguised television service fees—the Broadcast Surcharge and the Regional Sports Surcharge.

79.     Cox has increased the Broadcast Surcharge and the Regional Sports Surcharge at least once a year since 2015—each time between $1.00 to $3.50 for each Surcharge. And Cox imposed these annual increases on all of its cable TV subscribers <u>even if they were in the middle of a promised fixed-rate contract</u>.

80.     For example, Cox increased the monthly service price twice, by a total of $8.00, during the span of Plaintiffs Donald Christianson and Isabel Prado's supposedly "guaranteed" fixed-rate service contract. In February 2020—6 months into their 24-month term—Cox increased the Broadcast Surcharge from $10.00 to $13.50 and the Regional Sports Surcharge from $7.00 to $8.00. Then, in February 2021—18 months into their 24-month term—Cox again increased the Broadcast Surcharge from $13.50 to $16.00 and the Regional Sports Surcharge from $8.00 to $9.00.

FIRST AMENDED
CLASS ACTION COMPLAINT

- 15 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

81.     Contrary to Cox's fixed-price "guarantee," Cox utilized the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the supposedly fixed-rate contract. Because these subsequent increases to the Broadcast Surcharge and the Regional Sports Surcharge were relatively small—typically between $1.00 to $3.50 per Surcharge—and were not included in the "Total Your Cox Bundle" price displayed at the top of the bill, Cox knew that customers were unlikely to notice the increased amount of the service charges. Meanwhile, Cox did not define or explain the Surcharges anywhere on the bill.

82.     Given that taxes and other government-related charges can already vary by small amounts from month to month, Cox knew that customers reasonably expected small changes in the total amount billed each month and would not notice that Cox increased the service price by increasing the amount of these disguised service charges.

83.     Many, if not most, customers did not read the printed monthly statements described above at all because Cox encouraged its customers to sign up for electronic billing and automatic payment (which Cox calls "EasyPay") in lieu of receiving paper statements. Through this billing process, customers receive a monthly Cox billing email which states the customer's bill total and informs them that their bill will be automatically paid by the payment due date because they are signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge. Because the increases are relatively small compared to a customer's total monthly bill, customers would not notice the increase or would reasonably believe that the increase was due to increased taxes or government fees. A reasonable consumer would not assume that an increase to his or her monthly bill

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 16 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

total was due to Cox unlawfully increasing the monthly service rate in the middle of the promised fixed-price contract.

84.    At no point, either prior to or at the time customers signed up for a service agreement, did Cox disclose that Cox could, and would, increase the monthly service price mid-contract (via increases to the Broadcast Surcharge and the Regional Sports Surcharge). Rather, Cox made affirmative misrepresentations to the contrary. As detailed above, Cox repeatedly—and falsely—represented to customers that signing up for a 12- or 24-month service agreement would "guarantee" that the "rates for your services will not increase" during the contract term. Cox even explicitly—and falsely—stated that the service agreement covered "TV, Internet and Phone services plus their features" and only did not cover equipment, per use items, and "fees for non-services ..."

FIRST AMENDED
CLASS ACTION COMPLAINT

- 17 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**D.     It Is Indisputable That the Broadcast Surcharge and the Regional Sports Surcharge Are Charges for Service.**

85.     It cannot be disputed that the Surcharges are in fact charges for cable TV service. In fact, Cox has repeatedly <u>admitted</u> that the Broadcast Surcharge and the Regional Sports Surcharge are charges for services.

86.     Notably, Cox lists the Broadcast Surcharge and Regional Sports Surcharge in the "Monthly **<u>Services</u>**" section of the bill under "Additional TV"— where they are not defined and not explained. Below is a copy of the Monthly Services section of the customer bill:

**February 2021 Bill of Plaintiffs Christianson and Prado**

| MONTHLY SERVICES | Mar 1 - Mar 28 |
|---|---|
| ▷ Indicates the service is part of a 24 Month Service Agreement with Cox. You may make changes to the services indicated, however an early termination fee (ETF) may be charged if one or more of your TV, Internet, Home Automation or Phone service is fully disconnected and part of your Agreement. | |
| **YOUR COX BUNDLE** | |
| **TV** | |
| ▷ **Contour TV** | |
| Includes: Cox TV Starter, Expanded Service, Advanced TV Service and Contour Guide | |
| ▷ Contour Receiver | |
| ▷ HBO Max | |
| **Internet** | |
| ▷ **Cox High Speed Internet Preferred** | |
| Includes: Preferred Internet, Download speeds up to 150 Mbps, 1.25 TB (1,280 GB) Monthly Data Plan, Over 3 million WiFi hotspots and Cox Security Suite Plus. | |
| **Total Your Cox Bundle** | **$89.99** |
| **ADDITIONAL TV** | |
| **Other Fees and Surcharges** | |
| Broadcast Surcharge | $16.00 |
| Regional Sports Surcharge | 9.00 |
| Total Additional TV | **$25.00** |
| **TOTAL MONTHLY SERVICES** | **$114.99** |

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

87.    Meanwhile, Cox did <u>not</u> list the Broadcast Surcharge or the Regional Sports Surcharge under the separate section on the bill labeled "Taxes, Fees and Surcharges."

88.    Cox has <u>admitted</u> that the Broadcast Surcharge and the Regional Sports Surcharge are just carved-out portions of the customer's cable TV service, which <u>prior to 2015 were included in the top-line service plan price</u>.

89.    For example, in one discussion thread on Cox's website, a Cox representative stated that:

> <u>In the past, all Cox television programming costs and fees were simply rolled together in our charges for Advanced TV service or the specific Tier of service</u>. Over the years, Cox has had to raise service rates due to rising video programming costs and network retransmission fees. In an effort to meet the demand for more transparent billing practices, <u>we introduced surcharges as a way to highlight the different costs associated with the delivery of broadcast TV networks. The separate line items simply allow customers to better track how these costs impact their total TV charge</u>.[4]

90.    These admissions have made it abundantly clear that the Broadcast Surcharge and the Regional Sports Surcharge are television <u>service</u> charges.

**91.    And when Cox stopped charging the Surcharges to subscribers of its <u>new</u> cable TV plans beginning March 23, 2021—and Cox instead increased the top-line price of its advertised TV service plans by <u>an equivalent</u> <u>amount</u>— Cox was further <u>admitting</u> that the Surcharges had really just been <u>disguised</u> <u>double-charges for TV service all along</u>.**

---

[4] https://forums.cox.com/forum_home/tv_forum/f/tv-forum/16427/to-keep-you-better-informed-a-6-00-surcharge-what, last accessed November 22, 2022.

FIRST AMENDED
CLASS ACTION COMPLAINT                - 19 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    **PLAINTIFFS' FACTUAL ALLEGATIONS**

2    **Plaintiffs Donald Christianson and Isabel Prado**

3        92.    Plaintiffs Donald Christianson and Isabel Prado are, and at all relevant

4    times have been, citizens and residents of La Mesa, California.

5        93.    Since at least 2010, Mr. Christianson and Ms. Prado have been living

6    together. When they first moved to their previous address in 2010, they signed up

7    for one of Cox's cable TV and internet service plans. This was five years before

8    Cox first started charging the Broadcast Surcharge and seven years before Cox first

9    started charging the Regional Sports Surcharge.

10       94.    In 2012, Mr. Christianson and Ms. Prado moved to their current

11   address. When they moved, they transferred their Cox cable TV and internet service

12   plan from their old address to their new address. Cox still had not started charging

13   either the Broadcast Surcharge or the Regional Sports Surcharge.

14       95.    Mr. Christianson and Ms. Prado's Cox account is in Ms. Prado's name,

15   with Mr. Christianson being an authorized user who can make changes to their

16   services and pay their bills. Mr. Christianson and Ms. Prado would alternate

17   between paying their monthly bill using money from Mr. Christianson's bank

18   account and money from Ms. Prado's bank account. They would also occasionally

19   visit their nearby Cox service center and pay their monthly bill in cash.

20       96.    In June 2019, looking for ways to save money, Mr. Christianson and

21   Ms. Prado decided to downgrade their Cox service plan, which at that time was

22   over $150 a month for TV and internet. Initially, they intended to switch to an

23   internet-only plan and cut out television altogether. However, when they called Cox

24   to switch plans, the sales agent offered to give them a very basic television service

25   (approximately 30 channels) for free with their internet service.

26       97.    Mr. Christianson and Ms. Prado had this internet and "free" television

27   service plan for three months.

28       98.    In September 2019, a Cox sales agent called Mr. Christianson and

FIRST AMENDED
CLASS ACTION COMPLAINT                  - 20 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Ms. Prado to inform them that they were going over their internet data limit each month. They were going over their data limit because they now almost exclusively watched television shows using streaming services like Hulu and Netflix.

99.   Customers who went over their internet data limit had to pay additional monthly fees based on how much data the customer used over the limit. At the time, Cox also offered unlimited internet data plans at an additional monthly cost.

100.   Mr. Christianson and Ms. Prado could have purchased the unlimited internet data plan or paid the additional monthly fee for going over their data limit. Instead, however, the Cox sales agent used this opportunity to try to upsell them on one of Cox's higher-tier TV and internet service bundles. The agent's pitch was that if they had a television service plan with more channels, they could cut back on streaming and avoid going over their internet data limit each month.

101.   The Cox sales agent quoted Mr. Christianson and Ms. Prado a two-year "locked-in" price for TV and internet subject to a 24-month service agreement.

102.   Based on the sales agent's representations, Mr. Christianson and Ms. Prado reasonably believed that the monthly service price for TV and internet would not increase during the two-year "locked-in" period.

103.   Relying on the sales agent's representations, Mr. Christianson and Ms. Prado ordered the TV and internet service plan.

104.   At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the two-year price-locked period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

105.   In February 2020—6 months into Mr. Christianson and Ms. Prado's 24-month "locked-in" price contract—Cox increased the price of their cable TV service by $4.50 by raising the amount of the so-called Surcharges. Specifically,

FIRST AMENDED
CLASS ACTION COMPLAINT

- 21 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  Cox increased the Broadcast Surcharge by $3.50 (from $10.00 to $13.50) and the

2  Regional Sports Surcharge by $1.00 (from $7.00 to $8.00).

3      106.  In February 2021—18 months into their 24-month "locked-in" price

4  contract—Cox again increased the price of their cable TV service, this time by

5  $3.50, by raising the amount of the so-called Surcharges. Specifically, Cox

6  increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the

7  Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

8      107.  This was not the first time Cox had increased Mr. Christianson and

9  Ms. Prado's service rate in the middle of a promised fixed-rate period. Cox had

10  been increasing their service rate mid-contract ever since Cox first began charging

11  the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month,

12  and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month).

13  Mr. Christianson and Ms. Prado had not been aware that Cox had added these

14  Surcharges, and had not been aware that Cox had been quietly increasing them over

15  the years—even in the middle of their purportedly fixed-rate contracts.

16      108.  Each time Mr. Christianson and Ms. Prado agreed to a new

17  promotional offer and entered into a new term service agreement, Cox quoted them

18  a particular monthly price for the service plan and did not mention the Surcharges.

19      109.  Each time Mr. Christianson and Ms. Prado entered into a new term

20  service agreement, Cox did not disclose to them that the monthly price could, and

21  would, increase as a result of increases to the Surcharges.

22      110.  When Mr. Christianson and Ms. Prado's latest cable TV term contract

23  ended in August 2021, they dropped their cable TV service altogether and switched

24  to an internet-only plan from Cox.

25      111.  Mr. Christianson and Ms. Prado never noticed that Cox had increased

26  the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the

27  middle of their contracts.

28      112.  Mr. Christianson and Ms. Prado did not learn that Cox had been

FIRST AMENDED
CLASS ACTION COMPLAINT
- 22 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

increasing their cable TV service rate mid-contract until it was brought to their attention by their counsel in April 2022.

113.   Each time Mr. Christianson and Ms. Prado committed to a term contract, they were relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. They did not expect (and Cox did not tell them) that each year Cox would in fact covertly increase the monthly service rate in the middle of their supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to them. If Mr. Christianson and Ms. Prado had known that information, they would not have been willing to pay as much for their services and would have acted differently.

114.   Mr. Christianson and Ms. Prado suffered damages during their term contracts in the form of the *increases* to their purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Neil Moura**

115.   Plaintiff Neil Moura is, and at all relevant times has been, a citizen and resident of Oceanside, California.

116.   Mr. Moura has been a Cox cable TV subscriber for at least the last 15 years.

117.   Around four years ago, Mr. Moura started having technical problems with his Cox cable TV service. After speaking with several Cox customer service agents, Mr. Moura eventually spoke to a Cox agent named Kristi Swangel. In addition to helping Mr. Moura with his service issues, Ms. Swangel also gave him a promotional discount off his internet and TV service plan.

118.   In July 2020, the promotional discount that Ms. Swangel gave Mr. Moura expired, causing his monthly bill to increase. On July 4, 2020, Mr. Moura emailed Ms. Swangel asking if there was any way to lower his bill, such as cutting portions of his service or getting a promotional discount. Mr. Moura

FIRST AMENDED
CLASS ACTION COMPLAINT
- 23 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

explained that he was retired and on a fixed income. He needed an affordable and fixed-rate monthly bill.

119.  On July 8, 2020, Ms. Swangel emailed Mr. Moura back and stated that she could give him a promotional discount that would reduce his monthly service rate to "just under $208" for 24 months subject to a 24-month service agreement.

120.  Based on Ms. Swangel's representations, Mr. Moura reasonably believed that his monthly service rate would remain at "just under $208" for 24 months.

121.  Relying on Ms. Swangel's representations, Mr. Moura accepted the promotional offer and agreed to the 24-month fixed-price service agreement. When he received his next bill in August 2020, it was $207.79—"just under $208."

122.  Nowhere in Ms. Swangel's email did she inform Mr. Moura that Cox could, and would, increase his monthly service rate during the 24-month contract by increasing the Broadcast Surcharge and the Regional Sports Surcharge.

123.  In fact, Cox increased Mr. Moura's service rate *twice* during his 24-month contract—first in March 2021 and then again in March 2022.

124.  On Mr. Moura's March 2021 bill—only 8 months into his 24-month purportedly fixed price contract—Cox increased the price of his cable TV service by $3.50 by raising the amount of the so-called Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

125.  On Mr. Moura's March 2022 bill—20 months into his 24-month purportedly fixed price contract—Cox again increased the price of his cable TV service, this time by $3.00, by raising the amount of the Broadcast Surcharge by $3.00 (from $16.00 to $19.00).

126.  This was not the first time Cox had increased Mr. Moura's service rate in the middle of a promised fixed-rate period. Cox had been increasing his service rate mid-contract ever since Cox first began charging the Surcharges (beginning in

FIRST AMENDED
CLASS ACTION COMPLAINT
- 24 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Moura had not been aware that Cox had added these Surcharges, and had not been aware that Cox had been quietly increasing them over the years—even in the middle of his purportedly fixed-rate contracts.

127.   Each time Mr. Moura agreed to a new promotional offer and entered into a new term service agreement, Cox quoted him a particular monthly price for the service plan and did not mention the Surcharges.

128.   Each time Mr. Moura entered into a new term service agreement, Cox did not disclose to him that the monthly price could, and would, increase as a result of increases to the Surcharges.

129.   Mr. Moura never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

130.   Mr. Moura did not learn that Cox had been increasing his cable TV service rate mid-contract until it was brought to his attention by his counsel in April 2022.

131.   Each time Mr. Moura committed to a term contract, he was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Mr. Moura did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Moura had known that information, he would not have been willing to pay as much for his services and would have acted differently.

132.   Mr. Moura suffered damages during the term of his service agreements in the form of the *increases* to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

FIRST AMENDED
CLASS ACTION COMPLAINT

- 25 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**Plaintiff Daniel Polinsky**

133.    Since November 2020, Plaintiff Daniel Polinsky has been a citizen and resident of San Clemente, California. Prior to that, from August 2019 to October 2020, Mr. Polinsky was a citizen and resident of Nevada.

134.    Mr. Polinsky first signed up for Cox's services in August 2019 while he was living in Nevada. Mr. Polinsky signed up through Cox's website.

135.    After browsing Cox's various service plans on the Cox website, Mr. Polinsky selected one of Cox's internet and cable TV service plan bundles. On the offer webpage for the internet and cable TV service plan, Cox prominently advertised the plan as having a fixed monthly rate for 24 months with a two-year service agreement.

136.    Based on these representations, Mr. Polinsky selected the service plan and initiated the online order process.

137.    As Mr. Polinsky went through the online order process, he viewed Cox's repeated representations that the monthly charges for the service plan would be the same fixed rate for 24 months. For example, Mr. Polinsky viewed the "Service Agreement" webpage (see ¶ 74 above), where the "2 Year Term Service Agreement" option was preselected, and where Cox stated: "The Service Agreement lets you guarantee the regular rates on Cox TV, Internet and Phone services for the two years. The rates for your services will not increase above the Service Agreement rate when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years."

138.    Nowhere during the online order process did Cox indicate that Cox could, and would, increase the monthly service rate mid-contract via increases to additional disguised monthly service charges.

139.    Relying on Cox's repeated representations regarding the fixed monthly price of the service plan for the two-year contract period, Mr. Polinsky completed the online purchase process and submitted his order.

140.   At no point was Mr. Polinsky aware that Cox would bill him any additional monthly service charges. At no point in the online purchase process did Mr. Polinsky see any mention of the existence of the Broadcast Surcharge or the Regional Sports Surcharge. Mr. Polinsky also had no idea that Cox could, and would, increase the service rate during the promised two-year fixed-rate period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

141.   In February 2020—6 months into Mr. Polinsky's 24-month purportedly fixed price contract—Cox increased the Broadcast Surcharge from $10.00 to $13.50. Based on Plaintiffs' counsel's investigation, Cox also increased the Regional Sports Surcharge at the same time.[5]

142.   Mr. Polinsky never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contract.

143.   Mr. Polinsky was signed up for electronic billing and Cox's automatic payment program, EasyPay, as Cox encouraged him to do. Through this billing process, Mr. Polinsky received a monthly Cox billing email which stated his bill total and informed him that his bill would be automatically paid by the payment due date because he was signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

144.   In November 2020, Mr. Polinsky moved to San Clemente, California. When he moved, he was unable to transfer his existing Cox service plan from Nevada. Instead, Mr. Polinsky signed up for a new internet and cable TV service plan from Cox. Mr. Polinsky once again signed up through Cox's website. And,

---

[5] Based on Plaintiffs' counsel's investigation, Cox increased the Regional Sports Surcharge every year in nearly every region that Cox provided service, including in its Nevada service region. For example, in February 2021, Cox increased the Regional Sports Surcharge from $8.50 to $9.00 in its Nevada service region.

once again, Mr. Polinsky chose an internet and TV service plan that Cox advertised as having a fixed monthly rate for 24 months with a two-year service agreement. Mr. Polinsky went through materially the same online order process and saw materially the same representations as he had when he previously signed up in August 2019.

145.    When Mr. Polinsky signed up for Cox service in November 2020, he still did not know that Cox could, and would, increase his service rate during the promised fixed-rate period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

146.    On Mr. Polinsky's February 2021 bill—only 3 months into his 24-month purportedly fixed-price contract—Cox increased the price of his cable TV service by $3.50 by raising the amount of the so-called Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

147.    On Mr. Polinsky's February 2022 bill—15 months into his 24-month purportedly fixed-price contract—Cox increased the price of his cable TV service again, this time by $6.00, by raising the amount of the so-called Surcharges. Specifically, Cox increased the Broadcast Surcharge by $3.00 (from $16.00 to $19.00) and the Regional Sports Surcharge by $3.00 (from $9.00 to $12.00).

148.    Mr. Polinsky did not learn that Cox had been increasing his service rate mid-contract until it was brought to his attention by his counsel in May 2022.

149.    When Mr. Polinsky signed up for Cox's cable TV services, both in August 2019 in Nevada, and in November 2020 in California, he was relying on Cox's explicit representations regarding the fixed monthly rate under the 24-month contracts. Mr. Polinsky did not expect (and Cox did not tell him) that Cox would in fact increase the monthly service rate in the middle of the contract via increases to disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If

FIRST AMENDED
CLASS ACTION COMPLAINT
- 28 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Mr. Polinsky had known that information, he would not have been willing to pay as much for his services and would have acted differently.

150.   Mr. Polinsky suffered damages during his term contracts in Nevada and California, in the form of the ***increases*** to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

151.   Mr. Polinsky terminated his Cox services in mid-May 2022 when he moved to a new location outside of Cox's service area.

**Plaintiff Cristina Abdala**

152.   Plaintiff Cristina Abdala is, and at all relevant times has been, a citizen and resident of Aliso Viejo, California.

153.   Ms. Abdala had been a Cox cable TV subscriber for more than 20 years. Ms. Abdala recently cancelled her cable TV service around October 2021 when her last service agreement ended. Ms. Abdala is still a Cox customer; she just no longer subscribes to cable TV.

154.   Ms. Abdala often entered into term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement.

155.   Ms. Abdala entered into her most recent 24-month service agreement around October 2019 when she agreed to a new promotional offer over the phone with Cox. When Ms. Abdala agreed to the new promotional offer, the Cox sales agent quoted her a fixed price on her Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

156.   Based on the sales agent's representations, Ms. Abdala reasonably believed that the monthly service price for her Cox service plan would not increase

FIRST AMENDED
CLASS ACTION COMPLAINT

- 29 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    during the fixed-price period.

2        157.   Relying on the sales agent's representations, Ms. Abdala accepted the

3    promotional offer and agreed to the 24-month fixed-price service agreement.

4        158.   During Ms. Abdala's 24-month service agreement, Cox increased the

5    price of her cable TV service **twice** by raising the amount of the so-called

6    Surcharges. The first increase was in February 2020 and the second increase was in

7    February 2021.

8        159.   This was not the first time Cox had increased Ms. Abdala's service

9    rate in the middle of a promised fixed-rate period. Cox had been increasing Ms.

10   Abdala's service rate mid-contract ever since Cox first began charging the

11   Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and

12   then later, in 2017, with the Regional Sports Surcharge, also starting at $3.00 a

13   month). Ms. Abdala had not been aware that Cox had added these Surcharges, and

14   she had not been aware that Cox had been quietly increasing them over the years—

15   even in the middle of her purportedly fixed-rate contracts.

16       160.   Each time Ms. Abdala agreed to a new promotional offer and entered

17   into a new term service agreement, Cox quoted Ms. Abdala a particular monthly

18   price for the service plan and did not mention the Surcharges.

19       161.   Each time that Ms. Abdala entered into a new term service agreement,

20   Cox did not disclose to her that the monthly price could, and would, increase during

21   the contract period as a result of increases to the Surcharges.

22       162.   Ms. Abdala has been signed up for electronic billing and Cox's

23   automatic payment program, EasyPay, for the past few years, as Cox encouraged

24   her to do. Through this billing process, Ms. Abdala receives a monthly Cox billing

25   email which states her bill total and informs her that her bill will be automatically

26   paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay

27   program discourages customers from reviewing their monthly bill. And, because

28   Cox's billing emails only state the bill total, customers cannot tell from the email

FIRST AMENDED
CLASS ACTION COMPLAINT                - 30 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

163.   Ms. Abdala never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

164.   Ms. Abdala did not learn that Cox had been increasing her cable TV service rate mid-contract via increases to the Surcharges until it was brought to her attention by her counsel in September 2022.

165.   Each time Ms. Abdala committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Abdala did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Abdala had known that information, she would not have been willing to pay as much for her services and would have acted differently.

166.   Ms. Abdala suffered damages during the term of her service agreements in the form of the ***increases*** to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Jessica Bazan**

167.   Plaintiff Jessica Bazan is, and at all relevant times has been, a citizen and resident of Laguna Hills, California.

168.   Ms. Bazan has been a Cox cable TV subscriber for 2 years, since around September 2020. She initially signed up for Cox cable TV service by calling Cox and talking to a sales agent.

169.   When Ms. Bazan purchased her Cox cable TV service plan, the Cox sales agent quoted her a two-year fixed price for the services, subject to a 24-month service agreement. At no point during the phone call did the Cox sales agent

mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

170. Based on the sales agent's representations, Ms. Bazan reasonably believed that the monthly service price would not increase during the two-year fixed-price period.

171. Relying on the sales agent's representations, Ms. Bazan accepted the promotional offer and agreed to the 24-month fixed-price service agreement.

172. During Ms. Bazan's 24-month service agreement, Cox increased the price of her cable TV service *twice* by raising the amount of the so-called Surcharges. The first increase was in February 2021 and the second increase was in February 2022.

173. When Ms. Bazan signed up for Cox service, she also signed up for electronic billing and Cox's automatic payment program, EasyPay, as Cox encouraged her to do. Through this billing process, Ms. Bazan receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

174. Ms. Bazan never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contract.

175. Ms. Bazan did not learn that Cox had been increasing her cable TV service rate mid-contract via increases to the Surcharges until it was brought to her attention by her counsel in October 2022.

176. When Ms. Bazan committed to a term contract, she was relying on

Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Bazan did not expect (and Cox did not tell her) that Cox would in fact increase the monthly service rate *twice* in the middle of the contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Bazan had known that information, she would not have been willing to pay as much for her services and would have acted differently.

177.    Ms. Bazan suffered damages during the term of her service agreement in the form of the *increases* to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Paula Christopher**

178.    Plaintiff Paula Christopher is, and at all relevant times has been, a citizen and resident of San Diego, California.

179.    Ms. Christopher has been a Cox cable TV subscriber for more than 20 years. During this time, Ms. Christopher often entered into term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement. (Currently, Ms. Christopher is not in a term service agreement because the last time she spoke with a Cox agent, she was told that she was grandfathered into her current service plan and did not need another service agreement.)

180.    Ms. Christopher entered into her most recent 24-month service agreement around January 2018 when she agreed to a new promotional offer over the phone with Cox. When Ms. Christopher agreed to the new promotional offer, the Cox sales agent quoted her a fixed price on her Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Surcharge and Regional Sports Surcharge

181. Based on the sales agent's representations, Ms. Christopher reasonably believed that the monthly service price for her Cox service plan would not increase during the fixed-price period.

182. Relying on the sales agent's representations, Ms. Christopher accepted the promotional offer and agreed to the 24-month fixed-price service agreement.

183. During Ms. Christopher's 24-month service agreement, Cox increased the price of her cable TV service at least once, in February 2019, by raising the amount of the so-called Surcharges.

184. This was not the first time Cox had increased Ms. Christopher's service rate in the middle of a promised fixed-rate period. Cox had been increasing Ms. Christopher's service rate mid-contract ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also starting at $3.00 a month). Ms. Christopher had not been aware that Cox had added these Surcharges, and she had not been aware that Cox had been quietly increasing them over the years—even in the middle of her purportedly fixed-rate contracts.

185. Each time Ms. Christopher agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Ms. Christopher a particular monthly price for the service plan and did not mention the Surcharges.

186. Each time that Ms. Christopher entered into a new term service agreement, Cox did not disclose to her that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

187. Ms. Christopher never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

188. Ms. Christopher did not learn that Cox had been increasing her cable TV service rate mid-contract via increases to the Surcharges until it was brought to

FIRST AMENDED
CLASS ACTION COMPLAINT
- 34 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

her attention by her counsel in September 2022.

189.   Each time Ms. Christopher committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Christopher did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Christopher had known that information, she would not have been willing to pay as much for her services and would have acted differently.

190.   Ms. Christopher suffered damages during the term of her service agreements in the form of the ***increases*** to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiffs Gregory Clark and Janine Clark**

191.   Plaintiffs Gregory Clark and Janine Clark are, and at all relevant times have been, citizens and residents of San Marcos, California.

192.   The Clarks have been Cox cable TV subscribers for more than 20 years. During this time, they often entered into term service agreements. Typically, whenever one service agreement ended, they would call Cox to ask for a new promotional offer that was subject to another term service agreement. Although their Cox account is in Janine Clark's name, Gregory Clark is the one who typically called Cox to ask for a new promotional offer.

193.   The Clarks' most recent service agreement was in 2021, which they entered into when they agreed to a new promotional offer over the phone with Cox. When the Clarks agreed to the new promotional offer, the Cox sales agent quoted them a fixed price on their Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales

FIRST AMENDED
CLASS ACTION COMPLAINT
- 35 -
**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the undisclosed Broadcast Surcharge and Regional Sports Surcharge.

194. Based on the sales agent's representations, the Clarks reasonably believed that the monthly service price for their Cox service plan would not increase during the fixed-price period.

195. Relying on the sales agent's representations, the Clarks accepted the promotional offer and agreed to the fixed-price term service agreement.

196. During the Clarks' term service agreement, Cox increased the price of their cable TV service at least once by raising the amount of the so-called Surcharges.

197. This was not the first time Cox had increased the Clarks' service rate in the middle of a promised fixed-rate period. Cox had been increasing the Clarks' service rate mid-contract ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). The Clarks had not been aware that Cox had added these Surcharges, and had not been aware that Cox had been quietly increasing them over the years—even in the middle of their purportedly fixed-rate contracts.

198. Each time the Clarks agreed to a new promotional offer and entered into a new term service agreement, Cox quoted them a particular monthly price for the service plan and did not mention the Surcharges.

199. Each time that the Clarks entered into a new term service agreement, Cox did not disclose to them that the monthly price could, and would, increase as a result of increases to the Surcharges.

200. The Clarks never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of their contracts.

FIRST AMENDED
CLASS ACTION COMPLAINT

- 36 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

201.   The Clarks did not learn that Cox had been increasing their cable TV service rate mid-contract via increases to the Surcharges until it was brought to their attention by their counsel in September 2022.

202.   Each time the Clarks committed to a term contract, they were relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. They did not expect (and Cox did not tell them) that each year Cox would in fact covertly increase the monthly service rate in the middle of their supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to them. If the Clarks had known that information, they would not have been willing to pay as much for their services and would have acted differently.

203.   The Clarks suffered damages during the term of their service agreements in the form of the *increases* to their purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Joseph Depew**

204.   Plaintiff Joseph Depew is, and at all relevant times has been, a citizen and resident of El Cajon, California.

205.   Mr. Depew has been a Cox cable TV subscriber for at least 6 years, since around 2016. During this time, Mr. Depew has nearly always been in a term service agreement. Typically, whenever one service agreement ended, he would call Cox to ask for a new promotional offer that was subject to another term service agreement.

206.   Each time Mr. Depew agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Depew a particular monthly price for the service plan and did not mention the Surcharges.

207.   Each time that Mr. Depew entered into a new term service agreement, Cox did not disclose to him that the monthly price could, and would, increase

FIRST AMENDED
CLASS ACTION COMPLAINT

- 37 -

HATTIS & LUKACS
11711 SE 8ᵗʰ Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1   during the contract period as a result of increases to the Surcharges.

2   208.   Each time, based on the sales agent's representations, Mr. Depew

3   reasonably believed that the monthly service price for his Cox service plan would

4   not increase during the fixed-price period.

5   209.   Each time, relying on the sales agent's representations, Mr. Depew

6   accepted the promotional offer and agreed to the fixed-price term service

7   agreement.

8   210.   At least once during each of Mr. Depew's service agreements from

9   2016 to 2021, Cox increased the price of his cable TV service by raising the amount

10   of the so-called Surcharges. The increases always occurred in February of each

11   year.

12   211.   Mr. Depew never noticed that Cox had increased the amounts of the

13   Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

14   212.   Mr. Depew did not learn that Cox had been increasing his cable TV

15   service rate mid-contract via increases to the Surcharges until it was brought to his

16   attention by his counsel in October 2022.

17   213.   Each time Mr. Depew committed to a term contract, he was relying on

18   Cox's explicit representations regarding the fixed monthly rate under the term

19   contract. Mr. Depew did not expect (and Cox did not tell him) that each year Cox

20   would in fact covertly increase the monthly service rate in the middle of his

21   supposedly fixed-rate contract via increases to the disguised monthly service

22   charges which it labeled the Broadcast Surcharge and the Regional Sports

23   Surcharge. That information would have been material to him. If Mr. Depew had

24   known that information, he would not have been willing to pay as much for his

25   services and would have acted differently.

26   214.   Mr. Depew suffered damages during the term of his service

27   agreements in the form of the *increases* to his purportedly fixed monthly service

28   rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Brenda Depperschmidt**

215.   Plaintiff Brenda Depperschmidt is, and at all relevant times has been, a citizen and resident of El Cajon, California.

216.   Ms. Depperschmidt has been a Cox cable TV subscriber for 2 years, since around September 2020. She initially signed up for Cox cable TV service by calling Cox and talking to a sales agent. When she signed up for service, she entered into a 24-month service agreement.

217.   When Ms. Depperschmidt purchased her Cox service plan, the Cox sales agent quoted her a two-year fixed price for the services, subject to a 24-month service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the two-year price-locked period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

218.   Based on the sales agent's representations, Ms. Depperschmidt reasonably believed that the monthly service price would not increase during the two-year fixed-price period.

219.   Relying on the sales agent's representations, Ms. Depperschmidt accepted the promotional offer and agreed to the 24-month fixed-price service agreement.

220.   During Ms. Depperschmidt's 24-month service agreement, Cox increased the price of her cable TV service *twice* by raising the amount of the so-called Surcharges. The first increase was in February 2021 and the second increase was in February 2022.

221.   Ms. Depperschmidt never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contract.

222.   Ms. Depperschmidt did not learn that Cox had been increasing her

FIRST AMENDED
CLASS ACTION COMPLAINT
- 39 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

cable TV service rate mid-contract via increases to the Surcharges until it was brought to her attention by her counsel in October 2022.

223.   When Ms. Depperschmidt committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Depperschmidt did not expect (and Cox did not tell her) that Cox would in fact increase the monthly service rate *twice* in the middle of the contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Depperschmidt had known that information, she would not have been willing to pay as much for her services and would have acted differently.

224.   Ms. Depperschmidt suffered damages during the term of her service agreement in the form of the *increases* to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff James Gamble**

225.   Plaintiff James Gamble is, and at all relevant times has been, a citizen and resident of Irvine, California.

226.   Mr. Gamble has been a Cox cable TV subscriber for at least 4 years. Mr. Gamble first signed up for Cox services in May 2018 through Cox's website.

227.   After browsing Cox's various service plans on the Cox website, Mr. Gamble selected one of Cox's internet and cable TV service plan bundles. On the offer webpage for the internet and cable TV service plan, Cox prominently advertised the plan as having a fixed monthly rate for 12 months subject to a term service agreement.

228.   Relying on these representations, Mr. Gamble selected the service plan and initiated the online order process.

229.   As Mr. Gamble went through the online order process, he viewed Cox's repeated representations that the monthly charges for the service plan would

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 40 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

be the same fixed rate for 12 months. Nowhere during the online order process did Cox indicate that Cox could, and would, increase the monthly service rate mid-contract via increases to additional disguised monthly service charges.

230.   Relying on Cox's repeated representations regarding the fixed monthly price of the service plan for the one-year contract period, Mr. Gamble completed the online purchase process and submitted his order.

231.   At no point was Mr. Gamble aware that Cox would bill him any additional monthly service charges. At no point in the online purchase process did Mr. Gamble see any mention of the existence of additional monthly service charges such as the Broadcast Surcharge or the Regional Sports Surcharge. Mr. Gamble also had no idea that Cox could, and would, increase the service rate during the promised one-year fixed-rate period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

232.   After his initial service agreement ended, Mr. Gamble entered into new term service agreements by calling Cox to ask for a new promotional offer that was subject to another term service agreement.

233.   Each time Mr. Gamble agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Gamble a particular monthly price for the service plan that was fixed for the duration of the service agreement, and Cox did not mention the Surcharges.

234.   Each time that Mr. Gamble entered into a new term service agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

235.   Each time, based on the sales agent's representations, Mr. Gamble reasonably believed that the monthly service price for his Cox service plan would not increase during the fixed-price period.

236.   At least once during the term of each of Mr. Gamble's service agreements from 2018 to 2021, Cox increased the price of his cable TV service by

raising the amount of the so-called Surcharges. The increases always occurred in February of each year.

237.   Mr. Gamble has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Gamble receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

238.   Mr. Gamble never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

239.   Mr. Gamble did not learn that Cox had been increasing his cable TV service rate mid-contract via increases to the Surcharges until it was brought to his attention by his counsel in October 2022.

240.   Each time Mr. Gamble committed to a term contract, he was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Mr. Gamble did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Gamble had known that information, he would not have been willing to pay as much for his services and would have acted differently.

241.   Mr. Gamble suffered damages during the term of his service agreements in the form of the *increases* to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

FIRST AMENDED
CLASS ACTION COMPLAINT

- 42 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**Plaintiff Kelly Gilliland**

242. Plaintiff Kelly Gilliland is, and at all relevant times has been, a citizen and resident of Lemon Grove, California.

243. Mr. Gilliland was a Cox cable TV subscriber for more than 10 years. Mr. Gilliland cancelled his cable TV service around 2020 when his last cable TV service agreement ended. Mr. Gilliland is still a Cox customer; he just no longer subscribes to cable TV.

244. Mr. Gilliland often entered into term service agreements with Cox. Typically, whenever one service agreement ended, he would call Cox to ask for a new promotional offer that was subject to another term service agreement.

245. In 2018, Mr. Gilliland entered into his last term service agreement that included cable TV. He entered into the service agreement when he called Cox and agreed to a new promotional offer that was subject to a 24-month service agreement. When Mr. Gilliland agreed to the promotional offer, the Cox sales agent quoted him a fixed price for the services for the duration of the service agreement.

246. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

247. Based on the sales agent's representations, Mr. Gilliland reasonably believed that the monthly service price for his Cox service plan would not increase during the fixed-price period.

248. Relying on the sales agent's representations, Mr. Gilliland accepted the promotional offer and agreed to the 24-month fixed-price service agreement.

249. During Mr. Gilliland's 24-month service agreement, Cox increased the price of his cable TV service *twice* by raising the amount of the so-called Surcharges. The first increase was in February 2019 and the second increase was in

FIRST AMENDED
CLASS ACTION COMPLAINT
- 43 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

February 2020.

250.   This was not the first time Cox had increased Mr. Gilliland's service rate in the middle of a promised fixed-rate period. Cox had been increasing Mr. Gilliland's service rate mid-contract ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Gilliland had not been aware that Cox had added these Surcharges, and he had not been aware that Cox had been quietly increasing them over the years—even in the middle of his purportedly fixed-rate contracts.

251.   Each time Mr. Gilliland agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Gilliland a particular monthly price for the service plan and did not mention the Surcharges.

252.   Each time that Mr. Gilliland entered into a new term service agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

253.   Mr. Gilliland has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Gilliland receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

254.   Mr. Gilliland never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

255.   Mr. Gilliland did not learn that Cox had been increasing his cable TV service rate mid-contract via increases to the Surcharges until it was brought to his

FIRST AMENDED
CLASS ACTION COMPLAINT
- 44 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

attention by his counsel in October 2022.

256.  Each time Mr. Gilliland committed to a term contract, he was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Mr. Gilliland did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Gilliland had known that information, he would not have been willing to pay as much for his services and would have acted differently.

257.  Mr. Gilliland suffered damages during the term of his service agreements in the form of the ***increases*** to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Brian Hargett**

258.  Plaintiff Brian Hargett is, and at all relevant times has been, a citizen and resident of San Diego, California.

259.  Mr. Hargett has been a Cox cable TV subscriber for at least 10 years. During this time, Mr. Hargett often entered into term service agreements. Typically, whenever one service agreement ended, he would visit his local Cox store and ask for a new promotional offer that was subject to another term service agreement.

260.  Each time Mr. Hargett agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Hargett a particular monthly price for the service plan and did not mention the Surcharges.

261.  Each time that Mr. Hargett entered into a new term service agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

262.  Each time, based on the sales agent's representations, Mr. Hargett reasonably believed that the monthly service price for his Cox service plan would

FIRST AMENDED
CLASS ACTION COMPLAINT
- 45 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1   not increase during the fixed-price period.

2      263.   At least once during each of Mr. Hargett's service agreements from

3   2016 to 2021, Cox increased the price of his cable TV service by raising the amount

4   of the so-called Surcharges. The increases always occurred in February of each

5   year.

6      264.   Mr. Hargett has been signed up for electronic billing and Cox's

7   automatic payment program, EasyPay, for the past few years, as Cox encouraged

8   him to do. Through this billing process, Mr. Hargett receives a monthly Cox billing

9   email which states his bill total and informs him that his bill will be automatically

10   paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay

11   program discourages customers from reviewing their monthly bill. And, because

12   Cox's billing emails only state the bill total, customers cannot tell from the email

13   itself that Cox has increased their monthly service rate by increasing the Broadcast

14   Surcharge and Regional Sports Surcharge.

15      265.   Mr. Hargett never noticed that Cox had increased the amounts of the

16   Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

17      266.   Mr. Hargett did not learn that Cox had been increasing his cable TV

18   service rate mid-contract via increases to the Surcharges until it was brought to his

19   attention by his counsel in October 2022.

20      267.   Each time Mr. Hargett committed to a term contract, he was relying on

21   Cox's explicit representations regarding the fixed monthly rate under the term

22   contract. Mr. Hargett did not expect (and Cox did not tell him) that each year Cox

23   would in fact covertly increase the monthly service rate in the middle of his

24   supposedly fixed-rate contract via increases to the disguised monthly service

25   charges which it labeled the Broadcast Surcharge and the Regional Sports

26   Surcharge. That information would have been material to him. If Mr. Hargett had

27   known that information, he would not have been willing to pay as much for his

28   services and would have acted differently.

268.   Mr. Hargett suffered damages during the term of his service agreements in the form of the *increases* to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Adrienne Jackson**

269.   Plaintiff Adrienne Jackson is, and at all relevant times has been, a citizen and resident of San Diego, California.

270.   Ms. Jackson has been a Cox cable TV subscriber for at least 5 years. During this time, Ms. Jackson often entered into term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement.

271.   Around April 2021, Ms. Jackson entered into her last term service agreement under which she was charged the Surcharges. She entered into the service agreement when she called Cox and agreed to a new promotional offer that was subject to a 12-month service agreement.

272.   When Ms. Jackson agreed to the new promotional offer, the Cox sales agent quoted her a fixed price on her Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

273.   Based on the sales agent's representations, Ms. Jackson reasonably believed that the monthly service price for her Cox service plan would not increase during the fixed-price period.

274.   Relying on the sales agent's representations, Ms. Jackson accepted the promotional offer and agreed to the 12-month fixed-price service agreement.

275.   During Ms. Jackson's 12-month service agreement, Cox increased the price of her cable TV service once, in February 2022, by raising the amount of the

FIRST AMENDED
CLASS ACTION COMPLAINT

- 47 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    so-called Surcharges.

2        276.   This was not the first time Cox had increased Ms. Jackson's service

3    rate in the middle of a promised fixed-rate period. Cox had been increasing Ms.

4    Jackson's service rate mid-contract ever since she first signed up for services years

5    ago. Ms. Jackson had not been aware that Cox had added these Surcharges, and she

6    had not been aware that Cox had been quietly increasing them over the years—even

7    in the middle of her purportedly fixed-rate contracts.

8        277.   Each time Ms. Jackson agreed to a new promotional offer and entered

9    into a new term service agreement, Cox quoted Ms. Jackson a particular monthly

10   price for the service plan and did not mention the Surcharges.

11       278.   Each time that Ms. Jackson entered into a new term service agreement,

12   Cox did not disclose to her that the monthly price could, and would, increase during

13   the contract period as a result of increases to the Surcharges.

14       279.   Ms. Jackson never noticed that Cox had increased the amounts of the

15   Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

16       280.   Ms. Jackson did not learn that Cox had been increasing her cable TV

17   service rate mid-contract via increases to the Surcharges until it was brought to her

18   attention by her counsel in October 2022.

19       281.   Each time Ms. Jackson committed to a term contract, she was relying

20   on Cox's explicit representations regarding the fixed monthly rate under the term

21   contract. Ms. Jackson did not expect (and Cox did not tell her) that each year Cox

22   would in fact covertly increase the monthly service rate in the middle of her

23   supposedly fixed-rate contract via increases to the disguised monthly service

24   charges which it labeled the Broadcast Surcharge and the Regional Sports

25   Surcharge. That information would have been material to her. If Ms. Jackson had

26   known that information, she would not have been willing to pay as much for her

27   services and would have acted differently.

28       282.   Ms. Jackson suffered damages during the term of her service

agreements in the form of the ***increases*** to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Lyssa Jordan**

283.   Plaintiff Lyssa Jordan is, and at all relevant times has been, a citizen and resident of Spring Valley, California.

284.   Ms. Jordan has been a Cox cable TV subscriber for at least 15 years. During this time, Ms. Jordan often entered into term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement.

285.   Each time Ms. Jordan agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Ms. Jordan a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. Each time, the Cox sales agent did not disclose to her that the monthly price could, and would, increase during the contract as a result of increases to the Surcharges.

286.   Each time, based on the sales agent's representations, Ms. Jordan reasonably believed that the monthly service price for her Cox service plan would not increase during the fixed-price period.

287.   Each time, relying on the sales agent's representations, Ms. Jordan accepted the promotional offer and agreed to the fixed-price term service agreement.

288.   At least once during each of Ms. Jordan's service agreements from 2016 to 2021, Cox increased the price of her cable TV service by raising the amount of the so-called Surcharges. The increases always occurred in February of each year.

289.   Ms. Jordan has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged

her to do. Through this billing process, Ms. Jordan receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

290.   Ms. Jordan never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

291.   Ms. Jordan did not learn that Cox had been increasing her cable TV service rate mid-contract via increases to the Surcharges until it was brought to her attention by her counsel in October 2022.

292.   Each time Ms. Jordan committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Jordan did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Jordan had known that information, she would not have been willing to pay as much for her services and would have acted differently.

293.   Ms. Jordan suffered damages during the term of her service agreements in the form of the *increases* to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Wayne Kalayjian**

294.   Plaintiff Wayne Kalayjian is, and at all relevant times has been, a citizen and resident of Palos Verdes Estates, California.

295.   Mr. Kalayjian has been a Cox cable TV subscriber for at least 15

years. During this time, Mr. Kalayjian often entered into term service agreements. Typically, whenever one service agreement ended, he would call Cox to ask for a new promotional offer that was subject to another term service agreement.

296.   Mr. Kalayjian entered into a 24-month service agreement around November 2020 when he agreed to a new promotional offer over the phone with Cox. When Mr. Kalayjian agreed to the new promotional offer, the Cox sales agent quoted him a fixed price on his Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

297.   Based on the sales agent's representations, Mr. Kalayjian reasonably believed that the monthly service price for his Cox service plan would not increase during the fixed-price period.

298.   Relying on the sales agent's representations, Mr. Kalayjian accepted the promotional offer and agreed to the 24-month fixed-price service agreement.

299.   During Mr. Kalayjian's 24-month service agreement, Cox increased the price of his cable TV service *twice* by raising the amount of the so-called Surcharges. The first increase was in February 2021 and the second increase was in February 2022.

300.   This was not the first time Cox had increased Mr. Kalayjian's service rate in the middle of a promised fixed-rate period. Cox had been increasing Mr. Kalayjian's service rate mid-contract ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Kalayjian had not been aware that Cox had added these Surcharges, and he had not been aware that Cox had been quietly increasing them over the years—even in the

FIRST AMENDED
CLASS ACTION COMPLAINT

- 51 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1   middle of his purportedly fixed-rate contracts.

2       301.   Each time Mr. Kalayjian agreed to a new promotional offer and

3   entered into a new term service agreement, Cox quoted Mr. Kalayjian a particular

4   monthly price for the service plan and did not mention the Surcharges.

5       302.   Each time that Mr. Kalayjian entered into a new term service

6   agreement, Cox did not disclose to him that the monthly price could, and would,

7   increase during the contract period as a result of increases to the Surcharges.

8       303.   Mr. Kalayjian has been signed up for electronic billing and Cox's

9   automatic payment program, EasyPay, for the past few years, as Cox encouraged

10  him to do. Through this billing process, Mr. Kalayjian receives a monthly Cox

11  billing email which states his bill total and informs him that his bill will be

12  automatically paid by the payment due date because he is signed up for EasyPay.

13  Cox's EasyPay program discourages customers from reviewing their monthly bill.

14  And, because Cox's billing emails only state the bill total, customers cannot tell

15  from the email itself that Cox has increased their monthly service rate by increasing

16  the Broadcast Surcharge and Regional Sports Surcharge.

17      304.   Mr. Kalayjian never noticed that Cox had increased the amounts of the

18  Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

19      305.   Mr. Kalayjian did not learn that Cox had been increasing his cable TV

20  service rate mid-contract via increases to the Surcharges until it was brought to his

21  attention by his counsel in September 2022.

22      306.   Each time Mr. Kalayjian committed to a term contract, he was relying

23  on Cox's explicit representations regarding the fixed monthly rate under the term

24  contract. Mr. Kalayjian did not expect (and Cox did not tell him) that each year Cox

25  would in fact covertly increase the monthly service rate in the middle of his

26  supposedly fixed-rate contract via increases to the disguised monthly service

27  charges which it labeled the Broadcast Surcharge and the Regional Sports

28  Surcharge. That information would have been material to him. If Mr. Kalayjian had

1   known that information, he would not have been willing to pay as much for his

2   services and would have acted differently.

3       307.   Mr. Kalayjian suffered damages during the term of his service

4   agreements in the form of the *increases* to his purportedly fixed monthly service

5   rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

6   **Plaintiff Jennifer Klat**

7       308.   Plaintiff Jennifer Klat is, and at all relevant times has been, a citizen

8   and resident of San Diego, California.

9       309.   Ms. Klat has been a Cox cable TV subscriber for at least 4 years.

10   Ms. Klat first signed up for Cox services at the end of 2017 through Cox's website.

11       310.   After browsing Cox's various service plans on the Cox website,

12   Ms. Klat selected one of Cox's internet and cable TV service plan bundles. On the

13   offer webpage for the internet and cable TV service plan, Cox prominently

14   advertised the plan as having a fixed monthly rate for 24 months subject to a term

15   service agreement.

16       311.   Based on these representations, Ms. Klat selected the service plan and

17   initiated the online order process.

18       312.   As Ms. Klat went through the online order process, she viewed Cox's

19   repeated representations that the monthly charges for the service plan would be the

20   same fixed rate for 24 months. Nowhere during the online order process did Cox

21   indicate that Cox could, and would, increase the monthly service rate mid-contract

22   via increases to additional disguised monthly service charges.

23       313.   Relying on Cox's repeated representations regarding the fixed monthly

24   price of the service plan for the two-year contract period, Ms. Klat completed the

25   online purchase process and submitted her order.

26       314.   At no point was Ms. Klat aware that Cox would bill her any additional

27   monthly service charges. At no point in the online purchase process did Ms. Klat

28   see any mention of the Broadcast Surcharge or the Regional Sports Surcharge.

Ms. Klat also had no idea that Cox could, and would, increase the service rate during the promised two-year fixed-rate period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

315. After her initial service agreement ended, Ms. Klat entered into at least one more term service agreement through Cox's website. Her experience entering into another service agreement was substantially similar to her initial sign up experience. Once again, she viewed Cox's repeated representations that the monthly charges for the service plan would be the same fixed rate for the duration of the contract term. Nowhere during the online order process did Cox indicate that Cox could, and would, increase the monthly service rate mid-contract via increases to additional disguised monthly service charges. Relying on Cox's repeated representations regarding the fixed monthly price of the service plan, Ms. Klat accepted the new promotional offer and entered into a new service agreement.

316. At least once during each of Ms. Klat's service agreements from 2018 to 2021, Cox increased the price of her cable TV service by raising the amount of the so-called Surcharges. The increases always occurred in February of each year.

317. Ms. Klat never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

318. Ms. Klat did not learn that Cox had been increasing her cable TV service rate mid-contract via increases to the Surcharges until it was brought to her attention by her counsel in September 2022.

319. Each time Ms. Klat committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Klat did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Klat had

known that information, she would not have been willing to pay as much for her services and would have acted differently.

320.   Ms. Klat suffered damages during the term of her service agreements in the form of the ***increases*** to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Nestor Mendez**

321.   Plaintiff Nestor Mendez is, and at all relevant times has been, a citizen and resident of San Marcos, California.

322.   Mr. Mendez was a Cox cable TV subscriber for 1 year, from late 2019 to late 2020. After his first service agreement ended in late 2020, he cancelled his cable TV service. Mr. Mendez is still a Cox customer; he just no longer subscribes to cable TV.

323.   Mr. Mendez initially signed up for Cox service at his local Cox retail store.

324.   When Mr. Mendez purchased his Cox service plan, the Cox store sales agent quoted him a one-year fixed price for the services, subject to a 12-month service agreement. At no point during the sign-up process did the agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the one-year price-locked period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

325.   Based on the sales agent's representations, Mr. Mendez reasonably believed that the monthly service price would not increase during the one-year fixed-price period.

326.   Relying on the sales agent's representations, Mr. Mendez accepted the promotional offer and agreed to the 12-month fixed-price service agreement.

327.   During Mr. Mendez's 12-month service agreement, Cox increased the price of his cable TV service once, in February 2020, by raising the amount of the

1   so-called Surcharges.

2   328.   When Mr. Mendez signed up for Cox service, he also signed up for

3   electronic billing and Cox's automatic payment program, EasyPay, as Cox

4   encouraged him to do. Through this billing process, Mr. Mendez receives a

5   monthly Cox billing email which states his bill total and informs him that his bill

6   will be automatically paid by the payment due date because he is signed up for

7   EasyPay. Cox's EasyPay program discourages customers from reviewing their

8   monthly bill. And, because Cox's billing emails only state the bill total, customers

9   cannot tell from the email itself that Cox has increased their monthly service rate by

10   increasing the Broadcast Surcharge and Regional Sports Surcharge.

11   329.   Mr. Mendez never noticed that Cox had increased the amounts of the

12   Broadcast Surcharge and Regional Sports Surcharge in the middle of his contract.

13   330.   Mr. Mendez did not learn that Cox had increased his cable TV service

14   rate mid-contract via increases to the Surcharges until it was brought to his attention

15   by his counsel in September 2022.

16   331.   When Mr. Mendez committed to a term contract, he was relying on

17   Cox's explicit representations regarding the fixed monthly rate under the term

18   contract. Mr. Mendez did not expect (and Cox did not tell him) that Cox would in

19   fact increase the monthly service rate in the middle of the contract via an increase to

20   the disguised monthly service charges which it labeled the Broadcast Surcharge and

21   the Regional Sports Surcharge. That information would have been material to him.

22   If Mr. Mendez had known that information, he would not have been willing to pay

23   as much for his services and would have acted differently.

24   332.   Mr. Mendez suffered damages during the term of his service

25   agreement in the form of the *increase* to his purportedly fixed monthly service rate

26   via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

27   **Plaintiff Stephen Metzger**

28   333.   Plaintiff Stephen Metzger was a citizen and resident of Mission Viejo,

FIRST AMENDED
CLASS ACTION COMPLAINT
- 56 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

California, at all relevant times through May 2022. Mr. Metzger is currently a citizen and resident of Lake Forest, California.

334.  Mr. Metzger was a Cox cable TV subscriber for at least 6 years. Mr. Metzger cancelled his cable TV service in early 2021, switching to an internet-only plan with Cox. Then in May 2022, Mr. Metzger quit Cox altogether; he no longer receives any services from Cox.

335.  While he was a Cox subscriber, Mr. Metzger often entered into term service agreements. Typically, whenever one service agreement ended, he would call Cox to ask for a new promotional offer that was subject to another term service agreement.

336.  Until he cancelled his cable TV service in 2021, each time Mr. Metzger agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Metzger a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. Each time, the agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

337.  Each time, based on the sales agent's representations, Mr. Metzger reasonably believed that the monthly service price for his Cox service plan would not increase during the fixed-price period.

338.  Each time, relying on the sales agent's representations, Mr. Metzger accepted the promotional offer and agreed to the fixed-price term service agreement.

339.  At least once during each of Mr. Metzger's service agreements from 2016 to 2021, Cox increased the price of his cable TV service by raising the amount of the so-called Surcharges. The increases always occurred in February of each year.

FIRST AMENDED
CLASS ACTION COMPLAINT
- 57 -
**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

340.   Mr. Metzger was signed up for electronic billing and Cox's automatic payment program, EasyPay, for several years, as Cox encouraged him to do. Through this billing process, Mr. Metzger received a monthly Cox billing email which stated his bill total and informed him that his bill will be automatically paid by the payment due date because he was signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

341.   Mr. Metzger never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

342.   Mr. Metzger did not learn that Cox had increased his cable TV service rate mid-contract via increases to the Surcharges until it was brought to his attention by his counsel in September 2022.

343.   Each time Mr. Metzger committed to a term contract, he was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Mr. Metzger did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Metzger had known that information, he would not have been willing to pay as much for his services and would have acted differently.

344.   Mr. Metzger suffered damages during the term of his service agreements in the form of the ***increases*** to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff James Mills**

345.   Plaintiff James Mills is, and at all relevant times has been, a citizen

and resident of Escondido, California.

346.   Mr. Mills has been a Cox cable TV subscriber for at least 15 years. During this time, Mr. Mills often entered into term service agreements. Typically, whenever one service agreement ended, he would call Cox to ask for a new promotional offer that was subject to another term service agreement.

347.   Each time Mr. Mills agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Mills a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. Each time, the agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

348.   Each time, based on the sales agent's representations, Mr. Mills reasonably believed that the monthly service price for his Cox service plan would not increase during the fixed-price period.

349.   Each time, relying on the sales agent's representations, Mr. Mills accepted the promotional offer and agreed to the fixed-price term service agreement.

350.   At least once during each of Mr. Mills's service agreements from 2016 to 2022, Cox increased the price of his cable TV service by raising the amount of the so-called Surcharges. The increases always occurred in February of each year.

351.   Mr. Mills has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Mills receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email

FIRST AMENDED
CLASS ACTION COMPLAINT
- 59 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

352. Mr. Mills never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

353. Mr. Mills did not learn that Cox had been increasing his cable TV service rate mid-contract via increases to the Surcharges until it was brought to his attention by his counsel in September 2022.

354. Each time Mr. Mills committed to a term contract, he was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Mr. Mills did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Mills had known that information, he would not have been willing to pay as much for his services and would have acted differently.

355. Mr. Mills suffered damages during the term of his service agreements in the form of the ***increases*** to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Michael Mitchell**

356. Plaintiff Michael Mitchell is, and at all relevant times has been, a citizen and resident of Lemon Grove, California.

357. Mr. Mitchell has been a Cox cable TV subscriber since 2016. During this time, Mr. Mitchell often entered into term service agreements. Typically, whenever one service agreement ended, he would call Cox to ask for a new promotional offer that was subject to another term service agreement.

358. Mr. Mitchell entered into his most recent term service agreement around November 2021, when he agreed to a new promotional offer over the phone

with Cox. When Mr. Mitchell agreed to the new promotional offer, the Cox sales agent quoted him a fixed price on his Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

359.    Based on the sales agent's representations, Mr. Mitchell reasonably believed that the monthly service price for his Cox service plan would not increase during the fixed-price period.

360.    Relying on the sales agent's representations, Mr. Mitchell accepted the promotional offer and agreed to the fixed-price term service agreement.

361.    During Mr. Mitchell's term service agreement, Cox increased the price of his cable TV service once, in February 2022, by raising the amount of the so-called Surcharges.

362.    This was not the first time Cox had increased Mr. Mitchell's service rate in the middle of a promised fixed-rate period. Cox had been increasing Mr. Mitchell's service rate mid-contract ever since Cox first began charging him the Surcharges. Mr. Mitchell had not been aware that Cox had added these Surcharges, and he had not been aware that Cox had been quietly increasing them over the years—even in the middle of his purportedly fixed-rate contracts.

363.    Each time Mr. Mitchell agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Mitchell a particular monthly price for the service plan and did not mention the Surcharges.

364.    Each time that Mr. Mitchell entered into a new term service agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

365.    Mr. Mitchell has been signed up for electronic billing and Cox's

automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Mitchell receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

366.   Mr. Mitchell never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

367.   Mr. Mitchell did not learn that Cox had been increasing his cable TV service rate mid-contract via increases to the Surcharges until it was brought to his attention by his counsel in October 2022.

368.   Each time Mr. Mitchell committed to a term contract, he was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Mr. Mitchell did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Mitchell had known that information, he would not have been willing to pay as much for his services and would have acted differently.

369.   Mr. Mitchell suffered damages during the term of his service agreements in the form of the ***increases*** to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Rosa Montanez**

370.   Plaintiff Rosa Montanez is, and at all relevant times has been, a citizen and resident of Escondido, California.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

371.   Ms. Montanez has been a Cox cable TV subscriber since 2015. During this time, Ms. Montanez often entered into term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement.

372.   Ms. Montanez's Cox account is in her husband's name, Ivan Montanez. However, Ms. Montanez is an authorized user on the account, and she is the one who usually calls Cox to ask for a new promotional offer.

373.   Ms. Montanez entered into her most recent 12-month service agreement around September 2020, when she agreed to a new promotional offer over the phone with Cox. When Ms. Montanez agreed to the new promotional offer, the Cox sales agent quoted her a fixed price on her Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

374.   Based on the sales agent's representations, Ms. Montanez reasonably believed that the monthly service price for her Cox service plan would not increase during the fixed-price period.

375.   Relying on the sales agent's representations, Ms. Montanez accepted the promotional offer and agreed to the 12-month fixed-price service agreement.

376.   During Ms. Montanez's 12-month service agreement, Cox increased the price of her cable TV service once, in February 2021, by raising the amount of the so-called Surcharges.

377.   This was not the first time Cox had increased Ms. Montanez's service rate in the middle of a promised fixed-rate period. Cox had been increasing Ms. Montanez's service rate mid-contract ever since Ms. Montanez first signed up for Cox service in 2015 (at first, Cox just charged the Broadcast Surcharge at $3.00 a

month; then later, in 2017, Cox began charging the Regional Sports Surcharge, also at $3.00 a month).

378.   Ms. Montanez had not been aware that Cox had added these Surcharges, and she had not been aware that Cox had been quietly increasing them over the years—even in the middle of her purportedly fixed-rate contracts.

379.   Each time Ms. Montanez agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Ms. Montanez a particular monthly price for the service plan and did not mention the Surcharges.

380.   Each time that Ms. Montanez entered into a new term service agreement, Cox did not disclose to her that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

381.   Ms. Montanez never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

382.   Ms. Montanez did not learn that Cox had been increasing her cable TV service rate mid-contract via increases to the Surcharges until it was brought to her attention by her counsel in September 2022.

383.   Each time Ms. Montanez committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Montanez did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Montanez had known that information, she would not have been willing to pay as much for her services and would have acted differently.

384.   Ms. Montanez suffered damages during the term of her service agreements in the form of the *increases* to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Lauren Ramos**

385. Plaintiff Lauren Ramos is, and at all relevant times has been, a citizen and resident of San Pedro, California.

386. Ms. Ramos has been a Cox cable TV subscriber for at least 10 years. During this time, Ms. Ramos often entered into term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement.

387. Each time Ms. Ramos agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Ms. Ramos a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. Each time, the agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

388. Each time, based on the sales agent's representations, Ms. Ramos reasonably believed that the monthly service price for her Cox service plan would not increase during the fixed-price period.

389. Each time, relying on the sales agent's representations, Ms. Ramos accepted the promotional offer and agreed to the fixed-price term service agreement.

390. At least once during each of Ms. Ramos's service agreements from 2016 to 2021, Cox increased the price of her cable TV service by raising the amount of the so-called Surcharges. The increases always occurred in February of each year.

391. Ms. Ramos has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged her to do. Through this billing process, Ms. Ramos receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically

FIRST AMENDED
CLASS ACTION COMPLAINT
- 65 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay

2  program discourages customers from reviewing their monthly bill. And, because

3  Cox's billing emails only state the bill total, customers cannot tell from the email

4  itself that Cox has increased their monthly service rate by increasing the Broadcast

5  Surcharge and Regional Sports Surcharge.

6      392.  Ms. Ramos noticed the existence of the Surcharges on her bill in or

7  around 2018. At that time, Ms. Ramos called Cox customer service to ask what the

8  Surcharges were, but the customer service agent she spoke to could not give her a

9  clear answer and told her they were charges Ms. Ramos was required to pay if she

10 wanted to receive service. The agent did not inform or disclose to Ms. Ramos that

11 the Surcharges could, and would, be increased by Cox in the middle of her fixed-

12 rate contracts.

13     393.  Ms. Ramos never noticed that Cox had increased the amounts of the

14 Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

15     394.  Ms. Ramos did not learn that Cox had been increasing her cable TV

16 service rate mid-contract via increases to the Surcharges until it was brought to her

17 attention by her counsel in September 2022.

18     395.  Each time Ms. Ramos committed to a term contract, she was relying

19 on Cox's explicit representations regarding the fixed monthly rate under the term

20 contract. Ms. Ramos did not expect (and Cox did not tell her) that each year Cox

21 would in fact covertly increase the monthly service rate in the middle of her

22 supposedly fixed-rate contract via increases to the disguised monthly service

23 charges which it labeled the Broadcast Surcharge and the Regional Sports

24 Surcharge. That information would have been material to her. If Ms. Ramos had

25 known that information, she would not have been willing to pay as much for her

26 services and would have acted differently.

27     396.  Ms. Ramos suffered damages during the term of her service

28 agreements in the form of the ***increases*** to her purportedly fixed monthly service

1  rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

2  **Plaintiff Albert Renn**

3  397.   Plaintiff Albert Renn is, and at all relevant times has been, a citizen

4  and resident of San Diego, California.

5  398.   Mr. Renn has been a Cox cable TV subscriber for over 20 years.

6  During this time, Mr. Renn often entered into term service agreements. Typically,

7  whenever one service agreement ended, he would call Cox to ask for a new

8  promotional offer that was subject to another term service agreement.

9  399.   Around March 2020, Mr. Renn entered into his last term service

10  agreement that included the Surcharges. He entered into the service agreement

11  when he called Cox and agreed to a new promotional offer that was subject to a 24-

12  month service agreement. When Mr. Renn agreed to the new promotional offer, the

13  Cox sales agent quoted him a fixed price on his Cox services for the duration of the

14  service agreement. At no point during the phone call did the Cox sales agent

15  mention the existence or the amounts of the Broadcast Surcharge or Regional

16  Sports Surcharge. The sales agent also never mentioned that Cox could, and would,

17  increase the service rate during the fixed-price period by increasing the Broadcast

18  Surcharge and Regional Sports Surcharge.

19  400.   Based on the sales agent's representations, Mr. Renn reasonably

20  believed that the monthly service price for his Cox service plan would not increase

21  during the fixed-price period.

22  401.   Relying on the sales agent's representations, Mr. Renn accepted the

23  promotional offer and agreed to the 24-month fixed-price service agreement.

24  402.   During Mr. Renn's 24-month service agreement, Cox increased the

25  price of his cable TV service ***twice*** by raising the amount of the so-called

26  Surcharges. The first increase was in February 2021 and the second increase was in

27  February 2022.

28  403.   This was not the first time Cox had increased Mr. Renn's service rate

FIRST AMENDED
CLASS ACTION COMPLAINT                     - 67 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

in the middle of a promised fixed-rate period. Cox had been increasing Mr. Renn's service rate mid-contract ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Renn had not been aware that Cox had added these Surcharges, and he had not been aware that Cox had been quietly increasing them over the years—even in the middle of his purportedly fixed-rate contracts.

404.   Each time Mr. Renn agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Mr. Renn a particular monthly price for the service plan and did not mention the Surcharges.

405.   Each time that Mr. Renn entered into a new term service agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

406.   Mr. Renn has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Renn receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and Regional Sports Surcharge.

407.   Mr. Renn never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

408.   Mr. Renn did not learn that Cox had been increasing his cable TV service rate mid-contract via increases to the Surcharges until it was brought to his attention by his counsel in September 2022.

409.   Each time Mr. Renn committed to a term contract, he was relying on

FIRST AMENDED
CLASS ACTION COMPLAINT
- 68 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Cox's explicit representations regarding the fixed monthly rate under the term contract. Mr. Renn did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Renn had known that information, he would not have been willing to pay as much for his services and would have acted differently.

410.    Mr. Renn suffered damages during the term of his service agreements in the form of the *increases* to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Robynn Rowe**

411.    Plaintiff Robynn Rowe is, and at all relevant times has been, a citizen and resident of Santa Barbara, California.

412.    Ms. Rowe was a Cox cable TV subscriber for about 4 years, from 2016 to 2020. Ms. Rowe cancelled her cable TV service around September 2020 when her cable TV service agreement ended. Ms. Rowe is still a Cox customer; she just no longer has cable TV.

413.    While Ms. Rowe was a Cox cable TV subscriber, she entered into several term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement.

414.    Each time Ms. Rowe agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Ms. Rowe a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amount of the Broadcast Surcharge. Each time, the sales agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge.

415.   Each time, based on the sales agent's representations, Ms. Rowe reasonably believed that the monthly service price for her Cox service plan would not increase during the fixed-price period.

416.   Each time, relying on the sales agent's representations, Ms. Rowe accepted the promotional offer and agreed to the fixed-price term service agreement.

417.   At least once during each of Ms. Rowe's service agreements from 2016 to 2020, Cox increased the price of her cable TV service by raising the amount of the so-called Broadcast Surcharge. The increases always occurred in February of each year.

418.   Ms. Rowe did not learn that Cox had been increasing her cable TV service rate via the Broadcast Surcharge until 2020. Ms. Rowe called Cox at the end of her term contract in September 2020 to inquire about a new contract and to complain about increases to her bill including the Surcharge. Ms. Rowe decided to drop her cable TV service and to sign up for an internet-only service contract with Cox instead.

419.   Each time Ms. Rowe committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Rowe did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via an increase to the disguised monthly service charge which it labeled the Broadcast Surcharge. That information would have been material to her. If Ms. Rowe had known that information, she would not have been willing to pay as much for her services and would have acted differently.

420.   Ms. Rowe suffered damages during the term of her service agreements in the form of the *increases* to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge.

FIRST AMENDED
CLASS ACTION COMPLAINT

- 70 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**Plaintiff Patricia Salvacion**

421. Plaintiff Patricia Salvacion is, and at all relevant times has been, a citizen and resident of Chula Vista, California.

422. Ms. Salvacion has been a Cox cable TV subscriber for more than 20 years. During this time, Ms. Salvacion often entered into term service agreements. Typically, whenever one service agreement ended, she would call Cox to ask for a new promotional offer that was subject to another term service agreement.

423. Each time Ms. Salvacion agreed to a new promotional offer and entered into a new term service agreement, Cox quoted Ms. Salvacion a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amount of the Broadcast Surcharge. Each time, the agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge.

424. Each time, based on the sales agent's representations, Ms. Salvacion reasonably believed that the monthly service price for her Cox service plan would not increase during the fixed-price period.

425. Each time, relying on the sales agent's representations, Ms. Salvacion accepted the promotional offer and agreed to the fixed-price term service agreement.

426. At least once during each of Ms. Salvacion's service agreements from 2016 to 2021, Cox increased the price of her cable TV service by raising the amount of the so-called Broadcast Surcharge. The increases always occurred in February of each year.

427. Ms. Salvacion never noticed that Cox had increased the amount of the Broadcast Surcharge in the middle of her contracts.

428. Ms. Salvacion did not learn that Cox had been increasing her cable TV service rate mid-contract via increases to the Broadcast Surcharge until it was brought to her attention by her counsel in October 2022.

FIRST AMENDED
CLASS ACTION COMPLAINT
- 71 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

429.   Each time Ms. Salvacion committed to a term contract, she was relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. Ms. Salvacion did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via an increase to the disguised monthly service charge which it labeled the Broadcast Surcharge. That information would have been material to her. If Ms. Salvacion had known that information, she would not have been willing to pay as much for her services and would have acted differently.

430.   Ms. Salvacion suffered damages during the term of her service agreements in the form of the ***increases*** to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge.

**Plaintiff Robert Tice**

431.   Plaintiff Robert Tice is, and at all relevant times has been, a citizen and resident of Chula Vista, California.

432.   Mr. Tice was a Cox cable TV subscriber for 2 years, from late-2017 to late-2019. After his first service agreement ended in late-2019, Mr. Tice cancelled his cable TV service. Mr. Tice is still a Cox customer; he just no longer subscribes to cable TV.

433.   Mr. Tice initially signed up for Cox service at his local Cox store.

434.   When Mr. Tice purchased his Cox cable TV service plan, the Cox sales agent quoted him a two-year fixed price for the services, subject to a 24-month service agreement. At no point during the sign-up process did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the two-year price-locked period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

435.   Based on the sales agent's representations, Mr. Tice reasonably believed that the monthly service price would not increase during the two-year

1  fixed-price period.

2      436.   Relying on the sales agent's representations, Mr. Tice accepted the

3  promotional offer and agreed to the 24-month fixed-price service agreement.

4      437.   During Mr. Tice's 24-month service agreement, Cox increased the

5  price of his cable TV service *twice* by raising the amount of the so-called

6  Surcharges. The first increase was in February 2018 and the second increase was in

7  February 2019.

8      438.   When Mr. Tice signed up for Cox service, he also signed up for

9  electronic billing and Cox's automatic payment program, EasyPay, as Cox

10  encouraged him to do. Through this billing process, Mr. Tice receives a monthly

11  Cox billing email which states his bill total and informs him that his bill will be

12  automatically paid by the payment due date because he is signed up for EasyPay.

13  Cox's EasyPay program discourages customers from reviewing their monthly bill.

14  And, because Cox's billing emails only state the bill total, customers cannot tell

15  from the email itself that Cox has increased their monthly service rate by increasing

16  the Broadcast Surcharge and Regional Sports Surcharge.

17      439.   Mr. Tice did not learn that Cox had been increasing his cable TV

18  service rate mid-contract via increases to the Surcharges until the end of his 24-

19  month service agreement. When he learned about the increases, he tried to call Cox

20  but was put on hold indefinitely until he eventually hung up. Mr. Tice cancelled his

21  cable TV service at the end of his service agreement and switched to an internet-

22  only service plan with Cox.

23      440.   When Mr. Tice committed to a term contract for cable TV service, he

24  was relying on Cox's explicit representations regarding the fixed monthly rate. Mr.

25  Tice did not expect (and Cox did not tell him) that each year Cox would in fact

26  covertly increase the monthly service rate in the middle of his supposedly fixed-rate

27  contract via increases to the disguised monthly service charges which it labeled the

28  Broadcast Surcharge and the Regional Sports Surcharge. That information would

---

FIRST AMENDED
CLASS ACTION COMPLAINT

- 73 -

have been material to him. If Mr. Tice had known that information, he would not have been willing to pay as much for his services and would have acted differently.

441.   Mr. Tice suffered damages during the term of his service agreement in the form of the *increases* to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiffs John Wiley and Stephanie Wiley**

442.   Plaintiffs John Wiley and Stephanie Wiley are, and at all relevant times have been, citizens and residents of Santa Barbara, California.

443.   The Wileys have been Cox cable TV subscribers for more than 20 years. During this time, they often entered into term service agreements. Typically, whenever one service agreement ended, they would call Cox to ask for a new promotional offer that was subject to another term service agreement. Although their Cox account is in John Wiley's name, Stephanie Wiley is the one who usually calls Cox to ask for a new promotional offer.

444.   The Wileys' most recent service agreement was in 2019, which they entered into when they agreed to a new promotional offer over the phone with Cox. When the Wileys agreed to the new promotional offer, the Cox sales agent quoted them a fixed price on their Cox services for the duration of the 24-month service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

445.   Based on the sales agent's representations, the Wileys reasonably believed that the monthly service price for their Cox service plan would not increase during the 24-month fixed-price period.

446.   Relying on the sales agent's representations, the Wileys accepted the promotional offer and agreed to the 24-month fixed-price service agreement.

FIRST AMENDED
CLASS ACTION COMPLAINT
- 74 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

447.  During the Wileys' term service agreement, Cox increased the price of their cable TV service at least once by raising the amount of the so-called Surcharges.

448.  This was not the first time Cox had increased the Wileys' service rate in the middle of a promised fixed-rate period. Cox had been increasing the Wileys' service rate mid-contract ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month).

449.  The Wileys had not been aware that Cox had added these Surcharges, and had not been aware that Cox had been quietly increasing the Surcharges over the years—even in the middle of their purportedly fixed-rate contracts.

450.  Each time the Wileys agreed to a new promotional offer and entered into a new term service agreement, Cox quoted them a particular monthly price for the service plan and did not mention the Surcharges.

451.  Each time the Wileys entered into a new term service agreement, Cox did not disclose to them that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

452.  The Wileys never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of their contracts.

453.  The Wileys did not learn that Cox had been increasing their cable TV service rate mid-contract via increases to the Surcharges until it was brought to their attention by their counsel in October 2022.

454.  Each time the Wileys committed to a term contract, they were relying on Cox's explicit representations regarding the fixed monthly rate under the term contract. They did not expect (and Cox did not tell them) that each year Cox would in fact covertly increase the monthly service rate in the middle of their supposedly fixed-rate contract via increases to the disguised monthly service charges which it

labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to them. If the Wileys had known that information, they would not have been willing to pay as much for their services and would have acted differently.

455.   The Wileys suffered damages during the term of their service agreements in the form of the ***increases*** to their purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

## CLASS ALLEGATIONS

456.   Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

457.   All 29 Plaintiffs seek to represent the following "**California Class**":

> **All individual consumers who entered into a term contract for Cox cable TV service in California where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

458.   Plaintiffs Daniel Polinsky, James Gamble, and Jennifer Klat also seek to represent the following "**California Online Signup Subclass**":

> **All individual consumers who signed up online on Cox's website for a term contract for Cox cable TV service in California where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

459.   Plaintiff Daniel Polinsky also seeks to represent the following "**Nevada Class**":

> **All individual consumers who entered into a term contract for Cox cable TV service in Nevada where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

FIRST AMENDED
CLASS ACTION COMPLAINT
- 76 -
**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

460. Plaintiff Daniel Polinsky also seeks to represent the following **"Nevada Online Signup Subclass"**:

> **All individual consumers who signed up online on Cox's website for a term contract for Cox cable TV service in Nevada where Cox increased the amount of the "Broadcast Surcharge" and/or the "Regional Sports Surcharge" in the middle of the contract.**

461. *This Court should apply the **discovery rule** to extend any applicable limitations period (and the corresponding class period) for each class and subclass to the date on which Cox first engaged in its practice of increasing the Broadcast Surcharge and the Regional Sports Surcharge in the middle of a term contract.* The nature of Cox's misconduct was non-obvious and intentionally concealed from its cable TV subscribers. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Classes could have, through the use of reasonable diligence, learned of the accrual of their claims against Cox at an earlier time.

462. Specifically excluded from the Classes are Cox and any entities in which Cox has a controlling interest, Cox's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

463. ***Numerosity***. The number of members of each Class are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of class members of each Class prior to discovery. However, based on information and belief, each Class comprises tens of thousands of individuals. The exact number and identities of Class members are contained in Cox's records and can be easily ascertained from those records.

464. ***Commonality and Predominance***. This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions

FIRST AMENDED
CLASS ACTION COMPLAINT

- 77 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    predominate over any questions affecting individual Class members, if any. These

2    common questions include, but are not limited to, the following:

3           a.      Whether Cox employed a uniform policy of charging the

4    Broadcast Surcharge and the Regional Sports Surcharge to its customers who

5    subscribed to cable TV service;

6           b.      What is the nature or purpose of the Broadcast Surcharge;

7           c.      What is the nature or purpose of the Regional Sports Surcharge;

8           d.      Whether the Broadcast Surcharge is a monthly service fee for

9    providing cable TV service;

10          e.      Whether the Regional Sports Surcharge is a monthly service fee

11   for providing cable TV service;

12          f.      Whether increases to the Broadcast Surcharge and the Regional

13   Sports Surcharge are increases to the monthly service price;

14          g.      Whether Cox offered term contracts where Cox promised that

15   the monthly service price would be fixed during the term contract;

16          h.      Whether Cox advertised and represented to customers that the

17   monthly service price for Cox's cable TV service plans was fixed during the term

18   contract;

19          i.      Whether Cox's policy and practice of increasing the monthly

20   service price mid-contract via increases to the Broadcast Surcharge and the

21   Regional Sports Surcharge is material information, such that a reasonable consumer

22   would find that information important to the consumer's purchase decision;

23          j.      Whether Cox's policy and practice of advertising and

24   representing that the prices of its service plans were fixed and would not increase

25   during a term contract—when in fact Cox intended to, and did, increase service

26   prices during that period by increasing the Broadcast Surcharge and the Regional

27   Sports Surcharge—is false, deceptive, or misleading;

28          k.      Whether it was a breach of contract for Cox to increase the

FIRST AMENDED                           - 78 -                    HATTIS & LUKACS
CLASS ACTION COMPLAINT                                            11711 SE 8th Street, Suite 120
                                                                 Bellevue, WA 98005
                                                                 www.hattislaw

monthly service price mid-contract by increasing the Broadcast Surcharge and the Regional Sports Surcharge;

l.     Whether it was a breach of the covenant of good faith and fair dealing for Cox to increase the monthly service price mid-contract by increasing the Broadcast Surcharge and the Regional Sports Surcharge;

m.     For the California Classes: Whether Cox's misrepresentations and misconduct alleged herein violated California Civil Code § 1750 *et seq.* (CLRA), California Business & Professions Code § 17500 *et seq.* (FAL), and California Business & Professions Code § 17200 *et seq.* (UCL); and

n.     For the Nevada Classes: Whether Cox's misrepresentations and misconduct alleged herein violated the Nevada Deceptive Trade Practices Act (NDTPA), NRS Chapter 598.

465.   ***Typicality***. Plaintiffs' claims are typical of Class members' claims. Plaintiffs and Class members all sustained injury as a direct result of Cox's standard practices and schemes, bring the same claims, and face the same potential defenses.

466.   ***Adequacy***. Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Classes. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

467.   ***Superiority***. A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Cox's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would

also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

468.   By its conduct and omissions alleged herein, Cox has acted and refused to act on grounds that apply generally to the Classes, such that declaratory relief is appropriate respecting the Classes as a whole.

469.   Cox is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox that consist of representations of fact about Cox's business operations or services that is or was made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in, Cox's services or the statement is or was made in the course of delivering Cox's services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox for which the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statements to, or otherwise influence, an actual or potential buyer or customer.

## CAUSES OF ACTION

### COUNT I
**Violation of the Consumers Legal Remedies Act**
**California Civil Code § 1750 *et seq*.**

470.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

471.   All 29 Plaintiffs bring this cause of action in their individual capacities and as representatives of the California Class. Plaintiffs Daniel Polinsky, James Gamble, and Jennifer Klat also bring this cause of action as representatives of the California Online Signup Subclass.

472.   Defendants are each a "person," as defined by Cal. Civ. Code

FIRST AMENDED
CLASS ACTION COMPLAINT
- 80 -
**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1   § 1761(c).

2       473.   Plaintiffs and the members of the California Classes are each

3   "consumers," as defined by Cal. Civ. Code §1761(d).

4       474.   Cox's cable TV service plans—including service plans that "bundle"

5   television with other services such as internet, phone, and/or home security—are

6   "services," as defined by Cal. Civ. Code § 1761(b).

7       475.   The purchase of a Cox cable TV service plan by each Plaintiff is a

8   "transaction," as defined by Cal. Civ. Code § 1761(e).

9       476.   Each Plaintiff purchased Cox's cable TV service plans for personal,

10   family, and/or household purposes, as meant by Cal. Civ. Code § 1761(d).

11       477.   Venue is proper under Cal. Civil Code § 1780(d) because a substantial

12   portion of the transactions at issue occurred in this county. Plaintiffs' declarations

13   establishing that this Court is a proper venue for this action are attached hereto as

14   **Exhibit A.**

15       478.   By its conduct and omissions alleged herein, Cox has committed

16   unlawful methods, acts or practices, including:

17           a.      Misrepresenting that the prices of its cable TV service plans are

18   fixed and will not increase during the contract term, despite Cox's pattern and

19   practice of increasing service prices mid-contract by raising the Broadcast

20   Surcharge and the Regional Sports Surcharge; and

21           b.      Increasing the Broadcast Surcharge and Regional Sports

22   Surcharge on customers in the middle of promised fixed-rate contracts.

23       479.   The unlawful methods, acts or practices alleged herein to have been

24   undertaken by Cox were all committed intentionally and knowingly. The unlawful

25   methods, acts or practices alleged herein to have been undertaken by Cox did not

26   result from a bona fide error notwithstanding the use of reasonable procedures

27   adopted to avoid such error.

28

480.   Cox's conduct alleged herein has violated the CLRA in multiple respects, including, but not limited to, the following:

a.   Cox represented that its cable TV service plans had characteristics that they did not have (Cal. Civ. Code § 1770(a)(5));

b.   Cox advertised its cable TV service plans with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

c.   Cox made false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions. (Cal. Civ. Code § 1770(a)(13));

d.   Cox misrepresented that its cable TV service plans were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

e.   Cox inserted unconscionable provisions in its consumer agreements, including, but not limited to, an arbitration clause which impairs the ability of customers to enforce their legal rights including their ability to bring arbitrations, in violation of California law (Cal. Civ. Code § 1770(a)(19)).

481.   With respect to any omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and the members of the California Classes; (b) Cox concealed material information from Plaintiffs and the members of the California Classes; and (c) Cox made partial representations, including regarding the supposedly fixed monthly rate of its service plans, which were false and misleading absent the omitted information.

482.   Cox's misrepresentations deceive and have a tendency to deceive the general public.

483.   Cox's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

FIRST AMENDED
CLASS ACTION COMPLAINT

- 82 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

484.   Plaintiffs and the members of the California Classes reasonably relied on Cox's material misrepresentations, and would not have purchased, or would have paid less money for, Cox's cable TV service plans had they known the truth.

485.   As a direct and proximate result of Cox's violations of the CLRA, Plaintiffs and the members of the California Classes have been harmed and lost money or property.

486.   Cox's conduct has caused substantial injury to Plaintiffs and the members of the California Classes.

487.   Cox's misconduct is ongoing with regard to members of the California Classes who are under term contracts that are still subject to the Broadcast Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiffs seek an order enjoining Cox from charging members of the California Classes who are in fixed-rate contracts any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

488.   Cox's false advertising, misrepresentations, and omissions, even if they were to cease, are capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, each Plaintiff seeks a permanent public injunction against Cox under the CLRA to protect the general public from Cox's false advertisements, misrepresentations, and omissions. Specifically, each Plaintiff seeks a permanent public injunction against Cox as follows: (1) an order enjoining Cox from falsely advertising the prices of its service plans to members of the general public; (2) an order enjoining Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary monthly service charges or fees; and (3) an order enjoining Cox from advertising fixed-rate promotional or contract periods when in fact Cox may increase the service price during the fixed-rate period by imposing or increasing discretionary monthly service charges or fees.

FIRST AMENDED
CLASS ACTION COMPLAINT
- 83 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

489.   Plaintiffs lack an adequate remedy at law to prevent Cox's unlawful false advertising practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Plaintiffs desire and intend to sign up for different Cox service plans in the future if they are within Cox's service area and/or to sign up for another fixed-price promotional period or contract in the future. However, Plaintiffs want to be confident that the advertised and quoted price for Cox's service plans is the true and full price for the services. Plaintiffs also want to be confident that Cox is not going to increase the service price during any promised fixed-rate period by imposing or increasing discretionary monthly service charges. And, if Cox introduces any new discretionary monthly service charge, Plaintiffs want to be confident that Cox will include the amount of that service charge in the advertised and quoted service plan price. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Cox's representations are accurate and whether there are omissions of material facts regarding the service plans being advertised and represented to them.

490.   Monetary damages are not an adequate remedy at law for *future* harm for the following reasons, without limitation: First, damages are not an adequate remedy for future harm because they will not prevent Cox from perpetrating the unlawful conduct. Second, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) what service plan(s) Plaintiffs may want or need in the future; (2) what Cox's future disguised service fees will be, and how much they will be increased mid-contract; or (3) how many months Plaintiffs would subscribe to such services. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. Third, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with

FIRST AMENDED
CLASS ACTION COMPLAINT
- 84 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  future lawsuits by the general public, members of the Classes, and Plaintiffs for
2  future violations of the law by Cox.

3      491.   In accordance with California Civil Code § 1782(a), Plaintiffs, through
4  counsel, served Cox with notice of its CLRA violations by USPS certified mail,
5  return receipt requested on August 30, 2022.

6      492.   The letter was sent on behalf of Plaintiffs Donald Christianson, Isabel
7  Prado, Neil Moura, and Daniel Polinksy and for the benefit of a class of similarly
8  situated California consumers. The letter demanded that Cox: "(1) return all the
9  money that Cox California customers have paid in mid-contract price increases to
10  the Broadcast Surcharge and the Regional Sports Surcharge; and (2) stop charging
11  Cox California customers who are in fixed-rate contracts that are still subject to the
12  Surcharges, any amounts for the Surcharges that are higher than the initial rates of
13  the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the
14  start of their contracts."

15      493.   Cox has refused to undertake or provide the required actions or
16  corrections required by California Civil Code § 1782(c) for alleged class-wide
17  CLRA violations, and thus an action for damages on behalf of all Plaintiffs and the
18  members of the California Classes may now be maintained. Specifically, Cox has
19  failed to undertake the corrective actions specified in California Civil Code §
20  1782(c), including by: (1) not identifying, or making a reasonable effort to identify,
21  similarly situated consumers; (2) not notifying or offering to notify similarly
22  situated consumers that upon their request Cox will make the appropriate
23  correction, repair, replacement, or other remedy of the services; (3) not giving or
24  indicating that it will give appropriate remedies to similarly situated consumers at
25  their request; and (4) not ceasing to charge Cox California customers who are in
26  fixed-rate contracts still subject to the Surcharges, any amounts for the Surcharges
27  that are higher than the initial rates of the Broadcast Surcharge and Regional Sports
28  Surcharge that were in effect at the start of their contracts.

FIRST AMENDED
CLASS ACTION COMPLAINT
- 85 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

494.   Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiffs and the members of the California Classes are entitled to recover actual damages, attorneys' fees and costs, and any other relief the Court deems proper for Cox's CLRA violations.

495.   Each Plaintiff hereby rejects any unilateral non-class-wide attempt by Cox to provide the Plaintiff with a refund or reimbursement for past payments of the Surcharges, which Cox makes in an attempt to pick the Plaintiff off individually from this class action. For example, each Plaintiff hereby prophylactically rejects any attempt by Cox to unilaterally provide the Plaintiff with an individual bill credit for the Surcharges.

## COUNT II

### Violation of California's False Advertising Law
### California Business and Professions Code § 17500 *et seq.*

496.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

497.   All 29 Plaintiffs bring this cause of action in their individual capacities and as representatives of the California Class. Plaintiffs Daniel Polinsky, James Gamble, and Jennifer Klat also bring this cause of action as representatives of the California Online Signup Subclass.

498.   By its conduct and omissions alleged herein, Cox has committed acts of untrue or misleading advertising, as defined by and in violation of California Business & Professions Code § 17500, *et seq.*, also known as California's False Advertising Law ("FAL"). These acts include misrepresenting that the prices of its cable TV service plans are fixed and will not increase during the contract term, despite Cox's pattern and practice of increasing service prices mid-contract by raising the Broadcast Surcharge and the Regional Sports Surcharge.

499.   With respect to omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive

FIRST AMENDED
CLASS ACTION COMPLAINT

- 86 -

HATTIS & LUKACS
11711 SE 8ᵗʰ Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

knowledge of material information that was not known to Plaintiffs and the members of the California Classes; (b) Cox concealed material information from Plaintiffs and the members of the California Classes; and (c) Cox made partial representations, including regarding the supposedly fixed monthly prices of its services, which were false or misleading absent the omitted information.

500.   Cox committed such violations of the FAL with actual knowledge that its advertising was untrue or misleading, or Cox, in the exercise of reasonable care, should have known that its advertising was untrue or misleading.

501.   Cox's misrepresentations and nondisclosures deceived and had a tendency to deceive the general public.

502.   Cox's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

503.   Plaintiffs and the members of the California Classes reasonably relied on Cox's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, Cox's cable TV services had they known the truth.

504.   As a direct and proximate result of Cox's violations of the FAL, Plaintiffs and the members of the California Classes lost money.

505.   Cox's false advertising, even if it were to cease, is capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, each Plaintiff seeks a permanent public injunction against Cox under the FAL to protect the general public from Cox's false advertising. Specifically, each Plaintiff seeks a permanent public injunction against Cox as follows: (1) an order enjoining Cox from falsely advertising the prices of its service plans to members of the general public; (2) an order enjoining Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary monthly service charges or fees; and (3) an order enjoining

1  Cox from advertising fixed-rate promotional or contract periods when in fact Cox
2  may increase the service price during the fixed-rate period by imposing or
3  increasing discretionary monthly service charges or fees.

4      506.   Plaintiffs lack an adequate remedy at law to prevent Cox's unlawful
5  false advertising practices, as previously discussed in ¶¶ 489-490 above.

6      507.   By its conduct and omissions alleged herein, Cox received more
7  money from Plaintiffs and the members of the California Classes than it should
8  have received, and that money is subject to restitution.

9      508.   Plaintiffs seek an order granting restitution to Plaintiffs and the
10  members of the California Classes in an amount to be proven at trial. Plaintiffs
11  further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. §
12  1021.5.

13
14                    **COUNT III**
15   **Violation of California's Unfair Competition Law**
     **California Business and Professions Code § 17200 *et seq*.**

16      509.   Plaintiffs reallege and incorporate by reference all paragraphs
17  previously alleged herein.

18      510.   All 29 Plaintiffs bring this cause of action in their individual capacities
19  and as representatives of the California Class. Plaintiffs Daniel Polinsky, James
20  Gamble, and Jennifer Klat also bring this cause of action as representatives of the
21  California Online Signup Subclass.

22      511.   California Business & Professions Code § 17200, *et seq.*, also known
23  as California's Unfair Competition Law ("UCL"), prohibits any unfair, unlawful, or
24  fraudulent business practice.

25      512.   ***"Unlawful" prong:*** Cox has violated the UCL by engaging in the
26  following unlawful business acts and practices:

27          a.      Making material misrepresentations in violation of Cal. Civ.
28  Code §§ 1770(a)(5), (9), (13), and (16) (the CLRA);

1    b.    Inserting unconscionable provisions in its consumer agreements
2  in violation of Cal. Civ. Code § 1770(a)(19) (the CLRA);

3    c.    Making material misrepresentations in violation of Cal. Bus. &
4  Prof. Code § 17500 *et seq.* (the FAL); and

5    d.    Engaging in deceit in violation of Cal Civ. Code §§ 1709–1710.

6    513.  ***"Unfair and Fraudulent" prongs:*** Cox has violated the UCL by
7  engaging in the following unfair and fraudulent business acts and practices:

8    a.    Misrepresenting that the prices of its cable TV service plans are
9  fixed and will not increase during the contract term, despite Cox's pattern and
10  practice of increasing service prices mid-contract by raising the Broadcast
11  Surcharge and the Regional Sports Surcharge;

12    b.    Increasing the Broadcast Surcharge and Regional Sports
13  Surcharge on customers in the middle of promised fixed-rate contracts; and

14    c.    Preventing or discouraging customers from freely canceling
15  their services if they learned that Cox had increased the price of their services in the
16  middle of promised fixed-rate contracts via increases to the Broadcast Surcharge
17  and the Regional Sports Surcharge.

18    514.  With respect to omissions, Cox at all relevant times had a duty to
19  disclose the information in question because, inter alia: (a) Cox had exclusive
20  knowledge of material information that was not known to Plaintiffs and the
21  members of the California Classes; (b) Cox concealed material information from
22  Plaintiffs and the members of the California Classes; and (c) Cox made partial
23  representations, including regarding the supposedly fixed monthly prices of its
24  services, which were false or misleading absent the omitted information.

25    515.  Cox's misrepresentations and nondisclosures deceive and have a
26  tendency to deceive the general public.

27    516.  Cox's misrepresentations and nondisclosures are material, in that a
28  reasonable person would attach importance to the information and would be

1   induced to act on the information in making purchase decisions.

2      517.   Plaintiffs and the members of the California Classes reasonably relied

3   on Cox's material misrepresentations and nondisclosures, and would not have

4   purchased, or would have paid less money for, Cox's cable TV services had they

5   known the truth.

6      518.   As a direct and proximate result of Cox's unfair, unlawful, and

7   fraudulent conduct, Plaintiffs and the members of the California Classes lost

8   money.

9      519.   By its conduct and omissions alleged herein, Cox received more

10  money from Plaintiffs and the members of the California Classes than it should

11  have received, and that money is subject to restitution.

12     520.   Cox's conduct and omissions alleged herein are immoral, unethical,

13  oppressive, unscrupulous, unconscionable, and/or substantially injurious to

14  Plaintiffs and the members of the California Classes. Perpetrating a years-long

15  scheme of misleading and overcharging customers is immoral, unethical, and

16  unscrupulous. Moreover, Cox's conduct is oppressive and substantially injurious to

17  consumers. By its conduct alleged herein, Cox has improperly extracted tens of

18  millions of dollars from California consumers. There is no utility to Cox's conduct,

19  and even if there were any utility, it would be significantly outweighed by the

20  gravity of the harm to consumers caused by Cox's conduct alleged herein.

21     521.   Plaintiffs seek an order granting restitution to Plaintiffs and the

22  members of the California Classes in an amount to be proven at trial. Plaintiffs

23  further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. §

24  1021.5.

25     522.   Cox's misconduct is ongoing with regard to members of the California

26  Classes who are under term contracts that are still subject to the Broadcast

27  Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiffs seek an order

28  enjoining Cox from charging members of the California Classes who are in fixed-

rate contracts any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

523.   Cox's false advertising, misrepresentations, and omissions, even if they were to cease, are capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, each Plaintiff seeks a permanent public injunction against Cox under the UCL to protect the general public from Cox's false advertising, misrepresentations, and omissions. Specifically, each Plaintiff seeks a permanent public injunction against Cox as follows: (1) an order enjoining Cox from falsely advertising the prices of its service plans to members of the general public; (2) an order enjoining Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary monthly service charges or fees; and (3) an order enjoining Cox from advertising fixed-rate promotional or contract periods when in fact Cox may increase the service price during the fixed-rate period by imposing or increasing discretionary monthly service charges or fees. Plaintiffs lack an adequate remedy at law to prevent Cox's false advertising practices, as previously discussed in ¶¶ 489-490 above.

### COUNT IV
**Violation of the Nevada Deceptive Trade Practices Act**
**NRS Chapter 598**

524.   Plaintiff Daniel Polinsky realleges and incorporates by reference all paragraphs previously alleged herein.

525.   Plaintiff Polinsky brings this cause of action in his individual capacity and as a representative of the Nevada Classes.

526.   Under the Nevada Deceptive Trade Practices Act ("NDTPA"), "[a]n action may be brought by any person who is a victim of consumer fraud." NRS 41.600(1). "If the claimant is the prevailing party, the court shall award the

FIRST AMENDED
CLASS ACTION COMPLAINT                    - 91 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  claimant: (a) Any damages that the claimant has sustained; (b) Any equitable relief
2  that the court deems appropriate; and (c) The claimant's costs in the action and
3  reasonable attorney's fees." NRS 41.600(3).

4     527.   Actionable "consumer fraud" includes deceptive trade practices as
5  defined in NRS 598.0915 to 598.0925. *See* NRS 41.600(2)(e).

6     528.   "To state a private right of action under the NDTPA, a plaintiff must
7  allege: (1) defendant violated the NDTPA, (2) causing plaintiff, (3) damages."
8  *Switch, Ltd. v. Uptime Inst., LLC*, 426 F. Supp. 3d 636, 643 (D. Nev. 2019).

9     529.   Cox's practice of increasing service prices in the middle of promised
10  fixed-rate contracts by raising the Broadcast Surcharge and the Regional Sports
11  Surcharge violates the NDTPA in the following ways:

12         a.   Cox knowingly represented that its cable TV service plans had
13  characteristics that they did not have (NRS 598.0915(5));

14         b.   Cox advertised its cable TV service plans with an intent not to
15  sell them as advertised (NRS 598.0915(9));

16         c.   Cox made false or misleading statements of fact concerning the
17  prices of its cable TV service plans (NRS 598.0915(13));

18         d.   Cox knowingly made false representations in transactions
19  related to its cable TV service plans (NRS 598.0915(15));

20         e.   Cox failed to disclose a material fact in connection with the sale
21  of its cable TV service plans (NRS 598.0923(1)(b)); and

22         f.   Cox used an unconscionable practice in its transactions related
23  to its cable TV service plans ((NRS 598.0923(1)(e)).

24     530.   With respect to any omissions, Cox at all relevant times had a duty to
25  disclose the information in question because, inter alia: (a) Cox had exclusive
26  knowledge of material information that was not known to Plaintiff Polinsky and the
27  members of the Nevada Classes; (b) Cox concealed material information from Mr.
28  Polinsky and the members of the Nevada Classes; and (c) Cox made partial

1   representations, including regarding the supposedly fixed monthly rate of its service

2   plans, which were false and misleading absent the omitted information.

3       531.   The deceptive trade practices alleged herein to have been undertaken

4   by Cox were all committed intentionally and knowingly. The deceptive trade

5   practices alleged herein to have been undertaken by Cox did not result from a bona

6   fide error notwithstanding the use of reasonable procedures adopted to avoid such

7   error.

8       532.   Cox's misrepresentations deceive and have a tendency to deceive the

9   general public.

10      533.   Cox's misrepresentations are material, in that a reasonable person

11  would attach importance to the information and would be induced to act on the

12  information in making purchase decisions.

13      534.   Plaintiff Polinsky and the members of the Nevada Classes reasonably

14  relied on Cox's material misrepresentations, and would not have purchased, or

15  would have paid less money for, Cox's cable TV service plans had they known the

16  truth.

17      535.   As a direct and proximate result of Cox's violations of the NDTPA,

18  Mr. Polinsky and the members of the Nevada Classes have been harmed and lost

19  money or property.

20      536.   Plaintiff Polinsky seeks an order awarding damages and equitable

21  relief (including restitution and/or disgorgement) to Mr. Polinsky and the members

22  of the Nevada Classes in an amount to be proven at trial. NRS 41.600(3). Mr.

23  Polinsky also seeks punitive damages. NRS 42.005. Mr. Polinsky further seeks an

24  award of attorneys' fees and costs. NRS 41.600(3).

25      537.   Cox's misconduct is ongoing with regard to the members of the

26  Nevada Classes who are under term contracts that are still subject to the Broadcast

27  Surcharge and the Regional Sports Surcharge. Accordingly, Plaintiff Polinsky seeks

28  an order enjoining Cox from charging members of the Nevada Classes who are in

fixed-rate contracts, any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts.

538.   Cox's false advertising, misrepresentations, and omissions, even if they were to cease, are capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, Plaintiff Polinsky seeks a permanent public injunction against Cox under the NDTPA to protect the general public from Cox's false advertising, misrepresentations, and omissions. Specifically, Mr. Polinsky seeks a permanent public injunction against Cox as follows: (1) an order enjoining Cox from falsely advertising the prices of its service plans to members of the general public; (2) an order enjoining Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary monthly service charges or fees; and (3) an order enjoining Cox from advertising fixed-rate promotional or contract periods when in fact Cox may increase the service price during the fixed-rate period by imposing or increasing discretionary monthly service charges or fees. Plaintiff Polinsky lacks an adequate remedy at law to prevent Cox's false advertising practices, as previously discussed in ¶¶ 489-490 above.

## COUNT V
### Breach of Contract

539.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

540.   All 29 Plaintiffs bring this cause of action in their individual capacities and as representatives of the Classes.

541.   Plaintiffs allege this cause of action in the alternative to Count VI.

542.   Cox entered into contracts with Plaintiffs and all members of the Classes when Plaintiffs and the members of the Classes each accepted Cox's offer of a specified cable TV service plan at a specified monthly rate under a term

FIRST AMENDED
CLASS ACTION COMPLAINT
- 94 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    contract.

2        543.   All of the contracts between Cox and Plaintiffs and the members of the

3    Classes contained the following material terms: Cox would provide the ordered

4    cable TV service plan, and, in exchange, the customer would pay a specific

5    promised monthly price for service that was fixed for a specific period of months.

6        544.   Plaintiffs and the members of the Classes have performed, for the

7    relevant time frame, all of each's material obligations under the contract or have

8    been excused from any non-performance.

9        545.   Cox breached the contract by increasing the monthly service price in

10   the middle of its term contracts with Plaintiffs and each member of the Classes via

11   raises of the Broadcast Surcharge and the Regional Sports Surcharge.

12       546.   Plaintiffs and the members of the Classes sustained damages as a result

13   of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the

14   members of the Classes paid in mid-contract increases to the Broadcast Surcharge

15   and the Regional Sports Surcharge.

16                                **COUNT VI**

17        **Breach of the Implied Covenant of Good Faith and Fair Dealing**

18       547.   Plaintiffs reallege and incorporate by reference all paragraphs

19   previously alleged herein.

20       548.   All 29 Plaintiffs bring this cause of action in their individual capacities

21   and as representatives of the Classes.

22       549.   Plaintiffs allege this cause of action in the alternative to Count V.

23       550.   To the extent any applicable contract could be read as granting Cox

24   discretion to increase the Broadcast Surcharge and the Regional Sports Surcharge in

25   the middle of promised fixed-rate term service agreements—which Plaintiffs do not

26   concede—that discretion is not unlimited, but rather is limited by the covenant of

27   good faith and fair dealing implied in every contract by California law and by

28   Nevada law.

FIRST AMENDED
CLASS ACTION COMPLAINT                 - 95 -

551.  Cox has violated the covenant of good faith and fair dealing by its conduct alleged herein.

552.  Cox has abused any discretion it purportedly had under any applicable contract to raise the monthly price for Cox's cable TV services in the middle of the promised fixed-rate term contract. Cox used the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the contract period, despite Cox's promises and advertising that the service rates were "guaranteed" to not change during the contract term.

553.  Cox meanwhile utilized the threat of imposing an early termination fee to discourage customers from freely canceling their services if they ever learned that Cox had increased their service price mid-contract via increases to the Broadcast Surcharge and the Regional Sports Surcharge.

554.  Cox's mid-contract increases to the Broadcast Surcharge and the Regional Sports Surcharge defied customers' reasonable expectations, were objectively unreasonable, and frustrated the basic terms of the parties' agreement. Cox's conduct alleged herein was arbitrary and in bad faith.

555.  Cox's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the members of the Classes the full benefit of their bargains with Cox.

556.  Plaintiffs and the members of the Classes have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Cox. There is no legitimate excuse or defense for Cox's conduct.

557.  Any attempts by Cox to defend its mid-contract service price increases through reliance on supposed contractual provisions will be without merit. Plaintiffs and the members of the Classes never knowingly agreed to any such provisions, are not subject to them, or the provisions are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are

FIRST AMENDED
CLASS ACTION COMPLAINT
- 96 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  unenforceable in light of the hidden and deceptive nature of Cox's misconduct,

2  among other reasons. Any such provisions, even if they existed, would not excuse

3  Cox's abuses of discretion or otherwise preclude Plaintiffs and the members of the

4  Classes from recovering for breach of the covenant of good faith and fair dealing.

5      558.  Plaintiffs and the members of the Classes sustained damages as a result

6  of Cox's breaches of the covenant of good faith and fair dealing. Plaintiffs seek

7  damages in the amount they and the members of the Classes paid in mid-contract

8  increases to the Broadcast Surcharge and the Regional Sports Surcharge.

9                    **PRAYER FOR RELIEF**

10     559.  Plaintiffs request that the Court order relief and enter judgment against

11  Cox as follows:

12         a.     Declare this action to be a proper class action, certify the

13  proposed California Classes and Nevada Classes, appoint all 29 Plaintiffs and their

14  counsel to represent the California Class, appoint Plaintiffs Daniel Polinsky, James

15  Gamble, and Jennifer Klat and their counsel to represent the California Online

16  Signup Subclass, and appoint Plaintiff Polinsky and his counsel to represent the

17  Nevada Classes;

18         b.     Order that the discovery rule applies to extend any applicable

19  limitations period (and the corresponding class period) for each Class to the date on

20  which Cox first engaged in its practice of increasing the Broadcast Surcharge and

21  the Regional Sports Surcharge in the middle of its term contracts;

22         c.     Order Cox to stop charging Class members who are in fixed-rate

23  contracts any amounts for the Surcharges that are higher than the initial rates of the

24  Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start

25  of their contracts;

26         d.     Order disgorgement and/or restitution, including, without

27  limitation, disgorgement of all revenues, profits and/or unjust enrichment that Cox

28  obtained, directly or indirectly, from Plaintiffs and the members of the Classes as a

1  result of the unlawful conduct alleged herein regarding mid-contract increases of

2  the Broadcast Surcharge and the Regional Sports Surcharge;

3          e.     Order Cox to pay damages for breach of contract (or in the

4  alternative, for breach of the implied covenant of good faith and fair dealing) to all

5  29 Plaintiffs and the members of each Class in the amount they paid in mid-contract

6  increases to the Broadcast Surcharge and the Regional Sports Surcharge;

7          f.     Order Cox to pay damages, and also punitive damages, to all 29

8  Plaintiffs and the members of the California Classes for violation of the California

9  Consumers Legal Remedies Act;

10          g.     Order Cox to pay damages, and also punitive damages, to

11  Plaintiff Polinsky and the members of the Nevada Classes for violation of the

12  Nevada Deceptive Trade Practices Act;

13          h.     Enter a public injunction against Cox under the CLRA, FAL,

14  UCL, and NDTPA as follows:

15          (1)     Permanently enjoin Cox from falsely advertising the

16  prices of its service plans to members of the general public;

17          (2)     Permanently enjoin Cox from advertising or quoting a

18  service plan price to members of the general public if that price does not include all

19  applicable discretionary monthly service charges or fees; and

20          (3)     Permanently enjoin Cox from advertising fixed-rate

21  promotional or contract periods when in fact Cox may increase the service price

22  during the fixed-rate period by imposing or increasing discretionary monthly

23  service charges or fees;

24          i.     Order Cox to pay attorneys' fees, costs, and pre-judgment and

25  post-judgment interest to the extent allowed by law; and

26          j.     Grant such other relief as this Court deems just and proper.

27

28

FIRST AMENDED
CLASS ACTION COMPLAINT     - 98 -     **HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1

## **DEMAND FOR JURY TRIAL**

2      Each Plaintiff, individually and as a class representative on behalf of all

3  others similarly situated, demands a trial by jury on all issues so triable.

4

5      DATED: November 26, 2022.

6                                    Presented by:

7                                    HATTIS & LUKACS

8                                    By: _____

9                                    Daniel M. Hattis (SBN 232141)
                                     Paul Karl Lukacs (SBN 197007)
10                                   HATTIS & LUKACS
                                     11711 SE 8th Street, Suite 120
11                                   Bellevue, Washington 98005
                                     Telephone: (425) 233-8650
12                                   Facsimile: (425) 412-7171
                                     Email: dan@hattislaw.com
13                                   Email: pkl@hattislaw.com

14
                                     *Attorneys for Plaintiffs*
15                                   *and the Proposed Classes*

16

17

18

19

20

21

22

23

24

25

26

27

28