**HATTIS & LUKACS**
Daniel M. Hattis, Esq. (SBN 232141)
Paul Karl Lukacs, Esq. (SBN 197007)
11711 SE 8th Street, Suite 120
Bellevue, Washington 98005
Tel.: (425) 233-8650
Fax: (425) 412-7171
dan@hattislaw.com
pkl@hattislaw.com

*Attorneys for Plaintiffs*
*and the Proposed Classes and Subclasses*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD CHRISTIANSON, ISABEL PRADO, NEIL MOURA, DANIEL POLINSKY, CRISTINA ABDALA, JESSICA BAZAN, PAULA CHRISTOPHER, GREGORY CLARK, JANINE CLARK, JOSEPH DEPEW, BRENDA DEPPERSCHMIDT, JAMES GAMBLE, KELLY GILLILAND, BRIAN HARGETT, ADRIENNE JACKSON, LYSSA JORDAN, WAYNE KALAYJIAN, JENNIFER KLAT, DIANE KLEIN, NESTOR MENDEZ, STEPHEN METZGER, JAMES MILLS, MICHAEL MITCHELL, ROSA MONTANEZ, LAUREN RAMOS, ALBERT RENN, ROBYNN ROWE, PATRICIA SALVACION, HEATHER WEBSTER, JOHN WILEY, AND STEPHANIE WILEY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> COX COMMUNICATIONS, INC., COXCOM, LLC, and COX COMMUNICATIONS CALIFORNIA, LLC, <br><br> Defendants. | Case No. 3:22-cv-01290-RSH-MSB <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **FOR:** <br><br> **(1) VIOLATION OF CAL. CIVIL CODE § 1750;** <br><br> **(2) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17500;** <br><br> **(3) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17200;** <br><br> **(4) VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NRS 598;** <br><br> **(5) BREACH OF CONTRACT;** <br><br> **(6) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (PLEADED IN THE ALTERNATIVE)** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Cristina Abdala, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Jennifer Klat, Diane Klein, Nestor Mendez, Stephen Metzger, James Mills, Michael Mitchell, Rosa Montanez, Lauren Ramos, Albert Renn, Robynn Rowe, Patricia Salvacion, Heather Webster, John Wiley, and Stephanie Wiley, on behalf of themselves and all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendants Cox Communications, Inc., CoxCom, LLC, and Cox Communications California, LLC (collectively, "Cox"):

## **INTRODUCTION**

1.     This action challenges a deceptive pricing scheme whereby Cox falsely advertised and promised new and renewing customers that the monthly prices for its service plans[1] would be at quoted fixed rates for a 1- or 2-year Term Agreement[2] or Promotional Agreement[3], but then, after the customer signed up, Cox as a matter of policy would unlawfully increase the service price in the middle of the promised fixed-rate period.

2.     The particular methods Cox utilized to implement the mid-agreement price increases changed over time.

---

[1]     The term "service plan" refers to a Cox service plan with television service and/or internet service, including service plans that "bundled" television and/or internet service with phone or home security services.

[2]     "Term Agreement" or "Term Service Agreement" refers to an agreement where the subscriber is promised a quoted fixed-price promotion for a stated period of time, typically for 1 or 2 years, and the subscriber is subject to an early termination fee penalty if the subscriber terminates service prior to the end of the promotional period. Cox offered Term Agreements both to new customers and to customers who were renewing their existing subscriptions.

[3]     "Promotional Agreement" refers to an agreement where the subscriber is promised a quoted fixed-price promotion for a stated period of time, typically for 1 or 2 years, and there is no early termination fee penalty. Cox offered Promotional Agreements both to new customers and to customers who were renewing their existing subscriptions.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 1 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

3.     For customers who signed up for Term Agreements or Promotional Agreements <u>between 2015 and March 22, 2021</u>, the primary way Cox increased the purportedly fixed monthly rate in the middle of the agreement was by annually increasing two disguised monthly television service charges which Cox called the "Broadcast Surcharge" and the "Regional Sports Surcharge" (the "Surcharges"). Each year, typically between January and March, Cox would increase the Surcharges (each time between $1.00 to $3.50 per Surcharge) for every single Cox TV subscriber—including those in promised fixed-rate Term Agreements or Promotional Agreements.

4.     If customers noticed the price increases to their service plans and called Cox to complain, Cox agents would tell the customers that only the *Surcharges* had increased, and the agents would falsely say that the Surcharges were pass-through government fees and/or were outside of Cox's control.

5.     After Cox eliminated the Surcharges from new service plans on or around March 23, 2021, Cox switched to a new strategy of outright increasing the base price of the service plan itself in the middle of Promotional Agreements. (On or around March 23, 2021, Promotional Agreements replaced Term Agreements as the most common type of subscription offering by Cox.[4])

6.     While Cox continued to advertise and promise to its new and renewing customers (like it always had) that the customers were getting a <u>fixed dollar amount</u> **<u>price</u>** for the 1- or 2-year promotional period, that was <u>not</u> how Cox actually implemented the promotion in its back-end billing system. Instead, Cox implemented the promotion as a <u>fixed dollar amount</u> **discount** off of Cox's higher

---

[4]    Regarding those who signed up on or after March 23, 2021 for <u>Term Agreements</u> (after Cox eliminated the Surcharges from its new plans), those customers were no longer subject to Cox's mid-agreement price increase scheme. In contrast, customers who signed up for Promotional Agreements after that date (who were then the large majority of sign-ups) continued to be subject to Cox's price increase scheme via Cox's new strategy of mid-promotion increases to the base price of the (supposedly fixed-rate) service plan itself.

SECOND AMENDED
CLASS ACTION COMPLAINT     - 2 -     HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

so-called "retail rate" during the term of the Promotional Agreement. Meanwhile, Cox had a policy and practice of increasing the "retail rate" between January and March of each year to an amount entirely at Cox's whim. And whenever Cox increased the "retail rate," the customer's supposedly fixed promotional price suddenly increased in tandem by the same dollar amount—in complete defiance of Cox's previous and unmistakable promise of a fixed dollar amount price for the entire promotional period.

7.   If customers noticed the price increase in the middle of their Promotional Agreement and called Cox to complain, Cox agents justified the increase by arguing (based on the information that Cox provided to the agents) that Cox was honoring the promotion because the subscriber's discount dollar amount had remained the same. But this defied Cox's pre-sale representations and advertisements which had quoted a specific monthly price that would not increase during the promotional period.

8.   Plaintiffs estimate that Cox has extracted **over $100 million** since 2015 from more than 1 million California and Nevada subscribers via this illegal scheme of increasing service prices in the middle of promised fixed-rate Term Agreements or Promotional Agreements.

9.   All 31 Plaintiffs bring this lawsuit on behalf of themselves and classes of similarly situated California consumers, seeking damages and/or restitution, punitive damages, and pre- and post-judgment interest. Plaintiff Daniel Polinsky also brings this lawsuit on behalf of himself and classes of similarly situated Nevada consumers, seeking damages and/or restitution, punitive damages, and pre- and post-judgment interest.

10.   Plaintiffs also bring this lawsuit individually and as private attorneys general seeking public injunctive relief to protect the general public by putting an end to Cox's unlawful advertising scheme. Plaintiffs additionally seek declaratory relief, including a declaration that Cox's arbitration clause is unconscionable and/or

SECOND AMENDED
CLASS ACTION COMPLAINT

- 3 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

unenforceable, and a declaration that Cox's practices alleged herein are unlawful under California and Nevada law.

## THE PARTIES

11.    Plaintiff Donald Christianson is a citizen and resident of San Diego County, California.

12.    Plaintiff Isabel Prado is a citizen and resident of San Diego County, California.

13.    Plaintiff Neil Moura is a citizen and resident of San Diego County, California.

14.    Plaintiff Daniel Polinsky is a citizen and resident of Orange County, California.

15.    Plaintiff Cristina Abdala is a citizen and resident of Aliso Viejo, California.

16.    Plaintiff Jessica Bazan is a citizen and resident of Laguna Hills, California.

17.    Plaintiff Paula Christopher is a citizen and resident of San Diego, California.

18.    Plaintiff Gregory Clark is a citizen and resident of San Marcos, California.

19.    Plaintiff Janine Clark is a citizen and resident of San Marcos, California.

20.    Plaintiff Joseph Depew is a citizen and resident of El Cajon, California.

21.    Plaintiff Brenda Depperschmidt is a citizen and resident of El Cajon, California.

22.    Plaintiff James Gamble is a citizen and resident of Irvine, California.

23.    Plaintiff Kelly Gilliland is a citizen and resident of Lemon Grove, California.

SECOND AMENDED
CLASS ACTION COMPLAINT                     - 4 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

24.     Plaintiff Brian Hargett is a citizen and resident of San Diego, California.

25.     Plaintiff Adrienne Jackson is a citizen and resident of San Diego, California.

26.     Plaintiff Lyssa Jordan is a citizen and resident of Spring Valley, California.

27.     Plaintiff Wayne Kalayjian is a citizen and resident of Palos Verdes Estates, California.

28.     Plaintiff Jennifer Klat is a citizen and resident of San Diego, California.

29.     Plaintiff Diane Klein is a citizen and resident of San Diego, California.

30.     Plaintiff Nestor Mendez is a citizen and resident of San Marcos, California.

31.     Plaintiff Stephen Metzger is a citizen and resident of Lake Forest, California.

32.     Plaintiff James Mills is a citizen and resident of Escondido, California.

33.     Plaintiff Michael Mitchell is a citizen and resident of Lemon Grove, California.

34.     Plaintiff Rosa Montanez is a citizen and resident of Escondido, California.

35.     Plaintiff Lauren Ramos is a citizen and resident of San Pedro, California.

36.     Plaintiff Robynn Rowe is a citizen and resident of Santa Barbara, California.

37.     Plaintiff Albert Renn is a citizen and resident of San Diego, California.

38.     Plaintiff Patricia Salvacion is a citizen and resident of Chula Vista, California.

39.     Plaintiff Heather Webster is a citizen and resident of Laguna Hills,

SECOND AMENDED
CLASS ACTION COMPLAINT                    - 5 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1   California.

2        40.    Plaintiff John Wiley is a citizen and resident of Santa Barbara,

3   California.

4        41.    Plaintiff Stephanie Wiley is a citizen and resident of Santa Barbara,

5   California.

6        42.    Defendant Cox Communications, Inc., is a privately-owned subsidiary

7   of Cox Enterprises, Inc., and is incorporated in Delaware, with its headquarters,

8   executive office, principal place of business and/or nerve center in Atlanta,

9   Georgia. The footer of Cox's public website targeted to current and prospective

10  residential cable customers states: "©1998 – 2023 Cox Communications, Inc."[5]

11  Cox customer bills, including the bills sent to Plaintiffs, instruct customers that

12  checks should be made payable to "Cox Communications."

13       43.    Defendant CoxCom, LLC, is a subsidiary of Cox Communications,

14  Inc., and is incorporated in Delaware, with its headquarters, executive office,

15  principal place of business and/or nerve center in Atlanta, Georgia. The Cox

16  "Residential Customer Service Agreement"[6] for Cox residential customers states

17  that it "sets forth the terms and conditions under which CoxCom, LLC or one or

18  more of its subsidiaries or affiliates authorized by applicable regulatory, franchise

19  or license authority … agrees to provide Services."

20       44.    Defendant Cox Communications California, LLC, is a subsidiary of

21  Cox Communications, Inc., and is incorporated in Delaware, with its headquarters,

22  executive office, principal place of business and/or nerve center in Atlanta,

23  Georgia.

24

25

26  _____

    [5]   *See* https://www.cox.com/residential/home.html, last accessed Apri1 17,
27  2023.

    [6]   Available at https://www.cox.com/aboutus/policies/customer-service-
28  agreement.html, last accessed April 17, 2023.

---

SECOND AMENDED
CLASS ACTION COMPLAINT                          - 6 -

**JURISDICTION AND VENUE**

45.   **Subject Matter Jurisdiction.** The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—i.e., Class Action Fairness Act jurisdiction—because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

46.   **Personal Jurisdiction**. This Court has personal jurisdiction over Cox because, without limitation: (1) Cox has purposely availed itself of the privileges of conducting business activities in California; (2) Cox currently maintains systematic and continuous business contacts with California including marketing, selling, and issuing service plans to Plaintiffs and other California consumers; (3) Cox has entered into contracts with Plaintiffs and other California consumers to provide cable TV and internet services; and (4) Cox maintains offices and retail locations throughout California. Cox has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible.

47.   **Venue**. Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Jennifer Klat, Diane Klein, Nestor Mendez, James Mills, Michael Mitchell, Rosa Montanez, Albert Renn, and Patricia Salvacion reside in this District; many of the acts and transactions giving rise to this action occurred in this District; Cox is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District through distribution and sale of its services in this District, does substantial business in this District, and is subject to personal jurisdiction in this District.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 7 -

**HATTIS & LUKACS**
11711 SE 8ᵗʰ Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  **FACTUAL ALLEGATIONS OF COX'S DECEPTIVE PRICING SCHEME**

2      48.    Defendant Cox currently provides cable TV and/or internet services to

3  approximately 3.5 million households nationwide, including approximately 470,000

4  households in California and over 470,000 households in Nevada.

5      49.    At all relevant times, Cox has advertised its service plans through

6  pervasive marketing directed at the consuming public in California and Nevada.

7  This marketing has included advertisements on the Cox website; marketing emails;

8  direct mailers; materials and advertising at its California and Nevada retail stores;

9  video advertisements via social media including YouTube, Facebook, and Twitter;

10  and television, radio, and other internet advertisements.

11      50.    For years, Cox has falsely advertised, both to consumers who were

12  signing up for the first time, and to existing customers who were signing up for new

13  service plans, that the monthly rates for its service plans would be fixed and not

14  increase above the initially quoted rates during a 1- or 2-year Term Agreement or

15  Promotional Agreement. But after the customer signed up, and contrary to Cox's

16  previous representations, Cox as a matter of policy would unlawfully increase its

17  rates charged to the customer in the middle of the supposedly fixed-rate period.

18      51.    The particular method Cox utilized to implement the mid-agreement

19  price increases changed over time. For customers who signed up between 2015 and

20  March 22, 2021, the primary way Cox increased the purportedly fixed monthly

21  price in the middle of the fixed-price agreement was by annually increasing two

22  disguised monthly television service charges which Cox called the "Broadcast

23  Surcharge" and the "Regional Sports Surcharge" (the "Surcharges").

24      52.    After Cox eliminated the Surcharges from new plans on or around

25  March 23, 2021, Cox switched to a new strategy of outright increasing the base

26  price of the service plans in the middle of Promotional Agreements above the

27  initially quoted rates. (After March 2021, Promotional Agreements, which were

28  offered to both new and renewing customers, replaced Term Agreements as the

SECOND AMENDED
CLASS ACTION COMPLAINT

- 8 -

most common type of subscription offering by Cox.)

53.     Below are further details regarding how Cox implemented its price increases in the middle of promised fixed-rate agreements, and how those methods were tweaked over time.

**A.     2015 Through March 22, 2021: Mid-Agreement Price Increases By Raising the Broadcast Surcharge and the Regional Sports Surcharge.**

54.     For customers who signed up for their service plans between 2015 and March 22, 2021, the primary way Cox increased the purportedly fixed monthly price was by annually increasing two disguised television monthly service charges which Cox called the "Broadcast Surcharge" and the "Regional Sports Surcharge." Cox failed to adequately disclose these service charges during the signup or renewal process, and Cox never disclosed the fact that Cox could, and would, use the Surcharges as a covert way to increase the price mid-agreement despite Cox's representations and promises to the contrary.

55.     During this time period from 2015 through March 22, 2021, Cox primarily marketed and pushed consumers into 1- or 2-year fixed-rate Term Agreements.[7]

**1.     The Broadcast Surcharge and the Regional Sports Surcharge.**

56.     The Broadcast Surcharge is a monthly television service charge that Cox began adding to its bills in 2015 at a rate of $3.00 a month. Cox buried this service charge in its monthly bill at the end of the "Monthly Services" section under "Additional TV." Cox provided no definition or explanation of the Broadcast

_____

[7]     Up until March 22, 2021, it was also possible, but much less common, for a customer to sign up for a fixed-price Promotional Agreement of one or two years (which, unlike a Term Agreement, did not have an early termination fee penalty). Cox likewise increased the service price in the middle of these (supposedly) fixed-price Promotional Agreements via increases to the Surcharges.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 9 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Surcharge in its monthly bills. In fact, Cox used the Broadcast Surcharge as a way to covertly increase the monthly service price during a customer's promised fixed-rate Term Agreement or Promotional Agreement.

57.     The Regional Sports Surcharge is another, separate, monthly television service charge that Cox began adding to its bills in 2017 at a rate of $3.00 a month. The Regional Sports Surcharge was charged to Cox subscribers with "Contour TV" (previously called "Essential TV") or higher—which comprised the overwhelming majority of Cox cable TV subscribers. Cox similarly buried this service charge in its monthly bill at the end of the "Monthly Services" section under "Additional TV." Cox provided no definition or explanation of the Regional Sports Surcharge in its monthly bills. Like the Broadcast Surcharge, Cox used the Regional Sports Surcharge as a way to covertly increase the monthly service price during a customer's promised fixed-rate Term Agreement or Promotional Agreement.

58.     Cox has steadily increased the Broadcast Surcharge and the Regional Sports Surcharge on at least an annual basis since introducing them, regardless of whether the customer was in the middle of a promised fixed-price Term Agreement or Promotional Agreement. Today, the Broadcast Surcharge is $22.00 per month, and the Regional Sports Surcharge is up to $12.00 per month, for a total of up to $34.00 per month.

59.     Starting March 23, 2021, Cox updated its _new_ cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge. Instead, Cox increased the prices of the new service plans by a dollar amount that was _identical_ to the prior Surcharge dollar amounts—which confirmed that the Surcharges had really been extra charges for _service_ all along.

**2.     Cox Advertised and Promised "Guaranteed" Fixed Monthly Rates During Term Agreements.**

60.     From 2015 through March 22, 2021, Cox consistently and prominently advertised particular, flat monthly prices for its service plans that were

"guaranteed" and "price-locked" during a 1- or 2-year Term Agreement. Cox offered Term Agreements to both new and renewing customers.

61.     Customers who entered into these Term Agreements gave up their ability to freely quit or downgrade their service during the contract term without incurring an early termination fee. Customers locked themselves into these Term Agreements because Cox had represented to them that Cox was similarly locking itself into charging no more than the promised fixed service price during the contract term.

62.     **Online Advertising and Order Process**. On Cox's website and throughout the online order process, Cox repeatedly—and falsely—represented that signing up for a 1- or 2-year Term Agreement "guaranteed" that the monthly service price would be locked-in for the duration of the contract.

63.     For example, on Cox's FAQ webpages, one of the questions asked: "What if I don't want a service agreement?" Cox's posted answer to the question was: "**Service agreements give you peace of mind that your bill won't change over the course of the agreement**, but you can opt out during checkout for $10 more per month." (emphasis added).

64.     When a consumer went through the online order process to sign up for or renew Cox's services, at the top of each page was a link to "see Offer Terms" which, if clicked, opened a pop-up box where Cox explicitly promised that the price for the customer's service plan would not increase above the promised rates during the contract period.

65.     Cox made similar representations about the "guaranteed" fixed-price of its Term Agreement service plans on the "Service Agreement" page of the online order process.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 11 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

66. Below is a screenshot which is representative of what Cox displayed from at least 2018 through March 22, 2021, to consumers during the online ordering process after they selected one of Cox's advertised offers; a red box has been added to highlight relevant text:[8]

**Figure 1: Cox Online Order Process "Service Agreement" Webpage**



67. As the screenshot reflects, Cox advertised and promised: "The Service

_____

[8] This screenshot was taken from the Cox website on January 9, 2020, during the online order process for the "Cox Bronze Bundle with Homelife" 2-year Term Agreement service plan.

Agreement lets you <u>guarantee</u> the regular rates on Cox TV, Internet and Phone services for 2 years. The rates for your <u>services</u> will not increase above the Service Agreement rate when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years." (emphasis added).

68.　　Immediately below that, Cox stated: "**What's covered and not covered**. The Service Agreement is offered on TV, Internet and Phone services plus their features, such as a premium channel or voice mail. The Service Agreement does not apply to charges for equipment (such as a receiver or modem), per use items (like a movie rental) and fees for non-services (like taxes and surcharges) which may change."

69.　　While Cox here describes "surcharges" as "fees for non-services" (as a reasonable consumer would expect), Cox has <u>admitted</u> that the Broadcast "Surcharge" and the Regional Sports "Surcharge" are in fact fees for <u>services</u> (see Paragraphs 82–87 below).

70.　　In the online signup process for the Term Agreements, Cox also displayed a graphical monthly price chart which listed, month by month, the fixed dollar amounts that Cox would charge during the 1- or 2-year period.

71.　　**<u>Signing up with Cox sales or customer service agents</u>**. Likewise, when new or renewing customers signed up for Cox cable TV service over the phone, via internet chat, or at one of Cox's brick-and-mortar stores, Cox sales and customer service agents pushed Term Agreements by promising consumers that the advertised service rates were "guaranteed" and "price-locked" for those 1 or 2 years. And, even though it was possible to request to sign up for month-to-month service rather than a 1- or 2-year Term Agreement, Cox agents were trained to not mention the month-to-month option unless a customer specifically asked for it.

72.　　Cox sales and customers service agents as a matter of policy did not disclose or mention that Cox could, and would, increase the monthly service price mid-agreement by increasing the Broadcast Surcharge and/or the Regional Sports

SECOND AMENDED
CLASS ACTION COMPLAINT

- 13 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Surcharge.

### 3. Cox Increased the Monthly Service Rate Mid-Agreement by Raising the Broadcast Surcharge and the Regional Sports Surcharge.

73. Cox's representations that the monthly service rate was "guaranteed" and "price-locked" and that its Term Agreements "give you peace of mind that your bill won't change over the course of the agreement" were all **false**. Cox as a matter of policy increased the monthly price in the middle of customers' fixed-rate contracts by increasing two disguised television service fees—the Broadcast Surcharge and the Regional Sports Surcharge.

74. Cox has increased the Broadcast Surcharge and the Regional Sports Surcharge at least once a year since 2015—each time between $1.00 to $3.50 for each Surcharge. And Cox imposed these annual increases on <u>all</u> of its cable TV subscribers <u>even if they were in the middle of a promised fixed-rate agreement</u>.

75. For example, Cox increased the monthly service price twice, by a total of $8.00, during the span of Plaintiffs Donald Christianson and Isabel Prado's most recent "guaranteed" fixed-rate Term Agreement. In February 2020—6 months into their 24-month term—Cox increased the Broadcast Surcharge from $10.00 to $13.50 and the Regional Sports Surcharge from $7.00 to $8.00. Then, in February 2021—18 months into their 24-month term—Cox again increased the Broadcast Surcharge from $13.50 to $16.00 and the Regional Sports Surcharge from $8.00 to $9.00.

76. Contrary to Cox's fixed-price "guarantee," Cox utilized the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the supposedly fixed-rate Term Agreement. Because these subsequent increases to the Broadcast Surcharge and the Regional Sports Surcharge were relatively small—typically between $1.00 to $3.50 per Surcharge— and were not included in the "Total Your Cox Bundle" price displayed at the top of

SECOND AMENDED
CLASS ACTION COMPLAINT

- 14 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

the customer bill, Cox knew that customers were unlikely to notice the increased

amount of the service charges. Meanwhile, Cox did not define or explain the

Surcharges anywhere on the bill.

77.     Given that taxes and other government-related charges can already

vary by small amounts from month to month, Cox knew that customers reasonably

expected small changes in the total amount billed each month and would not notice

that Cox increased the service price by increasing the amount of these disguised

service charges.

78.     Many, if not most, customers did not read the printed monthly

statements described above at all because Cox encouraged its customers to sign up

for electronic billing and automatic payment (which Cox calls "EasyPay") instead

of receiving paper statements. Through this billing process, customers receive a

monthly Cox billing email which states the customer's bill total and informs them

that their bill will be automatically paid by the payment due date because they are

signed up for EasyPay. Cox's EasyPay program discourages customers from

reviewing their monthly bill. And, because Cox's billing emails only state the bill

total, customers cannot tell from the email itself that Cox has increased their

monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports

Surcharge. Because the increases are relatively small compared to a customer's

total monthly bill, customers would not notice the increase or would reasonably

believe that the increase was due to increased taxes or government fees. A

reasonable consumer would not assume that an increase to his or her monthly bill

total was due to Cox unlawfully increasing the monthly service rate in the middle of

the promised fixed-price contract.

79.     At no point, either prior to or at the time customers signed up for a

Term Agreement, did Cox disclose that Cox could, and would, increase the

monthly service price mid-agreement via increases to the Broadcast Surcharge

and/or Regional Sports Surcharge. Rather, Cox made affirmative

SECOND AMENDED
CLASS ACTION COMPLAINT

- 15 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

misrepresentations to the contrary. As detailed above, Cox repeatedly—and falsely—represented to customers that signing up for a 1- or 2-year Term Agreement would "guarantee" that the "rates for your services will not increase" during the contract term.

80.    If customers later noticed the price increases to their service plans and called Cox to complain, Cox agents would tell the customers that only the *Surcharges* had increased, and the agents would falsely say that the Surcharges were pass-through government fees and/or were outside of Cox's control.

81.    Meanwhile, customers in Term Agreements who discovered and were upset about the price increases could not terminate their Term Agreements without having to pay a significant early termination fee penalty.

### 4.    It Is Indisputable That the Broadcast Surcharge and the Regional Sports Surcharge Are Charges for Service.

82.    It cannot be disputed that the Surcharges are in fact extra charges for cable TV **service**. In fact, Cox has repeatedly admitted that the Broadcast Surcharge and the Regional Sports Surcharge are charges for services.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 16 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

83.  Notably, Cox listed the Broadcast Surcharge and Regional Sports Surcharge in the "Monthly <u>Services</u>" section of the bill under "Additional TV"— where they were not defined and not explained. Below is a copy of the Monthly Services section of the customer bill:

**Figure 2: February 2021 Bill of Plaintiffs Christianson and Prado**



84.  Meanwhile, Cox did <u>not</u> list the Broadcast Surcharge or the Regional Sports Surcharge under the separate section on the bill labeled "Taxes, Fees and Surcharges."

85.  Cox has <u>admitted</u> that the Broadcast Surcharge and the Regional

Sports Surcharge are just carved-out portions of the customer's cable TV service, which prior to 2015 were <u>included</u> in the top-line service plan price. For example, in one discussion thread on Cox's website, a Cox representative stated that:

> <u>In the past, all Cox television programming costs and fees were simply rolled together in our charges for Advanced TV service or the specific Tier of service.</u> Over the years, Cox has had to raise service rates due to rising video programming costs and network retransmission fees. In an effort to meet the demand for more transparent billing practices, we introduced surcharges as a way to highlight the different costs associated with the delivery of broadcast TV networks. The separate line items simply allow customers to better track how these costs impact their total TV charge.[9]

86.     These admissions have made it abundantly clear that the Broadcast Surcharge and the Regional Sports Surcharge are extra television <u>service</u> charges.

87.     And when Cox stopped charging the Surcharges to subscribers of its <u>new</u> cable TV plans beginning March 23, 2021—and Cox instead increased the top-line price of its advertised TV service plans by <u>an equivalent dollar amount</u>—Cox was further <u>admitting</u> that the Surcharges had really just been <u>disguised extra charges for TV service all along</u>.

**B.     <u>Starting March 23, 2021: Base Service Plan Price Was Increased During the Promised Fixed-Price Promotional Period.</u>**

88.     After Cox eliminated the Surcharges from new service plans on March 23, 2021, Cox switched to a new strategy of outright increasing the base price of the service plans in the middle of Promotional Agreements.

89.     Around March 2021, Promotional Agreements replaced Term Agreements as the most common type of subscription offering by Cox. Cox offered Promotional Agreements to both new and renewing customers. Promotional Agreement service plans had no early termination penalty, but Cox continued, like

---

[9] https://forums.cox.com/forum_home/tv_forum/f/tv-forum/16427/to-keep-you-better-informed-a-6-00-surcharge-what, last accessed April 17, 2023 (emphasis added).

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw

before, to promise a fixed-price for the promotional period of 1 or 2 years.

90.     Cox advertised these Promotional Agreement plans at <u>fixed-rate dollar</u> <u>amounts</u> for the 1- or 2-year term of the promotion (just like Cox had previously advertised its Term Agreements). For example, **"$139.99/mo for 24 mos. No term agrmt."** See the screenshot below:[10]

**Figure 3: Cox Advertising for Promotional Agreement Service Plans**



91.     Meanwhile, new or renewing customers who signed up on the phone with a Cox agent for a Promotional Agreement service plan were presented with <u>the</u> <u>same</u> fixed-rate representations and promises. Cox even stated on its website that you will **"Get the exact same price when you shop online, by phone or in-store."** And consistent with Cox's website advertising, Cox telephone agents told consumers that the monthly service price would be a <u>specific fixed dollar amount</u> for every month during the promotional period, which would not increase (just like the agents had said previously regarding Term Agreements).

---

[10]     This screenshot was taken from the Cox website on July 13, 2021, and is of Cox service plans advertised with a 2-year fixed-price Promotional Agreement. The $139.99/mo service plan on the left was labeled by Cox as the "Internet Preferred 150 + Contour TV Preferred" plan. This screenshot is representative of how Cox has advertised Promotional Agreement service plans on its website since at least March 23, 2021.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

92.     Likewise, in the online signup process on Cox's website for the Promotional Agreement service plans, <u>customers were shown the same graphical monthly price chart with a separate row for each month</u> (just like Cox had previously shown for its Term Agreement service plans). The chart <u>explicitly promised that Cox would charge a specified dollar amount for each and every month</u> during the term and that Cox would then increase the price after the 1- or 2-year promotion had ended. For example, see the screenshot below.[11]

**Figure 4: Promotional Agreement Monthly Price Chart Advertised on the Cox Website**



93.     The text above the chart reads: **"Promotional discounts begin and**

---

[11]     This screenshot was taken from the Cox website on September 13, 2021, and is of the chart on the "Pricing details" webpage for the "Internet Preferred 150 + Contour TV Preferred" 2-year Promotional Agreement plan. The monthly price chart is representative of the charts that Cox has displayed on its website as part of the online purchase process for every single service plan it has offered with a Promotional Agreement since at least March 23, 2021.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 20 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**end, but that shouldn't mean that your amount due each month should be a
surprise. Lean how this offer's discounts will affect your monthly statements."**
And then the chart below this text shows unequivocally that Cox is promising to
charge the same price, $139.99, for each and every one of the 24 months under the
Promotional Agreement.

94.     In fact, many if not most of these Promotional Agreement customers
did not even realize they had not technically signed up for a "Term Agreement,"
because Cox marketed the Promotional Agreement plans to both new and renewing
customers in the same way as Term Agreements and made the exact same
representations it had always made about a fixed price that would not increase
above the quoted rates during the 1- or 2-year period.

#### 1.     Cox's New Method For Increasing the Service Price In the Middle of Fixed-Price Promotional Agreements.

95.     Cox made the business decision to continue its unlawful price increase
scheme, even after it eliminated the Surcharges. (Previously, the Surcharges had
been the primary means Cox had utilized to impose mid-agreement price increases).

96.     Cox now had to come up with a new way to implement price increases
for all these customers who were in the middle of (purportedly) fixed-price
Promotional Agreements.[12] Starting March 23, 2021, Cox's new strategy was to
outright increase the base price of the service plans themselves in the middle of
Promotional Agreements—even though it defied Cox's explicit pre-sale statements
and advertisements that the promotional monthly price would remain at the initially
quoted rates and not increase during the promotional period.

97.     For example, despite the promise in the above September 2021 website
ad (at **Figure 3**) that the "Preferred 150 + Contour TV Preferred" service plan
would be "$139.99/mo for 24 mos", and despite displaying the 24-month chart (at

---

[12]     It was still possible for customers to sign up for Term Agreements after
March 22, 2021, but it was much less common.

SECOND AMENDED
CLASS ACTION COMPLAINT
- 21 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**Figure 4**) showing the service plan would be precisely $139.99 for each and every month, <u>Cox intended to, and did, twice increase the base plan price</u> during that 24-month Promotional Period which began September 2021.

98. Specifically, Cox raised the base plan price in Month 6 (February 2022) by $8.00, to **$147.99** per month, and then charged that higher rate for Months 6–16. And then, in Month 17 (January 2023), Cox raised the base plan price again by $7.00, to **$154.99**, and then charged that higher rate for Months 17–24. Cox's advertisements, price charts, and promises that it would charge $139.99 for the service plan each and every month during the 24-month Promotional Period were **<u>outright lies</u>**.

99. Counsel's investigation found that, contrary to Cox's explicit advertising representations and the statements of its sales and customer service agents, Cox actually implements the promotions in its back-end billing system as a <u>fixed dollar amount discount</u> off of Cox's higher so-called "retail rate" during the promotional period (and not as the <u>fixed dollar amount price</u> that Cox actually advertises and promises). And when Cox increases the "retail rate" (typically annually between January and March of each year, to whatever amount Cox desires), the customer's supposedly fixed promotional price <u>automatically increases in tandem</u> by the same dollar amount—<u>even in the middle of the promised fixed-price Promotional Agreement</u>.

100. Thus, for the aforementioned service plan advertised at a 2-year fixed price during the promotional term (see Figures 3 and 4 above), Cox's back-end billing system treated the $139.99 per month offer <u>as if</u> it were—<u>instead</u>—an offer for a 24-month constant <u>discount</u> of $83.99 <u>from whatever the "retail rate" happened to be that month</u>.

101. For example, during Months 1–5, the "retail rate" was $223.98, and the Cox billing system applied the $83.99 discount to that rate which resulted in the price charged to the customer as indeed being the $139.99 the advertised price.

SECOND AMENDED
CLASS ACTION COMPLAINT

\- 22 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

102.   However, in Month 6 (February 2022), Cox increased the "retail rate" for the service plan by $8.00 to $231.98. And thus, after the Cox billing system applied the $83.99 discount to the new $231.98 "retail rate," the price charged to the customer was now $147.99 ($8.00 <u>higher</u> than the $139.99 promised and advertised price). Then, in month 17 (January 2023), Cox increased the "retail rate" yet again by another $7.00 to $238.98. And after the Cox billing system applied the $83.99 discount to the new $238.98 "retail rate," the actual price charged to the customer was now $154.99 ($15.00 <u>higher</u> than the $139.99 promised and advertised price).

103.   Plaintiffs in the "Promotional Agreement Base Price Increase" Subclass were victims of these <u>blatantly unlawful practices and breaches of contract</u>. For example, when Plaintiff Heather Webster signed up for her most recent Promotional Agreement in November 2022, she specifically asked the Cox agent if the quoted price was truly fixed for the 1-year promotional period. The agent confirmed that the service price would not increase during the 12 months. Yet, on Ms. Webster's February 2023 bill—just three months into her 1-year Promotional Agreement—Cox breached its agreement and its promises to her by increasing the base price of her service plan by $7.00—from $98.00 to $105.00. **(As Cox had previously done every year between January and March, on January 5, 2023, Cox arbitrarily increased the "retail rates" for nearly all of its service plans and services. Consistent with Cox's standard practice, Cox automatically and unlawfully raised Ms. Webster's promised fixed promotional price by the same $7.00 price increase that Cox had implemented for the so-called "retail rate" of the plan.** The January 5, 2023, price increase took effect on Ms. Webster's February 4, 2023, bill.)

104.   For example, Plaintiff Lauren Ramos is currently in an advertised and promised 2-year fixed-rate Promotional Agreement, which ends in August 2023. Yet, in January 2023, Cox breached its agreement with her by increasing the price

SECOND AMENDED
CLASS ACTION COMPLAINT

- 23 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

of the cable TV portion of her service plan by $7.00 (from $98.00 to $105.00) and increasing the internet portion of her service plan by $6.00 (from $63.99 to $69.99). **(Consistent with Cox's standard practice, Cox automatically and unlawfully raised Ms. Ramos's promised fixed promotional price by the same $7.00 cable TV price increase and the same $6.00 internet price increase that Cox had implemented for the so-called "retail rates" of the services.** The January 5, 2023, price increase took effect on Ms. Ramos's January 8, 2023, bill.)

105. When customers called Cox to complain about these price increases in the middle of their Promotional Agreements, Cox agents justified the increases by arguing (based on the information Cox internally displayed to the <u>agents</u> on Cox's customer service software systems) that the customer's promotional <u>discount dollar amount</u> had remained the same. But this defied Cox's explicit pre-sale representations and advertisements that the promotional <u>monthly price</u> (e.g., $139.99 per month) would remain at the initially quoted rates and not increase during the Promotional Agreement.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### Plaintiffs Donald Christianson and Isabel Prado

106. Plaintiffs Donald Christianson and Isabel Prado are, and at all relevant times have been, citizens and residents of La Mesa, California.

107. Since at least 2010, Mr. Christianson and Ms. Prado have been living together. When they first moved to their previous address in 2010, they signed up for one of Cox's cable TV and internet service plans. This was five years before Cox first started charging the Broadcast Surcharge and seven years before Cox first started charging the Regional Sports Surcharge.

108. In 2012, Mr. Christianson and Ms. Prado moved to their current address. When they moved, they transferred their Cox cable TV and internet service plan from their old address to their new address. Cox still had not started charging either the Broadcast Surcharge or the Regional Sports Surcharge.

SECOND AMENDED
CLASS ACTION COMPLAINT
- 24 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

109.   Mr. Christianson and Ms. Prado's Cox account is in Ms. Prado's name, with Mr. Christianson being an authorized user who can make changes to their services and pay their bills. Mr. Christianson and Ms. Prado would alternate between paying their monthly bill using money from Mr. Christianson's bank account and money from Ms. Prado's bank account. They would also occasionally visit their nearby Cox service center and pay their monthly bill in cash.

110.   In June 2019, looking for ways to save money, Mr. Christianson and Ms. Prado decided to downgrade their Cox service plan, which at that time was over $150 a month for TV and internet. Initially, they intended to switch to an internet-only plan and cut out television altogether. However, when they called Cox to switch plans, the sales agent offered to give them a very basic television service (approximately 30 channels) for free with their internet service.

111.   Mr. Christianson and Ms. Prado had this internet and "free" television service plan for three months.

112.   In September 2019, a Cox sales agent called Mr. Christianson and Ms. Prado to inform them that they were going over their internet data limit each month. They were going over their data limit because they now almost exclusively watched television shows using streaming services like Hulu and Netflix.

113.   Customers who went over their internet data limit had to pay additional monthly fees based on how much data the customer used over the limit. At the time, Cox also offered unlimited internet data plans at an additional monthly cost.

114.   Mr. Christianson and Ms. Prado could have purchased the unlimited internet data plan or paid the additional monthly fee for going over their data limit. Instead, however, the Cox sales agent used this opportunity to try to upsell them on one of Cox's higher-tier TV and internet service bundles. The agent's pitch was that if they had a television service plan with more channels, they could cut back on streaming and avoid going over their internet data limit each month.

115.   The Cox sales agent quoted Mr. Christianson and Ms. Prado a 2-year "locked-in" price for TV and internet subject to a 2-year Term Agreement.

116.   Relying on the sales agent's representations, Mr. Christianson and Ms. Prado ordered the service plan.

117.   At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the 2-year price-locked Term Agreement by increasing the Broadcast Surcharge and Regional Sports Surcharge.

118.   In February 2020—6 months into Mr. Christianson and Ms. Prado's 2-year "locked-in" price contract—Cox increased the price of their cable TV service by $4.50 by raising the amount of the Surcharges. Specifically, Cox increased the Broadcast Surcharge by $3.50 (from $10.00 to $13.50) and the Regional Sports Surcharge by $1.00 (from $7.00 to $8.00).

119.   In February 2021—18 months into their 24-month "locked-in" price contract—Cox again increased the price of their cable TV service, this time by $3.50, by raising the amount of the Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

120.   This was not the first time Cox had increased Mr. Christianson and Ms. Prado's service rate in the middle of a promised fixed-rate period. Cox had been increasing their service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Christianson and Ms. Prado had not been aware that Cox had added these Surcharges, and had not been aware that Cox had been quietly increasing them over the years—even in the middle of their purportedly fixed-rate contracts.

121.   Each time Mr. Christianson and Ms. Prado agreed to a new

promotional offer and entered into a new Term Agreement, Cox quoted them a particular monthly price for the service plan and did not mention the Surcharges.

122. Each time Mr. Christianson and Ms. Prado entered into a new Term Agreement, Cox did not disclose to them that the monthly price could, and would, increase as a result of increases to the Surcharges.

123. When Mr. Christianson and Ms. Prado's latest Term Agreement ended in August 2021, they dropped their cable TV service altogether and switched to an internet-only plan from Cox.

124. Mr. Christianson and Ms. Prado never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of their contracts.

125. Mr. Christianson and Ms. Prado did not learn that Cox had been increasing their cable TV service rate mid-agreement until April 2022.

126. Each time Mr. Christianson and Ms. Prado committed to a Term Agreement, they were relying on Cox's explicit representations regarding the fixed monthly rate under the Term Agreement. They did not expect (and Cox did not tell them) that each year Cox would in fact covertly increase the monthly service rate in the middle of their supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to them. If Mr. Christianson and Ms. Prado had known that information, they would not have been willing to pay as much for their services and would have acted differently.

127. Mr. Christianson and Ms. Prado suffered damages during their Term Agreements in the amount of the increases to their purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**<u>Plaintiff Neil Moura</u>**

128. Plaintiff Neil Moura is, and at all relevant times has been, a citizen and

SECOND AMENDED
CLASS ACTION COMPLAINT

- 27 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

resident of Oceanside, California.

129.   Mr. Moura has been a Cox cable TV subscriber for at least the last 15 years.

130.   Around four years ago, Mr. Moura started having technical problems with his Cox cable TV service. After speaking with several Cox customer service agents, Mr. Moura eventually spoke to a Cox agent named Kristi Swangel. In addition to helping Mr. Moura with his service issues, Ms. Swangel also gave him a promotional discount off his internet and TV service plan.

131.   In July 2020, the promotional discount that Ms. Swangel gave Mr. Moura expired, causing his monthly bill to increase. On July 4, 2020, Mr. Moura emailed Ms. Swangel asking if there was any way to lower his bill, such as cutting portions of his service or getting a promotional discount. Mr. Moura explained that he was retired and on a fixed income. He needed an affordable and fixed-rate monthly bill.

132.   On July 8, 2020, Ms. Swangel emailed Mr. Moura back and stated that she could give him a promotional discount that would reduce his monthly service rate to "just under $208" for 24 months subject to a 24-month Term Agreement.

133.   Based on Ms. Swangel's representations, Mr. Moura reasonably believed that his monthly service rate would remain at "just under $208" for 24 months.

134.   Relying on Ms. Swangel's representations, Mr. Moura accepted the promotional offer and agreed to the 24-month fixed-price Term Agreement. When he received his next bill in August 2020, it was $207.79—"just under $208."

135.   Nowhere in Ms. Swangel's email did she inform Mr. Moura that Cox could, and would, increase his monthly service rate during the 2-year contract by increasing the Broadcast Surcharge and the Regional Sports Surcharge.

136.   In fact, Cox increased Mr. Moura's service rate twice during his 2-year contract—first in March 2021 and then again in March 2022.

SECOND AMENDED
CLASS ACTION COMPLAINT
- 28 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

137.   On Mr. Moura's March 2021 bill—only 8 months into his 24-month purportedly fixed price contract—Cox increased the price of his cable TV service by $3.50 by raising the amount of the Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

138.   On Mr. Moura's March 2022 bill—20 months into his 24-month purportedly fixed price contract—Cox again increased the price of his cable TV service, this time by $3.00, by raising the amount of the Broadcast Surcharge by $3.00 (from $16.00 to $19.00).

139.   This was not the first time Cox had increased Mr. Moura's service rate in the middle of a promised fixed-rate period. Cox had been increasing his service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Moura had not been aware that Cox had added these Surcharges, and had not been aware that Cox had been quietly increasing them over the years—even in the middle of his purportedly fixed-rate contracts.

140.   Each time Mr. Moura agreed to a new promotional offer and entered into a new agreement, Cox quoted him a particular monthly price for the service plan and did not mention the Surcharges.

141.   Each time Mr. Moura entered into a Term Agreement, Cox did not disclose to him that the monthly price could, and would, increase as a result of increases to the Surcharges.

142.   Mr. Moura never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

143.   Mr. Moura did not learn that Cox had been increasing his cable TV service rate mid-agreement until April 2022.

144.   Each time Mr. Moura committed to a Term Agreement, he was relying

1  on Cox's explicit representations regarding the fixed monthly rate under the

2  agreement. Mr. Moura did not expect (and Cox did not tell him) that each year Cox

3  would in fact covertly increase the monthly service rate in the middle of his

4  supposedly fixed-rate contract via increases to the disguised monthly service

5  charges which it labeled the Broadcast Surcharge and the Regional Sports

6  Surcharge. That information would have been material to him. If Mr. Moura had

7  known that information, he would not have been willing to pay as much for his

8  services and would have acted differently.

9       145.   Mr. Moura suffered damages during the term of his service agreements

10  in the amount of the increases to his purportedly fixed monthly service rate via

11  raises of the Broadcast Surcharge and the Regional Sports Surcharge.

12  **Plaintiff Daniel Polinsky**

13       146.   Since November 2020, Plaintiff Daniel Polinsky has been a citizen and

14  resident of San Clemente, California. Prior to that, from August 2019 to October

15  2020, Mr. Polinsky was a citizen and resident of Nevada.

16       147.   Mr. Polinsky first signed up for Cox's services in August 2019 while

17  he was living in Nevada. Mr. Polinsky signed up through Cox's website.

18       148.   After browsing Cox's various service plans on the Cox website, Mr.

19  Polinsky selected one of Cox's internet and cable TV service plan bundles. On the

20  offer webpage for the internet and cable TV service plan, Cox prominently

21  advertised the plan as having a fixed monthly rate for 24 months with a two-year

22  Term Agreement.

23       149.   Based on these representations, Mr. Polinsky selected the service plan

24  and initiated the online order process.

25       150.   As Mr. Polinsky went through the online order process, he viewed

26  Cox's repeated representations that the monthly charges for the service plan would

27  be the same fixed rate for 24 months. For example, Mr. Polinsky viewed the

28  "Service Agreement" webpage (see Paragraph 66 at Figure 1 above), where the "2

SECOND AMENDED
CLASS ACTION COMPLAINT                - 30 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Year Term Service Agreement" option was preselected, and where Cox stated: "The Service Agreement lets you guarantee the regular rates on Cox TV, Internet and Phone services for the two years. The rates for your services will not increase above the Service Agreement rate when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years."

151.   Nowhere during the online order process did Cox indicate that Cox could, and would, increase the monthly service rate in the middle of the Term Agreement via increases to additional disguised monthly service charges.

152.   Relying on Cox's repeated representations regarding the fixed monthly price of the service plan for the two-year contract period, Mr. Polinsky completed the online purchase process and submitted his order.

153.   At no point was Mr. Polinsky aware that Cox would bill him any additional monthly service charges. At no point in the online purchase process did Mr. Polinsky see any mention of the existence of the Broadcast Surcharge or the Regional Sports Surcharge. Mr. Polinsky also had no idea that Cox could, and would, increase the service rate during the promised two-year fixed-rate period by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

154.   In February 2020—6 months into Mr. Polinsky's 24-month purportedly fixed price Term Agreement—Cox increased the Broadcast Surcharge from $10.00 to $13.50. Based on Plaintiffs' counsel's investigation, Cox also increased the Regional Sports Surcharge at the same time.[13]

155.   Mr. Polinsky never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contract.

156.   Mr. Polinsky was signed up for electronic billing and Cox's automatic payment program, EasyPay, as Cox encouraged him to do. Through this billing

---

[13]   Based on counsel's investigation, Cox increased the Regional Sports Surcharge every year in nearly every region that Cox provided service, including in its Nevada service region. For example, in February 2021, Cox increased the Regional Sports Surcharge from $8.50 to $9.00 in its Nevada service region.

process, Mr. Polinsky received a monthly Cox billing email which stated his bill total and informed him that his bill would be automatically paid by the payment due date because he was signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

157.   In November 2020, Mr. Polinsky moved to San Clemente, California—another area where Cox was a cable service provider. When he moved, he was unable to transfer his existing Cox service plan from Nevada. Instead, Mr. Polinsky signed up for a new internet and cable TV service plan from Cox. Mr. Polinsky once again signed up through Cox's website. And, once again, Mr. Polinsky chose an internet and TV service plan that Cox advertised as having a fixed monthly rate for 24 months with a 2-year Term Agreement. Mr. Polinsky went through materially the same online order process and saw materially the same representations as he had when he previously signed up in August 2019.

158.   When Mr. Polinsky signed up for Cox service in November 2020, he still did not know that Cox could, and would, increase his service rate during the promised fixed-rate period by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

159.   On Mr. Polinsky's February 2021 bill—only 3 months into his 24-month purportedly fixed-price contract—Cox increased the price of his cable TV service by $3.50 by raising the amount of the Surcharges. Specifically, Cox increased the Broadcast Surcharge by $2.50 (from $13.50 to $16.00) and the Regional Sports Surcharge by $1.00 (from $8.00 to $9.00).

160.   On Mr. Polinsky's February 2022 bill—15 months into his 24-month purportedly fixed-price contract—Cox increased the price of his cable TV service again, this time by $6.00, by raising the amount of the Surcharges. Specifically,

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Cox increased the Broadcast Surcharge by $3.00 (from $16.00 to $19.00) and the Regional Sports Surcharge by $3.00 (from $9.00 to $12.00).

161.   Mr. Polinsky did not learn that Cox had been increasing his service rate mid-agreement until May 2022.

162.   When Mr. Polinsky signed up for Cox's cable TV services, both in August 2019 in Nevada, and in November 2020 in California, he was relying on Cox's explicit representations regarding the fixed monthly rate under the 24-month Term Agreements. Mr. Polinsky did not expect (and Cox did not tell him) that Cox would in fact increase the monthly service rate in the middle of the contracts via increases to disguised monthly service charges which it labeled the Broadcast Surcharge the Regional Sports Surcharge. That information would have been material to him. If Mr. Polinsky had known that information, he would not have been willing to pay as much for his services and would have acted differently.

163.   Mr. Polinsky suffered damages during his Term Agreements in Nevada and California, in the amount of the increases to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

164.   Mr. Polinsky terminated his Cox services in mid-May 2022 when he moved to a new location outside of Cox's service area.

**Plaintiff Cristina Abdala**

165.   Plaintiff Cristina Abdala is, and at all relevant times has been, a citizen and resident of Aliso Viejo, California.

166.   Ms. Abdala had been a Cox cable TV subscriber for more than 20 years. Ms. Abdala cancelled her cable TV service around October 2021 when her last service agreement ended. Ms. Abdala still subscribes to internet service from Cox; she just no longer subscribes to cable TV.

167.   Ms. Abdala often entered into Term Agreements with Cox. Typically, whenever one service agreement ended, she would call Cox to ask for a new

SECOND AMENDED
CLASS ACTION COMPLAINT

- 33 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

promotional offer that was subject to another Term Agreement.

168. Ms. Abdala entered into her most recent 2-year Term Agreement around October 2019 when she agreed to a new promotional offer over the phone with Cox. When Ms. Abdala agreed to the new promotional offer, the Cox sales agent quoted her a fixed price on her Cox services for the duration of the agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

169. Relying on the sales agent's representations, Ms. Abdala accepted the promotional offer and agreed to the 2-year Term Agreement.

170. During Ms. Abdala's 2-year Term Agreement, Cox increased the price of her cable TV service <u>twice</u> by raising the amount of the Surcharges. The first increase was in February 2020 and the second increase was in February 2021.

171. This was not the first time Cox had increased Ms. Abdala's service rate in the middle of a promised fixed-rate period. Cox had been increasing Ms. Abdala's service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also starting at $3.00 a month). Ms. Abdala had not been aware that Cox had added these Surcharges, and she had not been aware that Cox had been quietly increasing them over the years— even in the middle of her purportedly fixed-rate contracts.

172. Each time Ms. Abdala agreed to a new promotional offer and entered into a new Term Agreement, Cox quoted Ms. Abdala a particular monthly price for the service plan and did not mention the Surcharges.

173. Each time that Ms. Abdala entered into a new agreement, Cox did not disclose to her that the monthly price could, and would, increase during the contract

period above the initially quoted rates as a result of increases to the Surcharges.

174. Ms. Abdala has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged her to do. Through this billing process, Ms. Abdala receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

175. Ms. Abdala never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

176. Ms. Abdala did not learn that Cox had been increasing her cable TV service rate mid-agreement via increases to the Surcharges until September 2022.

177. Each time Ms. Abdala committed to a Term Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the Term Agreement. Ms. Abdala did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Abdala had known that information, she would not have been willing to pay as much for her services and would have acted differently.

178. Ms. Abdala suffered damages during her Term Agreements in the amount of the increases to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Jessica Bazan**

179. Plaintiff Jessica Bazan is, and at all relevant times has been, a citizen

SECOND AMENDED
CLASS ACTION COMPLAINT

- 35 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

and resident of Laguna Hills, California.

180.   Ms. Bazan has been a Cox cable TV subscriber for over 2 years, since around September 2020. She initially signed up for Cox cable TV service by calling Cox and talking to a sales agent.

181.   When Ms. Bazan purchased her Cox cable TV service plan, the Cox sales agent quoted her a two-year fixed price for the services, subject to a 24-month Term Agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

182.   Relying on the sales agent's representations, Ms. Bazan accepted the promotional offer and agreed to the 24-month Term Agreement.

183.   During Ms. Bazan's 24-month Term Agreement, Cox increased the price of her cable TV service twice by raising the amount of the Surcharges. The first increase was in February 2021 and the second increase was in February 2022.

184.   When Ms. Bazan signed up for Cox service, she also signed up for electronic billing and Cox's automatic payment program, EasyPay, as Cox encouraged her to do. Through this billing process, Ms. Bazan receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

185.   Ms. Bazan never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contract.

186.   Ms. Bazan did not learn that Cox had been increasing her cable TV

1    service rate mid-agreement via increases to the Surcharges until October 2022.

2         187.    When Ms. Bazan committed to a Term Agreement, she was relying on

3    Cox's explicit representations regarding the fixed monthly rate under the term

4    agreement. Ms. Bazan did not expect (and Cox did not tell her) that Cox would in

5    fact increase the monthly service rate (twice) in the middle of the contract via

6    increases to the disguised monthly service charges which it labeled the Broadcast

7    Surcharge and the Regional Sports Surcharge. That information would have been

8    material to her. If Ms. Bazan had known that information, she would not have been

9    willing to pay as much for her services and would have acted differently.

10        188.    Ms. Bazan suffered damages during her Term Agreement in the

11   amount of the increases to her purportedly fixed monthly service rate via raises of

12   the Broadcast Surcharge and the Regional Sports Surcharge.

13   **Plaintiff Paula Christopher**

14        189.    Plaintiff Paula Christopher is, and at all relevant times has been, a

15   citizen and resident of San Diego, California.

16        190.    Ms. Christopher has been a Cox cable TV subscriber for more than 20

17   years. During this time, Ms. Christopher often entered into Term Agreements.

18   Typically, whenever one Term Agreement ended, she would call Cox to ask for a

19   new promotional offer that was subject to another Term Agreement. (Currently,

20   Ms. Christopher is not in a Term Agreement because the last time she spoke with a

21   Cox agent, she was told that she was grandfathered into her current service plan and

22   did not need to sign up for another service agreement.)

23        191.    Ms. Christopher entered into her most recent 2-year Term Agreement

24   around January 2018 when she agreed to a new promotional offer over the phone

25   with Cox. When Ms. Christopher agreed to the new promotional offer, the Cox

26   sales agent quoted her a fixed price on her Cox services for the duration of the

27   agreement. At no point during the phone call did the Cox sales agent mention the

28   existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge.

The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

192.   Relying on the sales agent's representations, Ms. Christopher accepted the promotional offer and agreed to the 2-year Term Agreement.

193.   During Ms. Christopher's 2-year Term Agreement, Cox increased the price of her cable TV service at least once, in February 2019, by raising the amount of the Surcharges.

194.   This was not the first time Cox had increased Ms. Christopher's service rate in the middle of a promised fixed-rate period. Cox had been increasing Ms. Christopher's service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also starting at $3.00 a month). Ms. Christopher had not been aware that Cox had added these Surcharges, and she had not been aware that Cox had been quietly increasing them over the years—even in the middle of her purportedly fixed-rate contracts.

195.   Each time Ms. Christopher agreed to a new promotional offer and entered into a new agreement, Cox quoted Ms. Christopher a particular monthly price for the service plan and did not mention the Surcharges.

196.   Each time that Ms. Christopher entered into a new agreement, Cox did not disclose to her that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

197.   Ms. Christopher never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

198.   Ms. Christopher did not learn that Cox had been increasing her cable TV service rate mid-agreement via increases to the Surcharges until September 2022.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 38 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

199.   Each time Ms. Christopher committed to a Term Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Christopher did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Christopher had known that information, she would not have been willing to pay as much for her services and would have acted differently.

200.   Ms. Christopher suffered damages during her Term Agreements in the amount of the increases to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiffs Gregory Clark and Janine Clark**

201.   Plaintiffs Gregory Clark and Janine Clark are, and at all relevant times have been, citizens and residents of San Marcos, California.

202.   The Clarks have been Cox cable TV subscribers for more than 20 years. During this time, they often entered into Term Agreements. Typically, whenever one agreement ended, they would call Cox to ask for a new promotional offer that was subject to another Term Agreement. Although their Cox account is in Janine Clark's name, Gregory Clark is the one who typically called Cox to ask for a new promotional offer.

203.   The Clarks' most recent Term Agreement was in early 2021, which they entered into when they agreed to a new promotional offer over the phone with Cox. When the Clarks agreed to the new promotional offer, the Cox sales agent quoted them a fixed price on their Cox services for the duration of the agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate

SECOND AMENDED
CLASS ACTION COMPLAINT

- 39 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

during the fixed-price period by increasing the undisclosed Broadcast Surcharge and Regional Sports Surcharge.

204.   Relying on the sales agent's representations, the Clarks accepted the promotional offer and agreed to the fixed-price Term Agreement.

205.   During the Clarks' Term Agreement, Cox increased the price of their cable TV service at least once by raising the amount of the Surcharges.

206.   This was not the first time Cox had increased the Clarks' service rate in the middle of a promised fixed-rate period. Cox had been increasing the Clarks' service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). The Clarks had not been aware that Cox had added these Surcharges, and had not been aware that Cox had been quietly increasing them over the years—even in the middle of their purportedly fixed-rate contracts.

207.   Each time the Clarks agreed to a new promotional offer and entered into a new Term Agreement, Cox quoted them a particular monthly price for the service plan and did not mention the Surcharges.

208.   Each time that the Clarks entered into a new agreement, Cox did not disclose to them that the monthly price could, and would, increase as a result of increases to the Surcharges.

209.   The Clarks never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of their contracts.

210.   The Clarks did not learn that Cox had been increasing their cable TV service rate mid-agreement via increases to the Surcharges until September 2022.

211.   Each time the Clarks committed to a Term Agreement, they were relying on Cox's explicit representations regarding the fixed monthly rate under the Term Agreement. They did not expect (and Cox did not tell them) that each year

1    Cox would in fact covertly increase the monthly service rate in the middle of their

2    supposedly fixed-rate contract via increases to the disguised monthly service

3    charges which it labeled the Broadcast Surcharge and the Regional Sports

4    Surcharge. That information would have been material to them. If the Clarks had

5    known that information, they would not have been willing to pay as much for their

6    services and would have acted differently.

7        212.   The Clarks suffered damages during their Term Agreements in the

8    amount of the increases to their purportedly fixed monthly service rate via raises of

9    the Broadcast Surcharge and the Regional Sports Surcharge.

10   **Plaintiff Joseph Depew**

11       213.   Plaintiff Joseph Depew is, and at all relevant times has been, a citizen

12   and resident of El Cajon, California.

13       214.   Mr. Depew has been a Cox cable TV subscriber for at least 6 years,

14   since around 2016. During this time, Mr. Depew has nearly always been in a Term

15   Agreement. Typically, whenever one agreement ended, he would call Cox to ask

16   for a new promotional offer that was subject to another Term Agreement.

17       215.   Each time Mr. Depew agreed to a new promotional offer and entered

18   into a new Term Agreement, Cox quoted Mr. Depew a particular fixed monthly

19   price which would not increase during the period. Each time that Mr. Depew

20   entered into a new Term Agreement, Cox did not disclose to him that the monthly

21   price could, and would, increase during the contract period as a result of increases

22   to the Surcharges.

23       216.   Each time, relying on the sales agent's representations, Mr. Depew

24   accepted the promotional offer and agreed to the fixed-price Term Agreement.

25       217.   At least once during each of Mr. Depew's agreements that he signed

26   up for prior to March 23, 2021, Cox increased the price of his service plan by

27   raising the amount of the Surcharges. The increases typically occurred between

28   January and March of each year.

218.   Mr. Depew never noticed that Cox had increased the amounts of the Broadcast Surcharge and/or Regional Sports Surcharge in the middle of his contracts.

219.   Mr. Depew did not learn that Cox had been increasing his cable TV service rate mid-agreement via increases to the Surcharges until October 2022.

220.   Each time Mr. Depew committed to a Term Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Depew did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Depew had known that information, he would not have been willing to pay as much for his services and would have acted differently.

221.   Mr. Depew suffered damages during his Term Agreements in the amount of the increases to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Brenda Depperschmidt**

222.   Plaintiff Brenda Depperschmidt is, and at all relevant times has been, a citizen and resident of El Cajon, California.

223.   Ms. Depperschmidt has been a Cox cable TV subscriber for over 2 years, since around September 2020. She initially signed up for Cox cable TV service by calling Cox and talking to a sales agent. When she signed up for service, she entered into a 2-year Term Agreement.

224.   When Ms. Depperschmidt purchased her Cox service plan, the Cox sales agent quoted her a 2-year fixed price for the services, subject to a 2-year Term Agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge.

The sales agent also never mentioned that Cox could, and would, increase the service rate during the 2-year price-locked period by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

225.   Relying on the sales agent's representations, Ms. Depperschmidt accepted the promotional offer and agreed to the 2-year Term Agreement.

226.   During Ms. Depperschmidt's 2-year agreement, Cox increased the price of her cable TV service <u>twice</u> by raising the amount of the Surcharges. The first increase was in February 2021 and the second increase was in February 2022.

227.   Ms. Depperschmidt never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contract.

228.   Ms. Depperschmidt did not learn that Cox had been increasing her cable TV service rate mid-agreement via increases to the Surcharges until October 2022.

229.   When Ms. Depperschmidt committed to a Term Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Depperschmidt did not expect (and Cox did not tell her) that Cox would in fact increase the monthly service rate (twice) in the middle of the contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Depperschmidt had known that information, she would not have been willing to pay as much for her services and would have acted differently.

230.   Ms. Depperschmidt suffered damages during her Term Agreements in the amount of the increases to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff James Gamble**

231.   Plaintiff James Gamble is, and at all relevant times has been, a citizen

1     and resident of Irvine, California.

2         232.   Mr. Gamble has been a Cox cable TV subscriber for at least 4 years.

3         233.   Mr. Gamble first signed up for Cox services in May 2018 through

4     Cox's website. After browsing Cox's various service plans on the Cox website,

5     Mr. Gamble selected one of Cox's internet and cable TV service plan bundles. On

6     the offer webpage for the internet and cable TV service plan, Cox prominently

7     advertised the plan as having a fixed monthly rate for a 12-month promotional

8     period.

9         234.   Relying on these representations, Mr. Gamble selected the service plan

10    and initiated the online order process.

11        235.   As Mr. Gamble went through the online order process, he viewed

12    Cox's repeated representations that the monthly charges for the service plan would

13    be the same fixed rate for 12 months. Nowhere during the online order process did

14    Cox indicate that Cox could, and would, increase the monthly service rate in the

15    middle of the promotional period via increases to additional disguised monthly

16    service charges.

17        236.   Relying on Cox's repeated representations regarding the fixed monthly

18    price of the service plan for the 1-year Promotional Agreement, Mr. Gamble

19    completed the online purchase process and submitted his order.

20        237.   At no point was Mr. Gamble aware that Cox would bill him any

21    additional monthly service charges. At no point in the online purchase process did

22    Mr. Gamble see any mention of the existence of additional monthly service charges

23    such as the Broadcast Surcharge or the Regional Sports Surcharge. Mr. Gamble

24    also had no idea that Cox could, and would, increase the service rate during the

25    promised 1-year fixed-rate promotional period by increasing the Broadcast

26    Surcharge and Regional Sports Surcharge.

27        238.   After his initial promotion ended, Mr. Gamble called Cox to ask for a

28    new promotional offer for another term. Cox again quoted Mr. Gamble a particular

SECOND AMENDED                          - 44 -                    HATTIS & LUKACS
CLASS ACTION COMPLAINT                                           11711 SE 8th Street, Suite 120
                                                                 Bellevue, WA 98005
                                                                 www.hattislaw.com

monthly price for the service plan that was fixed for the duration of the promotion. Based on Cox's representations, he signed up for another Promotional Agreement. Mr. Gamble had no idea that Cox would, contrary to its representations to him, increase the base price of the service plan in the middle of the promotional period.

239.   At least once during the term of each of Mr. Gamble's fixed-price Promotional Agreements that he signed up for from 2018 to March 22, 2021, Cox increased the price of his service plan by raising the amount of the Surcharges. The increases typically occurred between January and March of each year.

240.   And at least once during the term of each of Mr. Gamble's fixed-price Promotional Agreements which he signed up for on or after March 23, 2021, Cox increased the price of the service by raising the base price of his supposedly fixed-rate plan.

241.   Mr. Gamble has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Gamble receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the base rate of the service plan itself.

242.   Mr. Gamble never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of the Promotional Agreements that he signed up for prior to March 23, 2021.

243.   Mr. Gamble never noticed that Cox had increased the base price of the service plan itself in the middle of his Promotional Agreements that he signed up for on or after March 23, 2021.

SECOND AMENDED
CLASS ACTION COMPLAINT                    - 45 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

244. Mr. Gamble did not learn that Cox had been increasing his cable TV service rate mid-promotion via its price increase schemes until October 2022.

245. Each time Mr. Gamble signed up for a Promotional Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Gamble did not expect (and Cox did not tell him) that each year Cox would in fact increase the monthly service rate in the middle of his supposedly fixed-rate promotional period via increases to the Surcharges or by increasing the base rate of the service plan itself. That information would have been material to him. If Mr. Gamble had known that information, he would not have been willing to pay as much for his services and would have acted differently.

246. Mr. Gamble suffered damages during his Promotional Agreements in the amount of the increases to his purportedly fixed monthly service rate.

**Plaintiff Kelly Gilliland**

247. Plaintiff Kelly Gilliland is, and at all relevant times has been, a citizen and resident of Lemon Grove, California.

248. Mr. Gilliland was a Cox cable TV subscriber for more than 10 years. Mr. Gilliland cancelled his cable TV service around 2020 when his last cable TV service agreement ended. Mr. Gilliland still subscribes to internet service from Cox; he just no longer subscribes to cable TV.

249. Mr. Gilliland often entered into Term Agreements with Cox. Typically, whenever one agreement ended, he would call Cox to ask for a new promotional offer that was subject to another agreement.

250. In 2018, Mr. Gilliland entered into his Term Agreement that included cable TV. He entered into the service agreement when he called Cox and agreed to a new promotional offer that was subject to a 2-year agreement. When Mr. Gilliland agreed to the promotional offer, the Cox sales agent quoted him a fixed price for the services for the duration of the Term Agreement.

251. At no point during the phone call did the Cox sales agent mention the

SECOND AMENDED
CLASS ACTION COMPLAINT — 46 —

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

252.   Relying on the sales agent's representations, Mr. Gilliland accepted the promotional offer and agreed to the 2-year Term Agreement.

253.   During Mr. Gilliland's 2-year Term Agreement, Cox increased the price of his cable TV service <u>twice</u> by raising the amount of the Surcharges. The first increase was in February 2019 and the second increase was in February 2020.

254.   This was not the first time Cox had increased Mr. Gilliland's service rate in the middle of a promised fixed-rate period. Cox had been increasing Mr. Gilliland's service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Gilliland had not been aware that Cox had added these Surcharges, and he had not been aware that Cox had been quietly increasing them over the years—even in the middle of his purportedly fixed-rate contracts.

255.   Each time Mr. Gilliland agreed to a new promotional offer and entered into a new Term Agreement, Cox quoted Mr. Gilliland a particular monthly price for the service plan and did not mention the Surcharges.

256.   Each time that Mr. Gilliland entered into a new Term Agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

257.   Mr. Gilliland has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Gilliland receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 47 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

258.  Mr. Gilliland never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

259.  Mr. Gilliland did not learn that Cox had been increasing his cable TV service rate mid-agreement via increases to the Surcharges until October 2022.

260.  Each time Mr. Gilliland committed to a Term Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Gilliland did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Gilliland had known that information, he would not have been willing to pay as much for his services and would have acted differently.

261.  Mr. Gilliland suffered damages during his Term Agreements in the amount of the increases to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Brian Hargett**

262.  Plaintiff Brian Hargett is, and at all relevant times has been, a citizen and resident of San Diego, California.

263.  Mr. Hargett has been a Cox cable TV subscriber for at least 10 years. During this time, Mr. Hargett often entered into Term Agreements. Typically, whenever one agreement ended, he would visit his local Cox store and ask for a new promotional offer that was subject to another Term Agreement.

264.  Each time Mr. Hargett agreed to a new promotional offer and entered

SECOND AMENDED
CLASS ACTION COMPLAINT
- 48 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

into a new Term Agreement, Cox quoted Mr. Hargett a particular monthly price for the service plan and did not mention the Surcharges.

265. Each time that Mr. Hargett entered into a new Term Agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

266. At least once during each of the Term Agreements which Mr. Hargett signed up for prior to March 23, 2021, Cox increased the price of his cable TV service by raising the amount of the Surcharges. The increases typically occurred between January and March of each year.

267. Mr. Hargett has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Hargett receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

268. Mr. Hargett never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

269. Mr. Hargett did not learn that Cox had been increasing his cable TV service rate mid-agreement via increases to the Surcharges until October 2022.

270. Each time Mr. Hargett committed to a Term Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Hargett did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports

SECOND AMENDED
CLASS ACTION COMPLAINT

- 49 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Surcharge. That information would have been material to him. If Mr. Hargett had known that information, he would not have been willing to pay as much for his services and would have acted differently.

271. Mr. Hargett suffered damages during his Term Agreements in the amount of the increases to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Adrienne Jackson**

272. Plaintiff Adrienne Jackson is, and at all relevant times has been, a citizen and resident of San Diego, California.

273. Ms. Jackson has been a Cox cable TV subscriber for at least 5 years. During this time, Ms. Jackson often entered into Term Agreements. Typically, whenever one agreement ended, she would call Cox to ask for a new promotional offer that was subject to another Term Agreement.

274. On or around February 2021, Ms. Jackson entered into her last Term Agreement under which she was charged the Surcharges. She entered into the service agreement when she called Cox and agreed to a new promotional offer that was subject to a 1-year Term Agreement.

275. When Ms. Jackson agreed to the new promotional offer, the Cox sales agent quoted her a fixed price on her Cox services for the duration of the agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

276. Relying on the sales agent's representations, Ms. Jackson accepted the promotional offer and agreed to the 1-year Term Agreement.

277. During Ms. Jackson's 1-year Term Agreement, Cox increased the price of her cable TV service once, in February 2022, by raising the amount of the

Surcharges.

278.   This was not the first time Cox had increased Ms. Jackson's service rate in the middle of a promised fixed-rate period. Cox had been increasing Ms. Jackson's service rate mid-agreement ever since she first signed up for services years ago. Ms. Jackson had not been aware that Cox had added these Surcharges, and she had not been aware that Cox had been quietly increasing them over the years—even in the middle of her purportedly fixed-rate contracts.

279.   Each time Ms. Jackson had agreed to a Term Agreement prior to March 23, 2021, Cox had quoted Ms. Jackson a particular monthly price for the service plan and did not mention the Surcharges. Cox had not disclosed to her that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

280.   Ms. Jackson never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

281.   Ms. Jackson did not learn that Cox had been increasing her cable TV service rate mid-agreement via increases to the Surcharges until October 2022.

282.   Each time Ms. Jackson committed to a Term Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Jackson did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Jackson had known that information, she would not have been willing to pay as much for her services and would have acted differently.

283.   Ms. Jackson suffered damages during her Term Agreements in the amount of the increases to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 51 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

**Plaintiff Lyssa Jordan**

284.   Plaintiff Lyssa Jordan is, and at all relevant times has been, a citizen and resident of Spring Valley, California.

285.   Ms. Jordan has been a Cox cable TV subscriber for at least 15 years. During this time, Ms. Jordan often entered into Term Agreements. Typically, whenever one agreement ended, she would call Cox to ask for a new promotional offer that was subject to another Term Agreement.

286.   Each time Ms. Jordan agreed to a new promotional offer and entered into a new Term Agreement, Cox quoted Ms. Jordan a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. Each time, the Cox sales agent did not disclose to her that the monthly price could, and would, increase during the contract as a result of increases to the Surcharges.

287.   Each time, relying on the sales agent's representations, Ms. Jordan accepted the promotional offer and agreed to the fixed-price Term Agreement.

288.   At least once during each of Ms. Jordan's Term Agreements that she entered into prior to March 23, 2021, Cox increased the price of her cable TV service by raising the amount of the Surcharges. The increases typically occurred between January and March of each year.

289.   Ms. Jordan has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged her to do. Through this billing process, Ms. Jordan receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

SECOND AMENDED
CLASS ACTION COMPLAINT                    - 52 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

290.   Ms. Jordan never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

291.   Ms. Jordan did not learn that Cox had been increasing her cable TV service rate mid-agreement via increases to the Surcharges until October 2022.

292.   Each time Ms. Jordan committed to a Term Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Jordan did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Jordan had known that information, she would not have been willing to pay as much for her services and would have acted differently.

293.   Ms. Jordan suffered damages during her Term Agreements in the amount of the increases to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Wayne Kalayjian**

294.   Plaintiff Wayne Kalayjian is, and at all relevant times has been, a citizen and resident of Palos Verdes Estates, California.

295.   Mr. Kalayjian has been a Cox cable TV subscriber for at least 15 years. During this time, Mr. Kalayjian often entered into Term Agreements. Typically, whenever one agreement ended, he would call Cox to ask for a new promotional offer that was subject to another Term Agreement.

296.   Mr. Kalayjian entered into a 2-year Term Agreement around November 2020 when he agreed to a new promotional offer over the phone with Cox. When Mr. Kalayjian agreed to the new promotional offer, the Cox sales agent quoted him a fixed price on his Cox services for the duration of Term Agreement. At no point during the phone call did the Cox sales agent mention the existence or

SECOND AMENDED
CLASS ACTION COMPLAINT

- 53 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

297.   Relying on the sales agent's representations, Mr. Kalayjian accepted the promotional offer and agreed to the 2-year Term Agreement.

298.   During Mr. Kalayjian's 2-year Term Agreement, Cox increased the price of his cable TV service <u>twice</u> by raising the amount of the Surcharges. The first increase was in February 2021 and the second increase was in February 2022.

299.   This was not the first time Cox had increased Mr. Kalayjian's service rate in the middle of a promised fixed-rate period. Cox had been increasing Mr. Kalayjian's service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Kalayjian had not been aware that Cox had added these Surcharges, and he had not been aware that Cox had been quietly increasing them over the years—even in the middle of his purportedly fixed-rate contracts.

300.   Each time Mr. Kalayjian agreed to a new promotional offer and entered into a new Term Agreement, Cox quoted Mr. Kalayjian a particular monthly price for the service plan and did not mention the Surcharges.

301.   Each time that Mr. Kalayjian entered into a new Term Agreement, Cox did not disclose to him that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

302.   Mr. Kalayjian has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Kalayjian receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay.

Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

303.   Mr. Kalayjian never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

304.   Mr. Kalayjian did not learn that Cox had been increasing his cable TV service rate mid-agreement via increases to the Surcharges until September 2022.

305.   Each time Mr. Kalayjian committed to a Term Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Kalayjian did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Kalayjian had known that information, he would not have been willing to pay as much for his services and would have acted differently.

306.   Mr. Kalayjian suffered damages during his Term Agreements in the amount of the increases to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Jennifer Klat**

307.   Plaintiff Jennifer Klat is, and at all relevant times has been, a citizen and resident of San Diego, California.

308.   Ms. Klat has been a Cox cable TV subscriber for at least 4 years. Ms. Klat first signed up for Cox services at the end of 2017 through Cox's website.

309.   After browsing Cox's various service plans on the Cox website, Ms. Klat selected one of Cox's internet and cable TV service plan bundles. On the offer webpage for the internet and cable TV service plan, Cox prominently

advertised the plan as having a fixed monthly rate for a 2-year promotional period.

310.   Relying on these representations, Ms. Klat selected the service plan and initiated the online order process.

311.   As Ms. Klat went through the online order process, she viewed Cox's repeated representations that the monthly charges for the service plan would be the same fixed rate for 2 years. Nowhere during the online order process did Cox indicate that Cox could, and would, increase the monthly service rate in the middle of the promotional period via increases to additional disguised monthly service charges.

312.   Relying on Cox's repeated representations regarding the fixed monthly price of the service plan for the 2-year Promotional Agreement, Ms. Klat completed the online purchase process and submitted her order.

313.   At no point was Ms. Klat aware that Cox would bill her any additional monthly service charges. At no point in the online purchase process did Ms. Klat see any mention of the Broadcast Surcharge or the Regional Sports Surcharge. Ms. Klat also had no idea that Cox could, and would, increase the service rate during the promised 2-year fixed-rate promotional period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

314.   After her initial promotion ended, Ms. Klat entered into at least one more Promotional Agreement through Cox's website. Her experience entering into another Promotional Agreement was substantially similar to her initial sign up experience. Once again, she viewed Cox's repeated representations that the monthly charges for the service plan would be the same fixed rate for the duration of the promotion. Nowhere during the online order process did Cox indicate that Cox could, and would, increase the monthly service rate in the middle of the Promotional Agreement via increases to additional disguised monthly service charges. Relying on Cox's repeated representations regarding the fixed monthly price of the service plan, Ms. Klat accepted the new promotional offer and entered

1    into the new Promotional Agreement.

2        315.   At least once during each of the Promotional Agreements Ms. Klat

3    entered into before March 23, 2021, Cox increased the price of her cable TV

4    service by raising the amount of the Surcharges. The increases typically occurred

5    between January and March of each year.

6        316.   Ms. Klat never noticed that Cox had increased the amounts of the

7    Broadcast Surcharge and Regional Sports Surcharge in the middle of her fixed-rate

8    promotional periods.

9        317.   Ms. Klat did not learn that Cox had been increasing her cable TV

10   service rate in the middle of her Promotional Agreements via increases to the

11   Surcharges until September 2022.

12       318.   Each time Ms. Klat signed up for a Promotional Agreement, she was

13   relying on Cox's explicit representations regarding the fixed monthly rate under the

14   agreement. Ms. Klat did not expect (and Cox did not tell her) that each year Cox

15   would in fact covertly increase the monthly service rate in the middle of her

16   supposedly fixed-rate agreement via increases to the disguised monthly service

17   charges which it labeled the Broadcast Surcharge and the Regional Sports

18   Surcharge. That information would have been material to her. If Ms. Klat had

19   known that information, she would not have been willing to pay as much for her

20   services and would have acted differently.

21       319.   Ms. Klat suffered damages during her Promotional Agreements in the

22   amount of the increases to her purportedly fixed monthly service rate via raises of

23   the Broadcast Surcharge and the Regional Sports Surcharge.

24   **Plaintiff Diane Klein**

25       320.   Plaintiff Diane Klein is, and at all relevant times has been, a citizen

26   and resident of San Diego, California.

27       321.   Ms. Klein has been a Cox cable TV subscriber for more than 20 years.

28   During this time, Ms. Klein has entered into Term Agreements and Promotional

Agreements. Typically, whenever one agreement ended, she would call Cox to ask for a new promotional price, and then sign up for another Term Agreement or Promotional Agreement.

322.   Ms. Klein is not certain whether, prior to the most recent Promotional Agreement that she signed up for in July 2021, she had previously signed up for "Term Agreements" versus "Promotional Agreements," although she believes she previously signed up for at least one Term Agreement. Cox sales agents described and marketed these Term Agreements and Promotional Agreements to her in the same way and made the exact same representations about a fixed rate that would not change during the 1- or 2-year period.

323.   In July 2021, Ms. Klein signed up for a new 2-year fixed-price Promotional Agreement over the phone with Cox. The Cox sales agent quoted her a specific, fixed price on her Cox services for 2 years. But because the Cox sales agent quoted her a fixed price for the 2 years in the same way that Cox had done before when she had signed up for Term Agreements, Ms. Klein initially believed that she was again signing up for a Term Agreement in July 2021. However, Ms. Klein recently called Cox and was informed that she was not currently in a Term Agreement, and that she had in fact been put in a Promotional Agreement in July 2021.

324.   Previous to the July 2021 agreement, Ms. Klein signed up for what she believed was a fixed-rate Term Agreement on or around January 2018. When Ms. Klein signed up for the January 2018 agreement, the Cox sales agent quoted her a fixed price on her Cox services for the duration of the service agreement. At no point during the phone call did the Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. The sales agent also never mentioned that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge. Relying on the sales agent's representations, Ms. Klein accepted the

SECOND AMENDED
CLASS ACTION COMPLAINT

- 58 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

promotional offer and agreed to the 2-year fixed-price service agreement.

325.   At least once during the term of each of Ms. Klein's fixed-price Term Agreements or Promotional Agreements that she signed up for prior to March 23, 2021, Cox increased the price of her service plan by raising the amount of the Surcharges. The increases typically occurred between January and March of each year.

326.   And at least once during the term of the Promotional Agreement that Ms. Klein signed up for in July 2021, Cox increased the price of the service by raising the base price of her supposedly fixed-rate plan.

327.   Ms. Klein never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of the Term Agreements or Promotional Agreements that she signed up for prior to March 23, 2021.

328.   Ms. Klein never noticed that Cox had increased the base price of the service plan itself in the middle of her July 2021 Promotional Agreement.

329.   Ms. Klein did not learn that Cox had been increasing her service plan rate in the middle of her supposedly fixed-price Term Agreements or Promotional Agreements until September 2022.

330.   Each time Ms. Klein signed up for a Term Agreement or Promotional Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Klein did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term via increases to the Surcharges or via increases to the base price of the service plan itself. That information would have been material to her. If Ms. Klein had known that information, she would not have been willing to pay as much for her services and would have acted differently.

331.   Ms. Klein suffered damages during her Term Agreements and Promotional Agreements in the amount of the increases to her purportedly fixed

SECOND AMENDED
CLASS ACTION COMPLAINT

- 59 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    monthly service rate.

2    **Plaintiff Nestor Mendez**

3    332.   Plaintiff Nestor Mendez is, and at all relevant times has been, a citizen

4    and resident of San Marcos, California.

5    333.   Mr. Mendez was a Cox cable TV subscriber for 1 year, from late 2019

6    to late 2020. After his first service agreement ended in late 2020, he cancelled his

7    cable TV service. Mr. Mendez is still a Cox internet subscriber; he just no longer

8    subscribes to cable TV.

9    334.   Mr. Mendez initially signed up for Cox service at his local Cox retail

10   store.

11   335.   When Mr. Mendez purchased his Cox service plan, the Cox store sales

12   agent quoted him a 1-year fixed price for the services, subject to a 1-year Term

13   Agreement. At no point during the sign-up process did the agent mention the

14   existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge.

15   The sales agent also never mentioned that Cox could, and would, increase the

16   service rate during the one-year price-locked period by increasing the Broadcast

17   Surcharge and Regional Sports Surcharge.

18   336.   Relying on the sales agent's representations, Mr. Mendez accepted the

19   promotional offer and agreed to the 1-year Term Agreement.

20   337.   During Mr. Mendez's 1-year agreement, Cox increased the price of his

21   cable TV service once, in February 2020, by raising the amount of the Surcharges.

22   338.   When Mr. Mendez signed up for Cox service, he also signed up for

23   electronic billing and Cox's automatic payment program, EasyPay, as Cox

24   encouraged him to do. Through this billing process, Mr. Mendez receives a

25   monthly Cox billing email which states his bill total and informs him that his bill

26   will be automatically paid by the payment due date because he is signed up for

27   EasyPay. Cox's EasyPay program discourages customers from reviewing their

28   monthly bill. And, because Cox's billing emails only state the bill total, customers

cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

339. Mr. Mendez never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contract.

340. Mr. Mendez did not learn that Cox had increased his cable TV service rate mid-agreement via increases to the Surcharges until September 2022.

341. When Mr. Mendez committed to a Term Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Mendez did not expect (and Cox did not tell him) that Cox would in fact increase the monthly service rate in the middle of the contract via an increase to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Mendez had known that information, he would not have been willing to pay as much for his services and would have acted differently.

342. Mr. Mendez suffered damages during his Term Agreement in the form of the increase to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Stephen Metzger**

343. Plaintiff Stephen Metzger was a citizen and resident of Mission Viejo, California, at all relevant times through May 2022. Mr. Metzger is currently a citizen and resident of Lake Forest, California.

344. Mr. Metzger was a Cox cable TV subscriber for at least 6 years. Mr. Metzger cancelled his cable TV service in early 2021, switching to an internet-only plan with Cox. Then in May 2022, Mr. Metzger quit Cox altogether; he no longer receives any services from Cox.

345. While he was a Cox subscriber, Mr. Metzger often entered into Term Agreements. Typically, whenever one service agreement ended, he would call Cox to ask for a new promotional offer that was subject to another Term Agreement.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 61 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

346.   Until he cancelled his cable TV service in 2021, each time Mr. Metzger entered into a new Term Agreement, Cox quoted Mr. Metzger a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. Each time, the agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

347.   Each time, relying on the sales agent's representations, Mr. Metzger accepted the promotional offer and agreed to the fixed-price Term Agreement.

348.   At least once during each of Mr. Metzger's Term agreements that he signed up for between 2016 and 2021, Cox increased the price of his service plan by raising the amount of the Surcharges. The increases typically occurred between January and March of each year.

349.   Mr. Metzger was signed up for electronic billing and Cox's automatic payment program, EasyPay, for several years, as Cox encouraged him to do. Through this billing process, Mr. Metzger received a monthly Cox billing email which stated his bill total and informed him that his bill will be automatically paid by the payment due date because he was signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

350.   Mr. Metzger never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

351.   Mr. Metzger did not learn that Cox had increased his cable TV service rate in the middle of his fixed-rate Term Agreements via increases to the Surcharges, until September 2022.

352.   Each time Mr. Metzger committed to a Term Agreement, he was

SECOND AMENDED
CLASS ACTION COMPLAINT

- 62 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Metzger did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Metzger had known that information, he would not have been willing to pay as much for his services and would have acted differently.

353.  Mr. Metzger suffered damages during his Term Agreements in the amount of the increases to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff James Mills**

354.  Plaintiff James Mills is, and at all relevant times has been, a citizen and resident of Escondido, California.

355.  Mr. Mills has been a Cox cable TV subscriber for at least 15 years. During this time, Mr. Mills often entered into Term Agreements. Typically, whenever one agreement ended, he would call Cox to ask for a new promotional offer that was subject to another Term Agreement.

356.  Each time Mr. Mills signed up for a new Term Agreement, Cox quoted him a particular, fixed monthly price for the service plan. Each time, the Cox sales agent did not mention the existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge. Each time, the agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

357.  Each time, relying on the sales agent's representations, Mr. Mills accepted the promotional offer and agreed to the fixed-price Term Agreement.

358.  At least once during each of Mr. Mills's Term Agreements which he signed up for prior to March 23, 2021, Cox increased the price of his service plan

SECOND AMENDED
CLASS ACTION COMPLAINT
- 63 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

by raising the amount of the Surcharges. The increases generally occurred between January and March of each year.

359.   Mr. Mills has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Mills receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

360.   Mr. Mills never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

361.   Mr. Mills did not learn that Cox had been increasing his service plan rates in the middle of the fixed-rate Term Agreements via increases to the Surcharges until September 2022.

362.   Each time Mr. Mills committed to a Term Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Mills did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to him. If Mr. Mills had known that information, he would not have been willing to pay as much for his services and would have acted differently.

363.   Mr. Mills suffered damages during his Term Agreements in the amount of the increases to his purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Michael Mitchell**

364.    Plaintiff Michael Mitchell is, and at all relevant times has been, a citizen and resident of Lemon Grove, California.

365.    Mr. Mitchell has been a Cox cable TV subscriber since 2016. During this time, Mr. Mitchell has entered into Promotional Agreements. Typically, whenever one promotional period ended, he would call Cox to ask for a new promotional offer that was subject to another Promotional Agreement. (Mr. Mitchell had thought he had been signing up for Term Agreements rather than Promotional Agreements, but Cox recently informed him through counsel that this was not the case. In fact, customers often did not know which type of agreement they had signed up for, because Cox sales agents described and marketed Term Agreements and Promotional Agreements in the same way and made the same representations about a fixed rate that would not change during the 1- or 2-year period.)

366.    Mr. Mitchell entered into his most recent Promotional Agreement around November 2021 over the phone with Cox. The Cox sales agent quoted him a fixed price on his Cox service plan that would not change for the duration of the promotional period.

367.    Relying on the sales agent's representations, Mr. Mitchell accepted the promotional offer and agreed to the Promotional Agreement.

368.    Contrary to Cox's advertising and promises, Cox increased the price of his service in the middle of the promotional period by raising the base price of his supposedly fixed-rate plan.

369.    This was not the first time Cox had increased Mr. Mitchell's service rate in the middle of a Promotional Agreement. During the Promotional Agreements that Mr. Mitchell had signed up for prior to March 23, 2021, Cox had increased Mr. Mitchell's service rates by increasing the amounts of the Broadcast Surcharge and the Regional Sports Surcharge.

370.   Each time Mr. Mitchell signed up for a Promotional Agreement, Cox quoted Mr. Mitchell a particular monthly price for the service plan that was fixed for the duration of the promotion.

371.   Each time that Mr. Mitchell entered into a Promotional Agreement, Cox did not disclose to him that the monthly price could, and would, increase during the promotion as a result of increases to the Surcharges or increases the base price of the service plan itself.

372.   Mr. Mitchell has been signed up for electronic billing and Cox's automatic payment program, EasyPay, for the past few years, as Cox encouraged him to do. Through this billing process, Mr. Mitchell receives a monthly Cox billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge.

373.   Mr. Mitchell never noticed that Cox had increased the prices of his service plans in the middle of the promotional periods via increases to the Surcharges or by increasing the base price of the service plan itself.

374.   Mr. Mitchell did not learn that Cox had been increasing his cable TV service rates in the middle of his Promotional Agreements via Cox's price increase schemes until October 2022.

375.   Each time Mr. Mitchell signed up for a Promotional Agreement, he was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Mr. Mitchell did not expect (and Cox did not tell him) that each year Cox would in fact covertly increase the monthly service rate in the middle of his supposedly fixed-rate promotional period via increases to the Surcharges or by increasing the base rate of the service plan itself. That information

1   would have been material to him. If Mr. Mitchell had known that information, he

2   would not have been willing to pay as much for his services and would have acted

3   differently.

4       376.   Mr. Mitchell suffered damages during his Promotional Agreements in

5   the amount of the increases to his purportedly fixed monthly service rate.

6   **Plaintiff Rosa Montanez**

7       377.   Plaintiff Rosa Montanez is, and at all relevant times has been, a citizen

8   and resident of Escondido, California.

9       378.   Ms. Montanez has been a Cox cable TV subscriber since 2015. During

10  this time, Ms. Montanez often entered into Term Agreements. Typically, whenever

11  one agreement ended, she would call Cox to ask for a new promotional offer that

12  was subject to another Term Agreement.

13      379.   Ms. Montanez's Cox account is in her husband's name, Ivan

14  Montanez. However, Ms. Montanez is an authorized user on the account, and she is

15  the one who usually calls Cox to ask for a new promotional offer.

16      380.   Ms. Montanez entered into her most recent 1-year Term Agreement

17  around September 2020, when she agreed to a new promotional offer over the

18  phone with Cox. The Cox sales agent quoted her a fixed price on her Cox services

19  for the duration of the Term Agreement. At no point during the phone call did the

20  Cox sales agent mention the existence or the amounts of the Broadcast Surcharge or

21  Regional Sports Surcharge. The sales agent also never mentioned that Cox could,

22  and would, increase the service rate during the fixed-price period by increasing the

23  Broadcast Surcharge and Regional Sports Surcharge.

24      381.   Relying on the sales agent's representations, Ms. Montanez agreed to

25  the 1-year fixed-price Term Agreement.

26      382.   Contrary to Cox's representations and promises to her, Cox increased

27  the price of her service plan in the middle of her Term Agreement (in February

28  2021) by raising the amount of the Surcharges.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

383. This was not the first time Cox had increased Ms. Montanez's service rate in the middle of a promised fixed-rate Term Agreement. Cox had been increasing Ms. Montanez's service rate mid-agreement ever since Ms. Montanez first signed up for Cox service in 2015 (at first, Cox just charged the Broadcast Surcharge at $3.00 a month; then later, in 2017, Cox began charging the Regional Sports Surcharge, also at $3.00 a month).

384. Ms. Montanez had not been aware that Cox had added these Surcharges, and she had not been aware that Cox had been quietly increasing them over the years—even in the middle of her purportedly fixed-rate contracts.

385. Each time Ms. Montanez agreed to a new promotional offer and entered into a new Term Agreement prior to March 23, 2021, Cox quoted Ms. Montanez a particular monthly price for the service plan and did not mention the Surcharges. Each time, Cox did not disclose to her that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

386. Ms. Montanez never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her contracts.

387. Ms. Montanez did not learn that Cox had been increasing her service rate mid-agreement via increases to the Surcharges until September 2022.

388. Each time Ms. Montanez committed to a Term Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Montanez did not expect (and Cox did not tell her) that each year Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate contract via increases to the disguised monthly service charges which it labeled the Broadcast Surcharge and the Regional Sports Surcharge. That information would have been material to her. If Ms. Montanez had known that information, she would not have been willing to pay as much for her services and would have acted differently.

SECOND AMENDED
CLASS ACTION COMPLAINT
- 68 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

389.   Ms. Montanez suffered damages during her Term Agreements in the amount of the increases to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge and the Regional Sports Surcharge.

**Plaintiff Lauren Ramos**

390.   Plaintiff Lauren Ramos is, and at all relevant times has been, a citizen and resident of San Pedro, California.

391.   Ms. Ramos has been a Cox cable TV subscriber for at least 10 years. During this time, Ms. Ramos has often signed up for Promotional Agreements. Typically, whenever one promotional period ended, she would call Cox to ask for a new promotional offer that was subject to another Promotional Agreement.

392.   Each time Ms. Ramos called Cox to sign up for a new promotional offer, Cox quoted Ms. Ramos a particular, fixed monthly price for the service plan for a period of 1 or 2 years. Each time, the Cox sales agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge, or by increasing the base price of the service plan itself.

393.   Each time, relying on the sales agent's representations, Ms. Ramos accepted the promotional offer and agreed to the fixed-price Promotional Agreement.

394.   At least once during the term of each of Ms. Ramos's fixed-price Promotional Agreements that she signed up for prior to March 23, 2021, Cox increased the price of her service plan by raising the amount of the Surcharges. The increases typically occurred between January and March of each year.

395.   Ms. Ramos noticed the existence of the Surcharges on her bill in or around 2018. At that time, Ms. Ramos called Cox customer service to ask what the Surcharges were, and the customer service agent she spoke to told her they were charges Ms. Ramos was required to pay to receive service. The agent did not inform or disclose to Ms. Ramos that the Surcharges could, and would, be increased

SECOND AMENDED
CLASS ACTION COMPLAINT

- 69 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

by Cox in the middle of her fixed-rate promotional periods.

396.   Ms. Ramos never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her Promotional Agreements.

397.   With regard to Ms. Ramos's most recent 2-year Promotional Agreement that she signed up for in August 2021 (which ends in August 2023), Cox has increased the price of the service by raising the base price of the service plan itself. Most recently, in January 2023, Cox increased the base price of her service plan by $13.00. More specifically, Cox increased the base price of the cable TV portion of her service plan by $7.00 (from $98.00 to $105.00) and increased the based price of the internet portion of her service plan by $6.00 (from $63.99 to $69.99). (As Cox had previously done every year between January and March, on January 5, 2023, Cox arbitrarily increased the "retail rates" for nearly all of its service plans and services. Consistent with Cox's standard practice, Cox automatically and unlawfully raised Ms. Ramos's promised fixed promotional rate by the same $7.00 cable TV price increase and the same $6.00 internet price increase that Cox had implemented for the so-called "retail rates" of the services. The January 5, 2023, price increase took effect on Ms. Ramos's January 8, 2023, bill.)

398.   Ms. Ramos did not learn that Cox had been increasing her service rates in the middle of her Promotional Agreements via Cox's price increase schemes until September 2022.

399.   Each time Ms. Ramos signed up for a Promotional Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Ramos did not expect (and Cox did not tell her) that each year Cox would in fact increase the monthly service rate in the middle of her supposedly fixed-rate promotion via increases to the Surcharges or by increasing the base price of the service plan itself. That information would have been material

SECOND AMENDED
CLASS ACTION COMPLAINT                    - 70 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    to her. If Ms. Ramos had known that information, she would not have been willing
2    to pay as much for her services and would have acted differently.

3        400.   Ms. Ramos suffered damages during her Promotional Agreements in
4    the amount of the increases to her purportedly fixed monthly service rate.

5    **Plaintiff Albert Renn**

6        401.   Plaintiff Albert Renn is, and at all relevant times has been, a citizen
7    and resident of San Diego, California.

8        402.   Mr. Renn has been a Cox cable TV subscriber for over 20 years.
9    During this time, Mr. Renn often entered into Term Agreements. Typically,
10   whenever one agreement ended, he would call Cox to ask for a new promotional
11   offer that was subject to another Term Agreement.

12       403.   Around March 2020, Mr. Renn called Cox and signed up for his last
13   Term Agreement which included the Broadcast Surcharge and the Regional Sports
14   Surcharge. When Mr. Renn agreed to the new promotional offer, the Cox sales
15   agent quoted him a fixed price on his Cox services for the duration of the Term
16   Agreement. At no point during the phone call did the Cox sales agent mention that
17   Cox could, and would, increase the service rate during the fixed-price period by
18   raising the Broadcast Surcharge and Regional Sports Surcharge.

19       404.   Relying on the sales agent's representations, Mr. Renn accepted the
20   promotional offer and agreed to the 2-year Term Agreement.

21       405.   During Mr. Renn's 2-year Term Agreement, Cox increased the price
22   of his cable TV service <u>twice</u> by raising the amount of the Surcharges. The first
23   increase was in February 2021 and the second increase was in February 2022.

24       406.   This was not the first time Cox had increased Mr. Renn's service rate
25   in the middle of a promised fixed-rate period. Cox had been increasing Mr. Renn's
26   service rate mid-agreement ever since Cox first began charging the Surcharges
27   (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later,
28   in 2017, with the Regional Sports Surcharge, also at $3.00 a month). Mr. Renn had

SECOND AMENDED
CLASS ACTION COMPLAINT                - 71 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  not been aware that Cox had added these Surcharges, and he had not been aware

2  that Cox had been quietly increasing them over the years—even in the middle of his

3  purportedly fixed-rate contracts.

4  407.   Each time Mr. Renn agreed to a new promotional offer and entered

5  into a new Term Agreement, Cox quoted Mr. Renn a particular monthly price for

6  the service plan and did not mention the Surcharges.

7  408.   Each time that Mr. Renn entered into a new Term Agreement, Cox did

8  not disclose to him that the monthly price could, and would, increase during the

9  contract period as a result of increases to the Surcharges.

10  409.   Mr. Renn has been signed up for electronic billing and Cox's

11  automatic payment program, EasyPay, for the past few years, as Cox encouraged

12  him to do. Through this billing process, Mr. Renn receives a monthly Cox billing

13  email which states his bill total and informs him that his bill will be automatically

14  paid by the payment due date because he is signed up for EasyPay. Cox's EasyPay

15  program discourages customers from reviewing their monthly bill. And, because

16  Cox's billing emails only state the bill total, customers cannot tell from the email

17  itself that Cox has increased their monthly service rate by increasing the Broadcast

18  Surcharge and/or Regional Sports Surcharge.

19  410.   Mr. Renn never noticed that Cox had increased the amounts of the

20  Broadcast Surcharge and Regional Sports Surcharge in the middle of his contracts.

21  411.   Mr. Renn did not learn that Cox had been increasing his cable TV

22  service rate mid-agreement via increases to the Surcharges until September 2022.

23  412.   Each time Mr. Renn committed to a Term Agreement, he was relying

24  on Cox's explicit representations regarding the fixed monthly rate under the

25  agreement. Mr. Renn did not expect (and Cox did not tell him) that each year Cox

26  would in fact covertly increase the monthly service rate in the middle of his

27  supposedly fixed-rate contract via increases to the disguised monthly service

28  charges which it labeled the Broadcast Surcharge and the Regional Sports

SECOND AMENDED
CLASS ACTION COMPLAINT

- 72 -

1    Surcharge. That information would have been material to him. If Mr. Renn had

2    known that information, he would not have been willing to pay as much for his

3    services and would have acted differently.

4         413.   Mr. Renn suffered damages during his Term Agreements in the

5    amount of the increases to his purportedly fixed monthly service rate via raises of

6    the Broadcast Surcharge and the Regional Sports Surcharge.

7    **Plaintiff Robynn Rowe**

8         414.   Plaintiff Robynn Rowe is, and at all relevant times has been, a citizen

9    and resident of Santa Barbara, California.

10        415.   Ms. Rowe was a Cox cable TV subscriber for about 4 years, from 2016

11   to 2020. Ms. Rowe cancelled her cable TV service around September 2020 when

12   her cable TV service agreement ended. Ms. Rowe still subscribes to internet service

13   from Cox; she just no longer has cable TV.

14        416.   While Ms. Rowe was a Cox cable TV subscriber, she entered into

15   several Term Agreements. Typically, whenever one Term Agreement ended, she

16   would call Cox to ask for a new promotional offer that was subject to another Term

17   Agreement.

18        417.   Each time Ms. Rowe contacted Cox to get a new promotional offer and

19   sign up for a new Term Agreement, Cox quoted Ms. Rowe a particular, fixed

20   monthly price for the service plan. Each time, the Cox sales agent did not mention

21   the existence or the amount of the Broadcast Surcharge. Each time, the sales agent

22   did not mention that Cox could, and would, increase the service rate during the

23   fixed-price period by increasing the Broadcast Surcharge.

24        418.   Each time, relying on the sales agent's representations, Ms. Rowe

25   accepted the promotional offer and agreed to the Term Agreement.

26        419.   At least once during each of Ms. Rowe's Term Agreements which she

27   signed up for between 2016 and 2020, Cox increased the price of her cable TV

28   service by raising the amount of the Broadcast Surcharge. The increases typically

---

SECOND AMENDED
CLASS ACTION COMPLAINT

- 73 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  occurred between January and March of each year.

2  420.  Ms. Rowe did not learn that Cox had been increasing her cable TV

3  service rate via the Broadcast Surcharge until 2020. Ms. Rowe called Cox at the

4  end of her Term Agreement in September 2020 to inquire about a new contract and

5  to complain about increases to her bill including the Surcharge. Cox told her it was

6  a pass-through charge that she had to pay. Ms. Rowe decided to drop her cable TV

7  service and to sign up for an internet-only service contract with Cox instead.

8  421.  Each time Ms. Rowe committed to a Term Agreement, she was relying

9  on Cox's explicit representations regarding the fixed monthly rate under the

10  agreement. Ms. Rowe did not expect (and Cox did not tell her) that each year Cox

11  would in fact covertly increase the monthly service rate in the middle of her

12  supposedly fixed-rate contract via an increase to the disguised monthly service

13  charge which it labeled the Broadcast Surcharge. That information would have been

14  material to her. If Ms. Rowe had known that information, she would not have been

15  willing to pay as much for her services and would have acted differently.

16  422.  Ms. Rowe suffered damages during her Term Agreements in the

17  amount of the increases to her purportedly fixed monthly service rate via raises of

18  the Broadcast Surcharge.

19  **Plaintiff Patricia Salvacion**

20  423.  Plaintiff Patricia Salvacion is, and at all relevant times has been, a

21  citizen and resident of Chula Vista, California.

22  424.  Ms. Salvacion has been a Cox cable TV subscriber for more than 20

23  years. During this time, Ms. Salvacion signed up for several Promotional

24  Agreements. Often, whenever one promotional period ended, she would call Cox to

25  ask for a new promotional offer that was subject to another Promotional

26  Agreement.

27  425.  Each time Ms. Salvacion called Cox to sign up for a new promotional

28  offer, Cox quoted Ms. Salvacion a particular, fixed monthly price for the service

plan for a period of 1 or 2 years. Each time, the Cox sales agent did not mention that Cox could, and would, increase the service rate during the fixed-price period by increasing the Broadcast Surcharge and Regional Sports Surcharge, or by increasing the base price of the service plan itself.

426.   Each time, relying on the sales agent's representations, Ms. Salvacion accepted the promotional offer and agreed to the fixed-price Promotional Agreement.

427.   At least once during the term of each of Ms. Salvacion's fixed-price Promotional Agreements that she signed up for prior to March 23, 2021, Cox increased the price of her service plan by raising the amount of the Surcharges. The increases typically occurred between January and March of each year.

428.   Ms. Salvacion never noticed that Cox had increased the amount of the Broadcast Surcharge in the middle of her Promotional Agreements.

429.   Ms. Salvacion did not learn that Cox had been increasing her cable TV service rate in the middle of her Promotional Agreements via increases to the Broadcast Surcharge until October 2022.

430.   Each time Ms. Salvacion signed up for a Promotional Agreement, she was relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. Ms. Salvacion did not expect (and Cox did not tell her) that each year Cox would in fact increase the monthly service rate in the middle of her supposedly fixed-rate promotion via increases to the Broadcast Surcharge. That information would have been material to her. If Ms. Salvacion had known that information, she would not have been willing to pay as much for her services and would have acted differently.

431.   Ms. Salvacion suffered damages during her Promotional Agreements in the amount of the increases to her purportedly fixed monthly service rate via raises of the Broadcast Surcharge.

SECOND AMENDED
CLASS ACTION COMPLAINT

- 75 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1 **Plaintiff Heather Webster**

2     432. Plaintiff Heather Webster is, and at all relevant times has been, a

3 citizen and resident of Laguna Hills, California.

4     433. Ms. Webster has been a Cox subscriber for several years. She has

5 always subscribed to cable TV and internet. Ms. Webster has previously been in

6 two Term Agreements, and she is currently in a Promotional Agreement. Typically,

7 whenever one promotional offer ended, she would call Cox to ask for a new

8 promotional offer.

9     434. Each time Ms. Webster entered into a Term Agreement, the Cox sales

10 agent quoted Ms. Webster a particular, fixed monthly price for the service plan.

11 Each time, the Cox sales agent did not mention the existence or the amount of the

12 Broadcast Surcharge or Regional Sports Surcharge. Each time, the sales agent did

13 not mention that Cox could, and would, increase the service rate during the fixed-

14 price period by increasing the Broadcast Surcharge and Regional Sports Surcharge.

15     435. Each time, relying on the sales agent's representations, Ms. Webster

16 agreed to the Term Agreement.

17     436. Ms. Webster signed up for her last Term Agreement in November

18 2020 (that 2-year agreement ended in November 2022). During that 2-year Term

19 Agreement, Cox increased the price of her service plan <u>twice</u> by raising the amount

20 of the Surcharges. The first increase was in February 2021 and the second increase

21 was in February 2022.

22     437. When the Term Agreement ended in November 2022, she called Cox

23 and entered into a new 1-year fixed-price Promotional Agreement. When Ms.

24 Webster agreed to the new Promotional Agreement, the Cox sales agent quoted her

25 a particular monthly price for the service plan that was fixed, and would not

26 increase, for 1 year.

27     438. In February 2023—3 months into Ms. Webster's 1-year fixed-price

28 Promotional Agreement—Cox raised the price of her service plan by $7.00 by

---

SECOND AMENDED
CLASS ACTION COMPLAINT
    - 76 -

increasing the base price of the service plan itself, contrary to Cox's prior representations and promises that the price would not increase during the term. (As Cox had previously done every year between January and March, on January 5, 2023, Cox arbitrarily increased the "retail rates" for nearly all of its service plans and services. Consistent with Cox's standard practice, Cox automatically and unlawfully raised Ms. Webster's promised fixed promotional rate by the same $7.00 price increase that Cox had implemented for the so-called "retail rate" of the plan. The January 5, 2023, price increase took effect on Ms. Webster's February 4, 2023, bill.)

439.   When Ms. Webster signed up for Cox service, she also signed up for Cox's automatic payment program, EasyPay, as Cox encouraged her to do. Through this billing process, Ms. Webster receives a monthly Cox billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she is signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill total, customers cannot tell from the email itself that Cox has increased their monthly service rate by either increasing Surcharges by increasing the base price of the service plan itself.

440.   Ms. Webster never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her November 2020 Term Agreement.

441.   Ms. Webster also never noticed that Cox had increased the base price of the service plan itself in the middle of her July 2021 Promotional Agreement.

442.   Ms. Webster did not learn that Cox had been increasing her service plan rate in the middle of her supposedly fixed-price Term Agreements or Promotional Agreement until early 2023.

443.   Each time Ms. Webster signed up for a Term Agreement or Promotional Agreement, she was relying on Cox's explicit representations

1   regarding the fixed monthly rate under the agreement. Ms. Webster did not expect

2   (and Cox did not tell her) that each year Cox would in fact covertly increase the

3   monthly service rate in the middle of her supposedly fixed-rate term via increases to

4   the Surcharges or by increasing the base price of the service plan itself. That

5   information would have been material to her. If Ms. Webster had known that

6   information, she would not have been willing to pay as much for her services and

7   would have acted differently.

8       444.   Ms. Webster suffered damages during her Term Agreements and

9   Promotional Agreements in the amount of the increases to her purportedly fixed

10  monthly service rate.

11  **Plaintiffs John Wiley and Stephanie Wiley**

12      445.   Plaintiffs John Wiley and Stephanie Wiley are, and at all relevant

13  times have been, citizens and residents of Santa Barbara, California.

14      446.   The Wileys have been Cox cable TV subscribers for more than 20

15  years. During this time, they often entered into Term Agreements. Typically,

16  whenever one agreement ended, they would call Cox to ask for a new promotional

17  offer that was subject to another Term Agreement. Although their Cox account is in

18  John Wiley's name, Stephanie Wiley is the one who usually calls Cox to ask for a

19  new promotional offer.

20      447.   The Wileys' most recent Term Agreement was in 2019, which they

21  entered into when they agreed to a new promotional offer over the phone with Cox.

22  When the Wileys agreed to the new promotional offer, the Cox sales agent quoted

23  them a fixed price on their Cox services for the duration of the 2-year Term

24  Agreement. At no point during the phone call did the Cox sales agent mention the

25  existence or the amounts of the Broadcast Surcharge or Regional Sports Surcharge.

26  The sales agent also never mentioned that Cox could, and would, increase the

27  service rate during the fixed-price period by increasing the Broadcast Surcharge and

28  Regional Sports Surcharge.

448.   Relying on the sales agent's representations, the Wileys accepted the promotional offer and agreed to the 2-year Term Agreement.

449.   During the Wileys' Term Agreement, Cox increased the price of their cable TV service at least once by raising the amount of the Surcharges.

450.   This was not the first time Cox had increased the Wileys' service rate in the middle of a promised fixed-rate period. Cox had been increasing the Wileys' service rate mid-agreement ever since Cox first began charging the Surcharges (beginning in 2015 with the Broadcast Surcharge at $3.00 a month, and then later, in 2017, with the Regional Sports Surcharge, also at $3.00 a month).

451.   The Wileys had not been aware that Cox had added these Surcharges, and had not been aware that Cox had been quietly increasing the Surcharges over the years—even in the middle of their purportedly fixed-rate contracts.

452.   Each time the Wileys agreed to a new promotional offer and entered into a new Term Agreement, Cox quoted them a particular monthly price for the service plan and did not mention the Surcharges. Cox also did not disclose to them that the monthly price could, and would, increase during the contract period as a result of increases to the Surcharges.

453.   The Wileys never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of their contracts.

454.   The Wileys did not learn that Cox had been increasing their service rate in the middle of their Term Agreements via increases to the Surcharges until October 2022.

455.   Each time the Wileys committed to a Term Agreement, they were relying on Cox's explicit representations regarding the fixed monthly rate under the agreement. They did not expect (and Cox did not tell them) that each year Cox would in fact covertly increase the monthly service rate in the middle of their supposedly fixed-rate contract via increases to the disguised monthly service

SECOND AMENDED
CLASS ACTION COMPLAINT

- 79 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

charges which it labeled the Broadcast Surcharge and the Regional Sports

Surcharge. That information would have been material to them. If the Wileys had

known that information, they would not have been willing to pay as much for their

services and would have acted differently.

456.   The Wileys suffered damages during their Term Agreements in the

amount of the increases to their purportedly fixed monthly service rate via raises of

the Broadcast Surcharge and the Regional Sports Surcharge.

## CLASS ALLEGATIONS

457.   Plaintiffs bring this lawsuit on behalf of themselves and all others

similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and

(b)(3).

458.   **"California Class" Definition**: All 31 Plaintiffs seek to represent the

following California Class:

> **All current and former Cox subscribers in California
> who signed up for a 1- or 2-year Term Agreement[14] or
> Promotional Agreement[15] and whose service price was
> increased in the middle of said 1- or 2-year period above
> the initially quoted rates.**

---

[14]   "Term Agreement" or "Term Service Agreement" refers to an agreement
where the subscriber is promised a quoted fixed-price promotion for a stated period
of time, typically for 1 or 2 years, and the subscriber is subject to an early
termination fee penalty if the subscriber terminates service prior to the end of the
promotional period. Cox offered Term Agreements both to new customers and to
customers who were renewing their existing subscriptions.

[15]   "Promotional Agreement" refers to an agreement where the subscriber is
promised a quoted fixed-price promotion for a stated period of time, typically for 1
or 2 years, and there is no early termination fee penalty. Cox offered Promotional
Agreements both to new customers and to customers who were renewing their
existing subscriptions.

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

459.  **<u>"California Surcharges Increase Subclass" Definition</u>**: Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Cristina Abdala, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Diane Kline, Nestor Mendez, Stephen Metzger, James Mills, Rosa Montanez, Albert Renn, Robyn Rowe, Heather Webster, John Wiley and Stephanie Wiley also seek to represent the following California Surcharges Increase Subclass:

> **All current and former Cox subscribers in California who signed up for a 1- or 2-year Term Agreement or Promotional Agreement and whose service price was increased in the middle of said 1- or 2-year period via increases to the Broadcast Surcharge and/or the Regional Sports Surcharge.**

460.  **<u>"California Promotional Agreement Base Price Increase Subclass" Definition</u>**: Plaintiffs James Gambell, Jennifer Klat, Diane Kline, Michael Mitchell, Lauren Ramos, Patricia Salvacion and Heather Webster also seek to represent the following California Promotional Agreement Base Price Increase Subclass:

> **All current and former Cox subscribers in California who signed up for a 1- or 2-year Promotional Agreement and whose service price was increased, in the middle of said 1- or 2-year period, above the initially quoted rates via increases to the base price of the service plan itself.**

461.  **<u>"Nevada Class" Definition</u>**: Plaintiff Daniel Polinsky also seeks to represent the following Nevada Class:

> **All current and former Cox subscribers in Nevada who signed up for a 1- or 2-year Term Agreement or Promotional Agreement and whose service price was increased in the middle of said 1- or 2-year period above the initially quoted rates.**

SECOND AMENDED
CLASS ACTION COMPLAINT

- 81 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

462.   **<u>"Nevada Surcharges Increase Subclass" Definition</u>**: Plaintiff Daniel Polinsky also seeks to represent the following Nevada Surcharges Increase Subclass:

> **All current and former Cox subscribers in Nevada who signed up for a 1- or 2-year Term Agreement or Promotional Agreement and whose service price was increased in the middle of said 1- or 2-year period via increases to the Broadcast Surcharge and/or the Regional Sports Surcharge.**

463.   This Court should apply the **<u>discovery rule</u>** to extend any applicable limitations period (and the corresponding class period) for each Class and Subclass to the date on which Cox first engaged in its deceptive price increase practices (e.g., increasing the price of the services in the middle of the Term Agreement or Promotional Agreement by raising the Surcharges or by raising the base price of the service plan itself). The nature of Cox's misconduct was non-obvious and intentionally concealed from its subscribers. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Classes and Subclasses could have, through the use of reasonable diligence, learned of the accrual of their claims against Cox at an earlier time.

464.   Specifically excluded from the Classes and Subclasses are Cox and any entities in which Cox has a controlling interest, Cox's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

465.   *Numerosity*. The number of members of the Classes and Subclasses (collectively, the "Class members") are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of Class members prior to discovery. However, based on information and belief, each Class and Subclass comprises tens of thousands of individuals. The exact number and

SECOND AMENDED
CLASS ACTION COMPLAINT

- 82 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

identities of Class members are contained in Cox's records and can be easily ascertained from those records.

466. ***Commonality and Predominance***. This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over any questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a. Whether Cox advertised and promised that the monthly price of its service plans would be fixed and not increase above the initially quoted rates during 1- or 2-year Term Agreements;

b. Whether Cox advertised and promised that the monthly price of its service plans would be fixed and not increase above the initially quoted rates during 1- or 2-year Promotional Agreements;

c. Whether Cox increased its monthly service prices in the middle of Term Agreements and Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

d. Whether Cox increased its monthly service prices in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

e. What is the nature or purpose of the Broadcast Surcharge, and whether the Broadcast Surcharge is a monthly service fee for providing cable TV service;

f. What is the nature or purpose of the Regional Sports Surcharge, and whether the Regional Sports Surcharge is a monthly service fee for providing cable TV service;

g. Whether increases to the Broadcast Surcharge and the Regional Sports Surcharge are increases to the price of the monthly service;

h. Whether Cox's policy and practice of increasing the monthly

service price in the middle of Term Agreements or Promotional Agreements by raising the Broadcast Surcharge and Regional Sports Surcharge is material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

i.      Whether Cox's policy and practice of increasing the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself is material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

j.      Whether it was a breach of contract for Cox to increase the monthly service price in the middle of Term Agreements by increasing the Broadcast Surcharge and/or Regional Sports Surcharge;

k.      Whether it was a breach of contract for Cox to increase the monthly service price in the middle of Promotional Agreements by increasing the Broadcast Surcharge and/or Regional Sports Surcharge;

l.      Whether it was a breach of contract for Cox to increase the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

m.      Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Term Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

n.      Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

o.      Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

SECOND AMENDED
CLASS ACTION COMPLAINT

- 84 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

p.      For the California Class and Subclasses: Whether Cox's misrepresentations and misconduct alleged herein violated California Civil Code § 1750 *et seq.* (CLRA), California Business & Professions Code § 17500 *et seq.* (FAL), and California Business & Professions Code § 17200 *et seq.* (UCL); and

q.      For the Nevada Class and Subclass: Whether Cox's misrepresentations and misconduct alleged herein violated the Nevada Deceptive Trade Practices Act (NDTPA), NRS Chapter 598.

467.   **Typicality**. Plaintiffs' claims are typical of Class members' claims. Plaintiffs and Class members all sustained injury as a direct result of Cox's standard practices and schemes, bring the same claims, and face the same potential defenses.

468.   **Adequacy**. Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Classes and Subclasses. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

469.   **Superiority**. A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Cox's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

SECOND AMENDED
CLASS ACTION COMPLAINT                        - 85 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

470.   By its conduct and omissions alleged herein, Cox has acted and refused to act on grounds that apply generally to the Classes and Subclasses, such that declaratory relief is appropriate respecting the Classes and Subclasses as a whole.

471.   Cox is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox that consist of representations of fact about Cox's business operations or services that are or were made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in, Cox's services or the statements are or were made in the course of delivering Cox's services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox for which the intended audience is an actual or potential customer or subscriber, or a person likely to repeat the statements to, or otherwise influence, an actual or potential customer or subscriber.

## CAUSES OF ACTION

### COUNT I

**Violation of the Consumers Legal Remedies Act**
**California Civil Code § 1750 *et seq*.**

472.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

473.   All 31 Plaintiffs bring this cause of action in their individual capacities, in their capacities as private attorneys general seeking the imposition of public injunctive relief, and as representatives of the California Class.

474.   Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Cristina Abdala, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Diane Kline,

SECOND AMENDED
CLASS ACTION COMPLAINT

- 86 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

Nestor Mendez, Stephen Metzger, James Mills, Rosa Montanez, Albert Renn, Robynn Rowe, Heather Webster, John Wiley, and Stephanie Wiley also bring this cause of action as representatives of the <u>California Surcharges Increase Subclass</u>.

475.   Plaintiffs James Gamble, Jennifer Klat, Diane Klein Michael Mitchell, Lauren Ramos, Patricia Salvacion, and Heather Webster also bring this cause of action as representatives of the <u>California Promotional Agreement Base Price Increase Subclass</u>.

476.   Defendants are each a "person," as defined by Cal. Civ. Code § 1761(c).

477.   Plaintiffs and the California Classes and Subclasses ("California Class members") are each "consumers," as defined by Cal. Civ. Code §1761(d).

478.   Cox's service plans are "services," as defined by Cal. Civ. Code § 1761(b).

479.   The purchase of a Cox service plan by each Plaintiff is a "transaction," as defined by Cal. Civ. Code § 1761(e).

480.   Each Plaintiff purchased Cox's service plans for personal, family, and/or household purposes, as meant by Cal. Civ. Code § 1761(d).

481.   Venue is proper under Cal. Civil Code § 1780(d) because a substantial portion of the transactions at issue occurred in this county. Plaintiffs' declarations establishing that this Court is a proper venue for this action are attached hereto as **Exhibit A.**

482.   By its conduct and omissions alleged herein, Cox has committed unlawful methods, acts or practices, including:

a.   Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Term Agreements or Promotional Agreements, despite Cox's pattern and practice of increasing service prices mid-agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

b.   Misrepresenting that the prices of its service plans were fixed

SECOND AMENDED
CLASS ACTION COMPLAINT
- 87 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

and would not increase during 1- or 2-year Promotional Agreements above the initially quoted rates, despite Cox's pattern and practice of increasing the base price of the service plan in the middle of the promotional period;

c.     Increasing the Broadcast Surcharge and/or Regional Sports Surcharge on customers in the middle of Term Agreements or Promotional Agreements, contrary to Cox's previous representations and advertising; and

d.     Increasing the base price of the service plan in the middle of Promotional Agreements above the initially quoted rates, contrary to Cox's previous representations and advertising.

483.   The unlawful methods, acts or practices alleged herein to have been undertaken by Cox were all committed intentionally and knowingly. The unlawful methods, acts or practices alleged herein to have been undertaken by Cox did not result from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

484.   Cox's conduct alleged herein has violated the CLRA in multiple respects, including, but not limited to, the following:

a.     Cox represented that its service plans had characteristics that they did not have (Cal. Civ. Code § 1770(a)(5));

b.     Cox advertised its service plans with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

c.     Cox made false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions (Cal. Civ. Code § 1770(a)(13));

d.     Cox misrepresented that its service plans were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

e.     Cox inserted unconscionable provisions in its consumer agreements (Cal. Civ. Code § 1770(a)(19)).

485.   With respect to any omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and California Class members; (b) Cox concealed material information from Plaintiffs and California Class members; and (c) Cox made partial representations, including regarding the supposedly fixed monthly rate of its service plans, which were false and misleading absent the omitted information.

486.   Cox's misrepresentations deceive and have a tendency to deceive the general public.

487.   Cox's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

488.   Plaintiffs and California Class members reasonably relied on Cox's material misrepresentations, and would not have purchased, or would have paid less money for, Cox's service plans had they known the truth.

489.   By its conduct and omissions alleged herein, Cox caused the demand for its service plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and California Class members, to pay premiums to Cox.

490.   As a direct and proximate result of Cox's violations of the CLRA, Plaintiffs and California Class members have been harmed and lost money or property in the amount of the mid-agreement price increases they were charged and paid, and have thereby suffered damages.

491.   Cox's conduct has caused substantial injury to Plaintiffs, California Class members, and the general public.

492.   Cox's misconduct is ongoing for Plaintiffs and members of the "California Surcharges Increase" Subclass who are currently under Term Agreements or Promotional Agreements where they continue to be subject to mid-agreement increases of the Broadcast Surcharge and/or Regional Sports Surcharge.

Cox's misconduct is also ongoing for Plaintiffs and members of the "California Promotional Agreement Base Price Increase" Subclass where they continue to be subject to mid-promotion increases to the service plan base price above the originally quoted rates. Accordingly, Plaintiffs seek an order (1) enjoining Cox from increasing the service price above the initially quoted rates for California Class members who are under Term Agreements or Promotional Agreements, and (2) enjoining Cox from continuing to charge and collect the increased amounts resulting from earlier mid-agreement price increases Cox had imposed during existing fixed-rate agreements.

493.  Plaintiffs lack an adequate remedy at law to prevent Cox's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service prices. Plaintiffs desire and intend to sign up for different Cox service plans and Term Agreements or Promotional Agreements in the future if they are within Cox's service area. However, Plaintiffs want to be confident that the advertised and quoted fixed-rate prices for Cox's service plans are in fact truly fixed for the duration of the Term Agreement or Promotional Agreement. Plaintiffs want to be confident that Cox is not going to increase the service price during any promised fixed-rate period by imposing or raising the Broadcast Surcharge or the Regional Sports Surcharge, or by raising the base price of the service plan itself. And, if Cox introduces any new discretionary monthly service charge, Plaintiffs want to be confident that Cox will not increase that new charge in the middle of promised fixed-rate periods. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Cox's representations are accurate and whether there are omissions of material facts regarding the service plans being advertised and represented to them.

494.  Monetary damages are not an adequate remedy at law for <u>future</u> harm for the following reasons, without limitation: <u>First</u>, damages are not an adequate

SECOND AMENDED
CLASS ACTION COMPLAINT
- 90 -
**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  remedy for future harm because they will not prevent Cox from continuing its
2  unlawful conduct. <u>Second</u>, damages for future harm cannot be calculated with
3  certainty and thus cannot be awarded. For example, it is impossible to know: (1)
4  what service plan(s) Plaintiffs may want or need in the future; (2) what will be the
5  dollar amounts by which Cox increases the price of the services mid-agreement; or
6  (3) how many months Plaintiffs would subscribe to such Cox services. Because
7  these factors are unknown, damages are impossible to calculate and cannot be
8  awarded for future harm. <u>Third</u>, injunctive relief is necessary (and monetary
9  damages do not provide a plain, adequate and complete remedy) because, without
10  forward-looking injunctive relief enjoining the unlawful practices, the courts would
11  be flooded with future lawsuits by the general public, Class members, and Plaintiffs
12  for future violations of the law by Cox.

13      495.  Plaintiffs, on behalf of themselves and as private attorneys general,
14  seek **<u>public injunctive relief</u>** under the CLRA to protect the general public from
15  Cox's false advertising, misrepresentations, and omissions. Specifically, Plaintiffs
16  seek a permanent public injunction against Cox under the CLRA as follows: **(1)**
17  enjoin Cox from falsely advertising to the general public that the prices of its
18  service plans are fixed and will not increase for the duration of the Term Agreement
19  or Promotional Agreement, when in fact Cox may increase service prices mid-
20  agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge;
21  **(2)** enjoin Cox from falsely advertising to the general public that the prices of its
22  service plans are fixed and will not increase above the initially quoted rates for the
23  duration of the Promotional Agreement, when in fact Cox may increase service
24  prices mid-promotion by raising the base price of the service plan itself; and **(3)**
25  enjoin Cox from advertising or quoting a service plan price to members of the
26  general public if that price does not include all applicable discretionary service
27  charges (such as the Broadcast Surcharge and the Regional Sports Surcharge).

28      496.  Cox's misconduct which affects the general public is ongoing in part

SECOND AMENDED
CLASS ACTION COMPLAINT

- 91 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Cox from committing these practices which harm the general public.

497.   In accordance with California Civil Code § 1782(a), Plaintiffs, through counsel, served Cox with notices of its CLRA violations.

498.   On August 30, 2022, Plaintiffs sent a CLRA letter notice by USPS certified mail, return receipt requested. The letter was sent on behalf of Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, and Daniel Polinksy and for the benefit of a class of similarly situated California consumers. The letter demanded that Cox: "(1) return all the money that Cox California customers have paid in mid-contract price increases to the Broadcast Surcharge and the Regional Sports Surcharge; and (2) stop charging Cox California customers who are in fixed-rate contracts that are still subject to the Surcharges, any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts."

499.   On February 8, 2023, Plaintiffs sent a second CLRA letter notice by USPS certified mail, return receipt requested. The letter was sent on behalf of Plaintiffs James Gamble, Jennifer Klat, Michael Mitchell, Lauren Ramos, Patricia Salvacion, Kelly Gilliland, Nestor Mendez, Diane Klein, and Heather Webster and for the benefit of a class of similarly situated California consumers. The letter demanded that Cox: "(1) return all the money that Cox California customers have paid in price increases to their monthly services during non-"Term Agreement" promised fixed-rate promotional periods, including increases to the price of the service plans themselves and increases to the Broadcast Surcharge and Regional Sports Surcharge; and (2) stop advertising and promising to customers a particular price for its services that is fixed for a promotional period, when in fact Cox intends to increase that price in the middle of that fixed-rate period, such as by increasing

the price of the service plans themselves or by increasing the Surcharges."

500.   Cox has not undertaken or provided the actions or corrections required by California Civil Code § 1782(c) for alleged class-wide CLRA violations.

501.   Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiffs and California Class members are entitled to recover actual damages, attorneys' fees and costs, and any other relief the Court deems proper for Cox's CLRA violations.

502.   Each Plaintiff hereby rejects any unilateral non-class-wide attempt by Cox to provide the Plaintiff with a refund or reimbursement for past payments of price increases made in the middle of a Term Agreement or Promotional Agreement, which Cox makes in an attempt to pick off the Plaintiff individually from this class action. For example, each Plaintiff hereby prophylactically rejects any attempt by Cox to unilaterally provide the Plaintiff with an individual bill credit for the mid-agreement price increases.

## COUNT II
### Violation of California's False Advertising Law
### California Business and Professions Code § 17500 *et seq*.

503.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

504.   All 31 Plaintiffs bring this cause of action in their individual capacities, in their capacities as private attorneys general seeking the imposition of public injunctive relief, and as representatives of the California Class.

505.   Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Cristina Abdala, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Diane Kline, Nestor Mendez, Stephen Metzger, James Mills, Rosa Montanez, Albert Renn,

Robynn Rowe, Heather Webster, John Wiley, and Stephanie Wiley also bring this cause of action as representatives of the California Surcharges Increase Subclass.

506.   Plaintiffs James Gamble, Jennifer Klat, Diane Klein Michael Mitchell, Lauren Ramos, Patricia Salvacion, and Heather Webster also bring this cause of action as representatives of the California Promotional Agreement Base Price Increase Subclass.

507.   By its conduct and omissions alleged herein, Cox has committed acts of untrue or misleading advertising, as defined by and in violation of California Business & Professions Code § 17500, *et seq.*, also known as California's False Advertising Law ("FAL"). These acts include but are not limited to:

a.     Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Term Agreements or Promotional Agreements, despite Cox's pattern and practice of increasing service prices mid-agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge; and

b.     Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Promotional Agreements above the initially quoted rates, despite Cox's pattern and practice of increasing the base price of the service plan in the middle of the promotion.

508.   With respect to omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and California Class members; (b) Cox concealed material information from Plaintiffs and California Class members; and (c) Cox made partial representations, including regarding the supposedly fixed monthly prices of its services during Term Agreements or Promotional Agreements, which were false or misleading absent the omitted information.

509.   Cox committed such violations of the FAL with actual knowledge that

SECOND AMENDED
CLASS ACTION COMPLAINT

- 94 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

its advertising was untrue or misleading, or Cox, in the exercise of reasonable care, should have known that its advertising was untrue or misleading.

510.   Cox's misrepresentations and nondisclosures deceive and have a tendency to deceive the general public.

511.   Cox's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

512.   Plaintiffs and California Class members reasonably relied on Cox's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, Cox's service plans had they known the truth.

513.   By its conduct and omissions alleged herein, Cox caused the demand for its service plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and California Class members, to pay premiums to Cox.

514.   As a direct and proximate result of Cox's violations of the FAL, Plaintiffs and California Class members have been harmed and lost money or property in the amount of the mid-agreement price increases they were charged and paid, and that money is subject to restitution.

515.   Cox's misconduct is ongoing for Plaintiffs and members of the "California Surcharges Increase" Subclass who are currently under Term Agreements or Promotional Agreements where they continue to be subject to mid-agreement increases of the Broadcast Surcharge and/or Regional Sports Surcharge. Cox's misconduct is also ongoing for Plaintiffs and members of the "California Promotional Agreement Base Price Increase" Subclass where they continue to be subject to mid-promotion increases to the service plan base price above the originally quoted rates. Accordingly, Plaintiffs seek an order (1) enjoining Cox from increasing the service price above the initially quoted rates for California Class members who are under Term Agreements or Promotional Agreements, and (2) enjoining Cox from continuing to charge and collect the increased amounts

1    resulting from earlier mid-agreement price increases Cox had imposed during

2    existing fixed-rate agreements.

3        516.   Plaintiffs lack an adequate remedy at law to prevent Cox's continued

4    unlawful practices, as previously discussed in Paragraph 493 above.

5        517.   Monetary damages are not an adequate remedy at law for future harm,

6    as previously discussed in Paragraph 494 above.

7        518.   Plaintiffs, on behalf of themselves and as private attorneys general,

8    seek **public injunctive relief** under the FAL to protect the general public from

9    Cox's false advertising, misrepresentations, and omissions. Specifically, Plaintiffs

10   seek a permanent public injunction against Cox under the FAL as follows: **(1)**

11   enjoin Cox from falsely advertising to the general public that the prices of its

12   service plans are fixed and will not increase for the duration of the Term Agreement

13   or Promotional Agreement, when in fact Cox may increase service prices mid-

14   agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

15   **(2)** enjoin Cox from falsely advertising to the general public that the prices of its

16   service plans are fixed and will not increase above the initially quoted rates for the

17   duration of the Promotional Agreement, when in fact Cox may increase service

18   prices mid-promotion by raising the base price of the service plan itself; and **(3)**

19   enjoin Cox from advertising or quoting a service plan price to members of the

20   general public if that price does not include all applicable discretionary service

21   charges (such as the Broadcast Surcharge and the Regional Sports Surcharge).

22       519.   Cox's false advertising which affects the general public is ongoing in

23   part or in whole and even if such conduct were to cease, it is behavior that is

24   capable of repetition or re-occurrence by Cox absent a permanent injunction.

25   Accordingly, Plaintiffs seek an order enjoining Cox from committing these

26   practices which harm the general public.

27       520.   Plaintiffs seek an order granting restitution to Plaintiffs and California

28   Class members in an amount to be proven at trial. Plaintiffs further seek an award

of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**COUNT III**

**Violation of California's Unfair Competition Law**
**California Business and Professions Code § 17200 *et seq*.**

521.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

522.   All 31 Plaintiffs bring this cause of action in their individual capacities, in their capacities as private attorneys general seeking the imposition of public injunctive relief, and as representatives of the <u>California Class</u>.

523.   Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Cristina Abdala, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Diane Kline, Nestor Mendez, Stephen Metzger, James Mills, Rosa Montanez, Albert Renn, Robynn Rowe, Heather Webster, John Wiley, and Stephanie Wiley also bring this cause of action as representatives of the <u>California Surcharges Increase Subclass</u>.

524.   Plaintiffs James Gamble, Jennifer Klat, Diane Klein Michael Mitchell, Lauren Ramos, Patricia Salvacion, and Heather Webster also bring this cause of action as representatives of the <u>California Promotional Agreement Base Price Increase Subclass</u>.

525.   California Business & Professions Code § 17200, *et seq.*, also known as California's Unfair Competition Law ("UCL"), prohibits any unfair, unlawful, or fraudulent business practice.

526.   **"Unlawful" prong.** Cox has violated the UCL by engaging in the following unlawful business acts and practices:

      a.     Making material misrepresentations in violation of Cal. Civ. Code §§ 1770(a)(5), (9), (13), and (16) (the CLRA);

      b.     Inserting unconscionable provisions in its consumer agreements

SECOND AMENDED
CLASS ACTION COMPLAINT
- 97 -
**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

in violation of Cal. Civ. Code § 1770(a)(19) (the CLRA);

        c.     Making material misrepresentations in violation of Cal. Bus. & Prof. Code § 17500 *et seq.* (the FAL); and

        d.     Engaging in deceit in violation of Cal Civ. Code §§ 1709–1710.

    527.   **_"Unfair" and "Fraudulent" prongs_**. Cox has violated the UCL by engaging in the following unfair and fraudulent business acts and practices:

        a.     Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Term Agreements or Promotional Agreements, despite Cox's pattern and practice of increasing service prices mid-agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

        b.     Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Promotional Agreements above the initially quoted rates, despite Cox's pattern and practice of increasing the base price of the service plan in the middle of the promotional period;

        c.     Increasing the Broadcast Surcharge and/or Regional Sports Surcharge on customers in the middle of Term Agreements or Promotional Agreements, contrary to Cox's previous representations and advertising;

        d.     Increasing the base price of the service plan in the middle of Promotional Agreements above the initially quoted rates, contrary to Cox's previous representations and advertising;

        e.     Preventing or discouraging customers from freely canceling their services in the event the customers desired to terminate their services after learning that Cox had increased the price of their services in the middle of their promised fixed-rate Term Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

        f.     Falsely stating to complaining customers who noticed the Broadcast Surcharge and/or Regional Sports Surcharge and increases thereto, that the Surcharges were pass-through government fees and/or were outside of Cox's

SECOND AMENDED
CLASS ACTION COMPLAINT
- 98 -
HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  control; and

2          g.      Falsely stating to complaining customers who noticed mid-

3  promotion price increases, that the price increases were justified because the

4  subscriber's promotional discount dollar amount had remained the same—when in

5  fact the increase defied Cox's pre-sale representations and advertisements regarding

6  the fixed monthly prices during the promotional period.

7          528.   With respect to omissions, Cox at all relevant times had a duty to

8  disclose the information in question because, inter alia: (a) Cox had exclusive

9  knowledge of material information that was not known to Plaintiffs and California

10  Class members; (b) Cox concealed material information from Plaintiffs and

11  California Class members; and (c) Cox made partial representations, including

12  regarding the supposedly fixed monthly prices of its services during Term

13  Agreements or Promotional Agreements, which were false or misleading absent the

14  omitted information.

15          529.   Cox's misrepresentations and nondisclosures deceive and have a

16  tendency to deceive the general public.

17          530.   Cox's misrepresentations and nondisclosures are material, in that a

18  reasonable person would attach importance to the information and would be

19  induced to act on the information in making purchase decisions.

20          531.   Plaintiffs and the members of the California Classes reasonably relied

21  on Cox's material misrepresentations and nondisclosures, and would not have

22  purchased, or would have paid less money for, Cox's service plans had they known

23  the truth.

24          532.   By its conduct and omissions alleged herein, Cox caused the demand

25  for its service plans to be artificially increased and caused all subscribers of those

26  plans, including Plaintiffs and California Class members, to pay premiums to Cox.

27          533.   As a direct and proximate result of Cox's unlawful, unfair, and

28  fraudulent conduct, Plaintiffs and California Class members have been harmed and

1   lost money or property in the amount of the mid-agreement price increases they

2   were charged and paid, and that money is subject to restitution.

3        534.   Cox's misconduct is ongoing for Plaintiffs and members of the

4   "California Surcharges Increase" Subclass who are currently under Term

5   Agreements or Promotional Agreements where they continue to be subject to mid-

6   agreement increases of the Broadcast Surcharge and/or Regional Sports Surcharge.

7   Cox's misconduct is also ongoing for Plaintiffs and members of the "California

8   Promotional Agreement Base Price Increase" Subclass where they continue to be

9   subject to mid-promotion increases to the service plan base price above the

10  originally quoted rates. Accordingly, Plaintiffs seek an order (1) enjoining Cox

11  from increasing the service price above the initially quoted rates for California

12  Class members who are under Term Agreements or Promotional Agreements, and

13  (2) enjoining Cox from continuing to charge and collect the increased amounts

14  resulting from earlier mid-agreement price increases Cox had imposed during

15  existing fixed-rate agreements.

16       535.   Cox's conduct and omissions alleged herein are immoral, unethical,

17  oppressive, unscrupulous, unconscionable, and/or substantially injurious to

18  Plaintiffs and California Class members. Perpetrating a years-long scheme of

19  misleading and overcharging customers is immoral, unethical, and unscrupulous.

20  Moreover, Cox's conduct is oppressive and substantially injurious to consumers.

21  By its conduct alleged herein, Cox has improperly extracted hundreds of millions of

22  dollars from California consumers. There is no utility to Cox's conduct, and even if

23  there were any utility, it would be significantly outweighed by the gravity of the

24  harm to consumers caused by Cox's conduct alleged herein.

25       536.   Plaintiffs lack an adequate remedy at law to prevent Cox's continued

26  unlawful practices, as previously discussed in Paragraph 493 above.

27       537.   Monetary damages are not an adequate remedy at law for future harm,

28  as previously discussed in Paragraph 494 above.

538.   Plaintiffs, on behalf of themselves and as private attorneys general, seek **public injunctive relief** under the UCL to protect the general public from Cox's false advertising, misrepresentations, and omissions. Specifically, Plaintiffs seek a permanent public injunction against Cox under the UCL as follows: **(1)** enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase for the duration of the Term Agreement or Promotional Agreement, when in fact Cox may increase service prices mid-agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge; **(2)** enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase above the initially quoted rates for the duration of the Promotional Agreement, when in fact Cox may increase service prices mid-promotion by raising the base price of the service plan itself; and **(3)** enjoin Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary service charges (such as the Broadcast Surcharge and the Regional Sports Surcharge).

539.   Cox's false advertising which affects the general public is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Cox from committing these practices which harm the general public.

540.   Plaintiffs seek an order granting restitution to Plaintiffs and California Class members in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## <u>COUNT IV</u>
### Violation of the Nevada Deceptive Trade Practices Act
### NRS Chapter 598

541.   Plaintiff Daniel Polinsky realleges and incorporates by reference all paragraphs previously alleged herein.

SECOND AMENDED
CLASS ACTION COMPLAINT                          - 101 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

542.   Plaintiff Polinsky brings this cause of action in his individual capacity, in his capacity as a private attorney general seeking the imposition of public injunctive relief, and as a representative of the Nevada Class and the Nevada Surcharges Increase Subclass (collectively, the "Nevada Classes" or the "Nevada Class members").

543.   Under the Nevada Deceptive Trade Practices Act ("NDTPA"), "[a]n action may be brought by any person who is a victim of consumer fraud." NRS 41.600(1). "If the claimant is the prevailing party, the court shall award the claimant: (a) Any damages that the claimant has sustained; (b) Any equitable relief that the court deems appropriate; and (c) The claimant's costs in the action and reasonable attorney's fees." NRS 41.600(3).

544.   Actionable "consumer fraud" includes deceptive trade practices as defined in NRS 598.0915 to 598.0925. *See* NRS 41.600(2)(e).

545.   "To state a private right of action under the NDTPA, a plaintiff must allege: (1) defendant violated the NDTPA, (2) causing plaintiff, (3) damages." *Switch, Ltd. v. Uptime Inst., LLC*, 426 F. Supp. 3d 636, 643 (D. Nev. 2019).

546.   Cox's conduct alleged herein has violated the NDTPA in multiple ways, including, but not limited to, the following:

a.      Cox knowingly represented that its service plans had characteristics that they did not have (NRS 598.0915(5));

b.      Cox advertised its service plans with an intent not to sell them as advertised (NRS 598.0915(9));

c.      Cox made false or misleading statements of fact concerning the prices of its service plans (NRS 598.0915(13));

d.      Cox knowingly made false representations in transactions related to its service plans (NRS 598.0915(15));

e.      Cox failed to disclose a material fact in connection with the sale of its service plans (NRS 598.0923(1)(b)); and

SECOND AMENDED
CLASS ACTION COMPLAINT                    - 102 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

f.    Cox used an unconscionable practice in its transactions related to its service plans ((NRS 598.0923(1)(e)).

547.    With respect to any omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and Nevada Class members; (b) Cox concealed material information from Plaintiffs and Nevada Class members; and (c) Cox made partial representations, including regarding the supposedly fixed monthly rate of its service plans, which were false and misleading absent the omitted information.

548.    The deceptive trade practices alleged herein to have been undertaken by Cox were all committed intentionally and knowingly. The deceptive trade practices alleged herein to have been undertaken by Cox did not result from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

549.    Cox's misrepresentations deceive and have a tendency to deceive the general public.

550.    Cox's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

551.    Plaintiff Polinsky and the members of the Nevada Classes reasonably relied on Cox's material misrepresentations, and would not have purchased, or would have paid less money for, Cox's service plans had they known the truth.

552.    By its conduct and omissions alleged herein, Cox caused the demand for its service plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and Nevada Class members, to pay premiums to Cox.

553.    As a direct and proximate result of Cox's violations of the NDTPA, Plaintiffs and Nevada Class members have been harmed and lost money or property in the amount of the mid-agreement price increases they were charged and paid.

554. Cox's conduct has caused substantial injury to Plaintiffs, Nevada Class members, and the general public.

555. Plaintiff Polinsky seeks an order awarding damages and equitable relief (including restitution and/or disgorgement) to Mr. Polinsky and Nevada Class members in an amount to be proven at trial. NRS 41.600(3). Mr. Polinsky also seeks punitive damages. NRS 42.005. Mr. Polinsky further seeks an award of attorneys' fees and costs. NRS 41.600(3).

556. Cox's misconduct is ongoing for members of the Nevada Classes who are currently under Term Agreements or Promotional Agreements where they continue to be subject to mid-agreement increases of the Broadcast Surcharge and/or Regional Sports Surcharge. Cox's misconduct is also ongoing for members of the Nevada Classes where they continue to be subject to mid-promotion increases to the service plan base price above the originally quoted rates. Accordingly, Plaintiff Polinsky seeks an order (1) enjoining Cox from increasing the service price above the initially quoted rates for Nevada Class members who are under Term Agreements or Promotional Agreements, and (2) enjoining Cox from continuing to charge and collect the increased amounts resulting from earlier mid-agreement price increases Cox had imposed during existing fixed-rate agreements.

557. Plaintiff Polinsky lacks an adequate remedy at law to prevent Cox's continued unlawful practices, as previously discussed in Paragraph 493 above.

558. Monetary damages are not an adequate remedy at law for future harm, as previously discussed in Paragraph 494 above.

559. Plaintiff Polinsky, on behalf of himself and as a private attorney general, seeks **public injunctive relief** under the NDTPA to protect the general public from Cox's false advertising, misrepresentations, and omissions. Specifically, Mr. Polinsky seeks a permanent public injunction against Cox under the NDTPA as follows: **(1)** enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase for the

SECOND AMENDED
CLASS ACTION COMPLAINT                - 104 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

duration of the Term Agreement or Promotional Agreement, when in fact Cox may increase service prices mid-agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge; **(2)** enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase above the initially quoted rates for the duration of the Promotional Agreement, when in fact Cox may increase service prices mid-promotion by raising the base price of the service plan itself; and **(3)** enjoin Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary service charges (such as the Broadcast Surcharge and the Regional Sports Surcharge).

560.   Cox's misconduct which affects the general public is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, Plaintiff Polinsky seeks an order enjoining Cox from committing these practices which harm the general public.

### COUNT V
### Breach of Contract

561.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

562.   All 31 Plaintiffs bring this cause of action in their individual capacities and as representatives of the Classes and Subclasses.

563.   **Surcharges Subclasses.** Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Cristina Abdala, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Diane Kline, Nestor Mendez, Stephen Metzger, James Mills, Rosa Montanez, Albert Renn, Robynn Rowe, Heather Webster, John Wiley, and Stephanie Wiley also bring this cause of action as representatives of the California

Surcharges Increase Subclass. Plaintiff Daniel Polinsky also brings this cause of action as a representative of the Nevada Surcharges Increase Subclass. The California Surcharges Increase Subclass and the Nevada Surcharges Increase Subclass are hereinafter collectively referred to as the "Surcharges Subclasses."

564.   Cox entered into contracts with Plaintiffs and members of the Surcharges Subclasses when Plaintiffs and the Subclass members each accepted Cox's offer of a specified service plan at specified monthly rates under a 1- or 2-year Term Agreement or Promotional Agreement.

565.   All of the contracts between Cox and Plaintiffs and Surcharges Subclass members contained the following material terms: Cox would provide the ordered service plan, and, in exchange, the customers would pay a specific promised price for service that was fixed and would not increase above the quoted rates for 1 or 2 years.

566.   Plaintiffs and the Subclass members have performed, for the relevant time frame, all of each's material obligations under the contract or have been excused from any non-performance.

567.   Cox breached the contract by raising the monthly service price in the middle of its fixed-rate Term Agreements or Promotional Agreements with Plaintiffs and Surcharges Subclass members, via increases to the Broadcast Surcharge and/or the Regional Sports Surcharge.

568.   Plaintiffs and Surcharges Subclass members sustained damages as a result of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the members of the Subclasses paid in mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge.

569.   **Base Price Increase Subclass.** Plaintiffs James Gambell, Jennifer Klat, Diane Kline, Michael Mitchell, Lauren Ramos, Patricia Salvacion and Heather Webster also bring this cause of action as representatives of the California Promotional Agreement Base Price Increase Subclass (the "Base Price Increase

Subclass").

570.   Cox entered into contracts with Plaintiffs and members of the Base Price Increase Subclass when Plaintiffs and the Subclass members each accepted Cox's offer of a specified service plan at specified monthly rates under a 1- or 2-year Promotional Agreement.

571.   All of the contracts between Cox and Plaintiffs and the members of the Base Price Increase Subclass contained the following material terms: Cox would provide the ordered service plan, and, in exchange, the customer would pay a specific promised monthly price for service that was fixed and would not increase above the quoted rates for 1 or 2 years.

572.   Plaintiffs and the members of the Subclass have performed, for the relevant time frame, all of each's material obligations under the contract or have been excused from any non-performance.

573.   Cox breached the contract by increasing the base price of the service plan above the quoted rates in the middle of fixed-rate Promotional Agreements with Plaintiffs and the members of the Subclass.

574.   Plaintiffs and Base Price Increase Subclass members sustained damages as a result of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the members of the Subclass paid in mid-promotion service price increases above the initially quoted rates.

<u>**COUNT VI**</u>

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

575.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 560 previously alleged herein.

576.   Plaintiffs allege this cause of action in the alternative to Count V.

577.   All 31 Plaintiffs bring this cause of action in their individual capacities and as representatives of the Classes and Subclasses.

578.   To the extent any applicable contract could be read as granting Cox

SECOND AMENDED
CLASS ACTION COMPLAINT

- 107 -

**HATTIS & LUKACS**
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

discretion to increase the Broadcast Surcharge and/or Regional Sports Surcharge in the middle of a promised fixed-rate Term Agreement or Promotional Agreement—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by California law and by Nevada law.

579.   To the extent any applicable contract could be read as granting Cox discretion to increase the base price of a customer's service plan while that customer was in the middle of a promised fixed-rate Promotional Agreement—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by California law and by Nevada law.

580.   Cox has violated the covenant of good faith and fair dealing by its conduct alleged herein.

581.   Cox has abused any discretion it purportedly had under any applicable contract to raise the monthly price of its service plans above the initially quoted rates in the middle of promised fixed-rate Term Agreements or Promotional Agreements. For example:

a.   Cox misrepresented in its advertising and in its communications with consumers that the prices of its service plans were fixed and would not increase above the initially quoted rates during 1- or 2-year Term Agreements or Promotional Agreements;

b.   With regard to customers in Term Agreements, Cox imposed early termination fee penalties in order to prevent or discourage customers from freely canceling their services if they learned that Cox had increased the price of their services above the initially quoted rates in the middle of promised fixed-rate Term Agreements;

c.   Cox falsely stated to complaining customers who noticed the Broadcast Surcharge and/or Regional Sports Surcharge and increases thereto, that

the Surcharges were pass-through government fees and/or were outside of Cox's control; and

        d.     Cox falsely stated to complaining customers who noticed mid-promotion price increases, that the price increases were justified because the subscriber's promotional discount dollar amount had remained the same—when in fact the increase defied Cox's pre-sale representations and advertisements regarding the fixed monthly price during the promotional period.

582.   Cox's mid-agreement increases to the service price above the initially quoted rates defied customers' reasonable expectations, were objectively unreasonable, and frustrated the basic terms of the parties' agreement. Cox's conduct alleged herein was arbitrary and in bad faith.

583.   Cox's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the members of the Classes and Subclasses the full benefit of their bargains with Cox.

584.   Plaintiffs and the members of the Classes and Subclasses have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Cox. There is no legitimate excuse or defense for Cox's conduct.

585.   Any attempts by Cox to defend its mid-agreement service price increases above the initially quoted rates through reliance on supposed contractual provisions will be without merit. Plaintiffs and the members of the Classes and Subclasses never knowingly agreed to any such provisions, are not subject to them, or the provisions are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are unenforceable in light of the hidden and deceptive nature of Cox's misconduct, among other reasons. Any such provisions, even if they existed, would not excuse Cox's abuses of discretion or otherwise preclude Plaintiffs and the members of the Classes and Subclasses from

SECOND AMENDED
CLASS ACTION COMPLAINT     - 109 -     HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1    recovering for breach of the covenant of good faith and fair dealing.

2        586.   Plaintiffs and the members of the Classes and Subclasses sustained

3    damages as a result of Cox's breaches of the covenant of good faith and fair

4    dealing. Plaintiffs seek damages in the amount they and the members of the Classes

5    and Subclasses paid in service price increases above the initially quoted rates,

6    which were imposed by Cox in the middle of their Term Agreements and

7    Promotional Agreements.

## PRAYER FOR RELIEF

**Public Injunctive Relief:**

10       A.     In order to prevent injury to the general public, Plaintiffs individually,

11   and as private attorneys general, request that the Court enter a public injunction

12   against Cox under California's CLRA, FAL, and UCL, and under the Nevada

13   Deceptive Trade Practices Act, as follows:

14           1.     Permanently enjoin Cox from falsely advertising to the general

15   public that the prices of its service plans are fixed and will not increase for the

16   duration of the Term Agreement or Promotional Agreement, when in fact Cox may

17   increase service prices in the middle of the agreement by raising discretionary

18   service charges such as the Broadcast Surcharge and/or Regional Sports Surcharge;

19           2.     Permanently enjoin Cox from falsely advertising to the general

20   public that the prices of its service plans are fixed and will not increase above the

21   initially quoted rates for the duration of the Promotional Agreement, when in fact

22   Cox may increase service prices mid-promotion by raising the base price of the

23   service plan itself;

24           3.     Permanently enjoin Cox from advertising or quoting a service

25   plan price to members of the general public if that price does not include all

26   applicable discretionary service charges (such as the Broadcast Surcharge and the

27   Regional Sports Surcharge); and

28           4.     Retain jurisdiction to monitor Cox's compliance with the

permanent public injunctive relief requested hereinabove.

**Individual And Class Relief:**

B.      On behalf of themselves and the proposed Classes and Subclasses (the "Class members"), Plaintiffs request that the Court order relief and enter judgment against Cox as follows:

1.      Declare that Cox's arbitration clause is unconscionable and/or unenforceable;

2.      Declare this action to be a proper class action, certify the proposed Classes and Subclasses, and appoint Plaintiffs and their counsel to represent the Classes and Subclasses;

3.      Order that the discovery rule applies to extend any applicable limitations period and the corresponding class period for the Classes and Subclasses to the date on which Cox first engaged in its deceptive price increase practices (e.g., raising the price of the services in the middle of the Term Agreement or Promotional Agreement above the initially quoted rates via increases to the Surcharges or via increases to the base price of the service plan itself);

4.      Declare that Cox's conduct alleged herein violates California's CLRA, FAL, and UCL;

5.      Declare that Cox's conduct alleged herein violates the Nevada Deceptive Trade Practices Act;

6.      Order disgorgement and/or restitution, including, without limitation, disgorgement of all revenues, profits and/or unjust enrichment that Cox obtained, directly or indirectly, from Plaintiffs and Class members as a result of the unlawful conduct alleged herein;

7.      Order Cox to pay damages to Plaintiffs and Class members in the amount that their service prices were increased in the middle of Term Agreements or Promotional Agreements above the initially quoted rates;

8.      Order Cox to pay punitive damages to Plaintiffs and Class

SECOND AMENDED
CLASS ACTION COMPLAINT

- 111 -

HATTIS & LUKACS
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
www.hattislaw.com

1  members;

2          9.      Order the following Private Injunctive Relief:

3                  a.      Enjoin Cox from increasing the service price above the

4  initially quoted rates for Class members who are under Term Agreements or

5  Promotional Agreements (e.g., by raising the Surcharges or raising the base price of

6  the service plan itself);

7                  b.      Enjoin Cox from continuing to charge and collect the

8  increased amounts resulting from earlier mid-agreement price increases Cox had

9  imposed on Class members in existing fixed-rate agreements; and

10         10.     Retain jurisdiction to monitor Cox's compliance with the

11  permanent private injunctive relief requested hereinabove (Prayer, Paragraph B(9)).

12  **<u>Other Relief:</u>**

13      C.      On behalf of themselves and the proposed Class and Subclasses, and in

14  their capacities as private attorneys general, Plaintiffs request that the Court order

15  relief as follows:

16         1.      Order Cox to pay attorneys' fees, costs, and pre-judgment and

17  post-judgment interest to the extent allowed by law; and

18         2.      Grant such other relief as this Court deems just and proper.

19                      **<u>DEMAND FOR JURY TRIAL</u>**

20      Each Plaintiff, individually and as a class representative on behalf of all

21  others similarly situated, demands a trial by jury on all issues so triable.

22

23      DATED: April 21, 2023

24                              Presented by:

25                              HATTIS & LUKACS

26                              By: _____

27                              Daniel M. Hattis (SBN 232141)
                                Paul Karl Lukacs (SBN 197007)
28                              HATTIS & LUKACS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11711 SE 8th Street, Suite 120
Bellevue, Washington 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

*Attorneys for Plaintiffs
and the Proposed Classes and Subclasses*

SECOND AMENDED
CLASS ACTION COMPLAINT

- 113 -