1
2
3
4
5
6

**HATTIS & LUKACS**
Daniel M. Hattis
Paul Karl Lukacs
11711 SE 8th St, Ste 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

*Attorneys for Plaintiffs and the Proposed Class*

7
8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| Cristina Abdala; Robynn Rowe; Donald Christianson; Isabel Prado; Neil Moura; Daniel Polinsky; Jessica Bazan; Paula Christopher; Gregory Clark; Janine Clark; Joseph Depew; Brenda Depperschmidt; James Gamble; Kelly Gilliland; Brian Hargett; Adrienne Jackson; Lyssa Jordan; Wayne Kalayjian; Jennifer Klat; Diane Klein; Nestor Mendez; Stephen Metzger; James Mills; Michael Mitchell; Rosa Montanez; Lauren Ramos; Albert Renn; Patricia Salvacion; Heather Webster; John Wiley; and Stephanie Wiley, on behalf of themselves and all others similarly situated, | Case No. 3:22-cv-01290-RSH-MSB <br><br> <u>**THIRD AMENDED**</u> <br> <u>**CLASS ACTION COMPLAINT**</u> <br><br> **For:** <br><br> **(1) Violation of Cal. Civil Code § 1750;** <br><br> **(2) Violation of Cal. Business & Professions Code § 17500;** <br><br> **(3) Violation of Cal. Business & Professions Code § 17200;** <br><br> **(4) Breach of Contract;** <br><br> **(5) Breach of the Implied Covenant of Good Faith and Fair Dealing (Pleaded in the Alternative)** |
| Plaintiffs, | |
| v. | |
| Cox Communications, Inc.; CoxCom, LLC; and Cox Communications California, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

1

Plaintiffs Cristina Abdala, Robynn Rowe, Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Jennifer Klat, Diane Klein, Nestor Mendez, Stephen Metzger, James Mills, Michael Mitchell, Rosa Montanez, Lauren Ramos, Albert Renn, Patricia Salvacion, Heather Webster, John Wiley, and Stephanie Wiley, individually and on behalf of all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendants Cox Communications, Inc.; CoxCom, LLC; and Cox Communications California, LLC (hereinafter collectively, "Cox" or "Defendants"):

# I.  **INTRODUCTION**

1. This action challenges a deceptive pricing and billing scheme whereby Cox falsely advertised and promised to new and existing customers that the monthly prices for Cox's service plans[1] would be at quoted, fixed rates for a 1- or 2-year Minimum Term Agreement[2] or Promotional Agreement[3], but then, after the customer signed up, Cox as a matter of policy would unlawfully increase the service price in the middle of the promised fixed-rate period. Notably, Cox's deceptive price advertising and practices were

---

[1] "Service plan" as used in this Complaint refers to a Cox cable service plan with television and/or internet service, including service plans that "bundled" television and/or internet service with phone or home security services.

[2] "Minimum Term Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, and the subscriber is subject to an early termination fee penalty if he or she terminates service prior to the end of the promotional period. "Minimum Term Agreement" is not used in this Complaint to refer to a specific written contract document. Cox offered Minimum Term Agreements both to new customers and to existing customers who were renewing or changing their service plans.

[3] "Promotional Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, with no early termination fee penalty. Cox offered Promotional Agreements both to new customers and to existing customers who were renewing or changing their service plans.

uniform in all of Cox's sales channels. According to Cox, consumers would "Get the exact same price when you shop online, by phone or in-store."

2. **Mid-Agreement Price Increase Method No. 1: Raising the Broadcast Surcharge and Regional Sports Surcharge.** For customers who signed up for Minimum Term Agreements or Promotional Agreements between 2014 and March 22, 2021, Cox increased the promised fixed monthly service rate in the middle of the agreement by annually increasing two disguised monthly television service charges, which Cox called the "Broadcast Surcharge" and the "Regional Sports Surcharge" (the "Surcharges"). (Prior to March 23, 2021, Minimum Term Agreements were the most common type of subscription service plan offering by Cox, and Promotional Agreements were less common.)

3. Cox advertised and quoted fixed rates for each Minimum Term Agreement or Promotional Agreement it offered, including a detailed graphical monthly price chart that broke out the price to be charged each and every month for the service plan under the agreement. On its website, Cox explicitly stated that for Minimum Term Agreements, the quoted fixed prices were "guaranteed" and only excluded equipment, movie rentals, and non-service charges. Notably, those advertised fixed rates, including the prices promised in the month-by-month price charts, excluded the amount of the Surcharges (and also their increases)—even though the Surcharges were, in fact, monthly "service charges."

4. Contrary to these promises and representations, a few months after the customer signed up Cox as a matter of policy would covertly increase the monthly service price mid-agreement by raising the Surcharges.

5. If a customer noticed the price increase to his or her service plan (after the Surcharges had been increased mid-agreement) and called Cox to complain, Cox agents would deceptively tell the customer that only the Surcharges had increased but that the service price remained the same (despite the fact that the Surcharges were charges for service). The agents would also falsely say that the Surcharges were pass-through government fees and/or were outside of Cox's control.

6. Notably, Cox recently entered into a **$13 million settlement with the Arizona Attorney General** in connection with the unilateral increase of these Surcharges during fixed-rate Minimum Term Agreements between January 2015 and March 2021. The Arizona Attorney General's office described the case against Cox as follows when announcing the settlement on January 4, 2024 (emphasis added):[4]

> Attorney General Mayes' lawsuit [filed December 15, 2023] alleged that Cox deceived Arizonans who purchased television services to enter long-term contracts through promises of a "price lock guarantee" and other fixed-pricing "deals." . . . Between January 2014 and March 2021, Cox reserved the ability to regularly raise the bills of price-locked customers through increases in company-imposed fees [of the Broadcast Surcharge and the Regional Sports Surcharge]. . . . **By disguising price increases as fees, Cox routinely raised the bills of customers who thought they had secured a locked-in price.**

7. Starting March 23, 2021 (the same month that the Arizona Attorney General served its Civil Investigative Demands on Cox concerning Cox's mid-agreement Surcharge increases), Cox modified its new cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge altogether. In their place, Cox increased the prices of the new service plans by an amount equivalent to the Surcharges—which further confirmed that the Surcharges had actually been extra charges for Cox's services all along.

8. **Mid-Agreement Price Increase Method No. 2: Outright Raising the Base Price of the Service Plan.** After Cox eliminated the Surcharges from new service plans on March 23, 2021, Cox switched to the mid-agreement price increase method of outright raising the base price of the service plan. (On or around March 23, 2021, Promotional Agreements replaced Minimum Term Agreements as the most common type

---

[4] *See* Arizona Attorney General press release dated January 4, 2024, "Attorney General Mayes Announces $13 Million Settlement with Cox Communications for Disguising Price Increases as Routine Fees," available at https://www.azag.gov/press-release/attorney-general-mayes-announces-13-million-settlement-cox-communications-disguising (last accessed September 3, 2024).

of subscription service plan offering by Cox.[5])

9.      Cox advertised and promised fixed rates for each Promotional Agreement service plan, and Cox continued to advertise a detailed graphical monthly price chart that broke out the price to be charged each and every month for the service plan under the Promotional Agreement.

10.     But then after the customer signed up, Cox—in violation of its representations and agreement with the customer—would raise the monthly service price above the promised fixed rate in the first quarter of each year when Cox implemented its annual company-wide price increases across nearly all of its service plans.

11.     While Cox advertised and promised on sign-up that customers would receive a fixed dollar-amount <u>price</u> for the 1- or 2-year Promotional Agreement, that was not how Cox actually implemented the promotion in its back-end billing system. The investigation by Plaintiffs' counsel revealed that Cox instead wrongly implemented the Promotional Agreement pricing in the customer's account as a fixed dollar-amount <u>discount</u> off Cox's ever-changing and higher so-called "retail rate."

12.     Meanwhile, Cox had a policy and practice of implementing across-the-board increases of the "retail rate" for nearly every one of its service plans in the first quarter of each year. And whenever Cox increased the "retail rate," the customer's monthly service price suddenly <u>increased in tandem</u> by the same dollar amount—even in the middle of a promised fixed-price Promotional Agreement.

13.     If customers noticed the price increase in the middle of their Promotional Agreement and called Cox to complain, Cox agents justified the increase by arguing that Cox was honoring the promotion because the subscriber's discount dollar amount had

---

[5] Regarding customers who signed up for <u>Minimum Term Agreements</u> on or after March 23, 2021 (after Cox eliminated the Surcharges from its new plans), those customers were no longer subject to Cox's mid-agreement price increase scheme. In contrast, customers who signed up for <u>Promotional Agreements</u> after that date (who were the large majority of customers) continued to be subject to Cox's price increase scheme via Cox's mid-agreement increases to the base price of the service plan itself.

remained the same.[6] But this defied Cox's uniform pre-sale statements, advertisements, and promises (including in detailed monthly price charts) of a quoted fixed rate that would not increase during the promotional period.

14.     Plaintiffs estimate that Cox has extracted more than $150 million from over 1.5 million California subscribers since 2015 via this illegal scheme of increasing its service prices in the middle of promised fixed-rate agreements.

15.     Plaintiffs bring this lawsuit on behalf of themselves and a class of similarly situated California consumers, seeking damages and/or restitution, punitive damages, and pre- and post-judgment interest. Plaintiffs also seek a declaration by this court that Cox's practices alleged herein violate California law. Additionally, Plaintiffs, on behalf of themselves and the Class, seek a public injunction to stop these unlawful advertising practices in order to protect the general public.

## II.     THE PARTIES

16.     Plaintiff Cristina Abdala is a citizen and resident of Alisa Viejo, California, where she was a victim of Cox's deceptive pricing and billing scheme described herein.

17.     Plaintiff Robyn Rowe was a citizen and resident of Santa Barbara, California, where she was a victim of Cox's deceptive pricing and billing scheme described herein. Ms. Rowe is currently a resident of Austin, Texas.

18.     Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, Daniel Polinsky, Jessica Bazan, Paula Christopher, Gregory Clark, Janine Clark, Joseph Depew, Brenda Depperschmidt, James Gamble, Kelly Gilliland, Brian Hargett, Adrienne Jackson, Lyssa Jordan, Wayne Kalayjian, Jennifer Klat, Diane Klein, Nestor Mendez, Stephen Metzger, James Mills, Michael Mitchell, Rosa Montanez, Lauren Ramos, Albert Renn, Patricia

---

[6] In reality, what Cox had <u>actually</u> advertised and promised to the customer was a fixed specific dollar amount <u>price</u>. At the time of purchase, any advertisements or statements of discounts by Cox were represented as applying to the regular price for the service in effect at the time of sign-up, resulting in the quoted and promised lower fixed price. Cox never told or disclosed to the customer that it would instead apply some discount dollar amount to an ever-changing "retail rate" which Cox would increase at its whim (thereby making any represented "discount" amount illusory).

Salvacion, Heather Webster, John Wiley, and Stephanie Wiley are citizens and residents of California, where they were victims of Cox's deceptive pricing and billing scheme as described herein.

19.    Defendant Cox Communications, Inc. is a privately-owned subsidiary of Cox Enterprises, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and nerve center in Atlanta, Georgia. The footer of Cox's public website targeted to current and prospective residential cable customers states: "©1998 – 2024 Cox Communications, Inc."[7] Cox customer bills instruct customers that checks should be made payable to "Cox Communications."

20.    Defendant CoxCom, LLC is a subsidiary of Cox Communications, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and nerve center in Atlanta, Georgia.

21.    Defendant Cox Communications California, LLC, is a subsidiary of Cox Communications, Inc., and is incorporated in Delaware, with its headquarters, executive office, principal place of business and nerve center in Atlanta, Georgia.

22.    Defendants Cox Communications, Inc.; CoxCom, LLC; and Cox Communications California, LLC, jointly created, implemented, participated in the collection of revenues from, and shared in the proceeds from, the unlawful uniform polices complained of in this Complaint, namely, the deceptive pricing and billing scheme whereby Cox promised and advertised to customers that the monthly prices for Cox's service plans would be at quoted, fixed rates for a 1- or 2-year Minimum Term Agreement or Promotional Agreement period, but then after the customer signed up Cox would increase the service price in the middle of the promised fixed-rate period. All Defendants are collectively referred to herein as "Cox" or "Defendants."

## III.    <u>JURISDICTION AND VENUE</u>

23.    **<u>Subject Matter Jurisdiction.</u>**  The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d)(2)—i.e., Class Action Fairness Act

---

[7] *See* https://www.cox.com/residential/home.html, last accessed September 3, 2024.

("CAFA") jurisdiction—because the amount in controversy exceeds the sum or value of $5 million (exclusive of interest and costs) and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

24.     **Personal Jurisdiction.**  This Court has personal jurisdiction over Cox because, without limitation: (1) Cox has purposely availed itself of the privileges of conducting business activities in California; (2) Cox currently maintains systematic and continuous business contacts with California including marketing, selling, and issuing service plans to California consumers; (3) Cox has entered into agreements with Plaintiffs and other California consumers to provide cable TV and internet services; and (4) Cox maintains offices and retail locations throughout California. Cox has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible.

25.     **Venue.**  Venue is proper pursuant to 28 U.S.C. §1391 because many of the acts and transactions giving rise to this action occurred in this District; Cox is authorized to conduct business in this District; Cox does substantial business in this District; Cox has intentionally availed itself of the laws and markets within this District through distribution, marketing and sale of its services in this District; and Cox is subject to personal jurisdiction in this District.

## IV.   FACTUAL ALLEGATIONS OF COX'S DECEPTIVE PRICING AND BILLING SCHEME

26.     Defendant Cox currently provides cable TV and/or internet services to approximately 6.5 million households nationwide, including approximately 500,000 million households in California.

27.     At all relevant times, Cox has advertised its service plans through pervasive marketing directed at the consuming public in California. This marketing has included advertisements on the Cox website; marketing emails; direct mailers; materials and advertising at its California retail stores; video advertisements via social media including YouTube, Facebook, and Twitter; and television, radio, and other internet advertisements.

28.    Cox's price advertising and price representations were uniform in all of Cox's sales channels. According to Cox, consumers would "Get the exact same price when you shop online, by phone or in-store." See **Figure 1** below (red box added).

**Figure 1:    Cox Statement on Website that Pricing is the Same in All Sales Channels**
(Screenshot from February 28, 2022)



GETTING STARTED WITH COX

- Get the exact same price when you shop online, by phone or in-store.
- The base equipment you need is included for TV, Homelife and Voice plans. Plus, get more from your TV plan with your choice of one premium channel and Record 1 Starter DVR service for 12 months.

29.    For years, Cox falsely advertised, both to consumers who were signing up for the first time, and to existing customers who were renewing or changing their service plans, that the monthly rates for its service plans would be fixed and would not increase above the quoted prices during a 1- or 2-year Minimum Term Agreement or Promotional Agreement. For each service plan agreement Cox offered, Cox also advertised a detailed graphical monthly price chart that broke out the quoted price to be charged each and every month under the agreement.

30.    But then after the customer signed up, Cox—in violation of its representations and agreement with the customer—would as a matter of policy unlawfully increase the service rate in the middle of the supposedly fixed-rate period.

31.    Below are further details regarding how Cox implemented its unlawful price increases in the middle of promised and agreed-to fixed-rate periods.

A.    **Mid-Agreement Price Increase Method No. 1: Raising the Broadcast Surcharge and the Regional Sports Surcharge.**

32.    For customers who signed up for their service plans between 2014 and March 22, 2021, Cox increased the promised fixed monthly price of its service plans by annually increasing two disguised television monthly service charges, which Cox called the "Broadcast Surcharge" and the "Regional Sports Surcharge" (the "Surcharges"). These mid-agreement increases were contrary to the fixed prices previously quoted and promised by Cox agents and were contrary to the advertisements on the Cox website at

sign-up.

33.   In addition to making these affirmative misrepresentations about Cox's service prices, Cox failed to adequately disclose the existence of the Surcharges during the signup process. And Cox <u>never</u> disclosed the fact that Cox could and would use the Surcharges as a way to increase the price of its service plans mid-agreement, directly contrary to Cox's representations and promises of quoted fixed rates.

34.   Notably, Cox recently entered into a **<u>$13 million settlement with the Arizona Attorney General</u>** in connection with the unilateral increase of these Surcharges during fixed-rate Minimum Term Agreements between January 2015 and March 2021.[8]

35.   The Arizona Attorney General's office described the case against Cox as follows when announcing the settlement on January 4, 2024 (emphasis added):[9]

> Attorney General Mayes' lawsuit [filed December 15, 2023] alleged that Cox deceived Arizonans who purchased television services to enter long-term contracts through promises of a "price lock guarantee" and other fixed-pricing "deals."  . . . Between January 2014 and March 2021, Cox reserved the ability to regularly raise the bills of price-locked customers through increases in company-imposed fees [of the Broadcast Surcharge and the Regional Sports Surcharge].  . . . **<u>By disguising price increases as fees, Cox routinely raised the bills of customers who thought they had secured a locked-in price.</u>**

### 1.   The Broadcast Surcharge and the Regional Sports Surcharge.

36.   The Broadcast Surcharge is a monthly television service charge that Cox began adding to its customers' bills in January 2015 at a rate of $3.00 per month. Between January 2017 and November 2022, Cox increased the per month Broadcast

---

[8] The Arizona Attorney General had served its Civil Investigative Demands on Cox on March 5, 2021. Later that same month, Cox modified its <u>new</u> cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge.

[9] *See* Arizona Attorney General press release dated January 4, 2024, "Attorney General Mayes Announces $13 Million Settlement with Cox Communications for Disguising Price Increases as Routine Fees," available at https://www.azag.gov/press-release/attorney-general-mayes-announces-13-million-settlement-cox-communications-disguising (last accessed September 3, 2024).

Surcharge in January or February of each year as well as in November 2022, for a total of 7 increases. Currently, the Broadcast Surcharge is $22.00 per month.

37.     Cox buried the Broadcast Surcharge in its monthly bill at the end of the "Monthly Services" section under "Additional TV" (thereby also admitting the Broadcast Surcharge was in fact a monthly <u>service charge</u>). Cox provided no definition or explanation of the Broadcast Surcharge in its monthly bills. In fact, Cox used the Broadcast Surcharge as a way to covertly increase the monthly service price for its plans during a customer's promised fixed-rate Minimum Term Agreement or Promotional Agreement.

38.     The Regional Sports Surcharge is another, separate, monthly television service charge that Cox began adding to its customers' bills in January 2017 at a rate of $3.00 per month. The Regional Sports Surcharge was charged to Cox subscribers with "Contour TV" (previously called "Essential TV") or higher—which comprised the overwhelming majority of Cox cable TV subscribers. Between January 2018 to November 2022, Cox increased the per month Regional Sports Charge in January or February of each year and in November 2022, for a total of 5 increases. Currently, the Regional Sports Surcharge ranges between $10.00 an $12.00 per month.

39.     Cox similarly buried the Regional Sports Surcharge in its monthly bill at the end of the "Monthly Services" section under "Additional TV" (thereby also admitting the Regional Sports Surcharge was in fact a monthly <u>service charge</u>). Cox provided no definition or explanation of the Regional Sports Surcharge in its monthly bills. Like the Broadcast Surcharge, Cox used the Regional Sports Surcharge as a way to covertly increase the monthly service price for its plans during a customer's promised fixed-rate Minimum Term Agreement or Promotional Agreement.

40.     Cox increased the Broadcast Surcharge and the Regional Sports Surcharge regardless of whether the customer was in the middle of a "guaranteed" fixed-rate and "price-locked" Minimum Term Agreement or Promotional Agreement.

41.     Starting March 23, 2021 (the same month that the Arizona Attorney

11

General served its Civil Investigative Demands on Cox concerning its mid-agreement Surcharge increases), Cox modified its <u>new</u> cable TV service plan offerings to eliminate the Broadcast Surcharge and the Regional Sports Surcharge altogether. In their place, Cox increased the prices of the new service plans by an amount equivalent to the Surcharges—which further confirmed that the Surcharges had actually been extra charges for Cox's <u>services</u> all along.

### 2.   Cox Advertised and Promised "Guaranteed" Fixed Monthly Rates During Minimum Term Agreements.

42.     During the period 2014 through March 22, 2021, Cox primarily marketed and pushed consumers into 1- or 2-year Minimum Term Agreements.[10] Cox consistently and prominently advertised and promised fixed quoted rates for each Minimum Term Agreement service plan, including a detailed monthly price chart that broke out the price to be charged each and every month for the service plan under the agreement.

43.     Cox promised that the service plan rates were "guaranteed" not to increase and were "price-locked" during the Minimum Term Agreement, and that the quoted rates excluded only equipment, movie rentals, and non-service charges. However, those advertised fixed rates, including the prices promised in the month-by-month price charts, excluded the amount of the Surcharges (and also their increases)—even though the Surcharges were, in fact, monthly "service charges."

44.     Customers who entered into these Minimum Term Agreements gave up their ability to freely quit their service during the agreement without incurring an early termination fee. Customers locked themselves into these Minimum Term Agreements because Cox had represented to them that Cox was similarly locking itself into charging no more than the quoted fixed price during the agreement period.

---

[10] Up until March 22, 2021, it was also possible, but less common, for a customer to sign up for a fixed-price Promotional Agreement of one or two years (which, unlike a Minimum Term Agreement, did not have an early termination fee penalty). Cox likewise increased the service price in the middle of these promised fixed-price Promotional Agreements via increases to the Surcharges.

45. **<u>Cox's Online Advertising and Order Process.</u>** On Cox's website and throughout the online order process, Cox repeatedly—and falsely—represented that signing up for a 1- or 2-year Minimum Term Agreement "guaranteed" that the advertised and promised monthly service price would be locked-in for the duration of the agreement.

46. For example, on Cox's FAQ webpages (see **Figure 2** below), one of the questions asked: "What if I don't want a service agreement?" Cox's posted answer to the question was: **"Service agreements give you peace of mind that your bill won't change over the course of the agreement**, but you can opt out during checkout for $10 more per month." (Emphasis added.)

**Figure 2:   Cox FAQ on Minimum Term Agreement**
(Screenshot from January 9, 2020)



^   **What if I don't want a service agreement?**

Service agreements give you peace of mind that your bill won't change over the course of the agreement, but you can opt out during checkout for $10 more per month.

47.     Throughout the online order process, Cox made explicit representations about the quoted and "guaranteed" fixed price of the service plan under the Minimum Term Agreement. For example, see **Figure 3** below, which is representative of what Cox displayed from at least 2018 through March 22, 2021, to consumers during the online ordering process after they had selected one of Cox's advertised offers.[11] (Red boxes added.)

---

[11] This screenshot was taken from the Cox website on January 9, 2020, during the online order process for the "Cox Bronze Bundle with Homelife" 2-year Minimum Term Agreement service plan.

1  **Figure 3:   Cox Online Order Process Webpage**
2             (Screenshot from January 9, 2020)



48.   As the screenshot above shows, Cox advertised fixed "monthly charges" of **"$99.99/mo For 12 months"**, which was a clear promise that the monthly service charges would stay fixed at $99.99 per month for all 12 months of the Minimum Term Agreement.

15

49.     And if the customer clicked the link to "see <u>Offer Terms</u>" it opened a pop-up box where Cox <u>again promised</u> that the price for the customer's service plan would not increase above the quoted rates during the agreement period. See **Figure 4** below.

**Figure 4:   Term Service Agreement Tab of "See Offer Terms" Pop-Up**
(Screenshot from January 9, 2020)



50.     Indeed, as shown in both Figures 3 and 4, Cox repeatedly advertised and promised: "The Service Agreement lets you **<u>guarantee the regular rates</u>** on Cox TV, Internet and Phone services for 2 years. The rates for your **<u>services will not increase above the Service Agreement rate</u>** when you agree to keep your main services (TV, Internet and/or Phone) for the 2 years." (Emphasis added.) Immediately below that, Cox stated: "**What's covered and not covered.** The Service Agreement is offered on TV, Internet and Phone services plus their features, such as a premium channel or voice mail. The Service Agreement does not apply to charges for equipment (such as a receiver or modem), per use items (like a movie rental) and fees for non-services (like taxes and surcharges) which may change."

51.     Cox promised that its fixed price "guarantee" excluded only equipment, movie rentals, and "fees for <u>non-services</u>." Yet Cox has <u>admitted</u> that the Broadcast Surcharge and the Regional Sports Surcharge are fees for <u>services</u> (see ¶¶ 62–67 below), such that this fine print "non-services" exception cannot apply to mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge.

52.     If the consumer clicked on the "Pricing Details" tab in the same pop-up shown in Figure 4 above, then Cox would display a graphical monthly price chart which listed the dollar amount Cox would charge each and every month for service. See **Figure 5** below (red box added).

**Figure 5:**   **Monthly Price Chart (Pricing Details Tab of "See Offer Terms" Pop-Up)**
(Screenshot from January 9, 2020)



53.     As the chart shows, Cox explicitly promised that each and every month, for Months 1-24, Cox would charge $99.99 for the service plan (if the consumer scrolled down by dragging the scrollbar on the right, the "Monthly Charges" listed for Months 9-

24 were the same).

54.     All of these pricing representations described above and documented in Figures 2–5 above are typical and representative of Cox's uniform price representations and advertising from 2014 through March 22, 2021 to its customers nationwide, including in the state of California.

55.     **Signing up with Cox sales or customer service agents.**  Likewise, when new or existing customers, including Plaintiffs, signed up for Cox service over the phone, via web-chat, or in-store, Cox sales and customer service agents quoted the exact same prices for the exact same service plans as on the Cox website, and made the exact same promises about fixed-rate prices under a Minimum Term Agreement. As Cox stated on its website, "Get the exact same price when you shop online, by phone or in-store." (See Figure 1 above.)

56.     Cox sales and customer service agents pushed Minimum Term Agreements by making the same promises to consumers as on the website that the advertised service rates were "guaranteed" and "price-locked" for those 1 or 2 years. Meanwhile, Cox agents as a matter of policy did not disclose or mention that Cox could, and would, increase the monthly service price mid-agreement by increasing the Broadcast Surcharge and/or the Regional Sports Surcharge. And, even though it was possible to request to sign up for month-to-month service rather than a 1- or 2-year Minimum Term Agreement, Cox agents were trained to not mention the month-to-month option unless a customer specifically asked for it.

57.     These quoted prices and promises of fixed rates for the service plan during the Minimum Term Agreement were false, because in fact Cox would covertly increase the service price mid-agreement by raising the amount of Surcharges.

### 3.   Cox Increased the Monthly Service Rate Mid-Agreement by Raising the Broadcast Surcharge and the Regional Sports Surcharge.

58.     Cox's representations that the monthly service rate was "guaranteed" and "price-locked" and that its Minimum Term Agreements "give you peace of mind that

your bill won't change over the course of the agreement" were false. To the contrary, Cox as a matter of uniform policy routinely increased the monthly price for its services in the middle of its customers' fixed-rate agreements by increasing the two disguised television service fees—the Broadcast Surcharge and the Regional Sports Surcharge.

59.     Cox increased the Broadcast Surcharge seven times since 2015, and increased the Regional Sports Surcharge five times since 2017. And Cox imposed these annual increases on <u>all</u> of its cable TV subscribers, <u>even if they were in the middle of a promised fixed-rate agreement</u>.

60.     Contrary to Cox's fixed-price "guarantee" and promise that the service rate was "price-locked" during the Minimum Term Agreement, Cox utilized the Broadcast Surcharge and the Regional Sports Surcharge as levers to covertly ratchet up the service price in the middle of the agreement.

61.     Meanwhile, customers in Minimum Term Agreements who discovered and were upset about the price increases could not terminate their agreements without having to pay a significant early termination fee penalty.

### 4.     <u>It Is Indisputable That the Broadcast Surcharge and the Regional Sports Surcharge Are Charges for Service.</u>

62.     It cannot be disputed that the Broadcast Surcharge and the Regional Sports Surcharge are extra charges for cable TV <u>service</u>. In fact, Cox has repeatedly admitted that the Surcharges are charges for services.

63.     Notably, Cox listed the Broadcast Surcharge and Regional Sports Surcharge in the "Monthly <u>Services</u>" section of the bill under "Additional TV"—where they were neither defined nor explained. (Meanwhile, Cox did <u>not</u> list the Broadcast Surcharge or the Regional Sports Surcharge under the separate section of the bill labeled "Taxes, Fees and Surcharges.")

64.     Cox has repeatedly confirmed that the Broadcast Surcharge and the Regional Sports Surcharge are just carved-out portions of the customer's cable TV service price. In fact, prior to 2015 those current Surcharge amounts were included in the

1  top-line service plan price.

2      65.    For example, in one discussion thread on Cox's website, a Cox

3  representative stated that:[12]

> In the past, all Cox television programming costs and fees were
> simply rolled together in our charges for Advanced TV service or
> the specific Tier of service. Over the years, Cox has had to raise
> service rates due to rising video programming costs and network
> retransmission fees. In an effort to meet the demand for more
> transparent billing practices, we introduced surcharges as a way to
> highlight the different costs associated with the delivery of
> broadcast TV networks. The separate line items simply allow
> customers to better track how these costs impact their total TV
> charge.

10      66.    These admissions further confirm that the Broadcast Surcharge and the

11  Regional Sports Surcharge are extra television service charges.

12      67.    And when Cox stopped charging the Surcharges to subscribers of its new

13  cable TV service plans beginning March 23, 2021—and Cox instead increased the top-

14  line price of its advertised TV service plans by an equivalent dollar amount—Cox was

15  further admitting that the Surcharges had really just been disguised extra charges for TV

16  service all along.

17  **B.**    **Mid-Agreement Price Increase Method No. 2: Outright Raising the**

18          **Base Price of the Service Plan.**

19      68.    After Cox eliminated the Surcharges from new service plans beginning on

20  March 23, 2021, Cox switched to a new price-increase method of outright raising the

21  base prices of its service plans in the middle of Promotional Agreements.

22

23  [12] *See* Cox website at: https://forums.cox.com/discussions/archive/to-keep-you-better-
informed-a-6-00-surcharge-what/95525, last accessed September 3, 2024 (emphasis added).

24  Meanwhile, the Cox representative's explanation that the Surcharges were implemented
by Cox to be "more transparent" in its billing practices and to "highlight" the cost of

25  delivery of the broadcast networks is specious nonsense—in fact, the opposite is true.
Cox actually utilized the Surcharges as a way to deceive its customers regarding the true

26  cost of its service plans. Cox enticed customers to sign up by falsely advertising a lower
price while utilizing the Surcharges to then covertly charge a higher price. Cox's

27  advertising and quoted prices excluded the amount of the Surcharges altogether, and then
Cox never defined or explained in the customer bill what the Broadcast Surcharge or

28  Regional Sports Surcharge were.

1.      <u>**Cox Advertised and Promised Promotional Agreements With Fixed Monthly Rates.**</u>

69.     Around March 2021, Promotional Agreements replaced Minimum Term Agreements as the most common type of subscription service plan offering by Cox. Promotional Agreement service plans had no early termination penalty, but Cox continued to promise (like Cox had for its Minimum Term Agreements) a fixed service price for the agreement period of 1 or 2 years.

70.     <u>**Online Advertising and Order Process.**</u>  Cox's website uniformly and consistently advertised Promotional Agreement service plans at quoted fixed prices. For example, below at **Figure 6**, Cox advertised a Promotional Agreement service plan as being **"$139.99/mo for 24 mos. No term agrmt."**:[13]

**Figure 6:   Cox Website Advertisement for Promotional Agreement Service Plans**



71.     Throughout the online order process for Promotional Agreement service plans (just like Cox had for Minimum Term Agreement service plans as described above), Cox continued to advertise a quoted fixed rate to be charged during the

---

[13] This screenshot was taken from the Cox website on July 13, 2021, and lists advertised Cox service plans with a 2-year fixed price Promotional Agreement. The $139.99/mo service plan on the left was labeled by Cox as the "Internet Preferred 150 + Contour TV Preferred" plan. This screenshot is representative of how Cox has advertised Promotional Agreement service plans on its website since at least March 23, 2021.

1   Promotional Agreement period.

2       72.    Likewise, Cox continued to advertise and display a graphical monthly price

3   chart in the "See Offer Terms" pop-up for Promotional Agreement plans, just like Cox

4   had for its Minimum Term Agreement plans (as demonstrated in Figure 5 above).

5       73.    For example, below at **Figure 7** is a graphical monthly price chart for a

6   Promotional Agreement service plan that was viewed by a particular consumer on Cox's

7   website on May 11, 2023 (red boxes added). This consumer ultimately purchased on that

8   same day, May 11, 2023, the bundled Internet and TV service plan advertised in Figure 7

9   as being **"$105.99/mo"** for 24 months. Figure 7 consists of 3 images which together

10  display the "Monthly Charges" as they appeared when scrolling down within the price

11  chart to display all of Months 1–24.[14]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26  [14] This screenshot was taken from the Cox website on May 11, 2023, and shows the
    monthly price chart for Cox's "Internet Preferred 250 + Contour TV Starter" plan with a
27  2-year fixed price Promotional Agreement. This monthly price chart is representative of
    how Cox has advertised and listed its Promotional Agreement service plans on its website
28  since at least March 23, 2021.

**Figure 7:    Monthly Price Chart for Promotional Agreement Plan (May 2023)**
(3 scrolling screenshots display 24 months of quoted monthly charges)



74.     The text above the price chart reads: **"Promotional discounts begin and end, but that shouldn't mean that your amount due each month should be a surprise. Learn how this offer's discounts will affect your monthly rate."** And then in the line-by-line monthly price chart below that, Cox promises to charge the same service price of $105.99 for each and every one of the 24 months under the Promotional Agreement.

75.     The pricing representations and price charts described above and documented in Figures 6 and 7 above are typical and representative of Cox's uniform price representations and advertising of Promotional Agreements since at least 2021 to its customers nationwide, including in the state of California.

76.     <u>**Signing up with Cox sales or customer service agents.**</u>  Meanwhile, new or existing customers, including Plaintiffs, who signed up on the phone, via web chat, or in-store with a Cox agent for a Promotional Agreement service plan were presented with the exact same fixed-rate representations and promises. As described above, Cox even stated on its website that customers would "Get the exact same price when you shop online, by phone or in-store" (see Figure 1 above). And consistent with Cox's website

24

advertising, Cox agents promised consumers that the monthly service price would be a quoted fixed dollar amount—e.g., "$105.99/mo"—that would not increase during the term of the Promotional Agreement (just like the agents had promised previously regarding Minimum Term Agreements).

> **2.** **Contrary to its Promises, Cox Increased the Service Price in the Middle of Fixed Price Promotional Agreement By Outright Increasing the Base Price of the Service Plan Itself.**

77.   Now that Cox could no longer increase its revenues mid-agreement by raising the Surcharges, Cox's new strategy was to outright increase the base price of the service plans themselves. Cox did so even though the price increase defied Cox's explicit pre-sale statements, advertisements, and promises—including in the detailed monthly price charts—that the monthly price would remain at the quoted fixed rate for the duration of the Promotional Agreement.[15]

78.   For example, directly contrary to Cox's advertising and graphical monthly price chart for the "$105.99/mo" 24-month Promotional Agreement service plan described above at ¶¶ 73–74 and Figure 7, **in Month 9 Cox outright increased the monthly price to that fixed-rate subscriber by $5.00 (to $110.99)**.

79.   Below at **Figure 8** is the Month 8 (December 2023) bill of the very same subscriber who signed up on May 11, 2023 for the "$105.99/mo" service plan shown in the screenshots above at Figure 7. (Red boxes, red lines, and black arrows added.) The Month 8 (December 2023) bill, consistent with the prior bills from Month 1 (May 2023) through Month 7 (November 2023), showed a "Total Monthly Services" price of $105.99, as had been advertised and displayed at sign-up on the price chart (see Figure 7 above).

---

[15] It was still possible for customers to sign up for Minimum Term Agreements after March 22, 2021, but it was much less common.

25

**Figure 8:   First 8 Months of Bills of Subscriber Were Consistent With Promised 24-Month Fixed Rate of $105.99/mo for the Promotional Agreement**





80.     **Then, in January 2024, Cox implemented its annual company-wide price increases for nearly all of its service plans.** This include increasing the "Contour TV Starter" portion of the bundled service plan that this subscriber (and also hundreds of thousands of other Cox subcribers) had signed up for, from $56.00 to $61.00. Cox implemented this price increase across-the-board to all of its subscribers—even if they were in a promised fixed-rate Promotional Agreement.

81.     Thus, on the subscriber's January 2024 bill (Month 9 of the subscriber's 24-month $105.99/mo fixed-rate agreement), the subscriber's monthly service price was increased by $5.00, to $110.99/mo. This increased price was directly contrary to Cox's explicit pre-sales advertisements and promises (including the monthly price chart), and in breach of Cox's agreement with the subscriber. See **Figure 9** below. (Red boxes, red lines, and black arrows added.)

**Figure 9:    In January 2024 (Month 9), Cox Implemented Its Annual Company-Wide Price Increases and Raised the Subscriber's Promised Fixed Rate by $5.00 (to $110.99/mo)**

**Price Chart at Sign-Up on 5/11/2023 (See Fig. 8)**
(Promised $105.99/mo fixed total service rate
for all 24 months including Month 9;
Contour TV Starter portion was $56.00/mo)

**January 2024 Customer Bill**
(Month 9 of 24-Month $105.99 Agreement)







82.     When the subscriber had signed up 9 months earlier, Cox had promised "Promotional price: $105.99" for all 24 months. Below that Cox had listed the $105.99 price as the "Monthly Charge" on 24 separate rows of its monthly price chart—one for each of the months 1 through 24. (See Figure 9 above at the top of the price chart on the right side.) Cox had assured the subscriber that the monthly prices Cox charged during the agreement would therefore not "be a surprise" (also see Figure 9 at the top of the price chart). But to anyone who took Cox at its word, Cox's $5.00 price increase in the middle of the 24-month fixed-rate agreement was not only "a surprise"—it was also in breach of, and directly contrary to, Cox's promises and explicit representations at sign-up.

83.     During the first quarter of every year, Cox has implemented its annual company-wide price increases for nearly all of its service plans. And as Figures 7–9 above illustrate, Cox has implemented these price increases across-the-board to its subscribers—even if they were in a promised fixed-rate Promotional Agreement.

84.     Cox's unlawful mid-agreement price increase to this subscriber (documented at Figures 7–9 above) is representative and typical of how Cox regularly and unlawfully breached its fixed-price agreements with millions of Promotional Agreement subscribers.

85.     Counsel's investigation found that, contrary to Cox's advertising and the statements of its sales and customer service agents, Cox actually implemented Promotional Agreement pricing in its back-end billing system as a fixed dollar amount <u>discount</u> off of Cox's ever-changing and higher so-called "retail rate" (and not as the fixed dollar amount <u>price</u> that Cox actually advertised and promised).[16] And whenever

---

[16] In reality, any advertisements or statements of discounts to customers by Cox were represented as applying to the regular price for the service in effect at the time of sign-up, resulting in the quoted and promised lower fixed price. (E.g., see the Cox price chart examples at Figures 5 and 7 above.) Cox never told or disclosed to the customer that Cox would instead apply some discount dollar amount to an ever-changing "retail rate" which Cox would increase at its whim (thereby making any represented "discount" amount illusory).

Cox increased the "retail rate" (typically annually in the first quarter of each year, to whatever amount Cox desired), then the customer's monthly service price suddenly increased in tandem by the same dollar amount—even in the middle of a promised fixed-rate Promotional Agreement.

86.     Consequently, Cox's advertisements and representations were and remain false and contrary to California law. Moreover, by failing to provide its services at the price promised by Cox and agreed to by its customers for the duration of the Promotional Agreement, Cox has breached its agreements with each and every customer in violation of California law.

**C.     Cox Concealed Its Price Increases and Deceived Customers After They Signed Up.**

87.     Cox continued to deceive its customers concerning its mid-agreement price increase scheme after they signed up.

88.     First, Cox concealed its mid-agreement price increases by implementing them several months into the service agreement—and not on the first bill, which a customer would have been more likely to examine after first signing up. Customers would not expect that, contrary to Cox's representations and promises, several months into the agreement Cox would then suddenly increase the supposedly fixed price (either by raising the Surcharges, or by raising the base price of the service plan itself).

89.     With regard to mid-agreement increases to the Broadcast Surcharge and the Regional Sports Surcharge, the increases were relatively small—typically between $1.00 to $3.50 per Surcharge—and were not included in the "Total Your Cox Bundle" price displayed at the top of the customer bill. Cox intended and knew that customers were unlikely to notice the increased amount of the service charges. Meanwhile, Cox did not define or explain the Surcharges anywhere on the bill.

90.     Likewise, with regard to the mid-agreement increases to the base price of the service plan, the increases were relatively small, typically between $2.00 to $5.00. Meanwhile, Cox did not provide any information on the monthly bill that would notify or

1    remind the customer that he or she was in a Promotional Agreement, and Cox did not

2    state on the bill when the promised fixed price would end—such that customers would be

3    even less likely to notice the mid-promotion price increases.

4         91.    Further, most Cox customers did not read the full printed monthly bills

5    described above because Cox encouraged its customers to sign up for electronic billing

6    and automatic payment (which Cox calls "EasyPay") instead of receiving paper

7    statements. Through this billing process, customers received a monthly Cox billing email

8    which stated the customer's bill total and informed them that their bill would be

9    automatically paid by the payment due date because they were signed up for EasyPay.

10    Cox's EasyPay program discouraged customers from reviewing their monthly bill. And,

11    because Cox's billing emails only stated the bill total, customers could not tell from the

12    email itself that Cox had increased their monthly service rate (e.g., by increasing the

13    Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the base price of

14    the service plan itself). Because the increases were relatively small compared to a

15    customer's total monthly bill, customers would typically not notice the increase.

16         92.    Cox also lied to and misled customers who noticed the mid-agreement price

17    increases and called Cox to complain. With regard to mid-agreement Surcharge

18    increases, if any customers discovered that their service plans had increased in price and

19    called Cox to complain, Cox agents would justify the increase by arguing that only the

20    Surcharges had increased while the service price had remained the same (even though the

21    Surcharges were in fact charges for service), and the agents would also falsely say that

22    the Surcharges were pass-through government fees and/or were outside of Cox's control.

23         93.    With regard to the increase of the service plan base price during a

24    Promotional Agreement, if any customers discovered the price increase and called Cox to

25    complain, Cox agents would justify the increase by arguing that the customer's

26    promotional discount dollar amount had remained the same (i.e., from Cox's ever-

27    increasing "retail rate"; see footnote 16 above). But this defied Cox's explicit pre-sale

28    statements, advertisements, and promises that the quoted monthly price (e.g.,

"$105.99/mo") would remain at the initially quoted rates and not increase during the Promotional Agreement.

## V.    PLAINTIFFS' FACTUAL ALLEGATIONS

### Plaintiff Cristina Abdala

94.    Plaintiff Cristina Abdala is a citizen and resident of Alisa Viejo, California, where she was a victim of Cox's deceptive pricing and billing scheme described herein.

95.    Ms. Abdala was a Cox cable TV, internet and phone service subscriber for approximately 22 years, from 2009 through 2021. Ms. Abdala cancelled her Cox TV service on September 24, 2021.

96.    Ms. Abdala typically signed up for and renewed her service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Abdala also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told her over the phone.

97.    Ms. Abdala signed up for Minimum Term Agreements and Promotional Agreements with Cox. Each time that Ms. Abdala signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

98.    But contrary to Cox's promises, at least once during each Minimum Term Agreement or Promotional Agreement that Ms. Abdala signed up for, Cox increased the price of her service plan by raising the amount of the Surcharges.

99.    **October 7, 2015, 2-Year Minimum Term Agreement.** For example, on October 7, 2015, Ms. Abdala called Cox to learn about her service plan options. The Cox agent she spoke to quoted and promised Ms. Abdala a fixed-price TV, internet and phone service plan, subject to a 2-year Minimum Term Agreement. The agent promised and assured Ms. Abdala that the service plan price would not increase during the term of the agreement. Relying on Cox's fixed price representations and promises, Ms. Abdala

signed up for the service plan.

100.    But contrary to Cox's promises, in February 2017 (16 months into her 24-month fixed-price agreement), Cox increased the monthly price of her service plan by: (1) increasing the Broadcast Surcharge by $1.00 (from $3.00 to $4.00); and (2) adding a $3.00 Regional Sports Charge. Cox continued to unlawfully charge Ms. Abdala these additional amounts over and above her promised fixed-rate for the remainder of the term of her service plan (i.e., through October 2017).

101.    **March 27, 2018, 2-Year Minimum Term Agreement.** On March 27, 2018, Ms. Abdala again called Cox to learn about her service plan options. The Cox agent she spoke to quoted and promised Ms. Abdala a fixed-price TV, internet and phone service plan at a rate of approximately $116.00 per month, subject to a 2-year Minimum Term Agreement. The agent promised and assured Ms. Abdala that the service plan price would not increase during the term of the agreement. Relying on Cox's fixed price representations and promises, Ms. Abdala signed up for the service plan.

102.    But contrary to Cox's promises, in February 2019 (11 months into her 24-month fixed-price agreement), Cox increased the monthly price of her service plan by: (1) increasing the Broadcast Surcharge by $2.50 (from $7.50 to $10.00), and (2) increasing the Regional Sports Surcharge by at least one dollar. Cox continued to unlawfully charge Ms. Abdala these additional amounts over and above her promised fixed-rate for the remainder of the term of her service plan (i.e., through March 2020).

103.    **April 6, 2020, 2-Year Minimum Term Agreement.** On April 6, 2020, Ms. Abdala again called Cox to learn about her service plan options. The Cox agent she spoke to quoted and promised Ms. Abdala a fixed-price TV, internet and phone service plan at a rate of approximately $140.00 per month, subject to a 2-year Minimum Term Agreement. The agent promised and assured Ms. Abdala that the service plan price would not increase during the term of the agreement. Relying on Cox's fixed price representations and promises, Ms. Abdala signed up for the service plan.

104.    But contrary to Cox's promises, in February 2021 (10 months into her 24-

month fixed-price agreement), Cox increased the monthly price of her service plan by: (1) increasing the Broadcast Surcharge by $2.50 (from $13.50 to $16.00), and (2) increasing the Regional Sports Surcharge by at least one dollar. Cox continued to unlawfully charge Ms. Abdala these additional amounts over and above her promised fixed-rate for the remainder of the period she had TV service (i.e., through September 2021).

105.    Cox did not disclose to Ms. Abdala that the monthly prices which she agreed to pay could, and would, increase during the agreements as a result of increases to the Surcharges; in fact Cox promised her the opposite, telling her that her quoted service rate at sign-up would not increase during the agreements.

106.    Each time Ms. Abdala signed up for a Minimum Term Agreement or Promotional Agreement, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Ms. Abdala did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term via increases to the Surcharges. That information would have been material to her. If Ms. Abdala had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

107.    Ms. Abdala never noticed that Cox had increased the amounts of the Broadcast Surcharge and Regional Sports Surcharge in the middle of her Minimum Term Agreements or Promotional Agreements.

108.    Since at least 2015, Ms. Abdala was signed up for electronic billing and Cox's automatic payment program, EasyPay, as Cox encouraged her to do. Through this billing process, Ms. Abdala received a monthly Cox billing email which stated her bill total and informed her that her bill would be automatically paid by the payment due date because she was signed up for EasyPay. Cox's EasyPay program discourages customers from reviewing their monthly bill. And, because Cox's billing emails only state the bill

total, customers cannot tell from the email itself that Cox has increased their monthly service rate by increasing the Broadcast Surcharge and/or Regional Sports Surcharge, or by increasing the base price of the service plan itself.

109.   Ms. Abdala never agreed to pay increased Surcharges for the service plan during the term of the agreements.

110.   Ms. Abdala first learned of Cox's mid-agreement price increase scheme and that she was a victim of the scheme on September 14, 2022. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Abdala.

111.   Ms. Abdala suffered damages during her Minimum Term Agreements and Promotional Agreements in the amount of the increases to her promised and quoted fixed monthly service price.

112.   Ms. Abdala has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Abdala will be harmed in the future by her inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service prices. Ms. Abdala desires and intends to sign up for different Cox service plans and Minimum Term Agreements or Promotional Agreements in the future. However, Ms. Abdala wants to be confident that the advertised and quoted fixed-rate prices for Cox's service plans are in fact truly fixed for the duration of the Minimum Term Agreement or Promotional Agreement.

**Plaintiff Robynn Rowe**

113.   Plaintiff Robyn Rowe was a citizen and resident of Santa Barbara, California, where she was a victim of Cox's deceptive pricing and billing scheme described herein. Ms. Rowe is currently a resident of Austin, Texas.

114.   Ms. Rowe was a Cox cable TV and internet subscriber for approximately 4 years, from 2016 to 2020. Ms. Rowe cancelled her Cox TV service on September 28,

2020.

115.    Ms. Rowe typically signed up for and renewed her service plans over the telephone with Cox. In the process of researching her service plan options, Ms. Rowe also visited the Cox website and viewed Cox's advertising regarding its fixed price service plan agreements, which was consistent with the promises and pricing that Cox agents told her over the phone.

116.    Ms. Rowe signed up for Minimum Term Agreements and Promotional Agreements with Cox. Each time that Ms. Rowe signed up for a new Minimum Term Agreement or Promotional Agreement, Cox affirmatively told her that the service price would be an advertised and promised fixed dollar amount that would not increase for the entire duration of the agreement.

117.    But contrary to Cox's promises, at least once during each Minimum Term Agreement or Promotional Agreement that Ms. Rowe signed up for, Cox increased the price of her service plan by raising the amount of the Surcharges.

118.    **October 16, 2018, 1-Year Minimum Term Agreement.** For example, on October 16, 2018, Ms. Rowe called Cox to learn about her service plan options. The Cox agent she spoke to quoted and promised Ms. Rowe a fixed-price TV and internet service plan at a rate of approximately $100.00 per month, subject to a 1-year Minimum Term Agreement. The agent promised and assured Ms. Rowe that the service plan price would not increase during the term of the agreement. Relying on Cox's fixed price representations and promises, Ms. Rowe signed up for the service plan.

119.    But contrary to Cox's promises, in February 2019 (4 months into her 12-month fixed-price agreement), Cox increased the monthly price of her service plan by increasing the Broadcast Surcharge by $2.50 (from $7.50 to $10.00). Cox continued to unlawfully charge Ms. Rowe this additional amount over and above her promised fixed-rate for the remainder of the term of her service plan (i.e., through February 2020).

120.    Cox did not disclose to Ms. Rowe that the monthly prices which she agreed to pay could, and would, increase during the agreements as a result of increases to the

36

Surcharges; in fact Cox promised her the opposite, telling her that her quoted service rate at sign-up would not increase during the agreements.

121.    Each time Ms. Rowe signed up for a Minimum Term Agreement or Promotional Agreement, she was relying on Cox's explicit representations that the monthly service rate would be the quoted and advertised dollar amount and would not increase during the term of the agreement. Ms. Rowe did not know or expect that contrary to Cox's promises and representations, Cox would in fact covertly increase the monthly service rate in the middle of her supposedly fixed-rate term via increases to the Surcharges. That information would have been material to her. If Ms. Rowe had known that information, she would not have been willing to pay as much for her service plans and would have acted differently.

122.    Ms. Rowe never noticed that Cox had increased the amounts of the Broadcast Surcharge and/or Regional Sports Surcharge in the middle of her Minimum Term Agreements or Promotional Agreements.

123.    Ms. Rowe never agreed to pay increased Surcharges during the term of the agreements.

124.    As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle as described herein, Cox's deceptive pricing and billing scheme was non-obvious and intentionally concealed from its subscribers, including Ms. Rowe.

125.    Ms. Rowe first became aware that the Broadcast Surcharge was being added to her bill in October 2020. In September 2020, Ms. Rowe called Cox to learn about her service plan options, and to complain about increases to her bill such as the Broadcast Surcharge. The Cox agent she spoke to told Ms. Rowe that the Broadcast Surcharge was a pass-through charge she had to pay. Ms. Rowe then dropped her Cox cable TV service.

126.    Ms. Rowe suffered damages during her Minimum Term Agreements and Promotional Agreements in the amount of the increases to her promised and quoted fixed

monthly service price.

127.    Ms. Rowe has a legal right to rely now, and in the future, on the truthfulness and accuracy of Cox's representations and advertisements regarding its service plan prices. Ms. Rowe will be harmed in the future by her inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service prices. Ms. Rowe desires and intends to sign up for different Cox service plans and Minimum Term Agreements or Promotional Agreements in the future if she is within Cox's service area. However, Ms. Rowe wants to be confident that the advertised and quoted fixed-rate prices for Cox's service plans are in fact truly fixed for the duration of the Minimum Term Agreement or Promotional Agreement.

## VI.    CLASS ALLEGATIONS

128.    Plaintiffs bring this lawsuit as a class action, on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

129.    **Class Definition.**  Plaintiffs seek certification of the following class:

> **All current and former Cox subscribers in California who signed up for a Minimum Term Agreement[17] or Promotional Agreement[18] and whose service price was increased in the middle of the agreement period above the initially quoted rates via increases to the Broadcast Surcharge and/or the Regional Sports Surcharge, or via increases to the base price of the service plan itself.**

---

[17] "Minimum Term Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, and the subscriber is subject to an early termination fee penalty if he or she terminates service prior to the end of the promotional period. "Minimum Term Agreement" does not refer to a specific written contract document. Cox offered Minimum Term Agreements both to new customers and to existing customers who were renewing or changing their service plans

[18] "Promotional Agreement" as used in this Complaint means a service plan agreement that is advertised by Cox where the subscriber is promised a quoted, fixed-price promotional rate for a stated period of time, typically for 1 or 2 years, with no early termination fee penalty. Cox offered Promotional Agreements both to new customers and to existing customers who were renewing or changing their service plans.

130.    This Court should apply the **discovery rule** to extend any applicable limitations period (and the corresponding Class periods) for the Plaintiffs and each Class member to January 1, 2015—which is the date, based on counsel's investigation, that Cox first engaged in its deceptive and unlawful practice of increasing its service prices in the middle of advertised and promised fixed-rate agreements. The nature of Cox's misconduct was non-obvious and intentionally concealed from its subscribers. As a result of Cox's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Class could have, through the use of reasonable diligence, learned of the accrual of their claims against Cox at an earlier time.

131.    Specifically excluded from the Class are Cox and any entities in which Cox has a controlling interest, Cox's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

132.    **Numerosity.**  The number of members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of class members prior to discovery. However, based on information and belief, the Class comprises hundreds of thousands of individuals. The exact number and identities of Class members are contained in Cox's records and can be easily ascertained from those records.

133.    **Commonality and Predominance.**  All claims in this action arise exclusively from the uniform policies and procedures of Defendants as outlined herein. This action involves multiple common legal or factual questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

a.    Whether Cox advertised and promised that the monthly price of its service plans would be fixed and would not increase above the initially-quoted rates during 1- or 2-year Minimum Term Agreements;

b.      Whether Cox advertised and promised that the monthly price of its service plans would be fixed and would not increase above the initially-quoted rates during 1- or 2-year Promotional Agreements;

c.      Whether Cox increased its monthly service prices in the middle of Minimum Term Agreements and Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

d.      Whether Cox increased its monthly service prices in the middle of Promotional Agreements above the initially-quoted rates by raising the base price of the service plan itself;

e.      What is the nature or purpose of the Broadcast Surcharge, and whether the Broadcast Surcharge is a monthly service fee for providing cable TV service;

f.      What is the nature or purpose of the Regional Sports Surcharge, and whether the Regional Sports Surcharge is a monthly service fee for providing cable TV service;

g.      Whether increases to the Broadcast Surcharge and the Regional Sports Surcharge are increases to the price of the monthly service;

h.      Whether Cox's policy and practice of increasing the monthly service price in the middle of Minimum Term Agreements or Promotional Agreements by raising the Broadcast Surcharge and Regional Sports Surcharge is material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

i.      Whether Cox's policy and practice of increasing the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself is material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

j.      Whether it was a breach of contract for Cox to unilaterally increase the monthly service price in the middle of Minimum Term Agreements or Promotional Agreements by increasing the Broadcast Surcharge and/or Regional Sports Surcharge;

40

k.      Whether it was a breach of contract for Cox to unilaterally increase the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

l.      Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Minimum Term Agreements or Promotional Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

m.      Whether Cox violated the covenant of good faith and fair dealing by increasing the monthly service price in the middle of Promotional Agreements above the initially quoted rates by raising the base price of the service plan itself;

n.      Whether Cox was unjustly enriched by its misconduct alleged herein;

o.      Whether Cox's misrepresentations and misconduct alleged herein violated California Civil Code § 1750 *et seq.* (CLRA), California Business & Professions Code § 17500 *et seq.* (FAL), and California Business & Professions Code § 17200 *et seq.* (UCL);

p.      Whether Plaintiffs and the Class are entitled to refunds and/or damages as a result of Cox's misconduct alleged herein; and

q.      Whether Plaintiffs and the Class are entitled to an order enjoining Cox from continued engagement in the misconduct alleged herein.

134.   **Typicality.**  Plaintiffs' claims are typical of Class members' claims. Plaintiffs and Class members all sustained injury as a direct result of Cox's uniform practices and schemes alleged herein, bring the same claims, and face the same potential defenses.

135.   **Adequacy.**  Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Class. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting

complex class action and consumer protection cases.

136. **Superiority.** A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Cox's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

137. By its misconduct and omissions alleged herein, Cox has acted and refused to act on grounds that apply generally to the Class, such that final declaratory relief and injunctive relief is appropriate respecting the Class as a whole.

138. Without the proposed class action, Cox will likely retain the benefits of its wrongdoing and will continue the complained-of practices, which will result in further damages to Plaintiffs and class members.

139. Cox is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox that consist of representations of fact about Cox's business operations or services that are or were made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in Cox's services, or the statements are or were made in the course of delivering Cox's services. Each cause of action brought by Plaintiffs against Cox in this Complaint arises from and is limited to statements or conduct by Cox for which the intended audience is an actual or potential customer or subscriber, or a person likely to repeat the statements to, or otherwise influence, an actual or potential customer or subscriber.

**COUNT I**

**Violation of the Consumers Legal Remedies Act**
**California Civil Code § 1750 *et seq.***

140.    Plaintiffs bring this cause of action in their individual capacities, in their capacities as private attorneys general seeking the imposition of public injunctive relief, and as representatives of the Class.

141.    Defendants are each a "person," as defined by Cal. Civ. Code § 1761(c).

142.    Plaintiffs and the Class members are each "consumers," as defined by Cal. Civ. Code §1761(d).

143.    Cox's service plans are "services," as defined by Cal. Civ. Code § 1761(b).

144.    The purchase of a Cox service plan by each Plaintiff is a "transaction," as defined by Cal. Civ. Code § 1761(e).

145.    Each Plaintiff purchased Cox's service plans for personal, family, and/or household purposes, as meant by Cal. Civ. Code § 1761(d).

146.    Venue is proper under Cal. Civil Code § 1780(d) because San Diego County is within the Southern District of California, and San Diego County is a county in which Defendants do business. Plaintiffs' declarations establishing that this Court is a proper venue for this action are attached hereto as **Exhibit A.**

147.    By its conduct and omissions alleged herein, Cox has committed unlawful methods, acts or practices, including:

148.    Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Minimum Term Agreements or Promotional Agreements, despite Cox's pattern and practice of increasing service prices mid-agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

149.    Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Promotional Agreements above the initially quoted rates, despite Cox's pattern and practice of increasing the base price of the service plan in the middle of the promotional period;

150.    Increasing the Broadcast Surcharge and/or Regional Sports Surcharge on customers in the middle of Minimum Term Agreements or Promotional Agreements, contrary to Cox's previous representations and advertising; and

151.    Increasing the base price of the service plan in the middle of Promotional Agreements above the initially quoted rates, contrary to Cox's previous representations and advertising.

152.    The unlawful methods, acts or practices alleged herein to have been undertaken by Cox were all committed intentionally and knowingly. The unlawful methods, acts or practices alleged herein to have been undertaken by Cox did not result from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

153.    Cox's conduct alleged herein has violated the CLRA in multiple respects, including, but not limited to, the following:

a.      Cox represented that its service plans had characteristics that they did not have (Cal. Civ. Code § 1770(a)(5));

b.      Cox advertised its service plans with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

c.      Cox made false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions (Cal. Civ. Code § 1770(a)(13));

d.      Cox misrepresented that its service plans were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

e.      Cox inserted unconscionable provisions in its consumer agreements (Cal. Civ. Code § 1770(a)(19)).

154.    With respect to any omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and the Class members; (b) Cox concealed material information from Plaintiffs and the Class members; and (c) Cox made

1  partial representations, including regarding the supposedly fixed monthly rate of its

2  service plans, which were false and misleading absent the omitted information.

3      155.   Cox's misrepresentations deceive and have a tendency to deceive the

4  general public.

5      156.   Cox's misrepresentations are material, in that a reasonable person would

6  attach importance to the information and would be induced to act on the information in

7  making purchase decisions.

8      157.   Plaintiffs and the Class members reasonably relied on Cox's material

9  misrepresentations, and would not have purchased, or would have paid less money for,

10  Cox's service plans had they known the truth.

11      158.   By its conduct and omissions alleged herein, Cox caused the demand for its

12  service plans to be artificially increased and caused all subscribers of those plans,

13  including Plaintiffs and the Class members, to pay premiums to Cox.

14      159.   As a direct and proximate result of Cox's violations of the CLRA, Plaintiffs

15  and the Class members have been harmed and lost money or property in the amount of

16  the mid-agreement price increases they were charged and paid, and have thereby suffered

17  damages.

18      160.   Cox's conduct has caused substantial injury to Plaintiffs, the Class

19  members, and the general public.

20      161.   Cox's misconduct is ongoing for the Plaintiffs and/or the Class members

21  where they continue to be subject to mid-promotion increases to the service plan base

22  price above the originally quoted rates. Accordingly, Plaintiffs seek an order (1)

23  enjoining Cox from increasing the service price above the initially quoted rates for Class

24  members who are under Minimum Term Agreements or Promotional Agreements, and

25  (2) enjoining Cox from continuing to charge and collect the increased amounts resulting

26  from earlier mid-agreement price increases Cox had imposed during existing fixed-rate

27  agreements.

28      162.   Plaintiffs lack an adequate remedy at law to prevent Cox's continued

unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Cox's representations and advertisements regarding its service prices. Plaintiffs desire and intend to sign up for different Cox service plans and Minimum Term Agreements or Promotional Agreements in the future if they are within Cox's service area. However, Plaintiffs want to be confident that the advertised and quoted fixed-rate prices for Cox's service plans are in fact truly fixed for the duration of the Minimum Term Agreement or Promotional Agreement. Plaintiffs want to be confident that Cox is not going to increase the service price during any promised fixed-rate period by imposing or raising by raising the base price of the service plan itself or imposing a discretionary monthly service charge. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Cox's representations are accurate and whether there are omissions of material facts regarding the service plans being advertised and represented to them.

163.    Monetary damages are not an adequate remedy at law for <u>future</u> harm for the following reasons, without limitation: <u>First</u>, damages are not an adequate remedy for future harm because they will not prevent Cox from continuing its unlawful conduct. <u>Second</u>, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) what service plan(s) Plaintiffs may want or need in the future; (2) what will be the dollar amounts by which Cox increases the price of the services mid-agreement; or (3) how many months Plaintiffs would subscribe to such Cox services. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. <u>Third</u>, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with future lawsuits by the general public, Class members, and Plaintiffs for future violations of the law by Cox.

164.    Plaintiffs, on behalf of themselves and as private attorneys general, seek **public injunctive relief** under the CLRA to protect the general public from Cox's false

advertising, misrepresentations, and omissions. Specifically, Plaintiffs seek a permanent public injunction against Cox under the CLRA as follows: (1) enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase for the duration of the Promotional Agreement, when in fact Cox may increase service prices mid-promotion by raising the base price of the service plan itself; and (2) enjoin Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary service charges (such as the Broadcast Surcharge and the Regional Sports Surcharge).

165.    Cox's misconduct which affects the general public is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Cox from committing these practices which harm the general public.

166.    In accordance with California Civil Code § 1782(a), Plaintiffs, through counsel, served Cox with notices of its CLRA violations.

167.    On August 30, 2022, Plaintiffs sent a CLRA letter notice by USPS certified mail, return receipt requested. The letter was sent on behalf of Plaintiffs Donald Christianson, Isabel Prado, Neil Moura, and Daniel Polinksy and for the benefit of a class of similarly situated California consumers. The letter demanded that Cox: "(1) return all the money that Cox California customers have paid in mid-contract price increases to the Broadcast Surcharge and the Regional Sports Surcharge; and (2) stop charging Cox California customers who are in fixed-rate contracts that are still subject to the Surcharges, any amounts for the Surcharges that are higher than the initial rates of the Broadcast Surcharge and Regional Sports Surcharge that were in effect at the start of their contracts."

168.    On February 8, 2023, Plaintiffs sent a second CLRA letter notice by USPS certified mail, return receipt requested. The letter was sent on behalf of Plaintiffs James Gamble, Jennifer Klat, Michael Mitchell, Lauren Ramos, Patricia Salvacion, Kelly Gilliland, Nestor Mendez, Diane Klein, and Heather Webster and for the benefit of a

class of similarly situated California consumers. The letter demanded that Cox: "(1) return all the money that Cox California customers have paid in price increases to their monthly services during non-'Term Agreement' promised fixed-rate promotional periods, including increases to the price of the service plans themselves and increases to the Broadcast Surcharge and Regional Sports Surcharge; and (2) stop advertising and promising to customers a particular price for its services that is fixed for a promotional period, when in fact Cox intends to increase that price in the middle of that fixed-rate period, such as by increasing the price of the service plans themselves or by increasing the Surcharges."

169.   Cox did not undertake or provide the actions or corrections required by California Civil Code § 1782(c) for alleged class-wide CLRA violations.

170.   Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiffs and the Class members are entitled to recover actual damages, attorneys' fees and costs, and any other relief the Court deems proper for Cox's CLRA violations.

171.   Each Plaintiff hereby rejects any unilateral non-class-wide attempt by Cox to provide the Plaintiff with a refund or reimbursement for past payments of price increases made in the middle of a Minimum Term Agreement or Promotional Agreement, which Cox makes in an attempt to pick off the Plaintiff individually from this class action. For example, each Plaintiff hereby prophylactically rejects any attempt by Cox to unilaterally provide the Plaintiff with an individual bill credit for the mid-agreement price increases.

**COUNT II**

**Violation of California's False Advertising Law**
**California Business and Professions Code § 17500 _et seq_.**

172.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

173.   Plaintiffs bring this cause of action in their individual capacities, in their capacities as private attorneys general seeking the imposition of public injunctive relief,

1  and as representatives of the Class.

2  174. By its conduct and omissions alleged herein, Cox has committed acts of

3  untrue or misleading advertising, as defined by and in violation of California Business &

4  Professions Code § 17500, *et seq.*, also known as California's False Advertising Law

5  ("FAL"). These acts include but are not limited to:

6  175. Misrepresenting that the prices of its service plans were fixed and would

7  not increase during 1- or 2-year Minimum Term Agreements or Promotional Agreements,

8  despite Cox's pattern and practice of increasing service prices mid-agreement by raising

9  the Broadcast Surcharge and/or Regional Sports Surcharge; and

10  176. Misrepresenting that the prices of its service plans were fixed and would

11  not increase during 1- or 2-year Promotional Agreements above the initially quoted rates,

12  despite Cox's pattern and practice of increasing the base price of the service plan in the

13  middle of the promotion.

14  177. With respect to omissions, Cox at all relevant times had a duty to disclose

15  the information in question because, inter alia: (a) Cox had exclusive knowledge of

16  material information that was not known to Plaintiffs and the Class members; (b) Cox

17  concealed material information from Plaintiffs and the Class members; and (c) Cox made

18  partial representations, including regarding the supposedly fixed monthly prices of its

19  services during Minimum Term Agreements or Promotional Agreements, which were

20  false or misleading absent the omitted information.

21  178. Cox committed such violations of the FAL with actual knowledge that its

22  advertising was untrue or misleading, or Cox, in the exercise of reasonable care, should

23  have known that its advertising was untrue or misleading.

24  179. Cox's misrepresentations and nondisclosures deceive and have a tendency

25  to deceive the general public.

26  180. Cox's misrepresentations and nondisclosures are material, in that a

27  reasonable person would attach importance to the information and would be induced to

28  act on the information in making purchase decisions.

181.    Plaintiffs and the Class members reasonably relied on Cox's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, Cox's service plans had they known the truth.

182.    By its conduct and omissions alleged herein, Cox caused the demand for its service plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and the Class members, to pay premiums to Cox.

183.    As a direct and proximate result of Cox's violations of the FAL, Plaintiffs and the Class members have been harmed and lost money or property in the amount of the mid-agreement price increases they were charged and paid, and that money is subject to restitution.

184.    Cox's misconduct is ongoing for the Plaintiffs and/or the Class members where they continue to be subject to mid-promotion increases to the service plan base price above the originally quoted rates. Accordingly, Plaintiffs seek an order (1) enjoining Cox from increasing the service price above the initially quoted rates for Class members who are under Minimum Term Agreements or Promotional Agreements, and (2) enjoining Cox from continuing to charge and collect the increased amounts resulting from earlier mid-agreement price increases Cox had imposed during existing fixed-rate agreements.

185.    Plaintiffs lack an adequate remedy at law to prevent Cox's continued unlawful practices, as previously discussed in ¶ 162 above.

186.    Monetary damages are not an adequate remedy at law for future harm, as previously discussed in ¶ 163 above.

187.    Plaintiffs, on behalf of themselves and as private attorneys general, seek **public injunctive relief** under the FAL to protect the general public from Cox's false advertising, misrepresentations, and omissions. Specifically, Plaintiffs seek a permanent public injunction against Cox under the FAL as follows: (1) enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase above the initially quoted rates for the duration of the Promotional Agreement,

when in fact Cox may increase service prices mid-promotion by raising the base price of the service plan itself; and (2) enjoin Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary service charges (such as the Broadcast Surcharge and the Regional Sports Surcharge).

188.   Cox's false advertising which affects the general public is ongoing in part or in whole and even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Cox from committing these practices which harm the general public.

189.   Plaintiffs seek an order granting restitution to Plaintiffs and the Class members in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

### COUNT III

**Violation of California's False Advertising Law**
**California Business and Professions Code § 17500 *et seq*.**

190.   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

191.   Plaintiffs bring this cause of action in their individual capacities, in their capacities as private attorneys general seeking the imposition of public injunctive relief, and as representatives of the Class.

192.   California Business & Professions Code § 17200, *et seq*., also known as California's Unfair Competition Law ("UCL"), prohibits any unfair, unlawful, or fraudulent business practice.

193.   **"Unlawful" prong.** Cox has violated the UCL by engaging in the following unlawful business acts and practices:

a.   Making material misrepresentations in violation of Cal. Civ. Code §§ 1770(a)(5), (9), (13), and (16) (the CLRA);

b.   Inserting unconscionable provisions in its consumer agreements in

51

violation of Cal. Civ. Code § 1770(a)(19) (the CLRA);

        c.     Making material misrepresentations in violation of Cal. Bus. & Prof. Code § 17500 *et seq.* (the FAL); and

        d.     Engaging in deceit in violation of Cal Civ. Code §§ 1709–1710.

194.  **"Unfair" and "Fraudulent" prongs.** Cox has violated the UCL by engaging in the following unfair and fraudulent business acts and practices:

        a.     Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Minimum Term Agreements or Promotional Agreements, despite Cox's pattern and practice of increasing service prices mid-agreement by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

        b.     Misrepresenting that the prices of its service plans were fixed and would not increase during 1- or 2-year Promotional Agreements above the initially quoted rates, despite Cox's pattern and practice of increasing the base price of the service plan in the middle of the promotional period;

        c.     Increasing the Broadcast Surcharge and/or Regional Sports Surcharge on customers in the middle of Minimum Term Agreements or Promotional Agreements, contrary to Cox's previous representations and advertising;

        d.     Increasing the base price of the service plan in the middle of Promotional Agreements above the initially quoted rates, contrary to Cox's previous representations and advertising;

        e.     Preventing or discouraging customers from freely canceling their services in the event the customers desired to terminate their services after learning that Cox had increased the price of their services in the middle of their promised fixed-rate Minimum Term Agreements by raising the Broadcast Surcharge and/or Regional Sports Surcharge;

        f.     Falsely stating to complaining customers who noticed the Broadcast Surcharge and/or Regional Sports Surcharge and increases thereto, that the Surcharges were pass-through government fees and/or were outside of Cox's control; and

g.   Falsely stating to complaining customers who noticed mid-promotion price increases, that the price increases were justified because the subscriber's promotional discount dollar amount (from Cox's ever-increasing "retail rate") had remained the same, when in fact Cox's explicit pre-sale representations and advertisements promised that the monthly price would remain the same.

195.   With respect to omissions, Cox at all relevant times had a duty to disclose the information in question because, inter alia: (a) Cox had exclusive knowledge of material information that was not known to Plaintiffs and the Class members; (b) Cox concealed material information from Plaintiffs and the Class members; and (c) Cox made partial representations, including regarding the supposedly fixed monthly prices of its services during Minimum Term Agreements or Promotional Agreements, which were false or misleading absent the omitted information.

196.   Cox's misrepresentations and nondisclosures deceive and have a tendency to deceive the general public.

197.   Cox's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

198.   Plaintiffs and the Class members reasonably relied on Cox's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, Cox's service plans had they known the truth.

199.   By its conduct and omissions alleged herein, Cox caused the demand for its service plans to be artificially increased and caused all subscribers of those plans, including Plaintiffs and the Class members, to pay premiums to Cox.

200.   As a direct and proximate result of Cox's unlawful, unfair, and fraudulent conduct, Plaintiffs and the Class members have been harmed and lost money or property in the amount of the mid-agreement price increases they were charged and paid, and that money is subject to restitution.

201.   Cox's misconduct is ongoing for the Plaintiffs and/or the Class members

where they continue to be subject to mid-promotion increases to the service plan base price above the originally quoted rates. Accordingly, Plaintiffs seek an order (1) enjoining Cox from increasing the service price above the initially quoted rates for Class members who are under Minimum Term Agreements or Promotional Agreements, and (2) enjoining Cox from continuing to charge and collect the increased amounts resulting from earlier mid-agreement price increases Cox had imposed during existing fixed-rate agreements.

202.    Cox's conduct and omissions alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the Class members. Perpetrating a years-long scheme of misleading and overcharging customers is immoral, unethical, and unscrupulous. Moreover, Cox's conduct is oppressive and substantially injurious to consumers. By its conduct alleged herein, Cox has improperly extracted hundreds of millions of dollars from California consumers. There is no utility to Cox's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm to consumers caused by Cox's conduct alleged herein.

203.    Plaintiffs lack an adequate remedy at law to prevent Cox's continued unlawful practices, as previously discussed in ¶ 162 above.

204.    Monetary damages are not an adequate remedy at law for future harm, as previously discussed in ¶ 163 above.

205.    Plaintiffs, on behalf of themselves and as private attorneys general, seek **public injunctive relief** under the UCL to protect the general public from Cox's false advertising, misrepresentations, and omissions. Specifically, Plaintiffs seek a permanent public injunction against Cox under the UCL as follows: (1) enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase above the initially quoted rates for the duration of the Promotional Agreement, when in fact Cox may increase service prices mid-promotion by raising the base price of the service plan itself; and (2) enjoin Cox from advertising or quoting a service plan price

1  to members of the general public if that price does not include all applicable discretionary

2  service charges (such as the Broadcast Surcharge and the Regional Sports Surcharge).

3      206.   Cox's false advertising which affects the general public is ongoing in part

4  or in whole and even if such conduct were to cease, it is behavior that is capable of

5  repetition or re-occurrence by Cox absent a permanent injunction. Accordingly, Plaintiffs

6  seek an order enjoining Cox from committing these practices which harm the general

7  public.

8      207.   Plaintiffs seek an order granting restitution to Plaintiffs and the Class

9  members in an amount to be proven at trial. Plaintiffs further seek an award of attorneys'

10 fees and costs under Cal. Code Civ. Proc. § 1021.5.

11                          **COUNT IV**

12                     **Breach of Contract**

13     208.   Plaintiffs repeat and incorporate by reference all preceding paragraphs as if

14 fully set forth herein.

15     209.   Plaintiffs bring this cause of action in their individual capacities and as

16 representatives of the Class.

17     210.   By the uniform conduct alleged herein, Cox has breached its contracts with

18 Plaintiffs and the members of the Class, who have sustained damages as a result of said

19 breaches.

20     211.   Specifically, Cox entered into contracts with Plaintiffs and the members of

21 the Class in which Cox promised that the monthly prices for Cox's service plans would

22 be at a specific quoted and fixed rate for a 1- or 2-year Minimum Term Agreement or

23 Promotional Agreement, but then, after the customer signed up, Cox as a matter of policy

24 would breach that contract by increasing the service price in the middle of the promised

25 fixed-rate period via increases to the Broadcast Surcharge and/or the Regional Sports

26 Surcharge and/or by increasing the base price of the service plan itself. Thus, Cox

27 unilaterally charged Plaintiffs and the members of the Class more money than they had

28 agreed and contracted to pay for Cox service plans during the specified time periods.

212. Plaintiffs and the members of the Class have performed, for the relevant time frame, all of each's material obligations under the contract or have been excused from any non-performance.

213. Cox breached the contract by raising the monthly service price in the middle of its fixed-rate Minimum Term Agreements or Promotional Agreements with Plaintiffs and the members of the Class, via increases to the Broadcast Surcharge and/or the Regional Sports Surcharge and/or by increasing the base price of the service plan itself.

214. Plaintiffs and the members of the Class sustained damages as a result of Cox's breaches of contract. Plaintiffs seek damages in the amount they and the members of the Class paid in mid-agreement price increases via increases to the Broadcast Surcharge and/or the Regional Sports Surcharge and/or by increases to the base price of the service plan itself.

## COUNT V

### **Breach of Implied Covenant of Good Faith and Fair Dealing**

215. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

216. Plaintiffs bring this cause of action in their individual capacities and as representatives of the Class.

217. Plaintiffs allege this cause of action in the alternative to Count IV.

218. To the extent any applicable contract could be read as granting Cox discretion to increase the Broadcast Surcharge and/or Regional Sports Surcharge or to increase the base price of a customer's service plan in the middle of a promised fixed-rate Minimum Term Agreement or Promotional Agreement—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by California law.

219. Cox has violated the covenant of good faith and fair dealing by its conduct alleged herein.

220.   Specifically, Cox has abused any discretion it purportedly had under any applicable contract to raise the monthly price of its service plans above the initially quoted and agreed-to rates in the middle of promised fixed-rate Minimum Term Agreements or Promotional Agreements. For example:

a.     Cox misrepresented in its advertising and in its communications with consumers that the prices of its service plans were fixed and would not increase above the initially quoted rates during 1- or 2-year Minimum Term Agreements or Promotional Agreements;

b.     Through the conduct alleged herein, Cox unilaterally increased the prices of its service plans in the middle of promised fixed-rate periods over and above the promised and advertised rates which its customers agreed to pay, and surreptitiously hid and failed to disclose these price increases;

c.     With regard to customers in Minimum Term Agreements, Cox imposed early termination fee penalties in order to prevent or discourage customers from freely canceling their services if they learned that Cox had increased the price of their services above the initially quoted rates in the middle of promised fixed-rate agreements;

d.     With regard to mid-agreement Surcharges increases, if any customers discovered that their service plans had increased in price and called Cox to complain, Cox agents would justify the increase by arguing that only the Surcharges had increased while the service price had remained the same (even though the Surcharges were in fact charges for service), and the agents would also falsely say that the Surcharges were pass-through government fees and/or were outside of Cox's control; and

e.     With regard to the increase of the service plan base price during a Promotional Agreement, if any customers discovered the price increases and called Cox to complain, Cox agents would justify the increases by arguing that the customer's promotional discount dollar amount (from Cox's ever-increasing "retail rate") had remained the same, even though Cox's explicit pre-sale representations and advertisements promised that the monthly price would remain the same.

221.    Cox's mid-agreement increases to the service price above the initially-quoted rates were contrary to Cox's representations and promises, defied customers' reasonable expectations, were objectively unreasonable, and frustrated the basic terms of the parties' agreement. Cox's conduct alleged herein was arbitrary and in bad faith.

222.    Cox's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the members of the Class the full benefit of their bargains with Cox.

223.    Plaintiffs and the members of the Class have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Cox. There is no legitimate excuse or defense for Cox's conduct.

224.    Any attempts by Cox to defend its mid-agreement service price increases above the initially quoted rates through reliance on supposed contractual provisions will be without merit. Plaintiffs and the members of the Class never knowingly agreed to any such provisions, are not subject to them, or the provisions are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are unenforceable in light of the hidden and deceptive nature of Cox's misconduct, among other reasons. Any such provisions, even if they existed, would not excuse Cox's abuses of discretion or otherwise preclude Plaintiffs and the members of the Class from recovering for breach of the covenant of good faith and fair dealing.

225.    Plaintiffs and the members of the Class sustained damages as a result of Cox's breaches of the covenant of good faith and fair dealing. Plaintiffs seek damages in the amount they and the members of the Class paid in service price increases above the initially quoted rates, which were imposed by Cox in the middle of their Minimum Term Agreements and Promotional Agreements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and proposed Class, ask this Court to:

**Public Injunctive Relief:**

A.     In order to prevent injury to the general public, Plaintiffs individually, and as private attorneys general, request that the Court enter a public injunction against Cox under California's CLRA, FAL, and UCL, as follows:

1.     Permanently enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase for the duration of the Minimum Term Agreement or Promotional Agreement, when in fact Cox may increase service prices in the middle of the agreement by raising discretionary service charges such as the Broadcast Surcharge and/or Regional Sports Surcharge;

2.     Permanently enjoin Cox from falsely advertising to the general public that the prices of its service plans are fixed and will not increase above the initially quoted rates for the duration of the Promotional Agreement, when in fact Cox may increase service prices mid-promotion by raising the base price of the service plan itself;

3.     Permanently enjoin Cox from advertising or quoting a service plan price to members of the general public if that price does not include all applicable discretionary service charges (such as the Broadcast Surcharge and the Regional Sports Surcharge); and

4.     Retain jurisdiction to monitor Cox's compliance with the permanent public injunctive relief requested hereinabove.

**Individual And Class Relief:**

B.     On behalf of themselves and the proposed Class, Plaintiffs request that the Court order relief and enter judgment against Cox as follows:

1.     Declare this action to be a proper class action, certify the proposed Class, and appoint Plaintiffs and their counsel to represent the Class;

2.     Order that the discovery rule applies to extend any applicable

1   limitations periods (and the corresponding class periods) for Plaintiffs and the Class

2   members to the date on which Cox first began the alleged unlawful practices, which

3   based on the investigation of Plaintiffs' counsel is January 1, 2015;

4          3.     Declare that Cox's conduct alleged herein violates California's

5   CLRA, FAL, and UCL;

6          4.     Declare that Cox is financially responsible for notifying all Class

7   members of Cox's deceptive and unconscionable business practices alleged herein;

8          5.     Order disgorgement and/or restitution, including, without limitation,

9   disgorgement of all revenues, profits and/or unjust enrichment that Cox obtained, directly

10   or indirectly, from Plaintiffs and the Class members as a result of the unlawful conduct

11   alleged herein;

12          6.     Order Cox to pay damages to Plaintiffs and the Class members in the

13   amount that their service prices were increased in the middle of Minimum Term

14   Agreements or Promotional Agreements above the initially quoted rates;

15          7.     Order Cox to pay punitive damages to Plaintiffs and the Class

16   members;

17          8.     Order Cox to hold in constructive trust all payments received from

18   Plaintiffs and the Class members with respect to the unlawful practices alleged herein;

19          9.     Order Cox to perform an accounting of all such payments;

20          10.    Order the following Private Injunctive Relief:

21          a.     Enjoin Cox from increasing the service price above the

22   initially quoted rates for Class members who are under Minimum Term Agreements or

23   Promotional Agreements (e.g., by raising the Surcharges or raising the base price of the

24   service plan itself);

25          b.     Enjoin Cox from continuing to charge and collect the

26   increased amounts resulting from earlier mid-agreement price increases Cox had imposed

27   on Class members in existing fixed-rate agreements; and

28          11.    Retain jurisdiction to monitor Cox's compliance with the permanent

private injunctive relief requested hereinabove (Prayer, Paragraph B(10)).

**<u>Other Relief:</u>**

      C.     On behalf of themselves and the proposed Class, and in their capacities as private attorneys general, Plaintiffs request that the Court order relief as follows:

          1.     Order Cox to identify and give notice to each and every past and current subscriber in California who signed up for a Minimum Term Agreement or Promotional Agreement and whose service price was increased in the middle of the agreement period above the initially quoted rates, of the following: (1) give notice that the subscriber was the victim of unlawful mid-agreement price increases by Cox; and (2) give notice of the specific dollar amount the subscriber was overcharged by Cox via the price increases;

          2.     Order Cox to pay attorneys' fees, costs, and pre-judgment and post-judgment interest to the extent allowed by law; and

          3.     Grant such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

      Each Plaintiff, individually and as a class representative on behalf of all others similarly situated, demands a trial by jury on all issues so triable.

Date: September 6, 2024

                              Presented by:

                              HATTIS & LUKACS

                              By: _/s/ Daniel M. Hattis_

                              Daniel M. Hattis (SBN 232141)
                              Paul Karl Lukacs (SBN 197007)
                              HATTIS & LUKACS
                              11711 SE 8th St, Ste 120
                              Bellevue, WA 98005
                              Telephone: (425) 233-8650
                              Email: dan@hattislaw.com
                              Email: pkl@hattislaw.com

                              *Attorneys for Plaintiffs and the Proposed Class*